**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- X

IN RE

TOPS HOLDING II CORPORATION, *et al.*,

                     Debtors.

------------------------------------------------------------- X

ALAN D. HALPERIN, AS THE LITIGATION
TRUSTEE FOR THE TOPS HOLDING
LITIGATION TRUST,

                     Plaintiff,

-against-

MORGAN STANLEY INVESTMENT
MANAGEMENT INC.; MORGAN STANLEY
CAPITAL PARTNERS V U.S. HOLDCO LLC a/k/a
NORTH HAVEN CAPITAL PARTNERS V U.S.
HOLDCO LLC; HSBC EQUITY PARTNERS USA,
L.P.; HSBC PRIVATE EQUITY PARTNERS II
USA LP; TURBIC INC; BEGAIN COMPANY
LIMITED; GARY MATTHEWS; ERIC KANTER;
ERIC FRY; GREG JOSEFOWICZ; AND STACEY
RAUCH,

                     Defendants.

------------------------------------------------------------- X

Chapter 11

Case No. 18-22279 (RDD)

(Jointly Administered)

Adversary Proceeding

Case No. _____

<u>**COMPLAINT**</u>

**JURY TRIAL DEMANDED**

Alan D. Halperin, as litigation trustee (the "Litigation Trustee" or "Trustee") for the Tops Holding Litigation Trust a/k/a GUC Litigation Trust ("Litigation Trust" or "Trust") of Tops Holding II Corporation and its affiliated debtors[1] ("Tops" or "Company"), by and through his undersigned counsel, for his complaint against Morgan Stanley Investment Management Inc. d/b/a Morgan Stanley Private Equity and Morgan Stanley Capital Partners ("MSIM"), Morgan Stanley Capital Partners V U.S. Holdco LLC a/k/a North Haven Capital Partners V U.S. Holdco LLC ("MSCP V Holdco.," and together with MSIM, "Morgan Stanley"), HSBC Equity Partners USA, L.P. ("HSBC I"), HSBC Private Equity Partners II USA LP ("HSBC II", and together with HSBC I, "HSBC"), Turbic Inc. ("Turbic"), and Begain Company Limited ("Begain," and collectively with Morgan Stanley, HSBC, and Turbic, the "Private Equity Investors"), Gary Matthews, Eric Kanter, Eric Fry, Greg Josefowicz, and Stacey Rauch (collectively, the "Director Defendants" and together with the Private Equity Investors, the "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      Prior to its bankruptcy, Tops was a regional supermarket retailer with 169 owned supermarkets, and five franchised stores, in upstate New York, northern Pennsylvania, and Vermont. Tops had approximately 14,000 employees, over 12,300 of whom were represented by unions. Due to the actions of Defendants, Tops was crippled by a series of massive, illegal dividends orchestrated by Morgan Stanley. As a result of these actions, Tops, a once healthy supermarket chain, was forced to file for bankruptcy on February 21, 2018.

---

[1] The Debtors include Tops Holding II Corporation, Tops MBO Corporation, Tops Holding LLC, Tops Markets, LLC, Tops Markets II Corporation, Tops PT, LLC, Tops Gift Card Company, LLC, Erie Logistics LLC, and TM1, LLC.

2.      In 2007, Morgan Stanley led a private equity investor group that purchased the equity of Tops for approximately $300 million.  The Private Equity Investors contributed only $100 million of their own money and financed the rest of the purchase price by having the Company issue over $200 million in debt.  Six years later, in 2013, after failing to find a buyer in a sale process, the Private Equity Investors exited their investment in Tops by selling their equity in the Company to management for a tiny fraction of the 2007 purchase price.

3.      During the time it owned and controlled Tops, Morgan Stanley paid itself and the other Private Equity Investors lavish and illegal dividends that drained the Company of its value and made it insolvent.  In total, Morgan Stanley directed the Company to pay out over $375 million in dividends, with Morgan Stanley receiving over $270 million.  To finance these dividends, Morgan Stanley had the Company take on crushing debt that the Company could not afford, over and above the $200 million in debt that the Private Equity Investors had already caused Tops to incur in connection with their acquisition of the Company.  Specifically, Morgan Stanley increased the Funded Debt[2] of the Company from $223 million just following the 2007 acquisition to $649 million in May 2013 when the last dividend was issued before the Private Equity Investors exited the Company.

4.      As a result of these illegal dividends, the Private Equity Investors realized a return of over three times their investment in Tops.  Meanwhile, the significant debt incurred to issue the dividends and finance the 2007 acquisition, in addition to Tops' unfunded pension plan withdrawal liabilities, rendered Tops insolvent at the time of each of the dividends and led Tops to file for bankruptcy, leaving the Company's creditors with over $1 billion in losses.  In six

_____

[2] "Funded Debt" means the various forms of debt or borrowings that existed at, and weighed on, the Company, including a revolving line of credit, term debt, mortgages, and secured or unsecured notes.

short years, Morgan Stanley and the other Private Equity Investors bled a once-thriving regional grocery chain dry. In the words of Tops' Chief Financial Officer ("CFO") at the time, Morgan Stanley was intent on taking "every nickel plus" out of the Company through the dividends.

5. 

6. . In 2007, and for the entire time Morgan Stanley owned and controlled Tops, the Company had liability arising from two pension plans: the UFCW Pension Plan and the New York State Teamsters Conference Pension and Retirement Fund/Teamsters Local 400 Pension Fund (the "Teamsters Pension Plan") (together, the "Pension Plans").[4] While the Pension Plans presented massive liabilities for Tops, they also served as the only safety net for Tops' thousands of union employees, many of whom earned minimum wage or close thereto and were wholly reliant on the Pension Plans to support them in retirement.

---

[3] "Ahold" refers to Koninklijke Ahold N.V. ("Ahold"), a Dutch international food retailer, which was the owner of Tops when it was purchased by the Private Equity Investors.

[4] As part of a Supply Agreement with C&S Wholesale Grocers, Inc. ("C&S"), Tops agreed to indemnify C&S for any pension withdrawal liabilities under the Teamsters Pension Plan.

7.     Tops was the largest participating employer in the UFCW Pension Plan and was responsible for the vast majority of its liabilities.  During the period the Private Equity Investors owned Tops, as a result of significant underfunding, the UFCW Pension Plan was in "critical status," one of the worst possible statuses for a pension fund, and was placed into rehabilitation and made subject to a legally required Rehabilitation Plan.  Unable to put into place measures that would result in the UFCW Pension Plan emerging from its "critical status" designation, the UFCW Pension Plan could only attempt to "forestall," as opposed to avoid, the insolvency of the UFCW Pension Plan.   Tops made only the minimum required annual payments to the UFCW Pension Plan, equating to less than 50% of the annual benefit payment by the Plan, causing the underfunding of the UFCW Pension Plan to increase each year.  In short, Tops, under the control of Morgan Stanley, made it inevitable that the UFCW Pension Plan would become insolvent.

8.     Morgan Stanley was fully aware that the Pension Plans would become insolvent and impose a massive liability on Tops.  Soon after the Private Equity Investors purchased Tops, on September 8, 2008, Gary Matthews, the Chairman of the Board of Directors of Tops and a managing director at Morgan Stanley, met with the President of the Union and Chairman of the Board of Trustees of the UFCW Pension Plan and told him that he knew the UFCW Pension Plan would go bankrupt and that Tops would be forced to incur withdrawal liability.  Later, in December 2012, the President of the Union and Chairman of the Board of Trustees of the UFCW Pension Plan met with Tops management and proposed that Tops issue $50 million in debt and contribute the proceeds into the UFCW Pension Plan in order to improve the funding of the Plan and was told that Tops could not do so because of the covenants in its existing loans.  However, within days, contrary to this representation, Tops issued $460 million of senior secured notes in order to pay a $100 million dividend to Morgan Stanley and the other Private Equity Investors.

9.  █████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████

10.     Of the $300 million purchase price, the Private Equity Investors only paid $100 million from their own pockets, with the remainder financed by over $200 million in debt that the Private Equity Investors caused the Company to issue as part of the transaction. Thus, from the very beginning of Morgan Stanley's ownership and control over Tops, the Company was saddled with significant debt as a result of the equity purchase. Less than two years later, at the time of the first dividend, Tops was insolvent. Tops' capital deficit only increased with each dividend, with Tops' debts steadily increasing while Tops and its new owners failed to meaningfully address the growing unfunded liabilities related to the Pension Plans. At the same time, Morgan Stanley severely constrained investment in Tops' stores, which was the lifeblood for its retail operations, wanting instead to preserve cash to issue dividends to itself and the other Private Equity Investors.

---

[5] Whenever the complaint references "Pension Plan liabilities," it is referring to the liabilities arising from both the UFCW Pension Plan and the Teamsters Pension Plan. If the complaint is referring to the liabilities of only one of the Pension Plans, it specifies which Pension Plan it is referring to.

11.     ████████████████████████████████████████████████

████████████████████ Tops' unfunded withdrawal liabilities from the Pension Plans

ballooned from $85 million in 2007 to $150 million in 2008 and to over $250 million in 2009, as

a result of investment losses during the recession and the continuing and worsening annual

funding gap.  Notwithstanding this constantly growing liability, and the reliance of the thousands

of union employees on the Pension Plans, Morgan Stanley began taking dividends out of the

Company in 2009, which it financed not with cash flow generated by the Company's operations,

but by having the Company issue more debt.

12.     With a much worsened financial outlook and unable to sell the Company, but

determined to recoup its investment and realize a handsome profit on it, Morgan Stanley

orchestrated the issuance of a series of dividends to itself and the other Private Equity Investors

irrespective of the consequences to the Company, its employees and its creditors.  From October

2009 to May 2013, Tops issued over $375 million in dividends to the Private Equity Investors:

- $105 million in October 2009;

- $30 million in July 2010;

- $100 million in December 2012; and

- $141.9 million in May 2013.

13.     During this same period, Tops' Funded Debt increased exponentially, from $227

million in 2007 to $649 million in May 2013.  At the same time, Tops' unfunded withdrawal

liabilities from the Pension Plans rose from $85 million at the time of the acquisition in 2007 to

over $515 million by the time of the May 2013 dividend.  Thus, in exchange for increasing the

Company's liabilities by over $1 billion, Morgan Stanley rewarded itself and the other Private

Equity Investors with dividends of over $375 million.

14. Morgan Stanley dominated and controlled Tops and treated it like a piggy bank for the Private Equity Investors by loading it up with debt to issue dividends, while doing little to maintain Tops and its stores. Morgan Stanley knew that every dollar spent on maintaining or improving Tops' stores or otherwise positioning Tops for long-term success was one less dollar available to be paid to Morgan Stanley and the other Private Equity Investors in dividends. As Tops' management noted, Morgan Stanley held Tops' cash "near and dear to [its] dividend heart."

15. Each of the 2009, 2010, 2012 and 2013 dividend payments was made while Tops was insolvent, and each was made with the intent of defrauding Tops' creditors for the benefit of Morgan Stanley and the other Private Equity Investors. Tops' Board of Directors approved these dividends because they stood to benefit from them and were employed by, or were under the control of, Morgan Stanley, which could replace even the so-called "independent" directors in its sole and absolute discretion. Morgan Stanley attempted to paper over the dividends with superficial and conflicting solvency analyses that Morgan Stanley controlled and manipulated to support whatever dividend Morgan Stanley desired. The solvency analyses were facially unreasonable, employed inconsistent methodologies that blatantly contradicted one another, and were based on information that Tops, Morgan Stanley and the Director Defendants knew to be false and inaccurate.

16. After Morgan Stanley and the other Private Equity Investors drained the Company of over $375 million in dividends, Morgan Stanley worked to exit its investment, so it could evade responsibility for the staggering debt and Pension Plan liabilities that burdened the Company. But no arms-length purchasers would acquire the Company and its Pension Plan liabilities. Morgan Stanley therefore devised a scheme to sell Tops to the Company's

management. Despite valuing Tops' equity at $209 million in a capital surplus analysis completed several months earlier – to justify a $142 million dividend – Tops' management purchased the equity of the company for a pittance and, adding insult to injury, the vast majority of the purchase price was once again funded by Tops itself.

17. By approving and taking the dividends and saddling the Company with massive debt and interest payments, the Defendants made it impossible for Tops to adequately invest in the Company or the Pension Plans and to otherwise survive. Eventually, and inevitably, Tops collapsed under the weight of its debt and its Pension Plan liabilities. Plaintiff, through this complaint, seeks to hold the Defendants responsible for the grave harm they inflicted on the Company and its creditors, who suffered over $1 billion in losses.

**PARTIES**

**PLAINTIFF**

18. Plaintiff is the Trustee of the Litigation Trust, which was created pursuant to (1) Section 5.21 of the Second Amended Joint Chapter 11 Plan of Reorganization of Tops Holding II Corporation and Its Affiliated Debtors, dated November 6, 2018 (the "Plan"), which was confirmed by this Court on November 9, 2018 (ECF No. 765), and (2) the Litigation Trust Agreement, dated November 16, 2018, among the Debtors and Alan D. Halperin, in his capacity as the Trustee. The Plan provides for the appointment of the Trustee to administer the Litigation Trust, to investigate and prosecute the GUC Litigation Trust Causes of Action, including the causes of action asserted in this complaint, and to oversee the GUC Litigation Trust Assets, as those capitalized terms are defined in the Plan.

**DEFENDANTS**

19.     Defendant MSIM is a Delaware corporation with its principal place of business at 1221 Avenues of Americas, New York, NY 10020.  Upon information and belief, MSIM also does business as Morgan Stanley Private Equity and Morgan Stanley Capital Partners, with MSIM switching between Morgan Stanley Private Equity and Morgan Stanley Capital Partners over time as the name for its private equity business.  According to MSIM, Morgan Stanley Private Equity operates as part of MSIM's Merchant Banking Division and makes private equity and equity-related investments on a global basis.  Similarly, MSIM describes Morgan Stanley Capital Partners as managing a middle-market private equity platform.  At the time of the 2007 acquisition, Morgan Stanley issued a press release stating: "Morgan Stanley Private Equity announced today that it will acquire Tops Markets, LLC…."

20.     Defendant MSCP V. Holdco is a Delaware limited liability company with its principal place of business at 1585 Broadway, Floor 39, New York, New York 10036.

21.     Defendant HSBC I is a Delaware limited partnership with its principal place of business at 452 Fifth Avenue, New York, NY 10018.

22.     Defendant HSBC II is a Delaware limited partnership with its principal place of business at 452 Fifth Avenue, New York, NY 10018.

23.     Defendant Turbic is incorporated in the Bahamas and maintains a principal place of business at P.O. Box No. 7776, New Providence, Bahamas.

24.     Defendant Begain is incorporated in the British Virgin Islands and maintains a principal place of business at 46/F, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong.

25. Defendant Gary Matthews was a Managing Director and Operating Partner at Morgan Stanley Private Equity from October 2007 to March 2019, as well the Chairman of the Board of Directors of Tops Holding Corporation and Tops Holding II Corporation from December 2007 to December 2013. In his roles as Chairman of the Board, Matthews approved the issuance of dividends in October 2009, July 2010, December 2012, and May 2013. Upon information and belief, Matthews resides in Connecticut.

26. Defendant Eric Fry was a Managing Director at Morgan Stanley Private Equity from October 2007 to September 2015, as well as a member of the Board of Directors of Tops Holding Corporation and Tops Holding II Corporation from September 2009 to December 2013. While serving on these boards, Fry approved the issuance of dividends in October 2009, July 2010, December 2012, and May 2013. Upon information and belief, Fry resides in New York.

27. Defendant Eric Kanter has been a Managing Director at Morgan Stanley Capital Partners since July 2007 and also served on the Board of Directors of Tops Holding Corporation and Tops Holding II Corporation from September 2009 to December 2013. While serving on these boards, Kanter approved the issuance of dividends in October 2009, July 2010, December 2012, and May 2013. Upon information and belief, Kanter resides in New Jersey.

28. Defendant Greg Josefowicz served on the Board of Directors of Tops Holding Corporation and Tops Holding II Corporation from January 2008 to December 2013. While serving on these boards, Josefowicz approved the issuance of dividends in October 2009, July 2010, December 2012, and May 2013. Upon information and belief, Josefowicz resides in Michigan.

29. Defendant Stacey Rauch served on the Board of Directors of Tops Holding Corporation and Tops Holding II Corporation from October of 2010 to December 2013. While

serving on these boards, Rauch approved the issuance of dividends in December 2012 and May 2013.  Upon information and belief, Rauch resides in New Jersey.

**JURISDICTION AND VENUE**

30.     This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

31.     This Court has personal jurisdiction over each of the Defendants under Bankruptcy Rule 7004(f).

32.     This Court has personal jurisdiction over each of the Defendants under N.Y. C.P.L.R. §§ 301 and 302 because Plaintiff's claims arise from acts by Defendants, in person or through agents, transacting business within New York, committing tortious acts within New York, and/or committing tortious acts causing injury to persons or property within New York.  A substantial part of the acts or omissions committed by each of the Defendants that give rise to the claims asserted herein occurred in New York including, but not limited to, the improper approval of dividends by the Director Defendants, the investment in Tops by the Private Equity Investors, and the receipt of the dividends by the Private Equity Investors.

33.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1409(a) and (c) because this Adversary Proceeding arises in or is related to the underlying consolidated chapter 11 proceeding.

**FACTUAL BACKGROUND**

**A.  Morgan Stanley's Acquisition of Tops**

34.     Tops traces its history back to the 1920s, when its Italian immigrant founders opened their first grocery store in Niagara Falls.  By the 1970s, Tops was a successful regional

retail grocery chain, having expanded throughout Western New York and Rochester and into Pennsylvania.

35. In 1991, Ahold acquired Tops. Ahold operated Tops for over a dozen years, deciding in late 2006 to divest and sell the Company. Morgan Stanley expressed interest in purchasing Tops, and eventually teamed with Frank Curci, Tops' then former Chief Executive Officer ("CEO"), in its bid for the Company.

36. In December 2007, Ahold sold Tops to a group of private equity investors led by Morgan Stanley. The initial investment group included Morgan Stanley Capital Partners V Funding, LP (which later transferred its holdings to MSCP V Holdco.), HSBC I, HSBC II, and Turbic, with a small cash contribution from Frank Curci.

37.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

39.     In addition to the Pension Plan liabilities, Tops was burdened with significant new debt because of the purchase by the Private Equity Investors.   Although the Private Equity Investors purchased Tops' equity for approximately $300 million, they only contributed $100 million of cash towards the purchase price.   The remainder of the purchase price, coupled with transaction fees and expenses, came from $227 million of debt issued by Tops (the "Acquisition Debt").

40.     As a result, Tops was already saddled with massive liabilities at the time the transaction closed in December 2007.   Thereafter, Morgan Stanley and Tops knew that the UFCW Pension Plan would become insolvent and Tops would be forced to incur withdrawal liability.   In fact, at a dinner meeting on September 8, 2008, Gary Matthews told the head of the UFCW Pension Plan that the Plan would go insolvent.   But, instead of focusing on creating value for the Company, managing its debt and funding the Pension Plans, Morgan Stanley singularly focused on extracting as much value as possible from the Company through dividends it directed the Company to make, and then exiting its ownership of the Company before the Pension Plans became insolvent.   As one example of this, in December 2012, the President of the Union and Chairman of the Board of Trustees of the UFCW Pension Plan met with Tops' management and proposed that Tops issue $50 million in debt and inject the proceeds into the Plan to improve its

funding. Tops' management told him that it would not be possible to do so because of the covenants in the Company's existing loans. Days later, at Morgan Stanley's direction, Tops issued $460 million of senior secured notes in order to pay a $100 million dividend to Morgan Stanley and the other Private Equity Investors.

### B. Morgan Stanley's Control of Tops

41.     Morgan Stanley was the lead Private Equity Investor in Tops and owned over 70% of the Company. From the time it purchased Tops in December 2007 until it sold the Company to management in December 2013, Morgan Stanley controlled the Company and its management. As set forth in the parties Shareholders' Agreement, dated November 30, 2007, Morgan Stanley controlled the Board of Directors of the Company:

> [T]he Board shall initially consist of five directors, comprising the Chief Executive Officer of the Company, initially Francis Curci, and four directors designated by the Morgan Stanley Investor.

During the six years that it owned and controlled Tops, Morgan Stanley filled the Board with Morgan Stanley employees and outside directors who were "independent" in name only, as they could be replaced by Morgan Stanley at any time in its sole and absolute discretion. As the Shareholders Agreement provided, "[t]he Morgan Stanley Investor shall be permitted at any time to increase or decrease the number of directors who serve on the Board and to designate any additional directors."

42.     As of September 2009, Tops' Board consisted of Gary Matthews, Frank Curci, Eric Fry, Eric Kanter, and Greg Josefowicz. In October 2010, Morgan Stanley added Stacey Rauch to the Board. Matthews, Fry, and Kanter were all managing or executive directors at Morgan Stanley. Matthews was Chairman of the Board at Tops.

43.     Curci was CEO of Tops from 2000 to 2003, when Ahold asked him to resign as a result of a SEC investigation into accounting irregularities at the Company that occurred under his watch. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  To induce and establish control over Curci, Morgan Stanley ████████

████████████████████████████  re-installed him as CEO and a Director of Tops.  During his second tenure as CEO of Tops, Curci was beholden to, and served at the pleasure of, Morgan Stanley.  Curci viewed Matthews as his boss and his role at the Company as fulfilling the needs and objectives of Morgan Stanley.

44.     Josefowicz and Rauch were placed on the Board by Morgan Stanley and could only remain on the Board if they acted in Morgan Stanley's interest.  Morgan Stanley also incentivized and rewarded Josefowicz and Rauch for approving dividends to Morgan Stanley by providing them with substantial bonuses in connection with the dividends.

45.     In addition to controlling all major decisions of Tops through its control of the Board of Directors, Morgan Stanley effectively ran Tops' business with a team of analysts at Morgan Stanley.  Tops communicated with Morgan Stanley's team on a daily basis.  Tops' management was required to obtain Morgan Stanley's approval on routine business decisions such as the renewal of store leases; bonuses to employees; and capital expenditures like maintaining or improving stores.  Tops also needed Morgan Stanley's approval for its budgets and new store acquisitions.

46.     Like with Josefowicz and Rauch, Morgan Stanley incentivized and rewarded Tops' management for facilitating the dividends.  In connection with the 2009, 2012, and 2013

Dividends, members of Tops' management were paid substantial bonuses. HSBC was consulted on and approved these bonuses.

47.     Morgan Stanley used its control over the Board and Tops to load the Company up with debt and ignore its Pension Plan liabilities while extracting all of the available cash from the Company through dividends at the expense of Tops and its creditors.

## C. The 2009 Dividend

48.     ███████████████████████████████████████████████████

████████████████████████████████████ ████████████████ on October 9, 2009, Morgan Stanley caused Tops to issue a $105 million dividend to Morgan Stanley and the other Private Equity Investors (the "2009 Dividend"). The 2009 Dividend, paid to the Private Equity Investors after only two years of ownership, was in excess of the entire initial cash investment that the Private Equity Investors made to acquire the equity of the Company. To finance the dividend, Morgan Stanley had Tops simultaneously issue $275 million of senior secured notes, which consisted of a partial refinancing of existing Tops' debt and the issuance of $122 million in new debt. The 2009 Dividend was approved by a unanimous vote of Tops' Board. At or around the time of the 2009 Dividend, Tops had approximately 8,400 employees participating in, and dependent upon, its UFCW Pension Plan in addition to the C&S employees participating in, and dependent upon, the Teamsters Pension Plan. (Tops was responsible for C&S' withdrawal liability pursuant to its indemnification agreement with C&S.) Tops' unfunded withdrawal liabilities for these Pension Plans was over $170 million.

49.     Commensurate with their respective holdings in Tops at the time of the 2009 Dividend, the Private Equity Investors received the following payouts: MSCP V Holdco. received over $78.4 million; HSBC I received approximately $16.7 million; Turbic received

approximately $5.2 million; HSBC II received $4.2 million; and Frank Curci received $420,000.[6]

50.     Tops received no consideration or value in exchange for the 2009 Dividend. Rather, at the same time the Private Equity Investors rewarded themselves with the $105 million dividend, Tops was burdened with $122 million of additional liabilities due to the increased incremental debt of the Company caused by the $275 million note issuance, which refinanced some of Tops' existing debt.

### a.     The 2009 Dividend Left Tops Insolvent

51.     Tops was insolvent at the time of the 2009 Dividend, as the present fair salable value of its assets was less than the amount that it was required to pay on its probable liability on its existing debts as they became absolute and matured.

52.     To justify the 2009 Dividend, Tops, at Morgan Stanley's direction, retained KPMG to conduct a valuation analysis (the "KPMG Valuation Analysis"). KPMG completed its analysis in just over two weeks after it was retained. As part of its engagement, Tops and KPMG agreed that KPMG "shall not in any respect be responsible for the accuracy or completeness of, or have any obligation to verify" any information provided to KPMG, and that KPMG "will not make an independent appraisal of the assets or liabilities (contingent or otherwise) of the Company." Thus, in conducting its valuation analysis, KPMG relied solely on the information provided to it by Tops. As detailed below, the information provided to KPMG by Morgan Stanley and Tops was critically incomplete and omitted significant liabilities.

53.     As a result of the inputs provided by Tops at the direction of Morgan Stanley, the KMPG Valuation Analysis was severely flawed. Specifically, in its provision of information to

---

[6] Begain became a shareholder in 2010 after the issuance of the 2009 Dividend.

KPMG, Tops identified the UFCW Pension Plan contingent liability, but omitted the Teamsters Pension Plan as a contingent liability of the Company. As a result, the KMPG Valuation Analysis did not include the Teamsters Pension Plan liability when calculating Tops' capital surplus. At the time of the KPMG Valuation Analysis, the after-tax value of the withdrawal liability of the Teamsters Pension Plan was estimated to be $45 million.

54.     Based on the incomplete information provided to KPMG by Tops at the direction of Morgan Stanley, the KPMG Valuation Analysis concluded that the fair value of Tops' assets exceeded the sum of its liabilities after issuance of the 2009 Dividend by $33.4 million. This capital surplus, per KPMG, represented an equity cushion (equity value as a percentage of enterprise value) of a mere 5.6%. However, when the estimated after-tax Teamsters Pension Plan withdrawal liability of $45 million is included in the KPMG Valuation Analysis, Tops had a capital deficit of $13 million and was insolvent.

55.     Morgan Stanley and Tops had no basis to withhold the Teamster Pension Plan liability from KPMG and exclude it from the 2009 KMPG Valuation Analysis. Beyond being a liability of the Company that is required by law to be included in the valuation analysis, its omission is glaringly at odds with the inclusion of the UFCW Pension Plan liability in the KMPG Valuation Analysis. The reason for its exclusion is obvious. By omitting the Teamster Pension Plan liability from the KMPG Valuation Analysis, Morgan Stanley and Tops could superficially try to justify the 2009 Dividend, albeit by the slimmest of margins.

56.     The KPMG Valuation Analysis was only the beginning of Morgan Stanley's and Tops' manipulation of the valuation analyses to try to legitimize the illegal dividends. Each time a dividend was issued, Morgan Stanley took a different approach to the Pension Plan liabilities

and the valuation analyses than it had previously, all with the goal of justifying whatever dividend amount Morgan Stanley desired to receive from the Company.

**b. The 2009 Dividend Left Tops With Unreasonably Small Capital**

57.     The 2009 Dividend left Tops with unreasonably small capital.

58.     As set forth above, Tops was insolvent at the time of the 2009 Dividend. Given that Tops was insolvent, the Company had insufficient capital to carry on the business in which it was engaged.

59.     Even if the KPMG Valuation Analysis is accepted at face value, meaning that Tops had a capital surplus of $33.4 million post-dividend, Tops was still left with unreasonably small capital. According to KPMG, Tops only had an equity cushion of 5.6% after issuing the 2009 Dividend. This was woefully inadequate. █████████████████████████████████████ █████████████████████████████ And the comparable grocery store companies used in the KPMG Valuation Analysis had an average equity cushion of 71%. An equity cushion of 5.6% is not even close to ██████████████████████ what the KPMG comparable companies had, and was inadequate to carry on Tops' business.

60.     Moreover, as set forth above, if the KPMG Valuation Analysis had included all of the Pension Plan liabilities that it was required to include, Tops would have been shown to be insolvent and without any equity cushion at all.

**c. Tops Incurred Liabilities Beyond its Ability to Pay When the Liabilities Became Due**

61.     Given that Tops was insolvent, the Company incurred liabilities beyond its ability to pay as they became due.

62.     At the time of the 2009 Dividend, Tops believed or intended that it would be unable to pay its liabilities as they became due. At the time of the 2009 Dividend, Tops' after-

tax Pension Plan withdrawal liabilities totaled $104 million, including $59 million from the UFCW Pension Plan and an estimated $45 million from the Teamsters Pension Plan. Tops had no plan to prevent the UFCW Pension Plan, which was steadily running out of money, from becoming insolvent. Thus, the insolvency of the UFCW Pension Plan was inevitable. Tops also was responsible for withdrawal liability for the Teamsters Pension Plan. Tops knew that incurring withdrawal liability was only a matter of time. Coupled with Tops' total Funded Debt of $300 million and capital lease obligations of $187 million, Tops believed or intended that it would not be able to satisfy its liabilities when they became due.

**d. Tops Acted With Fraudulent Intent in Issuing the 2009 Dividend**

63.     The 2009 Dividend was unanimously approved by Matthews, Curci, Fry, Kanter, and Josefowicz. Tops, through these directors, acted with the intent to hinder, delay, and defraud Tops' creditors through the issuance of the 2009 Dividend. In short, the Board of Directors knew that by issuing a dividend of $105 million to the Private Equity Investors, they were leaving Tops without the ability to pay both its massive pension obligations and its obligations to other creditors. Tops' CFO made clear that Morgan Stanley's "intent is to take every nickel plus" in the dividends, leaving insufficient funds to pay Tops' creditors. This fraudulent intent can be further inferred from several traditional "badges of fraud."

64.     *First*, the dividend was paid to insiders. Morgan Stanley owned over 70% of Tops' common stock at the time of the issuance and, consequently, received over $78.4 million from the 2009 Dividend. At the same time, Morgan Stanley's employees occupied three of the five seats on the Board (Matthews, Fry, and Kanter), and also controlled the other two directors (Curci and Josefowicz). Curci also was self-interested in approving the 2009 Dividend, which resulted in a dividend payment of approximately $420,000 to him. In addition, Tops paid Curci

a bonus of $1 million in connection with the dividend. Similarly, purportedly "independent" director Greg Josefowicz was paid a $112,500 bonus in connection with the 2009 Dividend.

65. *Second*, Tops did not receive any consideration for the 2009 Dividend. In fact, to fund the dividend, Tops took on debt that replaced debt of the Company that had a lower interest rate as well as additional debt. Thus, Tops received no benefit from making the dividend and could not even finance it from its own internal capital or profits.

66. *Third*, the transfer was unusual and not in the ordinary course of business. Generally, dividend recapitalizations are consummated only after material improvements in the performance and/or financial position of the business. In this instance, to the contrary, there was no material improvement in the Company since the 2007 acquisition, especially in light of the increased liabilities of the Company related to its debt and pension obligations and the effects of the recession. Given this, a debt issuance to finance a dividend to repay 105% of the Private Equity Investors initial cash investment made less than two years earlier was unwarranted and highly unusual.

67. *Fourth*, as noted above, Tops was insolvent at the time of the 2009 Dividend.

68. *Fifth*, the Private Equity Investors retained the possession, benefit, and use of the funds dispersed by the 2009 Dividend.

69. *Sixth*, the 2009 Dividend was not an isolated transaction, but rather a step in an ongoing scheme by Morgan Stanley to extract as much value as possible from Tops at the expense of the Company, its employees, and its creditors, including the Pension Plans. When it purchased Tops, ███████████████████████████████████████████████████ ███████████████████ Morgan Stanley and Tops knew that the Pension Plans would become insolvent. Notwithstanding this well understood financial peril, rather than fund the Pension

Plans and manage the debt burden on the Company, Morgan Stanley took a series of significant dividends that enriched itself and the other Private Equity Investors. In the first part of the scheme, Matthews, Fry, and Kanter, aided and abetted by Morgan Stanley, arranged the retention of KPMG and controlled the flow of information to KPMG to ensure that KPMG's Valuation Analysis would reflect a capital surplus, despite the fact that Tops was insolvent at the time of issuance of the 2009 Dividend.

70.     Finally, Tops' intent to defraud its creditors was apparent because the 2009 Dividend was premised on a bad faith assessment of Tops' liabilities by Morgan Stanley and Tops. Tops hired KPMG at Morgan Stanley's direction to rubber-stamp a decision already made by Morgan Stanley. The KPMG Valuation Analysis – due to the intentionally incomplete information provided by Morgan Stanley and Tops – unjustifiably omitted the Teamsters Pension Plan liability. Morgan Stanley and Tops knew the liability that Tops faced from the Teamsters Pension Plan, but chose in bad faith not to include it in the information provided to KPMG. The Board of Directors was similarly aware of the Teamsters Pension Plan liability when it reviewed the KPMG Valuation Analysis and approved the 2009 Dividend. Indeed, Tops Director Eric Kanter (and Morgan Stanley employee) only approved inclusion of the UFCW Pension Plan liability in the KPMG Valuation Analysis because it would not "create any issues given where their analysis is coming out." The same could not be said if the Teamsters Pension Plan liability was also included. Morgan Stanley also incentivized and rewarded the nominally "independent" director Greg Josefowicz for approving the dividend, awarding him a $112,500 bonus in connection with the 2009 Dividend. The Board, Tops, and Morgan Stanley were all aware that Tops was insolvent, had unreasonably small capital, and could not pay its debts as they came due at the time the Company made the 2009 Dividend.

71.     Morgan Stanley also incentivized and rewarded Tops' management for facilitating the 2009 Dividend.  Tops' management received significant bonuses in connection with the 2009 Dividend.  Curci received a $1 million plus bonus, and six other executives received bonuses ranging from just under $500,000 to $135,000.  HSBC was consulted and approved these bonuses.

**D.  The 2010 Dividend**

72.     Only six months later, on July 26, 2010, Tops issued at the direction of Morgan Stanley another dividend, this one for $30 million (the "2010 Dividend").  The 2010 Dividend was unanimously approved by the Tops Board of Directors.  Notably, Morgan Stanley and Tops did not even bother with the pretense of a solvency analysis.  No valuation analysis was conducted, and Tops' Board did not even meet to discuss the 2010 Dividend.  Instead, the Dividend was approved by the Board by written consent without any valuation analysis or discussion.  At or around the time of the 2010 Dividend, Tops had approximately 11,500 employees participating in, and dependent upon, the UFCW Pension Plan in addition to the C&S employees participating in, and dependent upon, the Teamsters Pension Plan.  Tops' unfunded withdrawal liabilities for these Pension Plans was over $290 million.

73.     As a result of the 2010 Dividend, the Private Equity Investors, which now included Begain, received the following payouts:  MSCP V Holdco. received approximately $21.5 million, HSBC I received over $4.7 million; HSBC II received approximately $1.2 million; Turbic received over $1 million (after withholdings); Frank Curci received approximately $120,000; and Begain received approximately $650,000 (after withholdings).

74. Tops received no consideration or value in exchange for the 2010 Dividend, which was a one-way payment to the Private Equity Investors for which the Company received nothing in return.

### a. The 2010 Dividend Left Tops Insolvent

75. Tops was insolvent at the time of the 2010 Dividend, as the present fair salable value of its assets was less than the amount that it was required to pay on its probable liability on its existing debts as they became absolute and matured.

76. Notwithstanding that Tops was insolvent at the time of the 2009 Dividend, Tops issued another $30 million dividend only nine months later. This time, Morgan Stanley and Tops did not even bother with the pretense of a third party valuation analysis, notwithstanding that the Company's financial health had not improved since the last dividend. In fact, Tops' financial status had gotten dramatically worse, as the after-tax UFCW Pension Plan withdrawal liability alone had increased from $59 million at the time of the 2009 Dividend to $145 million at the time of the 2010 Dividend. The UFCW Pension Plan liability increased dramatically in January 2010, when Tops acquired all of the assets and certain liabilities of the Penn Traffic Company ("Penn Traffic"), a 79-store regional grocery chain located in upstate New York that had filed for bankruptcy. Penn Traffic was the second largest participant (after Tops) in the critically underfunded UFCW Pension Plan, and Penn Traffic's bankruptcy filing meant that Tops would assume most of Penn Traffic's pension liability, whether or not Tops acquired the company. The acquisition increased Tops' 56% share of the unfunded UFCW Pension Plan liability to 85%. Moreover, between the time of the 2009 Dividend and the 2010 Dividend, the Company had taken on $75 million more in Funded Debt via a February 2010 notes issuance, in addition to the additional debt it had incurred in order to finance the 2009 Dividend. Tops had

no plan to avoid the insolvency of the Pension Plans. Tops knew that incurring withdrawal liability from the Pension Plans was only a matter of time.

77.     Had Tops actually conducted a solvency analysis in connection with issuing the 2010 Dividend, it would have reflected Tops' insolvency. If the same methodology that KPMG employed in the KPMG Valuation Analysis for the 2009 Dividend was used for the 2010 Dividend, but with the inclusion of both after-tax Pension Plan withdrawal liabilities, Tops would be left with an estimated capital deficit of at least $34 million after issuing the 2010 Dividend, rendering Tops insolvent.

**b.   The 2010 Dividend Left Tops With Unreasonably Small Capital**

78.     The 2010 Dividend left Tops with unreasonably small capital.

79.     As set forth above, Tops was insolvent after issuing the 2010 Dividend. Given that Tops was insolvent, the Company had insufficient capital to carry on the business in which it was engaged.

80.     Using the same methodology employed in the KPMG Valuation Analysis for the 2009 Dividend, but with the inclusion of both Pension Plan withdrawal liabilities, Tops was left with a negative 4.6% capital deficit after issuing the 2010 Dividend. Given that the comparable companies used in the KPMG Valuation Analysis had an average capital surplus of 69% and

██████████████████████████████████████████████

████, a negative 4.6% capital surplus is not even close to those metrics and is facially insufficient to carry on Tops' business.

**c.   Tops Incurred Liabilities Beyond its Ability to Pay When the Liabilities Became Due**

81.     Given that Tops was insolvent, the Company incurred liabilities beyond its ability to pay as they became due.

82.     At the time of the 2010 Dividend, Tops believed or intended that it would be unable to pay its liabilities as they became due. At the time of 2010 Dividend, Tops' after-tax Pension Plan withdrawal liabilities totaled an estimated $210 million, including $145 million from the UFCW Pension Plan and an estimated $65 million from the Teamsters Pension Plan. Tops continued to incur pension benefit obligation liabilities for active employees and to underfund the UFCW Pension Plan on an annual basis. Tops had no plan to prevent the UFCW Pension Plan, which was steadily running out of money, from becoming insolvent. Thus, the insolvency of the UFCW Pension Plan was inevitable. Tops also was responsible for withdrawal liability for the Teamsters Pension Plan. Tops knew that incurring withdrawal liability was only a matter of time. Coupled with Tops' total Funded Debt of $350 million and capital lease obligations of $185 million, Tops believed or intended that it would not be able to satisfy its liabilities when they became due.

### d.  Tops Acted With Fraudulent Intent in Issuing the 2010 Dividend

83.     The 2010 Dividend was unanimously approved by Matthews, Curci, Fry, Kanter, and Josefowicz. Tops, through these directors, acted with the intent to hinder, delay, and defraud Tops' creditors through the issuance of the 2010 Dividend. In short, the Board knew that by issuing a dividend of $30 million to the Private Equity Investors, they were leaving Tops without the ability to pay its massive pension obligations and its obligations to other creditors. Tops' CFO made clear that Morgan Stanley's "intent is to take every nickel plus" in the dividends, leaving insufficient funds to Tops' creditors. This intent can be further inferred from several traditional "badges of fraud."

84.     *First*, the dividend was paid to insiders. Morgan Stanley owned over 70% of common stock at the time of the issuance and, consequently, received over $21.4 million from

the 2010 Dividend. At the time, Morgan Stanley employees occupied three of the five seats on the Board (Matthews, Fry, and Kanter), and also controlled the other two directors (Curci and Josefowicz). Curci also was self-interested in approving the 2010 Dividend, which resulted in a dividend payment of approximately $120,000 to him.

85. *Second*, Tops did not receive any consideration for the 2010 Dividend.

86. *Third*, the transfer was unusual and not in the ordinary course of business. Like the 2009 Dividend, which was paid with debt issued by the Company, the 2010 Dividend was not made from cash flow generated by the operations of the Company. The Company's overall financial position had gotten dramatically worse since the 2009 Dividend, because the Company had assumed significant additional unfunded pension plan liabilities as a result of the Penn Traffic acquisition. Specifically, the Penn Traffic acquisition resulted in an estimated increase in Tops' UFCW Pension Plan liability of approximately $50 million. Notwithstanding the increased liabilities that Tops was assuming, as soon as the Penn Traffic acquisition was deemed to be "on schedule[,]" Morgan Stanley felt it "is it the right time to have Tops pay [it] a dividend." Finally, Tops did not even prepare a valuation analysis showing a capital surplus sufficient to issue the 2010 Dividend, which by itself makes the 2010 Dividend out of the ordinary course of business.

87. *Fourth*, the 2010 Dividend was not an isolated transaction, but rather a step in an ongoing scheme by Morgan Stanley to extract as much value as possible from Tops at the expense of the Company, its employees, and its creditors, including the Pension Plans. When it purchased Tops, ███████████████████████████████████████████████████ ████████████ and Tops and Morgan Stanley knew that the Pension Plans would become insolvent. Notwithstanding this, rather than fund the Pension Plans and manage the Company's

debt, Morgan Stanley took a series of significant dividends that enriched itself and the other Private Equity Investors.

88. *Fifth*, as noted above, Tops was insolvent at the time of the 2010 Dividend.

89. *Sixth*, the Private Equity Investors retained the possession, benefit, and use of the funds dispersed by the 2010 Dividend.

90. Finally, Tops' intent to defraud its creditors was apparent because Tops did not even bother to conduct a valuation analysis in connection with the 2010 Dividend. Given that the Company's financial status had only deteriorated since the 2009 Dividend, the Board, Tops, and Morgan Stanley were all aware that Tops was insolvent, had unreasonably small capital, and could not pay its debts as they became due at the time the Company made the 2010 Dividend.

**E. Tops' Liabilities Continue to Soar**

91. While Morgan Stanley spent the first two and a half years of its ownership and control of the Company adding on debt and extracting dividends from Tops, it took no meaningful measures to address Tops' Pension Plan liabilities.

92. Due to massive underfunding and an inability to avoid insolvency, the UCFW Pension Plan remained in "critical status." Morgan Stanley and Tops knew that the UFCW Pension Plan would continue to be drastically underfunded and become insolvent. By calendar year end 2010, Tops' withdrawal liability from the UCFW Pension Plan increased to $242 million. By calendar year end 2010, the Teamsters Pension Plan withdrawal liability grew to approximately $108 million and was also in "critical status."

93. As of January 1, 2012, Tops' withdrawal liability was approximately $299 million for the UFCW Pension Plan and $151 million for the Teamsters Pension Plan, making Tops'

total withdrawal liability for the Pension Plans $450 million. Additionally, at that time, Tops' Funded Debt had grown to $358 million.

**F. Tops Reduces Its Capital Expenditures In Order to Preserve Cash to Pay Out to Morgan Stanley and the Other Private Equity Investors in Dividends**

94.     Ordinarily, a company with mounting debt and liabilities would be assessing ways to increase the company's sales and pay down the company's debt and liabilities. Here, Morgan Stanley, Tops, and the Director Defendants did the opposite.

95.     Capital expenditures (or "CapEx") are funds used by a company to acquire, upgrade, and maintain physical assets such as property – or, in the case of Tops, its supermarkets. For a regional grocery store chain like Tops, capital expenditures were and are its lifeblood and the primary driver of the company's sales. Tops' CFO insisted that capital expenditures "be an integral part of [Tops'] strategy" and that "reduced spending would only succeed in decreasing both sales and profits now and with a multiple effect well into the future."

96.     However, having no interest in the long-term future of the Company, Morgan Stanley saw capital expenditures differently. Kanter, a Tops director and Morgan Stanley insider, dismissed capital expenditures as "not the key driver of valuation." To Morgan Stanley, every dollar spent on improving Tops' stores was one less dollar that could be paid to it through a dividend. As Tops' CFO succinctly put it, Kanter was reluctant to approve any increase in capital expenditures because he held Tops' cash "near and dear to his dividend heart."

97.     In reviewing Tops' forecasts, Morgan Stanley frequently required Tops to lower the amount budgeted for capital expenditures. For example, in March 2012, Tops had to revise a sales forecast to reflect lower capital expenditures because, as Tops' CFO stated, "MS didn't want us to ... use Cap-X to drive sales." Later that year, Tops estimated that it needed to spend $45-50 million per year in order to achieve its five-year growth plan. However, Morgan Stanley

objected and prevented this from happening. Ultimately, capital expenditures were significantly reduced, resulting in "[s]everal new store projects [being] delayed until second half of the year."

98. While certain members of Tops' management would complain internally about Morgan Stanley putting its interest over that of Tops, they would always acquiesce to Morgan Stanley's demands due to Morgan Stanley's unquestioned control over the Company.

## G. **Morgan Stanley Seeks to Exit From Its Investment In Tops**

99. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

100. Morgan Stanley's attempts to sell Tops failed, primarily due to Tops' Pension Plan liabilities. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

101. ████████████████████████████████████████████

████████████████████████████████████████████████████ one of the three potential purchasers that submitted a bid, ACON Equity Management, LLC ("ACON") ████████████████████ was well-aware of the risks posed by the Pension Plans. ACON's consultant, Deloitte & Touche LLP ("Deloitte"), analyzed the liabilities that would accrue when the plans inevitably became insolvent, triggering mass withdrawal liabilities that would make Tops jointly and severally liable for all obligations of the plans. The cumulative liability for these withdrawals was staggering. The UFCW Pension Plan mass withdrawal liability was

projected to be over $1 billion and the Teamsters Pension Plan mass withdrawal liability was
projected to be over $196 million.

████████████

████████████

### H. The 2012 Dividend

103.    Unable to exit their investment via a sale due to the Company's deteriorating
financial condition caused by the growing Pension Plan liabilities, significant debt and other
liabilities and poor condition of Tops' stores due to a lack of CapEx spending, Morgan Stanley
decided to simply take another dividend from the Company.    ████████████

████████████

████████████

104.    On December 20, 2012, Tops issued a $100 million dividend to Morgan Stanley
and the other Private Equity Investors (the "2012 Dividend").  To finance the dividend, Morgan
Stanley had Tops issue $460 million of senior secured notes.  The 2012 Dividend was approved
by a unanimous vote of the Board.  At or around the time of the 2012 Dividend, Tops had
approximately 11,400 employees participating in, and dependent upon, its UFCW Pension Plan
in addition to the C&S employees participating in, and dependent upon, the Teamsters Pension
Plan. Tops' total unfunded withdrawal liabilities related to these Pension Plans was
approximately $450 million.

105.    In accordance with their respective holdings, the Private Equity Investors received
the following pay-outs:  MSCP V Holdco. received over $71.6 million; HSBC I received
approximately $15.9 million; Turbic received approximately $5 million; HSBC II received
approximately $4.0 million; Begain received over $2.7 million; and Curci received

approximately $400,000. Additionally, Josefowicz and Rauch received approximately $200,000 as "equitable compensation" in connection with the 2012 Dividend.

### a. The 2012 Dividend Left Tops Insolvent

106.  Tops was insolvent at the time of the 2012 Dividend, as the present fair salable value of its assets was less than the amount that it was required to pay on its probable liability on its existing debts as they became absolute and matured.

107.  To justify the dividend, Tops, at Morgan Stanley's direction, retained Duff & Phelps ("D&P") to perform a valuation analysis (the "D&P Valuation Analysis"). D&P provided its Valuation Analysis just two weeks after it was retained. Like with KPMG, Tops and D&P agreed that "D&P will not independently verify the accuracy or completeness of any provided information, data, advice, opinions or representations, whether obtained from public or private sources, and Duff & Phelps will state that it has not independently verified the accuracy or completeness of such information. Duff & Phelps also will not independently appraise any of the Company's specific assets or liabilities (contingent or otherwise)." In the D&P Valuation Analysis, D&P further stated that it "[r]elied upon the accuracy, completeness, and fair presentation of all information, data, advice, opinions and representations ... provided to it from ... Company management, and did not independently verify such information." Thus, the accuracy of the D&P Valuation Analysis was dependent on the accuracy of the information provided to it by Tops.

108.  The D&P Valuation Analysis was significantly flawed because it relied on, among other things, inappropriate and inconsistent comparable companies, resulting in a grossly inflated assessment of the fair value of Tops' assets. Instead of using grocery chains similarly situated to Tops, D&P included upscale, "specialty" national chains, such as Whole Foods and

The Fresh Market, national retailers such as Wal-Mart that were not exclusively grocery stores, and multi-national companies that had grocery stores as only one part of their operation. These entities often bore no relation to Tops. For instance, one comparable company that was used, Tesco PLC, offers banking and telecommunications services and another, J. Sainsbury, offers banking services and has retail clothing operations, justifying higher EBITDA multiples than companies in the same market segment as Tops.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

110.    The D&P Valuation Analysis concluded that the fair value of Tops' assets exceeded the sum of its total debt by a capital surplus of approximately $68 million. This capital surplus represented an equity cushion of a mere 6.9%. However, ████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████ Tops had a capital deficit of $44 million and was insolvent.

111.    In addition to the improper comparables, the asset valuations of Tops used by D&P were based on "pro forma" EBITDA adjustments that Tops' auditor could not support, as it could not tie the adjustments to Tops' actual books and records. Tops' Director of Finance/Budgeting remarked that the unaudited adjusted pro forma EBITDA projections, which

were heavily influenced by Morgan Stanley, should be called "Estimated Numbers To Make Us Look Better."

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

112.    The projections provided to D&P were problematic in other ways. In the year 2011, the Company's adjusted EBITDA was approximately $142 while the acquired Grand Union stores' diligence adjusted EBITDA was under $8 million, implying a combined FY11 Adjusted EBITDA of under $150 million. Despite declining sales in existing stores and Tops' management's belief that the Grand Union acquisition had "no real upside," the projections provided by Tops that D&P relied on showed the Company's EBITDA for 2012 rising to $154 million, and growing to approximately $161 million for 2013 and approximately $166 million for 2014. According to these projections, by 2017, the Company's EBITDA was projected to increase to approximately $185 million.

113.    These projections were not based in reality. Among other things, to justify the increasing EBITDA, Tops and Morgan Stanley projected same-store sales growth to average 1.6% during 2012-2017 versus a historical average of 0.8% for Tops during 2007-2011 and zero growth on average for the acquired Grand Union stores from 2009-2011. Tops projected this previously unachieved level of same-store sales growth notwithstanding that Tops was spending significantly less than the 2% of CapEx as a percentage of sales that management believed was required to maintain (not improve) its current fleet of stores.

114.    Rather than increase, predictably, Tops' Adjusted EBITDA began to shrink after 2012, decreasing to $142 million in 2013 and $135 million in 2014. By 2017, Tops' Adjusted

EBITDA had shriveled to $110 million, 40% lower than the manipulated projections provided to D&P by Tops at the direction of Morgan Stanley. If realistic growth projections had been used, Tops' capital deficit at the time of the 2012 Dividend would have increased significantly, further demonstrating Tops' insolvency.

115. D&P's analysis had other serious flaws. One was the multiple of last twelve months ("LTM") EBITDA D&P used to determine the enterprise value for Tops given the multiple of LTM EBITDA Tops used to purchase the Grand Union stores shortly before the 2012 dividend was issued. In October 2012, Tops acquired the 21 Grand Union stores, which constituted 14% of its pro forma store footprint, for $27.4 million in an arms-length and non-distressed transaction, which implied an "acquisition multiple of 3.2x LTM EBITDA." Notwithstanding this, D&P used a multiple of 6.0x LTM EBITDA to calculate Tops' enterprise value without any discussion of the multiple used by Tops to purchase the Grand Union stores. The failure to consider the Grand Union multiple is especially alarming since these Grand Union stores "were previously owned and operated by (us here at) Tops, before Ahold divested," and appear to have been one of the best indicators of the value of Tops. Not only was the Grand Union purchase multiple ignored, but Grand Union was not even included as a precedent transaction in the D&P Valuation Analysis.

116. The D&P Valuation Analysis, unlike any of the other valuation analyses that were done for the dividends, at least included both of the Pension Plan liabilities. D&P's inclusion of these liabilities demonstrates the improper omission of them in the other valuation analyses, and the Director Defendants' improper reliance on valuation analyses that excluded one or more of the Pension Plan liabilities to justify making a dividend.

### b.  The 2012 Dividend Left Tops With Unreasonably Small Capital

117.     The 2012 Dividend left Tops with unreasonably small capital.

118.     As set forth above, Tops was insolvent at the time of the 2012 Dividend.  Given that Tops was insolvent, the Company had insufficient capital to carry on the business in which it was engaged.

119.     Even if one was to suspend reality and take D&P's Valuation Analysis at face value, meaning that Tops had a capital surplus of $68 million at the time of the 2012 Dividend, Tops was still left with unreasonably small capital.  According to D&P, Tops only had a 6.9% capital surplus after issuing the 2012 Dividend.  This was woefully inadequate.  Given that the comparable companies used in the D&P Valuation Analysis had an average capital surplus of 76% and ███████████████████████████████████████████ ██████████████, a 6.9% capital surplus is not even close to those metrics and is facially insufficient to carry on Tops' business.  Needless to say, the 6.9% capital surplus shown in the D&P Valuation Analysis is grossly inflated and the true capital deficit of the Company does not come close to ███████████████████████████████ meeting comparable company metrics.

### c.  The 2012 Dividend Resulted in Tops Incurring Liabilities Beyond its Ability to Pay When the Liabilities Become Due

120.     Given that Tops was insolvent, the Company incurred liabilities beyond its ability to pay as they became due.

121.     At the time of the 2012 Dividend, Tops believed or intended that it would be unable to pay its liabilities as they became due.  At the time of the 2012 Dividend, Tops' after-tax Pension Plan withdrawal liabilities totaled $272 million, including $181 million from the UFCW Pension Plan and $91 million from the Teamsters Pension Plan.  Notwithstanding the

ever-increasing amount of liabilities associated with the Pension Plans, Tops continued to incur pension benefit obligation liabilities for active employees. Tops had no plan to prevent the UFCW Pension Plan, which was steadily running out of money, from becoming insolvent. Thus, the insolvency of the UFCW Pension Plan was inevitable. Tops also was responsible for withdrawal liability for the Teamsters Pension Plan. Tops knew that incurring withdrawal liability was only a matter of time. Tops also had Funded Debt of at least $484 million and capital lease obligations of $168 million, and Tops believed or intended that it would not be able to satisfy its liabilities when they became due.

### d. Tops Acted With Fraudulent Intent

122.    The 2012 Dividend was unanimously approved by the Director Defendants and Frank Curci. Tops, through the Director Defendants, acted with the intent to hinder, delay, and defraud Tops' creditors through the issuance of the 2012 Dividend. In short, the Director Defendants knew in issuing $100 million to the Private Equity Investors, Tops did not have the ability to pay its massive Pension Plan obligations and its obligations to other creditors. Tops' CFO made clear that Morgan Stanley's "intent is to take every nickel plus" in the dividends, leaving insufficient funds to properly operate the business, much less pay Tops' creditors. This intent can further be inferred from several traditional "badges of fraud."

123.    *First*, the dividend was paid to insiders. Morgan Stanley owned over 70% of Tops at the time of the issuance and, consequently, received approximately $72 million from the 2012 Dividend. At the time, Morgan Stanley employees occupied three of the six seats on the Board (Matthews, Fry, and Kanter), and Morgan Stanley also controlled the other three directors (Curci, Josefowicz and Rauch). Curci also was self-interested in approving the 2012 Dividend, which resulted in a dividend payment of approximately $400,000 to him and a bonus of over $2

million in connection with the dividend. Additionally, Josefowicz and Rauch were also self-interested, receiving collectively approximately $200,000 as "equitable compensation" in connection with the 2012 Dividend.

124. *Second*, Tops did not receive any consideration for the 2012 Dividend. In fact, Tops took on additional debt to fund the dividend. Thus, Tops received no benefit from making the dividend and could not even finance it from its own internal capital or profits.

125. *Third*, the transfer was unusual and not in the ordinary course of business. Like the 2009 and 2010 Dividends, the 2012 Dividend was not made from cash flow generated by operations of the Company. Instead, the 2012 Dividend was paid with debt issued by the Company. Since the time of the 2010 Dividend, the Company's Funded Debt and withdrawal liabilities related to the Pension Plans continued to grow recklessly. Given that the financial condition of the Company continued to deteriorate, a debt issuance to finance another massive dividend was unwarranted and highly unusual.

126. *Fourth*, as noted above, Tops was insolvent at the time of the 2012 Dividend.

127. *Fifth*, the Private Equity Investors retained the possession, benefit, and use of the funds dispersed by the 2012 Dividend.

128. *Sixth*, the 2012 Dividend was not an isolated transaction, but rather a step in an ongoing scheme by Morgan Stanley to extract as much value as possible from Tops at the expense of the Company, its employees, and its creditors, including the Pension Plans. When it purchased Tops, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Tops and Morgan Stanley knew that the Pension Plans would become insolvent. Notwithstanding this, rather than fund the Pension Plans or manage the debt burden on the Company, Morgan Stanley took a series of significant dividends that enriched itself and

the other Private Equity Investors. In fact, right before taking the 2012 Dividend, Tops refused the UFCW Pension Plan's request to issue $50 million in debt and invest the proceeds in the Plan because of claimed covenant restrictions, only to issue the $460 million in debt days later that funded the 2012 Dividend. As part of the scheme, Matthews, Fry, and Kanter, aided and abetted by Morgan Stanley, ███████████████████ controlled the flow of information to D&P to ensure that D&P's Valuation Analysis would reflect a capital surplus, despite the fact that Tops was insolvent at the time of issuing the 2012 Dividend.

129. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████ With no interested buyers given Tops' existing liabilities, Morgan Stanley directed the issuance of the 2012 Dividend, which was the only means available to extract money from the Company, and financed it with debt issued by the Company. Additionally, costs associated with the financing to pay the dividend were at least $28.3 million, including over $17.7 million in breakage costs from early redemption of the Company's existing notes, which were refinanced. As a result of this debt issuance and associated costs, Morgan Stanley increased Tops' Funded Debt to at least $484 million.

130. Finally, Tops' intent to defraud its creditors was apparent because the 2012 Dividend issuance was premised on baseless, bad faith projections of Tops' future performance.

Morgan Stanley directed Tops to retain D&P to provide the D&P Valuation Analysis to justify the 2012 Dividend. Morgan Stanley manipulated and controlled the Company's projections that were provided as the inputs for the D&P Valuation Analysis. Morgan Stanley and Tops knew that the projections used in the D&P Valuation Analysis were inflated and inaccurate.

131. For example, Tops acknowledged internally that Deloitte, its auditor, could not sign off on the "pro-forma" adjustments that were made to the adjusted EBITDA of Tops. Specifically, Deloitte noted that the adjustments "relate to items Deloitte cannot comfort as they cannot agree to [Tops'] books and records… and cannot be tied into journal entries, account balances, invoices, etc." Tops' CFO agreed with Deloitte that the projections needed to be tied to the actual performance of the Company. Tops' Director of Finance/Budgeting stated that the projections should be called "Estimated Numbers to Make Us Look Better."

132. Morgan Stanley heavily influenced Tops' projections in order to justify the dividends the Company issued. For example, on November 24, 2012, just weeks before issuing the 2012 Dividend, Morgan Stanley pushed Tops to project an adjusted EBITDA for 2013 that was higher than 2012, after Tops modeled a decrease. Morgan Stanley also pushed Tops to increase Tops' gross profit margin rate to increase Tops' projected EBITDA, even though Tops' management believed the gross margin was "tapped out." Frank Curci described Morgan Stanley's demand for aggressive and unrealistic growth projections while simultaneously reducing Tops' capital expenditures "the old two step." Given Morgan Stanley's control over Tops, management followed Morgan Stanley's directions and provided D&P with a projection showing a 4.8% increase in adjusted EBITDA from fiscal year ("FY") 2012 to FY2013, which D&P relied on to find a capital surplus. Contrary to the inflated projections provided to D&P, Tops' adjusted EBITDA decreased by nearly 2.8% from FY2012 to FY2013.

133.    Tops, Morgan Stanley and the Director Defendants also ignored obvious red flags in the D&P Valuation Analysis. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████ The high-end national and multinational comparable companies used by D&P were objectively unreasonable and bore no relation to Tops and the EBITDA multiples used by D&P conflicted with what Tops had just paid to acquire the similarly situated Grand Union stores. ████████████████████████████████████████

██████████████████████████████████████████████ Yet, the Board, including Matthews, Fry, and Kanter, approved the 2012 Dividend notwithstanding that D&P used different comparable companies that bore no relation to Tops and D&P found an equity cushion of only 6.9%, which was well below the over 76% equity cushion of the comparable companies in the D&P Valuation Analysis.

a.    **The Director Defendants Breached Their Fiduciary Duties to Tops in Approving the 2012 Dividend.**

134.    The Director Defendants unanimously approved the 2012 Dividend. In doing so, the Director Defendants were acting in their own self-interest and the interest of Morgan Stanley instead of the interest of Tops.

135.    The purpose of the 2012 Dividend was to benefit Morgan Stanley, at the expense of Tops and its creditors. The Director Defendants approved the distribution of $100 million in cash from the Company in the face of the Company's staggering debt and Pension Plan liabilities. Instead of addressing that debt and liabilities, the Director Defendants chose to

increase the debt on the Company in order to finance the 2012 Dividend and enrich Morgan Stanley and the other Private Equity Investors.

136. Three of the Director Defendants, Gary Matthews, Eric Kanter, and Eric Fry, were high-ranking employees of Morgan Stanley and were under Morgan Stanley's direct control. As such, these directors were focused on maximizing payments to Morgan Stanley to the detriment of Tops. ████████████████████████████████

████████████████████████████████████████████████████

████████████████ They also manipulated the Company's projections and controlled the flow of information to D&P to ensure that the D&P Valuation Analysis concluded that the 2012 Dividend could be made.

137. Greg Josefowicz and Stacey Rauch were also under the control of Morgan Stanley. Morgan Stanley appointed them to the Board and could remove them from the Board at any time in Morgan Stanley's sole and absolute discretion. As a result, these directors served at the pleasure of Morgan Stanley. Both directors' careers were solely focused on serving on Boards, and meeting Morgan Stanley's needs on the Tops' Board would mean the possibility of Morgan Stanley appointing them to other Boards.

138. The "independent" directors were also self-interested in the 2012 Dividend and received compensation from it. Greg Josefowicz received $174,607 and Stacey Rauch received $12,680 as "equitable compensation" for the 2012 Dividend. By approving the 2012 Dividend, Josefowicz and Rauch put their own interests and the interests of Morgan Stanley over the interests of Tops.

139. The Director Defendants consciously disregarded their duty to Tops by elevating the interests of Morgan Stanley in receiving dividends over the interest of Tops in making the

capital investments that management believed were necessary for "the stores to maintain economic value," managing and reducing the Company's debt burden, and funding the Pension Plans. The Company was not paying the dividend out of profits or even its operating income. The Company was financing the dividend by taking on even more debt.

140. The Director Defendants were aware that the Company was unable to generate any interest in the market for a sales transaction because of Tops' Pension Plan liabilities. Rather than address those liabilities, the Director Defendants chose to bow to Morgan Stanley's interest in extracting all the cash from the Company, even if it meant burdening an already overburdened Company with more liabilities it could never satisfy. This dereliction of duty was the result of a systematic failure by the Board to exercise oversight over Morgan Stanley's control of the Company.

### b. Morgan Stanley Aided and Abetted the Director Defendants in Breaching Their Fiduciary Duties to Tops in Approving the 2012 Dividend

141. Morgan Stanley provided substantial assistance to the Director Defendants' breach of fiduciary duty. Morgan Stanley directed Tops to retain D&P and controlled the flow of information to D&P to ensure that the D&P Valuation Analysis would find a capital surplus to justify the 2012 Dividend.

142. Morgan Stanley orchestrated D&P's analysis from the inception. ███████████ █████████████████████████████████████████████████████████ ████████████████████████████████ Eric Kanter then negotiated the fee arrangement upon which Tops would pay D&P for its work on the Valuation Analysis. ████ ████████████████████████████████ In addition, Morgan Stanley controlled the flow of information to D&P by directing Tops' employees as to which specific materials to provide in response to D&P's information request list. By controlling the flow of information

and the inputs to be used in the D&P Valuation Analysis, Morgan Stanley ensured that a capital surplus would be found, despite the fact that Tops was insolvent.

143.     Morgan Stanley exercised its control over the Director Defendants to vote in favor of the 2012 Dividend.  The 2012 Dividend was not the idea of Tops.  It was the idea of Morgan Stanley.  Matthews, Fry, and Kanter were employees of, and under the direct control of, Morgan Stanley.  Morgan Stanley knew that Tops was insolvent and had unreasonably small capital and could not legally pay the 2012 Dividend.  However, Morgan Stanley, through its employees, exercised its control over the Company to approve and issue the 2012 Dividend.

144.     Morgan Stanley similarly exercised its control over Frank Curci as the CEO of the Company to vote in favor of the 2012 Dividend.  Frank Curci viewed Gary Matthews as his boss and if Gary Matthews, as Morgan Stanley's chief representative, wanted the 2012 Dividend, then Frank Curci was going to vote in favor of it.  Moreover, Curci was financially incentivized to approve the 2012 Dividend.  In connection with the 2012 Dividend, Curci received a dividend payment of approximately $400,000 and Morgan Stanley approved a bonus of $2,108,019.04 to Curci.

145.     Josefowicz and Rauch also followed the directions of Morgan Stanley, including by voting in favor of every dividend that Morgan Stanley requested knowing that Morgan Stanley could remove them from the Board if they did not act in Morgan Stanley's interest and follow its directions.  Morgan Stanley also financially incentivized these "independent" directors to approve the 2012 Dividend and breach their fiduciary duties to Tops.  In connection with the 2012 Dividend, Morgan Stanley approved bonus payments of $174,607 to Greg Josefowicz and $12,680 to Stacey Rauch.

146.    Morgan Stanley also incentivized and rewarded Tops' management for facilitating the 2012 Dividend.  Tops' management received significant bonuses in connection with the 2012 Dividend.  In addition to Curci's $2 million plus bonus, fourteen management level employees received bonuses ranging from over $1 million to $6,000.  HSBC was consulted and approved these bonuses.

## I.  The 2013 Dividend

147.    After Tops issued the 2012 Dividend, Morgan Stanley immediately began working on issuing another massive dividend.

148.    On May 15, 2013, only five months after the 2012 Dividend, Tops issued a $141.9 million dividend to Morgan Stanley and the other Private Equity Investors (the "2013 Dividend").  To finance the 2013 Dividend, Tops simultaneously issued $150 million of senior secured notes.  Virtually all of the proceeds from the debt issuance were used to make the 2013 Dividend.  The 2013 Dividend was unanimously approved by Gary Matthews, Eric Fry, Eric Kanter, Frank Curci, and Stacey Rauch.[7]  At or around the time of the 2013 Dividend, Tops had approximately 11,800 employees participating in, and dependent upon, its UFCW Pension Plan in addition to the C&S employees participating in, and dependent upon, the Teamsters Pension Plan.  Tops' total unfunded withdrawal liabilities related to these Pension Plans was approximately $450 million.

149.    In light of their respective holdings, the Private Equity Investors received the following pay-outs:  MSCP V Holdco. received approximately $101.6 million; HSBC received approximately $22.6 million; Turbic received approximately $7.1 million; HSBC II received

---

[7] Greg Josefowicz did not attend the Board meeting, but according to the meeting minutes "was fully briefed on the actions taken at the meeting."

approximately $5.7 million; Begain received approximately $4.4 million; and Frank Curci received approximately $600,000.

150.    Morgan Stanley knew that another dividend would be impossible if the same methodology D&P employed to assess the 2012 Dividend was used since the D&P Valuation Analysis found only a 6.9% equity cushion.  Specifically, the D&P Valuation Analysis included the Pension Plan liabilities and Morgan Stanley knew that those liabilities would need to be excluded from any analysis to justify another dividend.

151.    On December 9, 2012, two days after receiving a draft of the D&P Valuation Analysis for the 2012 Dividend, Eric Kanter wrote to Tops' management to inform them that while D&P included the Pension Plan liabilities in its analysis, this should not necessarily be included in an analysis for any future dividend.  Eric Kanter and Morgan Stanley knew it would not be feasible to have D&P conduct a valuation analysis for the 2013 Dividend that excluded the Pension Plan liabilities, given that D&P had included those liabilities in the D&P Valuation Analysis, so it turned to Houlihan Lokey ("HL") to provide the valuation analysis for the 2013 Dividend (the "HL Valuation Analysis").  On its face, Tops' retention of a different valuation firm only five months after the 2012 Dividend, so that it could employ a different valuation methodology to justify another dividend, is a giant red flag.

152.    HL was retained to conduct the HL Valuation Analysis on May 1, 2013, only two weeks before the 2013 Dividend was paid.  As with the retention of KPMG and D&P, HL and Tops agreed that HL was not responsible for verifying the accuracy of the information that Tops provided to it, including the existence and amount of Tops' contingent liabilities.

153.    On May 2, 2013, HL sent Morgan Stanley a list of "Due Diligence Questions," which included a request for Tops to disclose "any potential obligations from the Company's

underfunded multiemployer pension plans ('MEPPs'), specifically for employees represented by the Local One plan [i.e., the UFCW Pension Plan]." A week after receiving the Due Diligence Questions, Tops' CFO provided HL with the Company's financials, including Tops' contingent liabilities, which were drafted by Morgan Stanley. The document for "Contingent Liabilities" stated "None."

154. Just one week after being retained, on May 8, 2013, HL issued the HL Valuation Analysis and, on May 16, 2013, its Opinion Letter. As instructed by Tops, at Morgan Stanley's direction, HL valued Tops' contingent liabilities at zero. With the Pension Plan liabilities excluded, HL concluded that Tops would have a capital surplus of approximately $209 million even after issuing $150 million in debt and paying the $142 million dividend. As a result, the HL Valuation Analysis purported to show that Tops' capital surplus increased nearly $300 million in the five months since the 2012 Dividend. This obviously was not true and could not be relied upon to issue a dividend. The flaws in the HL Valuation Analysis were obvious, but the Board of Directors recklessly continued to bless Morgan Stanley's ceaseless draining of the Company's coffers.

### a. The 2013 Dividend Left Tops Insolvent

155. Tops was insolvent at the time of the 2013 Dividend, as the present fair salable value of its assets was less than the amount that it was required to pay on its probable liability on its existing debts as they became absolute and matured.

156. The HL Valuation Analysis was deeply flawed because it excluded the Pension Plan liabilities. By doing so, the HL Valuation Analysis omitted at least $272 million in after-tax liabilities from Tops' balance sheet in order to justify the Dividend. Had the HL Valuation Analysis included Tops' liabilities from the Pension Plans, it would have concluded that Tops

was insolvent. If Tops' pension liabilities had been included, the Company's balance sheet would have reflected a capital deficit of at least $63 million.

157. The HL Valuation Analysis was also flawed because HL relied on comparable companies that were not similarly situated to Tops, such as multi-national companies and upscale, "specialty" chains, ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ When combined with the adjustment for the after-tax Pension Plan liabilities, the HL Valuation Analysis would show an aggregate capital deficit of approximately $98 million.

158. HL also relied on many of the same improper adjusted "pro-forma" projections that D&P relied on in creating the D&P Valuation Analysis for the 2012 Dividend. Were realistic projections used, Tops' capital deficit at the time of the 2013 Dividend would be significantly increased, further demonstrating Tops' insolvency.

**b. The 2013 Dividend Left Tops With Unreasonably Small Capital**

159. Tops also had unreasonably small capital after the 2013 Dividend.

160. As set forth above, Tops was insolvent at the time of the 2013 Dividend. Given that Tops the Company had insufficient capital to carry on the business in which it was engaged.

161. Even if one was to suspend reality and take the HL Valuation Analysis at face value, meaning that Tops had a capital surplus of $209 million at the time of the 2013 Dividend, Tops was still left with unreasonably small capital. According to HL, Tops only had a 20% capital surplus after issuing the 2013 Dividend. This was inadequate. Given that the comparable companies used in the HL Valuation Analysis had an average capital surplus of 70%███████████

███████████████████████████████████████████████████████████, a

20% capital surplus does not meet those metrics and is insufficient to carry on Tops' business. Needless to say, the 20% capital surplus shown in the HL Valuation Analysis is grossly inflated and the true capital deficit of the Company does not come close to meeting the ████████ ██ comparable company metrics.

### c. Tops Incurred Liabilities Beyond Its Ability to Pay When the Liabilities Became Due.

162.     Given that Tops was insolvent, the Company incurred liabilities beyond its ability to pay as they became due.

163.     At the time of the 2013 Dividend, Tops believed or intended that it would be unable to pay its liabilities as they became due.  Tops continued to incur pension benefit obligation liabilities for active employees and to underfund the UFCW Pension Plan on an annual basis.  Tops had no plan to prevent the UFCW Pension Plan, which was steadily running out of money, from becoming insolvent.  Thus, the insolvency of the UFCW Pension Plan was inevitable.  Tops also was responsible for withdrawal liability for the Teamsters Pension Plan. Tops knew that incurring withdrawal liability was only a matter of time.  At the time of the 2013 Dividend, Tops' after-tax Pension Plan withdrawal liabilities totaled at least $272 million. Coupled with Tops' Funded Debt of $646 million and capital lease obligations of $161 million, Tops believed or intended that it would not be able to satisfy its liabilities of over $1 billion when they became due.

### d. Tops Acted With Fraudulent Intent in Issuing the 2013 Dividend

164.     The 2013 Dividend was unanimously approved by the Director Defendants and Frank Curci.  Tops, through the Director Defendants, acted with the intent to hinder, delay, and defraud Tops' creditors through the issuance of the $142 million 2013 Dividend.  In short, the

Director Defendants knew that in issuing $142 million to the Private Equity Investors, Tops did not have the ability to pay its massive Pension Plan obligations and its obligations to other creditors. This intent can further be inferred from several traditional "badges of fraud."

165. *First*, the 2013 Dividend was paid to insiders. Morgan Stanley owned over 70% of Tops at the time of the issuance and, consequently, received approximately $101.6 million from the 2013 Dividend. At the time, Morgan Stanley employees occupied three of the six seats on the Board (Matthews, Fry, and Kanter), and Morgan Stanley also controlled the other three directors (Curci, Josefowicz and Rauch). Curci was self-interested in approving the 2013 Dividend, which resulted in a dividend payment of over $567,000 to him and a bonus of over $2 million in connection with the dividend. The "independent" directors also were rewarded with substantial bonuses in connection with approving the 2013 Dividend – Greg Josefowicz received a bonus of $172,800 and Stacey Rauch received a bonus of $150,000.

166. *Second*, Tops did not receive any consideration for the 2013 Dividend. In fact, Tops took on additional debt to fund the dividend. Thus, Tops received no benefit from making the dividend and could not even finance it from its own internal capital or profits.

167. *Third*, the transfer was unusual and not in the ordinary course of business. Like the 2009, 2010 and 2012 Dividends, the 2013 Dividend was not made from cash flow generated by operations of the Company. Instead, the 2013 Dividend was paid with debt issued by the Company. Since the time of the 2012 Dividend, the Company's Funded Debt and withdrawal liabilities related to the Pension Plans continued to grow. Given that the financial condition of the Company continued to deteriorate, a debt issuance to finance another massive dividend was unwarranted and highly unusual.

168. *Fourth*, as noted above, Tops was insolvent at the time of the 2013 Dividend.

169.    *Fifth*, the Private Equity Investors retained the possession, benefit, and use of the funds dispersed by the 2013 Dividend.

170.    *Sixth*, the 2013 Dividend was not an isolated transaction, but rather a step in an ongoing scheme by Morgan Stanley to extract as much value as possible from Tops at the expense of the Company, its employees, and its creditors, including the Pension Plans. █████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

171.    Rather than fund the Pension Plans and manage the debt burden on the Company, Morgan Stanley enriched itself and the other Private Equity Investors by directing the issuance of

the 2013 Dividend. As part of the scheme, Matthews, Fry, and Kanter, aided and abetted by Morgan Stanley, manipulated the valuation process by replacing D&P with HL and ensuring that HL did not include the Pension Plan liabilities in the HL Valuation Analysis.

172. Finally, Tops' intent to defraud its creditors was apparent because Morgan Stanley, Tops and the Director Defendants knew that the HL Solvency Analysis omitted the Pension Plan liabilities that D&P had included five months earlier in the D&P Valuation Analysis.

173. Morgan Stanley, Tops and the Director Defendants were acutely aware of the impact the Pension Plan liabilities had on the value of Tops because they had just seen potential purchasers of the Company decline to pursue a transaction because of the Pension Plans. Moreover, Morgan Stanley consistently identified the Pension Plan liabilities as a "weakness" when Tops conducted "strengths, weaknesses, opportunities, threats (SWOT)" analyses. In August 2012, Gary Matthews of Morgan Stanley noted that a draft SWOT analysis was "missing" the Pension Plan liabilities, which needed to be included. The next year, Matthews made the same comment: "SWOT is good…. On weaknesses, seems like pension ... belong[s] there."

174. The HL Valuation Analysis determined that, in the five months between the December 19, 2012 D&P Valuation Analysis and the May 8, 2013 HL Valuation Analysis, the Company's purported capital surplus increased from approximately $68 million to approximately $209 million even after the Company issued $150 million of additional debt and paid the $142 million 2013 Dividend. If the 2013 Dividend was not paid, the HL Valuation Analysis implies an increase in Tops' capital surplus of almost $300 million in the five months after the 2012 Dividend. The HL Valuation Analysis valued the equity in Tops at $209 million after paying the

2013 Dividend. However, in November 2013, just six months after the HL Valuation Analysis, the Private Equity Investors sold the equity of Tops to management for less than 10% of that amount–just under $21 million. Tops, Morgan Stanley and the Director Defendants obviously did not believe the HL Valuation Analysis. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████

175.     In addition, similar to the D&P Valuation Analysis, the HL Valuation Analysis was premised on a set of comparable companies that materially differed from Tops ██████████

████████████████████████████████████ The HL Valuation Analysis also relied on the "pro-forma" projections that Tops' Director of Finance/Budgeting internally called "Estimated Numbers to Make Us Look Better."

### c. The Director Defendants Breached Their Fiduciary Duties to Tops in Approving the 2013 Dividend.

176.     The Director Defendants unanimously approved the 2013 Dividend. In doing so, the Director Defendants were acting in their own interests and the interest of Morgan Stanley instead of the interest of Tops.

177.     The purpose of the 2013 Dividend was to benefit Morgan Stanley, at the expense of Tops and its creditors. The Director Defendants approved the distribution of $142 million in cash from the Company in the face of the Company's staggering debt and Pension Plan liabilities. Instead of addressing that debt and those liabilities, the Director Defendants chose to further increase the debt on the Company in order to finance the 2013 Dividend and enrich Morgan Stanley.

178.     Three of the Director Defendants (Matthews, Kanter, and Fry) were high-ranking employees of Morgan Stanley and were under Morgan Stanley's direct control. As such, these

directors were focused on maximizing payments to Morgan Stanley to the detriment of Tops. ■

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

They also manipulated the Company's projections and controlled the flow of information to HL to ensure that the HL Valuation Analysis concluded that the 2013 Dividend could be made.

179.    Josefowicz and Rauch were also under the control of Morgan Stanley. Morgan Stanley appointed them to the Board and could remove them from the Board at any time in Morgan Stanley's sole and absolute discretion. As a result, these directors served at the pleasure of Morgan Stanley. Both directors' careers were solely focused on serving on Boards, and meeting Morgan Stanley's needs on the Tops' Board would mean the possibility of Morgan Stanley appointing them to other Boards.

180.    As was the case with the 2012 Dividend, the "independent" directors were also self-interested in the 2013 Dividend and received compensation from it. In connection with the 2013 Dividend, the Board of Directors approved bonus payments of $172,800 to Greg Josefowicz and $150,000 to Stacey Rauch. By approving the 2013 Dividend, Mr. Josefowicz and Ms. Rauch put their own interests and the interests of Morgan Stanley over the interests of Tops.

181.    The Director Defendants consciously disregarded their duty to Tops by elevating the interests of Morgan Stanley in receiving dividends over the interest of Tops in making CapEx expenditures to grow the Company, and managing and reducing the Company's debt burden and Pension Plan liabilities. The Company was not paying the 2013 Dividend out of its profits or cash from the Company's operations. The Company was financing the 2013 Dividend by taking on even more debt. The Director Defendants were aware that the Company was unable to

generate any interest in the market for a sales transaction because of Tops' Pension Plan liabilities. Rather than address those liabilities or even make necessary investments to maintain and properly run the business, the Director Defendants chose to bow to Morgan Stanley's interest in extracting dividends from the Company, even if it meant increasing the debt burden on the Company. As cover, the Director Defendants consciously disregarded their fiduciary duties by "relying" on the HL Valuation Analysis, which ignored Tops' massive Pension Plan liabilities that were included in the D&P Valuation Analysis only five months earlier. These derelictions of duty were the result of a systematic failure by the Board to exercise oversight over Morgan Stanley's control over the Company.

### d. Morgan Stanley Aided and Abetted the Director Defendants in Breaching Their Fiduciary Duties to Tops in Approving the 2013 Dividend

182. Morgan Stanley provided substantial assistance to the Director Defendants' breach of fiduciary duty. Morgan Stanley knew issuing another substantial dividend so shortly after the 2012 Dividend would be impossible using the same valuation methodology used in the D&P Valuation Analysis. On December 9, 2012, two days after receiving the D&P draft Solvency Analysis for the 2012 Dividend, Eric Kanter wrote to Tops' management complaining that D&P's treatment of the Company's pension liabilities would not be suitable in "the event we have another [dividend] recap in the future[.]"

183. As a result, Morgan Stanley decided to retain HL to perform the HL Valuation Analysis. In essence, Morgan Stanley was HL's client, rather than Tops. ███████████ ████████████████████████████████████████████████████████ HL even sent the invoice for its work directly to Morgan Stanley, which Morgan Stanley then forwarded to Tops for payment.

184.     Morgan Stanley rigidly controlled the flow of information to HL throughout the process in order to ensure that the HL Valuation Analysis would find a capital surplus.  For example, Morgan Stanley sent HL Tops' financial information, including financial statements and prior budgets.  Morgan Stanley also sent HL inflated projections to incorporate in the HL Valuation Analysis.   In the one instance where Tops management sent two largely inconsequential items directly to HL (a corporate structure chart and litigation list), Morgan Stanley chastised them, stating that Morgan Stanley needed "to make sure we know exactly what they [HL] are looking at."

185.     By controlling the flow of information, Morgan Stanley withheld information it deemed problematic.  For example, HL requested "3rd party valuations of Tops Holding Corp. and Tops Markets LLC performed within last 3 years[.]"  This request plainly encompassed the D&P Valuation Analysis that included the Pension Plan liabilities and was conducted only six months prior.   If the D&P Valuation Analysis was provided, it would conflict with Tops' representations that it did not possess any contingent liabilities.  Knowing this, Morgan Stanley put the request "on hold" and did not provide the requested information.

186.     Morgan Stanley's control over the HL Valuation Analysis included the decision to not disclose the Pension Plan liabilities to HL.  Morgan Stanley drafted the exhibit that identified Tops' contingent liabilities to be incorporated in HL's Valuation Analysis as "None."

187.     Morgan Stanley exercised its control over the Director Defendants to vote in favor of the 2013 Dividend.  The 2013 Dividend was not the idea of Tops.  It was the idea of Morgan Stanley.  Matthews, Fry, and Kanter were employees of, and under the direct control of, Morgan Stanley.  Morgan Stanley knew that Tops was insolvent, had unreasonably small capital and could not legally pay the 2013 Dividend.  However, Morgan Stanley exercised its control over its

employees to have them direct the Company to make the 2013 Dividend and support it by voting in favor of it.

188.    Morgan Stanley exercised its control over Frank Curci as the CEO of the Company to vote in favor of the 2013 Dividend.  Frank Curci viewed Gary Matthews as his boss and if Gary Matthews as Morgan Stanley's chief representative wanted the 2013 Dividend, then Frank Curci was going to vote in favor of it.  Moreover, Curci was financially incentivized to approve the 2013 Dividend.  In connection with the 2013 Dividend, Curci received a dividend payment of $600,000 and the Board of Directors approved a bonus of $2,224,200 to Curci.

189.    Morgan Stanley similarly incentivized the "independent" directors to approve the 2013 Dividend and breach their fiduciary duties to Tops.  As detailed above, in connection with the 2013 Dividend, the Board of Directors approved bonus payments of $172,800 to Greg Josefowicz and $150,000 to Stacey Rauch.

190.    Morgan Stanley also incentivized and rewarded Tops' management for facilitating the 2013 Dividend.  In connection with the 2013 Dividend, Tops' management received significant bonuses.  In addition to Curci's $2 million plus bonus, thirteen employees received bonuses ranging from $75,000 to over $1.25 million.  HSBC was consulted and approved these bonuses.

**J.    Morgan Stanley Exits Tops Through The 2013 Management Buy-Out**

191.    Having extracted all of Tops' value through the dividends, burdened it with significant additional debt to finance those dividends, and crippled the Company operationally through grossly inadequate CapEx expenditures, Morgan Stanley was ready to exit Tops.  In December 2013, Tops, Morgan Stanley, the other Private Equity Investors, and Tops MBO Corporation executed a Purchase and Sale Agreement pursuant to which Tops MBO

Corporation—an entity owned and controlled by the six senior Tops executives—agreed to purchase substantially all of the common stock of Tops ("Management Buyout").  After the sale, when describing Morgan Stanley's "motivations for the acquisition," and any due diligence conducted, Tops' management simply stated that Morgan Stanley's "investment had run its course [because] they realized they had gotten about all they were going to out of the Company through multiple dividends since 2009."  In other words, Morgan Stanley had removed all value from the Company and rather than engage in an arms-length transaction with a third party purchaser, which they knew was not possible, they sold the Company to management for a pittance, with Tops itself funding the vast majority of the purchase price.

### K.  Tops Files for Bankruptcy

192.    During Morgan Stanley's tenure as majority owner of Tops, it directed the Company to incur over $640 million of Funded Debt while distributing over $375 million in dividends and ignoring Tops' ballooning Pension Plan liabilities.  Tops was unable to overcome the burdens placed on the Company by Morgan Stanley, including the massive interest payments owed to Tops' lenders.  After management's purchase of the Company, in order to service the massive debt accumulated under the Private Equity Investors' ownership, Tops reduced its capital expenditures each year, spending only approximately $24 million in CapEx in 2017.  Meanwhile, Tops' union employees were forced to reduce their health and welfare benefits in order to help forestall insolvency of the UFCW Pension Plan, resulting in a depletion of their healthcare reserve fund from approximately $30 million to $5 million.  Tops' lack of capital investment in maintaining the business, coupled with its minimal payments to its Pension Plans, enabled by the employees' sacrifices, allowed Tops to keep its doors open until February 18, 2018, when it filed for bankruptcy.  Tops' creditors, including the Pension Plans, suffered over

$1 billion in losses as a result of Tops' bankruptcy. Plaintiff, through this complaint, seeks to hold Morgan Stanley and the other Defendants responsible for the grave harm they knowingly inflicted on the Company and its creditors.

## CAUSES OF ACTION

### COUNT I

**Avoidance of the 2009 Dividend as a Constructive Fraudulent Transfer
Against MSCP V Holdco., HSBC I, HSBC II, and Turbic (11 U.S.C. §§ 544(b), 550(a)(1);
NY DCL §§ 273-275)**

193.    Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

194.    The 2009 Dividend resulted in the transfer of $105 million to the Private Equity Investors, including $78,435,000 to MSCP V Holdco.; $16,695,000 to HSBC I; $4,200,000 to HSBC II, and $5,250,000 to Turbic.

195.    The 2009 Dividend was not made for any consideration.

196.    At the time the 2009 Dividend was made, (a) Tops was insolvent, (b) the 2009 Dividend rendered Tops insolvent, (c) the 2009 Dividend left Tops with unreasonably small capital; and (d) Tops believed that it would incur or intended to incur debts beyond Tops' ability to pay as they matured and became absolute.

197.    Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of Tops exist who could avoid the 2009 Dividend under applicable non-bankruptcy law, including the Internal Revenue Service ("IRS").

198.    The 2009 Dividend is avoidable as a constructively fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## COUNT II

**Avoidance of the 2010 Dividend as a Constructive Fraudulent Transfer
Against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain (11 U.S.C. §§ 544(b),
550(a)(1); NY DCL §§ 273-275)**

199. Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

200. The 2010 Dividend resulted in the transfer of $30 million to the Private Equity Investors, including $21,482,359 to MSCP V Holdco.; $4,769,942 to HSBC I; $1,199,970 to HSBC II, $1,050,029.40 to Turbic; and $649,396.30 to Begain.

201. The 2010 Dividend was not made for any consideration.

202. At the time the 2010 Dividend was made, (a) Tops was insolvent, (b) the 2010 Dividend rendered Tops insolvent, (c) the 2010 Dividend left Tops with unreasonably small capital; and (d) Tops believed that it would incur or intended to incur debts beyond Tops' ability to pay as they matured and became absolute.

203. Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of Tops exist who could avoid the 2010 Dividend under applicable non-bankruptcy law, including the IRS.

204. The 2010 Dividend is avoidable as a constructively fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## COUNT III

**Avoidance of the 2012 Dividend as a Constructive Fraudulent Transfer
Against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain (11 U.S.C. §§ 544(b),
550(a)(1); NY DCL §§ 273-275)**

205. Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

206.     The 2012 Dividend resulted in the transfer of $100 million to the Private Equity Investors, including $71,607,836.18 to MSCP V Holdco.; $15,899,734.76 to HSBC I; $3,999,972.37 to HSBC II, $4,376,759.18 to Turbic; and $2,706,831.17 million to Begain.

207.     The 2012 Dividend was not made for any consideration.

208.     At the time the 2012 Dividend was made, (a) Tops was insolvent, (b) the 2012 Dividend rendered Tops insolvent, (c) the 2012 Dividend left Tops with unreasonably small capital; and (d) Tops believed that it would incur or intended to incur debts beyond Tops' ability to pay as they matured and became absolute.

209.     Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Tops exist who could avoid the 2012 Dividend under applicable non-bankruptcy law, including the IRS.

210.     The 2012 Dividend is avoidable as a constructively fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

### COUNT IV

**Avoidance of the 2013 Dividend as a Constructive Fraudulent Transfer
Against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain (11 U.S.C. §§ 544(b),
550(a)(1); NY DCL §§ 273-275)**

211.     Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

212.     The 2013 Dividend resulted in the transfer of $141.9 million to the Private Equity Investors, including $101,625,517.17 to MSCP V Holdco.; $22,564,835.13 to HSBC I; $5,676,743.57 to HSBC II, $7,096,174.53 to Turbic; and $4,388,668.79 to Begain.

213.     The 2013 Dividend was not made for any consideration.

214.    At the time the 2013 Dividend was made, (a) Tops was insolvent, (b) the 2013 Dividend rendered Tops insolvent, (c) the 2013 Dividend left Tops with unreasonably small capital; and (d) Tops believed that it would incur or intended to incur debts beyond Tops' ability to pay as they matured and became absolute.

215.    Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Tops exist who could avoid the 2013 Dividend under applicable non-bankruptcy law, including the IRS.

216.    The 2013 Dividend is avoidable as a constructively fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## COUNT V

**Avoidance of the 2009 Dividend as an Actual Fraudulent Transfer**
**Against MSCP V Holdco., HSBC I, HSBC II, and Turbic (11 U.S.C. §§ 544(b), 550(a)(1);**
**NY DCL § 276)**

217.    Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

218.    The 2009 Dividend resulted in the transfer of $105 million to the Private Equity Investors, including $78,435,000 to MSCP V Holdco.; $16,695,000 to HSBC I; $4,200,000 to HSBC II, and $5,250,000 to Turbic.

219.    Tops made the 2009 Dividend for the benefit of the Private Equity Investors, including MSCP V Holdco., HSBC, HSBC II, and Turbic.

220.    The 2009 Dividend was made with the actual intent to hinder, delay, and/or defraud Tops' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the 2009 Dividend.

221.    As a result of the 2009 Dividend, Tops and its creditors have been harmed.

222.    Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Tops exist who could avoid the 2009 Dividend under applicable non-bankruptcy law, including the IRS.

223.    The 2009 Dividend is avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## COUNT VI

### Avoidance of the 2010 Dividend as an Actual Fraudulent Transfer
### Against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276)

224.    Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

225.    The 2010 Dividend resulted in the transfer of $30 million to the Private Equity Investors, including $21,482,359 to MSCP V Holdco.; $4,769,942 to HSBC I; $1,199,970 to HSBC II, $1,050,029.40 to Turbic; and $649,396.30 to Begain.

226.    Tops made the 2010 Dividend for the benefit of the Private Equity Investors, including MSCP V Holdco., HSBC, HSBC II, Turbic, and Begain.

227.    The 2010 Dividend was made with the actual intent to hinder, delay, and/or defraud Tops' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the 2010 Dividend.

228.    As a result of the 2010 Dividend, Tops and its creditors have been harmed.

229.    Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Tops exist who could avoid the 2010 Dividend under applicable non-bankruptcy law, including the IRS.

230.    The 2010 Dividend is avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## COUNT VII

**Avoidance of the 2012 Dividend as an Actual Fraudulent Transfer
Against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain (11 U.S.C. §§ 544(b),
550(a)(1); NY DCL § 276)**

231.    Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

232.    The 2012 Dividend resulted in the transfer of $100 million to the Private Equity Investors, including $71,607,836.18 to MSCP V Holdco.; $15,899,734.76 to HSBC I; $3,999,972.37 to HSBC II, $4,376,759.18 to Turbic; and $2,706,831.17 million to Begain.

233.    Tops made the 2012 Dividend for the benefit of the Private Equity Investors, including MSCP V Holdco., HSBC, HSBC II, Turbic, and Begain.

234.    The 2012 Dividend was made with the actual intent to hinder, delay, and/or defraud Tops' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the 2012 Dividend.

235.    As a result of the 2012 Dividend, Tops and its creditors have been harmed.

236.    Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Tops exist who could avoid the 2012 Dividend under applicable non-bankruptcy law, including the IRS.

237.    The 2012 Dividend is avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## COUNT VIII

### Avoidance of the 2013 Dividend as an Actual Fraudulent Transfer
### Against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276)

238.     Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

239.     The 2013 Dividend resulted in the transfer of $141.9 million to the Private Equity Investors, including $101,625,517.17 to MSCP V Holdco.; $22,564,835.13 to HSBC I; $5,676,743.57 to HSBC II, $7,096,174.53 to Turbic; and $4,388,668.79 to Begain.

240.     Tops made the 2013 Dividend for the benefit of the Private Equity Investors, including MSCP V Holdco., HSBC, HSBC II, Turbic, and Begain.

241.     The 2013 Dividend was made with the actual intent to hinder, delay, and/or defraud Tops' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the 2013 Dividend.

242.     As a result of the 2013 Dividend, Tops and its creditors have been harmed.

243.     Under Section 544(b) of the Bankruptcy Code, the Trustee may avoid any transfer in the interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Tops exist who could avoid the 2013 Dividend under applicable non-bankruptcy law, including the IRS.

244.     The 2013 Dividend is avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## COUNT IX

### Recovery of the 2012 Illegal Dividend
### Against the Director Defendants (N.Y. Bus. & Corp. Law §§ 510, 719, and 720)

245.     Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

246.    The Tops' Board of Directors approved and directed payment of the 2012 Dividend.  The value of the 2012 Dividend was approximately $100 million.

247.    The 2012 Dividend was received by the Private Equity Investors, including MSCP V Holdco., HSBC, HSBC II, Turbic and Begain.

248.    At the time of the 2012 Dividend, Tops' liabilities exceeded its assets, so that Tops did not have any capital surplus.  Tops' net profits for 2011 or 2012 were insufficient to fund the 2012 Dividend.

249.    The Director Defendants are jointly and severally liable for the full amount of the 2012 Dividend, which was declared and paid while they were directors of Tops.  None of the identified directors dissented from the 2012 Dividend.

250.    Under N.Y. Bus. & Corp. § 720, a bankruptcy trustee may bring an action for relief pursuant to N.Y. Bus. & Corp. § 719(a).

## COUNT X

**Recovery of the 2013 Illegal Dividend**
**Against the Director Defendants (N.Y. Bus. & Corp. Law §§ 510, 719, and 720)**

251.    Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

252.    The Tops' Board of Directors approved and directed payment of the 2013 Dividend.  The value of the 2013 Dividend was approximately $142 million.

253.    The 2013 Dividend was received by the Private Equity Investors, including MSCP V Holdco., HSBC, HSBC II, Turbic, and Begain

254.    At the time of the 2013 Dividend, Tops' liabilities exceeded its assets, so that Tops did not have any capital surplus.  Tops' net profits for 2012 or 2013 were insufficient to fund the 2013 Dividend.

255. The Director Defendants are jointly and severally liable for the full amount of the 2013 Dividend, which was declared and paid while they were directors of Tops. None of the identified directors dissented from the 2013 Dividend.

256. Under N.Y. Bus. & Corp. § 720, a bankruptcy trustee may bring an action for relief pursuant to N.Y. Bus. & Corp. § 719(a).

## COUNT XI

**Breach of Fiduciary Duty Against the Director Defendants (N.Y. Bus. Corp. Law § 717 and New York Common Law)**

257. Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

258. The Director Defendants owed a fiduciary duty to Tops as Directors. Gary Matthews owed a fiduciary duty to Tops as Director and Chairman of the Board. These fiduciary duties included the duties of care and loyalty.

259. These duties required the Director Defendants to at all times perform their duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate their own personal interests to the interests of Tops.

260. The Director Defendants breached their fiduciary duties, including by, without limitation:

a. Approving the 2012 Dividend when they were aware Tops was insolvent, would be rendered insolvent, would be left with reasonably small capital, and in doing so believed that it would incur or intended to incur debts beyond Tops' ability to pay as they matured.

b. Approving and not dissenting from the 2013 Dividend when they were aware Tops was insolvent, would be rendered insolvent, would be left with reasonably

small capital, and in doing so believed that it would incur or intended to incur debts beyond Tops' ability to pay as they matured.

c.  Approving the 2012 Dividend while relying on the D&P Capital Surplus Analysis they knew was critically flawed;

d.  Approving and not dissenting from the 2013 Dividend while relying on the HL Capital Surplus Analysis they knew was critically flawed;

e.  Accumulating debt for the sole purpose of issuing dividends;

f.  Accruing hundreds of millions in debt and Pension Plan liabilities without an adequate plan to address those liabilities; and

g.  Reducing Tops' capital expenditures to levels insufficient to maintain or grow the Company.

261.    The Director Defendants intentionally disregarded their fiduciary obligations in engaging in the above-described conduct.

262.    The Director Defendants did not exercise independent or honest judgment in undertaking the above-described conduct.

263.    As a result of these breaches, the Director Defendants received monetary and other benefits at the expense of Tops and its creditors.

264.    As a direct and proximate result of these breaches, Tops and its creditors were injured.  The Director Defendants are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

## COUNT XII

**Aiding and Abetting the Breach of Fiduciary Duty Against MSIM (New York Common Law)**

265.    Plaintiff re-alleges paragraphs 1 through 192 above as if fully set forth herein.

266. The Director Defendants owed a fiduciary duty to Tops as Directors. Gary Matthews owed a fiduciary duty to Tops as Director and Chairman of the Board. These fiduciary duties included the duties of care and loyalty.

267. These duties required the Director Defendants to at all times perform their duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate their own personal interests to the interests of Tops. MSIM was aware the Director Defendants owed these fiduciary duties to Tops.

268. At all times, MSIM controlled Tops through its control of Tops' board of directors. MSIM controlled the Director Defendants through (i) its employment of three of the Director Defendants; (ii) its ability to replace any director that did not adhere with MSIM's demands; and (iii) offering financial incentives to the Director Defendants in exchange for pursuing courses of action in breach of their fiduciary duties.

269. MSIM knew of the Director Defendants' breaches of fiduciary duties to Tops and provided substantial assistance to those breaches.

270. MSIM's substantial assistance and/or encouragement of the wrongdoing by the Director Defendants included, without limitation, (i) arranging and directing the creation of a flawed capital surplus analysis in connection with the 2012 Dividend; (ii) arranging and directing the creation of a flawed capital surplus analysis in connection with the 2013 Dividend; (iii) arranging and directing the accumulation of debt for the purpose of issuing the 2012 and 2013 Dividends; (iv) orchestrating the reduction of capital expenditures to unsustainably low levels; and (v) orchestrating the accrual of hundreds of millions in debt, on top of growing Pension Plan liabilities, without an adequate plan to address any of those liabilities.

271. Tops and its creditors suffered damages as a result of MSIM's aiding and abetting of such breaches of fiduciary duties.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests the Court to enter a judgment and grant the following relief:

      a.      A judgment against MSCP V Holdco., HSBC I, HSBC II, and Turbic finding and declaring that the 2009 Dividend constitutes an actual and constructive fraudulent transfer;

      b.      A judgment against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain finding and declaring that the 2010 Dividend constitutes an actual and constructive fraudulent transfer;

      c.      A judgment against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain finding and declaring that the 2012 Dividend constitutes an actual and constructive fraudulent transfer;

      d.      A judgment against MSCP V Holdco., HSBC I, HSBC II, Turbic, and Begain finding and declaring that the 2013 Dividend constitutes an actual and constructive fraudulent transfer;

      e.      Avoidance of the fraudulent transfers;

      f.      Recovery of the property fraudulently transferred, or compensatory damages in an amount to be determined at trial for the fair value thereof, from the direct transferees;

      g.      A judgment against the Director Defendants finding and declaring that the 2012 Dividend was an illegal dividend;

      h.      A judgment against the Director Defendants finding and declaring that the 2013 Dividend was an illegal dividend;

      i.      Compensatory damages in an amount to be determined at trial from the Director Defendants for the full amount of the illegal 2012 and 2013 Dividends approved under their tenure as directors;

      j.      Compensatory damages in an amount to be determined at trial from the Private Equity Investors for the amounts of the 2009, 2010, 2012, and 2013 Dividend that each received;

k.     A judgment against the Director Defendants finding and declaring that the Director Defendants breached their fiduciary duties;

l.     Compensatory and consequential damages in an amount to be determined at trial from the Director Defendants for their breaches of their fiduciary duties;

m.     Disgorgement from the Director Defendants of their ill-gotten gains from their breaches of their fiduciary duties;

n.     A judgment against MSIM finding and declaring that it aided and abetted the Director Defendants' breach of their fiduciary duties;

o.     Compensatory and consequential damages in an amount to be determined at trial from Morgan Stanley for its aiding and abetting the Director Defendants' breaches of their fiduciary duties;

p.     Prejudgment interest;

q.     Reasonable attorneys' fees, costs, and expenses incurred in this action; and

r.     Any other and further relief as the Court deems just, proper, or equitable under the circumstances.

## **Jury Trial Demand**

Plaintiffs demand a jury trial on all issues so triable.


Dated:  New York, New York
         February 12, 2020

McKool Smith, P.C.

By: */s/ Kyle A. Lonergan*
Kyle A. Lonergan
(klonergan@mckoolsmith.com)
James H. Smith
(jsmith@mckoolsmith.com)
One Manhattan West, 50th Floor
395 9th Avenue
New York, NY 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Mike McKool
(mmckool@mckoolsmith.com)
Lewis T. LeClair
(lleclair@mckoolsmith.com)
300 Crescent Court, Suite 1500
Dallas, TX 75021
Telephone: (212) 402-9400
Facsimile: (212) 402-9444