Pamela A. Miller
Peter Friedman (admitted *pro hac vice*)
Daniel S. Shamah
Patrick D. McKegney
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: pmiller@omm.com
         pfriedman@omm.com
         dshamah@omm.com
         pmckegney@omm.com

*Attorneys for Defendants Morgan Stanley Investment Management, Inc., Morgan Stanley Capital Partners V U.S. Holdco LLC, Gary Matthews, Eric Kanter, and Eric Fr*y

**Objection Deadline: July 17, 2020**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>TOPS HOLDING II CORPORATION, *et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 18-22279 (RDD)<br>(Jointly Administered) |
| ALAN D. HALPERIN, AS THE LITIGATION TRUSTEE FOR THE TOPS HOLDING LITIGATION TRUST,<br><br>        Plaintiff,<br><br>        v.<br><br>MORGAN STANLEY INVESTMENT MANAGEMENT, INC., *et al.*,<br><br>        Defendants. | Adv. Proc. No. 20-08950<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 6

    A.    MSCP V Holdco's Investment in Tops ................................................ 6

    B.    Tops Issues Notes and Shares and Pays Dividends to Shareholders ......... 7

    C.    Tops' Pension Obligations .......................................................... 9

        1.    *Multiemployer Plans and "Critical Status"* ................................. 9

        2.    *Withdrawal Liability* ............................................................ 11

        3.    *Tops' Contributions to Its Pension Plans* ................................... 11

    D.    2013 Sale of the Company to Management ........................................... 12

    E.    Tops Continues Operating After the Management Buy-Out .................. 13

    F.    The Decline of the Retail Grocery Industry and Tops' Subsequent
        Bankruptcy .......................................................................... 14

ARGUMENT ...................................................................................................... 15

    I.    The Court Should Dismiss All of the Claims as Implausible. ............................. 15

    A.    Each of the Trustee's claims fails based on the Complaint's
        implausible insolvency theory. ................................................. 15

    B.    The Complaint does not allege necessary details regarding Tops'
        financial health. ................................................................... 19

    C.    The Trustee's conclusory allegations ignore the Company's
        successful operations between 2007 and 2017. ............................... 19

    D.    The Trustee's conclusion that Tops' pension obligations rendered
        it insolvent for nearly a decade is erroneous and implausible. ............... 24

        1.    The Trustee has not adequately alleged that Tops'
            contingent withdrawal liabilities were "probable" liabilities
            under New York law. ...................................................... 24

        2.    The Trustee ignores Tops' continued ability to pay any
            periodic withdrawal liability. .......................................... 26

        3.    The Pension Plans' funding level does not equate to Tops'
            financial strength. ......................................................... 27

    E.    The December 2013 management buy-out undercuts the
        plausibility of the Trustee's claims. ........................................... 28

    F.    The Company operated outside of bankruptcy for more than four
        years after the management buy-out. ........................................... 29

## TABLE OF CONTENTS
(continued)

Page

G.    The retail grocery industry has suffered dramatic challenges since MSCP V Holdco divested its interests in Tops ........................................ 30

H.    The Trustee's alleged "badges of fraud" do not adequately plead fraudulent intent. .................................................................................. 31

II.    The Court Should Dismiss the Trustee's Fraudulent Transfer Claims Against MSCP V Holdco (Counts I–VIII) and the Illegal Dividend Claims (Counts IX and X) Against the Directors. ........................................................ 35

A.    The Trustee's claims to avoid the 2009 and 2010 Dividends as fraudulent transfers (Counts I, II, V, and VI) are time-barred. ................ 35

B.    The Trustee cannot rely on the IRS as a "golden" or "triggering" creditor to avoid New York's six-year statute of limitations .................. 35

    1.    The Trustee is not entitled to cloak himself in immunity available only to the federal government. .................................... 36

    2.    The Trustee has not adequately alleged the IRS could bring fraudulent transfer claims based on the 2009 and 2010 Dividends. .................................................................................... 41

C.    The Trustee's fraudulent transfer claims for the 2009, 2012, and 2013 Dividends (Counts I, III, IV, V, VII, and VIII) and illegal dividend claims (Counts IX and X) are barred under Bankruptcy Code section 546(e). ................................................................................ 42

    1.    The Safe Harbor Dividends were "transfers in connection with a securities contract." .......................................................... 43

    2.    The Safe Harbor Dividends were transfers made by and to a "financial institution." ................................................................. 44

    3.    The New York illegal dividend claims are likewise barred by section 546(e). ......................................................................... 46

III.    The Court Should Dismiss the Illegal Dividend Claims and Fiduciary Duty Claims against Matthews, Kanter, and Fry (Counts IX–XI), and the Aiding and Abetting Breach of Fiduciary Duty Claims Against MSIM (Count XII) ........................................................................................................... 46

A.    The fiduciary duty and illegal dividend claims (Counts IX to XII) are time-barred. ..................................................................................... 46

    1.    The illegal dividend claims are time-barred under New York law (Counts IX and X) ........................................................ 47

    2.    The fiduciary duty and aiding and abetting claims are time-barred.  (Counts XI and XII) ....................................................... 47

# TABLE OF CONTENTS
(continued)

**Page**

    B.    The Trustee lacks standing to bring the fiduciary duty and aiding and abetting breach of fiduciary duty claims (Counts XI and XII). ........ 51

    C.    The Trustee fails to adequately plead an aiding and abetting claim (Count XII) .............................................................................................. 53

IV.    The Complaint Should be Dismissed with Prejudice Because Any Effort to Replead Would Be Futile. .................................................................................. 53

CONCLUSION ............................................................................................................. 55

APPENDIX A ............................................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
   599 B.R. 730 (Bankr. S.D.N.Y. 2019) ...................................................................... 6

*Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I)*,
   365 B.R. 293 (Bankr. D.D.C. 2006).......................................................................... 40

*Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*,
   2006 WL 278138 (S.D.N.Y. Feb. 2, 2006) .......................................................... 48, 49

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
   842 F. Supp. 2d 1216 (C.D. Cal. 2012)...................................................................... 34

*AP Servs. v. Silva*,
   483 B.R. 63 (S.D.N.Y. 2012) ..................................................................................... 46

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009). ...................................................................................... 15, 29, 53

*Baldi v. Samuel Son & Co. Ltd.*,
   548 F.3d 579 (7th Cir. 2008)...................................................................................... 25

*BBS Norwalk One, Inc. v. Raccolta, Inc.*,
   60 F. Supp. 2d 123 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000) .............. 49

*Beauvoir v. Israel*,
   794 F.3d 244 (2d Cir. 2015) ................................................................................. 22, 29

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 15, 53

*Bernstein v. Crazy Eddie, Inc.*,
   702 F. Supp. 962 (E.D.N.Y. 1988) *vacated in part on other grounds sub nom. In re
   Crazy Eddie Sec. Litig.*, 714 F. Supp. 1285 (E.D.N.Y. 1989).................................... 48

*Brandon v. Musoff*,
   2012 WL 135592 (S.D.N.Y. Jan. 17, 2012)............................................................... 54

*Buckley v. Deloitte & Touche USA LLP*,
   2007 WL 1491403 (S.D.N.Y. May 22, 2007);........................................................... 49

*Butner v. United States*,
   440 U.S. 48 (1979) ..................................................................................................... 38

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chase Nat. Bank of City of N.Y. v. U.S. Trust Co. of N.Y.*,
 260 N.Y.S. 40 (N.Y. App. Div. 1932) .................................................................. 25

*Clark v. Nevis Capital Mgmt., LLC*,
 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ......................................................... 48

*Contemporary Indus. Corporation v. Frost*,
 564 F.3d 981 (8th Cir. 2009) *abrogated on other grounds by Merit Mgmt. Grp., LP v.
 FTI Consulting*, 138 S. Ct. 883 L.Ed.2d 183 (2018) ........................................ 46

*Covey v. Commercial Nat. Bank of Peoria*,
 960 F.2d 657 (7th Cir. 1992) .............................................................................. 26

*CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73*,
 162 F.3d 405 (6th Cir. 1998) .............................................................................. 25

*Crescent Res. Litig. Tr. v. Duke Energy Corp.*,
 500 B.R. 464 (W.D. Tex. 2013) ......................................................................... 44

*Daley v. Chang (In re Joy Discovery Corp.)*,
 286 B.R. 54 (Bankr. N.D. Ill. 2002) ................................................................... 31

*Dole v. Local 427, IUE*,
 894 F.2d 607 (3d Cir. 1990) ............................................................................... 37

*Glob. Fin. Corp. v. Triarc Corp.*,
 93 N.Y.2d 525 (1999) ......................................................................................... 51

*Gluck v. Amicor Inc.*,
 487 F.Supp. 608 (S.D.N.Y. 1980) ................................................................. 50, 51

*Gordon & Co. v. Ross*,
 63 F. Supp. 2d 405 (S.D.N.Y. 1999) .................................................................. 51

*Gordon v. Credno*,
 960 N.Y.S.2d 360 (N.Y. App. Div. 2013) .......................................................... 50

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*,
 452 B.R. 391 (Bankr. S.D.N.Y. 2011) ............................................................... 16

*Griffith v. United States (In re Griffith)*,
 206 F.3d 1389 (11th Cir. 2000) .......................................................................... 39

*H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*,
 171 F. Supp. 2d 135 (S.D.N.Y. 2001) ................................................................ 48

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Hayden v. Cty. of Nassau,*
  180 F.3d 42 (2d Cir. 1999) ....................................................................................... 54

*IKB Int'l S.A. v. Bank of Am.,*
  2014 WL 1377801 (S.D.N.Y. Mar. 31, 2014), *aff'd sub nom.* 584 F. App'x 26 (2d Cir.
  2014) ......................................................................................................................... 50

*In re Dean Witter P'ship Litig.,*
  1998 WL 442456 (Del. Ch. July 17, 1998) *aff'd,* 725 A.2d 441 (Del. 1999) ........................ 48

*In re Essendant, Inc. Stockholder Litig.,*
  2019 WL 7290944 (Del. Ch. Dec. 30, 2019) .............................................................. 53

*In re Kaiser,*
  525 B.R. 697 (Bankr. N.D. Ill. 2014) ...................................................................... 40

*In re Kipnis,*
  555 B.R. 877 (Bankr. S.D. Fla. 2016) ...................................................................... 40

*In re Navidea Biopharms. Litig.,*
  2019 WL 7187111 (S.D.N.Y. Dec. 26, 2019) ............................................................ 48

*In re Refco, Inc. Sec. Litig.,*
  2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) ........................................................... 34

*In re Rose,*
  318 B.R. 771(Bankr. S.D.N.Y. 2004) ...................................................................... 38

*In re Tribune Co. Fraudulent Conveyance Litig.,*
  2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019) ...................................................... 6, 54

*In re Tribune Co. Fraudulent Conveyance Litig.,*
  946 F.3d 66 (2d Cir. 2019), *pet. for rehearing or rehearing en banc denied,* ECF No.
  13-3992 (2d Cir. Feb. 6, 2020) ................................................................... 44, 45, 46

*In re Tropicana Entm't, LLC,*
  520 B.R. 455 (Bankr. D. Del. 2014) ........................................................................ 52

*In re Truong,*
  285 F. App'x 837 (3d Cir. 2008) ............................................................................. 38

*In re United Merchants & Mfrs., Inc.,*
  166 B.R. 234 (Bankr. D. Del. 1994) ........................................................................ 25

*In re Worldcom, Inc.,*
  323 B.R. 844 (Bankr. S.D.N.Y. 2005) ...................................................................... 52

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Xonics Photochemical Inc.*,
  841 F.2d 198 (7th Cir. 1988) ................................................................................. 26

*In re Yahweh Center, Inc.*,
  No. 16-bk-04306-5 (E.D.N.C. Sept. 24, 2018) ...................................................... 40

*Interventure 77 Hudson LLC v. Falcon Real Estate Inv. Co., LP*,
  101 N.Y.S.3d 326 (N.Y. App. Div. 2019) ............................................................. 51

*Interventure 77 Hudson LLC v. Halengren*,
  2018 WL 2234878 (N.Y. Sup. Ct. May 16, 2018) ................................................. 49

*Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*,
  2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018), *reconsideration denied*, 2019 WL
  549380 (S.D.N.Y. Feb. 12, 2019) .................................................................. 17, 18, 52

*Kittery Point Partners, LLC v. Bayview Loan Servicing LLC (In re Kittery Point
  Partners, LLC)*,
  2018 WL 1613573 (Bankr. D. Me. Mar. 12, 2018) ............................................... 42

*L–7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011) ................................................................................... 16

*Liquidation Tr. v. Daimler AG (In re Old CarCo LLC)*,
  435 B.R. 169 (Bankr. S.D.N.Y. 2010) ................................................................... 32

*Liquidation Tr. v. Daimler AG (In re Old CarCo, LLC)*,
  454 B.R. 38 (Bankr. S.D.N.Y. 2011), *aff'd* 2011 WL 5865193 (S.D.N.Y. Nov. 22,
  2011), *aff'd sub nom.* 509 F. App'x 77 (2d Cir. 2013) ................................... 23, 24, 28

*Luria v. Thunderflower LLC (In re Taylor, Bean & Whitaker Mortg. Corp.)*,
  2018 WL 6721987 (Bankr. M.D. Fla. Sept. 28, 2018) ........................................... 42

*Malone v. Brincat*,
  722 A.2d 5 (Del. 1998) ........................................................................................... 49

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ..................................................................................... 53

*Marshall v. Intermountain Elec. Co.*,
  614 F.2d 260 (10th Cir. 1980) ................................................................................ 37

*McCloskey & Co. v. Wright*,
  363 F. Supp. 223 (E.D. Va. 1973) .......................................................................... 37

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Mendelsohn v. Kovalchuk (In re APCO Merch. Servs., Inc.),*
    585 B.R. 306 (Bankr. E.D.N.Y. 2018) ............................................ 35

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,*
    910 F. Supp. 913 (S.D.N.Y. 1995) .................................................. 31

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,*
    930 A.2d 92 (Del. 2007) .................................................................. 52

*New York State Teamsters Conference Pension & Retirement Fund v. United Parcel*
    *Service, Inc.,*
    382 F.3d 272 (2d Cir. 2004) .............................................................. 9

*O'Toole v. Karnani (In re Trinsum Grp., Inc.),*
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) .................................. 19, 20, 31

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman,*
    277 B.R. 20 (S.D.N.Y. 2002) .......................................................... 50

*Official Comm. of Unsecured Cred. of Quebecor World (USA) Inc. v. Am. United Life*
    *Ins. Co. (In re Quebecor World (USA) Inc.),*
    719 F.3d 94 (2d Cir. 2013) *abrogated on other grounds by Merit Mgmt. Grp., LP v.*
    *FTI Consulting,* 138 S. Ct. 883 L.Ed.2d 183 (2018) ..................... 43

*Picard v. Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC),*
    773 F.3d 411 (2d Cir. 2014) ...................................................... 35, 43

*Picard v. Taylor (In re Park S. Sec., LLC),*
    326 B.R. 505 (Bankr. S.D.N.Y. 2005) ............................................ 32

*Portfolio Recovery Assocs. v. King,*
    14 N.Y.3d 410 (2010) ...................................................................... 50

*Potomac LLC v. Motorola, Inc. (In re Iridium Operating LLC),*
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ............................................ 23

*Potter v. Arrington,*
    810 N.Y.S.2d 312 (N.Y. Sup. Ct. 2006) ......................................... 50

*Purves v. ICM Artists, Ltd.,*
    119 B.R. 407 (S.D.N.Y. 1990) ........................................................ 47

*Putkowski v. Warwick Valley Cent. Sch. Dist.,*
    363 F. Supp. 2d 649 (S.D.N.Y. 2005) ............................................. 54

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Sama v. Mullaney (In re Wonderwork, Inc.),*
    611 B.R. 169 (Bankr. S.D.N.Y. 2020) ...................................................... 26

*Schmidt v. Stone,*
    2018 WL 4522082 (E.D.N.Y. Jan. 29, 2018) ........................................... 47

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),*
    403 F.3d 43 (2d Cir. 2005) ..................................................................... 32

*Shelly v. Doe,*
    660 N.Y.S.2d 937 (N.Y. Sup. Ct. 1997), *aff'd as modified,* 671 N.Y.S.2d 803 (1998) ........... 25

*Shelly v. Doe,*
    671 N.Y.S.2d 803 (N.Y. App. Div. 1998) ................................................ 25

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Tech., Ltd.),*
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...................................... 17, 32, 33, 34

*Sira v. Morton,*
    380 F.3d 57 (2d Cir. 2004) ....................................................................... 6

*Staten Island Sav. Bank v. Reddington,*
    260 A.D.2d 365 (N.Y. App. Div. 1999) ................................................... 25

*Stuart v. American Cynamid Co.,*
    158 F.3d 622 (2d Cir. 1998) ................................................................... 49

*Tese-Milner v. Edidin and Assoc. (In re Operations NY LLC),*
    490 B.R. 84 (Bankr. S.D.N.Y. 2013) ................................................. 16, 17

*Tese-Milner v. TPAC, LLC (In re Ticketplanet.com),*
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) ...................................................... 48

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),*
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) .................................................... 26

*U.S. Bank N.A. v. Verizon Commun'cns Inc.,*
    892 F. Supp. 2d 805 (N.D. Tex. 2012) ................................................... 46

*United States v. Beebe,*
    127 U.S. 338 (1888) ............................................................................... 37

*United States v. Dreier,*
    952 F. Supp. 2d 582 (S.D.N.Y. 2013) .................................................... 26

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Knight,*
   39 U.S. 301 (1840) ............................................................................................................... 37

*United States v. Rodgers*,
   461 U.S. 677 (1983) ............................................................................................................. 36

*United States v. Summerlin,*
   310 U.S. 414 (1940) ............................................................................................................. 36

*Verizon Directories Corp. v. Continuum Health Partners, Inc.*,
   902 N.Y.S.2d 343 (N.Y. App. Div. 2010) ............................................................................ 50

*VFB LLC v. Campbell Soup Co.*,
   2005 WL 2234606 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007) .................... 23

*Wagner v. Ultima Holmes, Inc. (In re Vaughan Co.)*,
   498 B.R. 297 (Bankr. D.N.M. 2013) ........................................................................ 36, 38, 40

*Williams v. Infra Commerc Anstalt*,
   131 F. Supp. 2d 451 (S.D.N.Y. 2001) .................................................................................. 51

**Statutes**

11 U.S.C. § 101(22)(A) ............................................................................................................ 44

11 U.S.C. § 101(49)(A) ............................................................................................................ 43

11 U.S.C. § 544(b)(1) .............................................................................................................. 35

11 U.S.C. § 546(e) ................................................................................................................... 42

11 U.S.C. § 548 ....................................................................................................................... 39

11 U.S.C. § 741(7)(A)(i), (vii) ................................................................................................. 43

11 U.S.C. § 108(a) ................................................................................................................... 47

26 U.S.C. § 6502 ..................................................................................................................... 41

29 U.S.C. § 1085 ..................................................................................................................... 10

29 U.S.C. § 1103(a) ................................................................................................................. 10

29 U.S.C. § 1301(a)(3) ............................................................................................................... 9

29 U.S.C. § 1381(a) ................................................................................................................. 11

# TABLE OF AUTHORITIES
(continued)

Page(s)

29 U.S.C. § 1383(a) ................................................................................................ 11

29 U.S.C. § 1399(c) ................................................................................ 11, 26, 27

D.C.L. § 271(1) ................................................................................................ 16, 24

D.C.L. § 273 ............................................................................................................ 16

D.C.L. § 274 ...................................................................................................... 16, 17

D.C.L. § 275 ............................................................................................................ 16

D.C.L. § 276 ............................................................................................................ 17

Del. Code Ann. tit.10, § 8106 ............................................................................... 48

N.Y. Bus. & Corp. Law § 510 ............................................................................... 17

## Other Authorities

*Critical, Critical and Declining, Endangered and WRERA Status Notices*, Dept. of Labor
    (last visited May 3, 2020), https://www.dol.gov/agencies/ebsa/about-ebsa/our-
    activities/public-disclosure/critical-status-notices .................................................. 27

*DPH Holdings Corp., et al,* Case No. 05-44481, List of Creditors (*available at*
    https://ecf.nysb.uscourts.gov/cgi-bin/login.pl) ............................................................ 38

H.R. Doc. No. 137, 93rd Cong., 1st Sess. (1973) .......................................................... 38

Internal Revenue Service, Proof of Claim 1039 (Form 410) (Sept. 19, 2018) (*available at*
    https://dm.epiq11.com/case/top/claims) ............................................................... 37, 41

Internal Revenue Service, Proof of Claim 1040 (Form 410) (Sept. 19, 2018) (*available at*
    https://dm.epiq11.com/case/top/claims) ............................................................... 37, 41

Internal Revenue Service, Proof of Claim 348 (Form 410) (Jun. 27, 2018) (*available at*
    https://dm.epiq11.com/case/top/claims) ............................................................... 37, 41

N.Y. Legis. 580 § 7 (2019) ........................................................................................... 16

*National Banks Active as of 4/30/2020*, Office of Comptroller of the Currency, U.S.
    Department of the Treasury, https://www.occ.treas.gov/topics/charters-and-
    licensing/financial-institution-lists/national-by-name.pdf (last visited May 11, 2020) ............ 45

*Rehabilitation Plan for the New York State Teamsters Conference Pension and
    Retirement Fund*, N.Y. State Teamsters Conf. Pension and Retirement Fund (June 1,

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

2012),
https://www.nystpensionfund.org/forms-publications, ............................................................ 10

*Sears Holdings Corporation,* Case No. 18-23538, List of Creditors (*available at*
https://ecf.nysb.uscourts.gov/cgi-bin/login.pl) ............................................................ 38

*The Great Atlantic & Pacific Tea Company, Inc.,* Case No. 15-23007, Claims Listing
(*available at* https://cases.primeclerk.com/aptea/Home-ClaimInfo) ...................................... 38

*Windstream Holdings, Inc.,* Case No. 19-22312, Claims Listing (*available at*
http://www.kccllc.net/windstream/creditor/cdb/24661119/ ...................................................... 38

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................. 17

N.Y. C.P.L.R. § 202 ...................................................................................................... 48, 49

N.Y. C.P.L.R. § 213 ......................................................................................................... 3, 35

N.Y. C.P.L.R. § 214(2) .................................................................................................... 4, 47

Defendants Morgan Stanley Investment Management Inc. ("MSIM"), Morgan Stanley

Capital Partners V U.S. Holdco LLC ("MSCP V Holdco," and together with MSIM, the "MS

Defendants"), Gary Matthews, Eric Kanter, and Eric Fry (the "Directors") respectfully submit

this memorandum of law in support of their motion to dismiss the Complaint for failure to state a

claim on which relief can be granted under Federal Rule of Bankruptcy Procedure 7012 and

Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT[2]

The Trustee's transparent attempt to find a scapegoat for Tops' bankruptcy—rather than

acknowledge that widespread disruptions sweeping the grocery industry forced the company's

hand—is both legally defective and logically unsound.  Despite having access to thousands of

pages of documents from both Tops and the MS Defendants over the past year and a half, the

Trustee waited until the eleventh hour to launch a complaint alleging that Tops "was crippled by

a series of massive, illegal dividends" between 2009 and 2013.  Relying on unsupported rhetoric

and ignoring facts central to his pleadings, the Trustee seeks to claw back nearly $376 million

from a group of defendants who ended their relationship with Tops more than four years before it

filed for bankruptcy.

The Complaint's story—that Tops was insolvent for nearly a decade even as

sophisticated investors and lenders believed it was adequately capitalized and paying its debts in

---

[1] To consolidate briefing, defendants HSBC Equity Partners USA, L.P. ("HSBC I"), HSBC Private Equity Partners II USA LP ("HSBC II"), Turbic Inc. ("Turbic"), Begain Company Limited ("Begain"), Greg Josefowicz, and Stacey Rauch have filed separate motions joining in this Motion to Dismiss and incorporating arguments that are relevant to claims also brought against them.  Appendix A identifies the relevant claims and arguments for each defendant.

[2] Capitalized terms not defined in this brief have the meanings used in the Complaint (ECF No. 1). References to "Tops" or the "Company" include Tops Holding II Corporation and its affiliated debtors, including Tops MBO Corporation and Tops Holding Corporation, among others.

due course—rests on a wildly implausible theory of insolvency.  The Complaint ignores that Tops operated 174 stores, employed approximately 14,000 people, and accessed the capital markets repeatedly both before and after MSCP V Holdco sold its shares to Tops' management in 2013.  It omits the fact that Tops' current management made solvency representations to lenders and issued dividends to themselves *after* the 2013 sale that ended the defendants' involvement with Tops.  It avoids any discussion of the profound grocery industry changes that forced numerous major grocery chains into bankruptcy from 2016–2018.  And the Complaint anchors its insolvency allegations on a fundamental misunderstanding of Tops' pension obligations, seeking to convert the "critical status" of the pension plans for Tops' workers into actual insolvency for Tops.  Tops and the pension plans are distinct entities that cannot be collapsed into one.  Moreover, the Trustee's theory is undone by his admission that Tops fulfilled all of its obligations to the plans in the nearly nine years between the first dividend at issue here and Tops' bankruptcy filing.  The Complaint should be dismissed with prejudice for several independent reasons.

 ***The claims are implausible.***  On its face, the Complaint fails to satisfy Rule 8's requirement that it allege facts giving rise to a *plausible* inference of actionable claims.  The Complaint is remarkable for what it does not say:

- The Complaint does not allege that Tops (or its shareholders) maintained multiple sets of books, or that Tops or any defendant omitted from public disclosures the potential pension liabilities that allegedly rendered Tops insolvent;

- The Complaint does not credibly allege that lenders funding dividends during the height of the Great Recession were duped into buying Tops' notes or induced into making investment decisions based on false information;

- The Complaint offers no explanation for why Tops' management—which had unfettered visibility into Tops' financial condition—would buy the Company for $21 million (including more than $4 million of their own money) when it was purportedly insolvent, weighed down by unserviceable debt and unmanageable pension liabilities;

- The Complaint does not explain how Tops survived between December 2013 (the management buy-out) and February 2018 (the bankruptcy filing). The Complaint also ignores that during those same years, Tops (i) refinanced the vast majority of the debt that was incurred in connection with the challenged dividends, (ii) twice issued shareholder dividends (in 2014 and 2016), and (iii) represented that it was solvent when it entered into a secured ABL facility in December 2016;

- The Complaint ignores that after management acquired Tops, the grocery industry underwent a profound transformation. In other filings with this Court, Tops has stated that industry changes led to its inevitable decline; and

- The Complaint does not allege that Tops failed to make required pension contributions or otherwise breached its obligations under its collective bargaining agreement. Nor does the Trustee allege that Tops actually incurred withdrawal liability at the time it issued the challenged dividends. The Complaint *admits* that Tops met its ongoing obligations to the pension plans, including the additional contribution payments that actually resulted from the plans' "critical status," and lacks any plausible basis for inferring that Tops was required to treat the wholly contingent future obligations to the plans as liabilities that purportedly made Tops insolvent in 2009, 2010, 2012, or 2013.

These pleading failures show that the Complaint has not, and cannot, meet the well-settled pleading standards for plausibility under *Iqbal* and *Twombly*.

Moreover, the fraudulent transfer and illegal dividend claims are each legally deficient for various additional reasons.

***The Trustee cannot assume the IRS's powers.*** Counts I, II, V, and VI (fraudulent transfer claims for the 2009 and 2010 dividends) are barred by New York's six-year statute of limitations. N.Y. C.P.L.R. § 213. The Trustee seeks to rely on a novel legal theory to evade that limitations period, contending that he can step into the shoes of the Internal Revenue Service and assert the "*nullum tempus*" doctrine to pursue claims going back nearly a decade. This theory is inconsistent with the plain language and structure of Bankruptcy Code sections 544(b) and 548, the Internal Revenue Code, and the underpinnings of the *nullum tempus* doctrine itself, which relies on the government's unique role as a sovereign (a status the Trustee cannot assume for

-3-

himself).  It is unsurprising that the U.S. government rejected a trustee's use of the *nullum tempus* doctrine in a fraudulent transfer case, as has the best-reasoned case to address the issue.

 ***Section 546(e)'s safe harbor offers a complete defense.***  Counts I, III, IV, V, VII, and VIII—fraudulent transfer claims for the 2009, 2012, and 2013 dividends—and the related illegal dividend claims for the 2012 and 2013 dividends in Counts IX and X should be dismissed under Bankruptcy Code section 546(e).  Each of those dividends was financed with the proceeds of notes Tops issued to the public markets.  Therefore, the dividends were "transfers made in connection with a securities contract."  Under the Second Circuit's recent decision in *Tribune*, both Tops and MSCP V Holdco were "financial institutions," because they were customers of nationally registered banks that acted as their agents for the notes offerings and dividends.  As a consequence, those dividends cannot be challenged as fraudulent transfers.  In addition, the 546(e) safe harbor is a complete defense to the Trustee's state-law illegal dividend claims (Counts IX and X) for those specific transactions.

 ***The claims are time-barred.***  The illegal dividend, fiduciary duty, and aiding and abetting claims (all of which relate exclusively to the 2012 and 2013 dividends) are each subject to a three-year statute of limitations, and thus are time-barred.  Counts IX and X asserting illegal dividends are alleged to arise under New York law, which applies a three-year limitations period, and they therefore must be dismissed.  N.Y. C.P.L.R. § 214(2).  And the fiduciary duty and aiding and abetting claims (Counts XI and XII) are time-barred under Delaware's three-year statute of limitations, whether the Court looks to Delaware law under the internal affairs doctrine or applies New York's borrowing statute.

 ***The Trustee lacks standing.***  Even if the Trustee's fiduciary duty claims were timely, the Trustee would lack standing to bring them.  Creditors have standing to bring breach of fiduciary

duty claims against a corporation's directors only if the corporation is insolvent or if the directors' alleged breaches caused a corporation's insolvency. Since the Trustee fails to plausibly allege that Tops was insolvent during the period that Tops' directors allegedly breached their fiduciary duties, or that their conduct caused Tops to become insolvent, he lacks standing to bring both his breach of fiduciary duty claim and aiding and abetting breach of fiduciary duty claim.

**_Amendment would be futile._** Finally, the Court should deny the Trustee leave to amend. Any amendment would be futile, because no facts could (i) overcome indisputable, judicially noticeable facts about Tops' history in the lead-up to its bankruptcy; (ii) sever the connection between the dividends and the notes that Tops issued to finance them; or (iii) resurrect time-barred claims. The Complaint is the result of thousands of documents from both Tops and the MS Defendants, and millions of dollars of Tops' money.[3] If the Trustee's story had any merit, he would have alleged additional facts to support it in the Complaint.

For these reasons, and as explained in greater detail below, the Court should dismiss the Complaint with prejudice.

---

[3] _See_ Second Interim and Final Fee Appl. of Morrison & Foerster LLP (ECF No. 814) at 19–22 (describing Creditors' Committee's counsel's fee application, seeking more than $2.5 million in legal fees for over 2,000 hours of time spent reviewing approximately 14,000 pages of documents obtained during the investigation, and "extensive" preparation for interview of Company's former Chief Financial Officer (among other activities), and over 1,000 hours spent analyzing estate claims against the MS Defendants). _See also_ Order Granting Final and Interim Applications for Allowance of Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred (ECF No. 868) at Schedule A (approving Creditors' Committee's counsel's requested fees).

## STATEMENT OF FACTS[4]

### A.    MSCP V Holdco's Investment in Tops

In December 2007, various entities including MSCP V Holdco acquired Tops and its subsidiaries for over $300 million. (Compl. ¶ 2.) This group[5] paid $100 million in cash and financed the remainder through debt issued by Tops. (*Id.* ¶¶ 2, 35–36) Following the acquisition, Gary Matthews and Frank Curci joined Tops' Board of Directors.[6] Matthews, a Managing Director with Morgan Stanley Private Equity ("MSPE"), brought significant expertise in structuring complex financial transactions, utilizing market and industry knowledge, and collaborating with management teams. (Compl. ¶ 25.) Curci, Tops' former Chief Executive Officer who had worked closely with MSCP V Holdco to formulate the bid for Tops and invested alongside MSCPV Holdco and the other Sponsors (*id.* ¶¶ 35, 43), returned as Tops'

---

[4] Unless otherwise indicated these facts are taken from the Complaint, which the MS Defendants accept as true for purposes of this Motion to Dismiss only. Facts are also taken from public filings, which the Court may take judicial notice of as "relevant matters of public record." *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *5 (S.D.N.Y. Apr. 23, 2019). Certain facts are drawn from Tops' "Offering Memorandum" and "Funds Flow Memorandum" documents, which the Court can consider on this Motion to Dismiss because they are integral to the Complaint. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (complaint is deemed to include documents that are "integral"). To be integral to a complaint, "the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon th[e] documents in framing the complaint." *See 45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 739 (Bankr. S.D.N.Y. 2019). The Trustee had notice of the content of the memoranda by virtue of his access to the Company's internal documents. *See* Second Amended Joint Chapter 11 Plan of Reorganization of Tops Holding II Corporation and its Affiliated Debtors (ECF No. 751, the "Second Amended Plan") § 5.21(e)–(f) (describing Tops' obligation to cooperate with the Trustee, including by providing the Trustee with access to the Company's documents). Moreover, the Trustee relied on the contents of the memoranda in framing the Complaint. For example, the Trustee specifically alleges that funds from the notes offerings were used to finance the Dividends. (*See* Compl. ¶¶ 64, 124, 166.)

[5] MSCP V Holdco, HSBC I, HSBC II, Turbic, and Frank Curci initially purchased Tops in 2007. Begain joined as a shareholder in 2010. These investors, excluding Curci, will be collectively referred to as the "Sponsors."

[6] "Board of Directors" and "Board" are defined to include the boards of directors for Tops Holding Corporation and Tops Holding II Corporation.

CEO.[7]  Curci personally received dividends in 2009, 2010, 2012, and 2013, each time voting to approve the Company's issuances.  (Compl. ¶¶ 48–49, 72–73, 104–105, 144, 148–149.)

Gregory Josefowicz joined the Board in 2008, followed by Eric Fry and Eric Kanter in 2009, who were a Vice President and Managing Director at MSPE, respectively.  (Compl. ¶¶ 26–28.)  Josefowicz had extensive experience in the retail industry, including serving as Chairman of the Borders Group's Board of Directors and a Director of Winn-Dixie Stores Inc.[8]  In October 2010, the Tops Board elected Stacey Rauch as a Director.  (Compl. ¶ 29.)  Rauch spent twenty-four years with McKinsey & Company, including as a leader in the Retail and Consumer Goods Practices and head of the North American Retail and Apparel Practice.[9]

### B.    Tops Issues Notes and Shares and Pays Dividends to Shareholders

Tops issued notes in 2009, 2012, and 2013 (the "Notes Offerings," each a "Notes Offering"), and issued four dividends in 2009, 2010, 2012, and 2013 (the "Dividends," each a "Dividend").

- **The 2009 Notes and Dividend**.  On October 9, 2009, Tops Holding Corporation issued $275 million of senior secured notes to refinance its debt and fund a $105 million dividend to shareholders.  Banc of America Securities, Morgan Stanley & Co., and HSBC Securities (USA) purchased the notes, which bore an annual interest of 10.125% due in 2015.[10]  Tops retained KPMG to conduct a valuation analysis in advance of the transaction.  (Compl. ¶ 52.)  KPMG concluded that Tops had a capital surplus of $33.4 million after issuance of the 2009 Dividend.  (*Id.* ¶ 54.)

- **The 2010 Dividend**.  In 2010, Tops took additional steps to increase its asset base and further refinance its debt on more favorable terms.  Tops refinanced its debt through a $75 million notes issuance at a 10.125% interest rate, and successfully

---

[7] *See* Declaration of Daniel S. Shamah in Support of Defendants' Motion to Dismiss (hereinafter "Shamah Decl.") Ex. 1 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 29, 2012)), at 65; Compl. ¶ 43.

[8] *See* Shamah Decl. Ex. 1 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 29, 2012)), at 66.

[9] *Id.* at 67.

[10] *See* Shamah Decl. Ex. 2 (Tops Holding Corp. Purchase Agreement (Oct. 1, 2009)), at 1–2.

acquired all of Penn Traffic Company's assets and certain liabilities.[11]  In January 2010, Tops Holding Corporation issued 44,776 shares of common stock, bringing in $30 million of cash.[12]  On July 26, 2010, Tops Holding Corporation issued a $30 million dividend to its shareholders (which corresponded to the proceeds of the stock sale),[13] which was unanimously approved by the Board.  (Compl. ¶¶ 72, 83.)

- **2012 Notes and Dividend**.  On December 20, 2012, Tops Holding Corporation and Tops Markets LLC issued approximately $460 million of senior secured notes at an 8.875% interest rate due in 2017.[14]  Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), Morgan Stanley & Co., BMO Capital Markets Corporation, and Wells Fargo Securities purchased the notes.[15]  Tops used the proceeds of these notes to purchase the Company's existing 10.125% senior secured notes due in 2015 (i.e., new debt was issued at a lower interest rate than the retired notes), and to pay a $100 million shareholder dividend.[16]  Tops retained Duff & Phelps to conduct a valuation analysis of the transaction.  (Compl. ¶ 107.)  Duff & Phelps found that Tops had a capital surplus of $68 million after issuance of the 2012 Dividend.  (Id. ¶ 110.)

- **The 2013 Notes and Dividend**.  On May 15, 2013, Tops Holding II Corporation, a newly formed company that wholly owned Tops Holding Corporation, issued $150 million of senior contingent cash pay notes at an 8.75% interest rate due in 2018.[17]  Merrill Lynch and Morgan Stanley & Co. purchased the notes, and Tops used the proceeds to pay a $141.9 million dividend to shareholders.[18]  Tops retained Houlihan Lokey to conduct a valuation analysis for the 2013 Dividend.  (Compl. ¶ 151.)  Houlihan Lokey concluded that Tops would have a capital surplus of approximately $209 million after issuing the 2013 Dividend.  (Id. ¶ 154.)

At the time of each Notes Offering, Tops disclosed its contingent pension liabilities in its

offering documents, including that the Company contributed "to an underfunded multiemployer

---

[11] See Shamah Decl. Ex. 1 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 29, 2012)), at 22.

[12] Id.

[13] Id.

[14] See Shamah Decl. Ex. 3 (Tops Holding Corp. Indenture (Dec. 20, 2012), Ex. 4.1 to Tops Holding Corp., Current Report (Form 8-K) (Dec. 20, 2012)), at 1.

[15] Id. at 16.

[16] See Shamah Decl. Ex. 4 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 27, 2014)), at 16.

[17] See Shamah Decl. Ex. 5 (Tops Holding II Corp. Indenture (May 15, 2013), Ex. 4.5 to Tops Holding II Corp., Registration Statement (Form S-4) (Sept. 6, 2013)), at 1.

[18] Id. at 15; see also Shamah Decl. Ex. 4 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 27, 2014)), at 16.

pension plan" that was in "critical status."[19]  With each Notes Offering, Tops obtained debt at the

same or lower interest rate, which allowed the Company to successfully restructure existing

liabilities on more favorable terms.

### C.    Tops' Pension Obligations

From 2007 through the 2013 management buy-out, Tops had pension obligations related

to two plans: the United Food & Commercial Workers Local One Pension Fund (the "UFCW

Pension Plan") and the New York State Teamsters Conference Pension and Retirement

Fund/Teamsters Local 400 Pension Fund (the "Teamsters Pension Plan," and together with the

UFCW Pension Plan, the "Pension Plans" or "Plans").  (*See* Compl. ¶ 6.)  The Complaint

misrepresents the impact of these obligations, which are knowable from the well-developed

statutory schemes governing such plans.

### 1.    *Multiemployer Plans and "Critical Status"*

Both the Pension Plans are "multiemployer" plans, meaning they obligate more than one

employer to make regularly scheduled contributions at levels established by collective

bargaining agreements.[20]  *See* 29 U.S.C. § 1301(a)(3); *New York State Teamsters Conference

Pension & Retirement Fund v. United Parcel Service, Inc.*, 382 F.3d 272, 274 (2d Cir. 2004).

Each Plan is governed by a board of trustees that has a fiduciary responsibility to protect the

---

[19] *See, e.g.*, Shamah Decl. Ex. 6 (Tops Holding II Corp., Offering Memorandum (May 8, 2013)), at 15 ("Although we do not intend to withdraw from the [pension] plan, if we were to withdraw, either completely or partially, we would incur withdrawal liability with respect to our share of the [pension] plan's unfunded vested benefits.").

[20] Tops did not itself participate in the Teamsters Pension Plan, and was not obligated to make regular contributions to it.  However, as part of a supply agreement with C&S Wholesale Grocers, Inc. ("C&S"), certain of Tops' warehouse personnel became C&S employees, and Tops agreed to indemnify C&S for any withdrawal liabilities related to the Teamsters Pension Plan.  *See* Compl. ¶ 6 n. 4; Shamah Decl. Ex. 7 (Tops Holding Corp., Annual Report (Form 10-K) (March 31, 2011)), at 26.

Plans' financial health and oversee the disbursement of benefits.[21]  29 U.S.C. § 1103(a).

Multiemployer plans must meet certain threshold funding levels and, when funding falls below

these levels, the plan (through its trustees) must take certain steps to improve its financial health.

*See* 29 U.S.C. § 1085(a).

When a plan's underfunded status becomes sufficiently urgent, as defined by ERISA, the

plan enters "critical status." *Id.* § 1085(b)(2).  According to the Trustee, the UFCW Pension Plan

was in "critical status" when MSCP V Holdco first acquired an ownership interest in Tops, and

the Teamsters Pension Plan entered "critical status" by the end of 2010.  (Compl. ¶¶ 7, 92.)

Once a plan reaches "critical status," ERISA obligates the plan trustees to present a

"rehabilitation plan" (which must include options for increased contributions and/or reduced

benefits) to the contributing employers and the unions representing the covered employees.  *See*

29 U.S.C. §§ 1085(e)(1)(B), 1085(e)(3).  Through this mechanism, ERISA empowers plan

trustees to compel employers to increase contributions to an underfunded plan when the

employers and unions are unable to agree to increased contributions through collective

bargaining.  *See id.* § 1085(e)(3)(C).  Both Pension Plans' trustees adjusted employer

contribution levels according to these rules during this period, and Tops undisputedly satisfied

those increased contribution obligations.[22]

---

[21] The Trustee does not allege that Tops served on the board of either Plan, or that the Plans' boards failed to discharge their fiduciary duties to the Plans consistent with ERISA's requirements.

[22] *See* Shamah Decl. Ex. 8 (UFCW Local One Pension Fund, Annual Return/Report of Employee Benefit Plan (Form 5500) (Oct. 6, 2010), at 4; *Rehabilitation Plan for the New York State Teamsters Conference Pension and Retirement Fund*, N.Y. State Teamsters Conf. Pension and Retirement Fund (June 1, 2012), https://www.nystpensionfund.org/forms-publications, at 6; Compl. ¶ 7.

2.    *Withdrawal Liability*

The Trustee separately alleges that Tops was rendered insolvent by its "unfunded pension plan withdrawal liabilities." (Compl. ¶ 4.)  Under ERISA, the payment of withdrawal liability is contingent on extrinsic occurrences that may never happen—namely, when an employer "permanently ceases to have an obligation to contribute" to a multiemployer plan or "permanently ceases all covered operations." 29 U.S.C. §§ 1381(a), 1383(a).  These changes can be triggered directly (for example, if a collectively bargained agreement is amended to cease plan contributions) or indirectly (if the employer ceased its operations covered by the plan). Only if one of those contingencies occurs does the employer become obligated to pay "withdrawal liability." *Id.* § 1381(a).  Importantly, the same contingency that triggers a withdrawal liability also signals the end of the employer's obligation to make regular, ongoing plan contributions—the employer's periodic payments toward its withdrawal liability replace its prior contribution payments.[23]

3.    *Tops' Contributions to Its Pension Plans*

As the Trustee recognizes, Tops met ***all*** of its contribution obligations to the Pension Plans throughout MSCP V Holdco's 2007–2013 ownership. (Compl. ¶ 7.)  Tops disclosed the Pension Plans' critical status in contemporaneous SEC filings, including the Company's obligation to increase annual contributions under its collective bargaining agreement and

---

[23] If an employer incurs withdrawal liability, ERISA creates a set of rules that govern the employer's liability. *See* 29 U.S.C. § 1399(c)(1)(C).  Three such rules are relevant to this case. *First*, an employer's annual withdrawal liability payments are determined based on a formula that approximates the employer's annual contributions during the 10-year period preceding withdrawal. *Id.* § 1399(c). *Second*, payments are made on a quarterly basis, i.e., there is no obligation to pay withdrawal liability as a lump sum. *Id.* § 1399(c)(3).  *Third*, the employer's quarterly contributions continue for up to a maximum of 20 years, at which point the employer's obligation ends even if it has not paid the full balance of the withdrawal liability originally assessed. *Id.* § 1399(c)(1)(B).

relevant rehabilitation plans.[24]  While the Company continually reiterated that it had no intention

to withdraw, it acknowledged the contingent withdrawal liabilities for each of the Pension

Plans.[25]  The Trustee does not allege that Tops incurred withdrawal liability when MSCP V

Holdco had an ownership interest in Tops, or that the Pension Plans' critical status could—or

ever did—trigger the withdrawal liability.

### D.    2013 Sale of the Company to Management

In December 2013, Frank Curci—whose implausible and contradictory statements the

Complaint relies on—led a management buy-out of Tops.  (Compl. ¶ 174.)  Six longstanding

Tops executives purchased substantially all of Tops Holding II Corporation's common stock for

approximately $21 million: (i) Curci; (ii) John Barrett, Senior Vice President of Human

Resources since 2000; (iii) Lynne Burgess, Senior Vice President, General Counsel and

Secretary since 2010; (iv) Kevin Darrington, Chief Operating Officer since 2010 after serving as

Tops' Senior Vice President and Chief Financial Officer beginning in 2008; (v) William Mills,

Senior Vice President and Chief Financial Officer since 2010; and (vi) John Persons, Senior Vice

President of Operations since 2007.[26]  The management buy-out was funded in part with $12.3

million in debt financing provided by Bank of America and $4.3 million in equity financing

provided by the buyers.[27]

---

[24] *See, e.g.*, Shamah Decl. Ex. 1 (Tops Holding Corp. Annual Report (Form 10-K) (Mar. 29, 2012)), at 24–25.

[25] *Id.* at 25.

[26] *See* Shamah Decl. Ex. 9 (Tops Holding II Corp. Shareholders Agreement (Nov. 29, 2013), Ex. 4.7 to Tops Holding II Corp. Registration Statement (Form S-4) (Dec. 3, 2013)); Shamah Decl. Ex. 1 (Tops Holding Corp. Annual Report (Form 10-K) (Mar. 29, 2012), at 65–66.

[27] *See* Shamah Decl. Ex. 10 (Tops Holding II Corp., Purchase and Sale Agreement (Nov. 14, 2013), Ex. 10.12 to Tops Holding II Corp., Registration Statement (Form S-4) (Dec. 20, 2013)), at 12.

### E.   Tops Continues Operating After the Management Buy-Out

Under Curci's leadership, Tops continued expanding its operations and refinancing existing credit lines after the management buy-out.  In June 2015, Tops issued $560 million in senior secured notes, due in 2022, at an interest rate of 8%.[28]  Merrill Lynch and Wells Fargo Securities purchased the notes,[29] and Tops used the proceeds to redeem the balance of higher interest notes due in 2017 and to fund a tender offer for $60 million of the $150 million outstanding 8.75% and 9.5% notes due in 2018.[30]  Similarly, in 2016, Tops amended its existing ABL facility with Bank of America and other lenders, extending the maturity date from 2017 to 2021 and increasing its maximum borrowing capacity by $25 million.[31]

Although the Complaint alleges that the dividends issued in 2009, 2010, 2012, and 2013 rendered Tops insolvent, Tops continued to represent that it was solvent in the years after the management buy-out in 2013.  For example, in connection with the ABL facility, Tops represented to its lenders in 2016 that it was solvent.[32]  During that same period, Tops also paid dividends to its current shareholders totaling $14 million.[33]  Curci remains Tops' CEO, and received full and complete releases under the Tops Second Amended Plan.[34]

---

[28] *See* Shamah Decl. Ex. 11 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 30, 2017)), at 16.

[29] *See* Shamah Decl. Ex. 12 (Tops Holding II Corp. Indenture (Jun. 10, 2015), Ex. 4.1 to Tops Holding II Corp., Current Report (Form 8-K) (Jun. 10, 2015)), at 16.

[30] *See* Shamah Decl. Ex. 11 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 30, 2017)), at 16.

[31] *Id.* at 22.

[32] *See* Shamah Decl. Ex. 13 (Tops Markets LLC Second Amended and Restated Credit Agreement (Dec. 30, 2016)) § 5.20.

[33] *See* Shamah Decl. Ex. 11 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 30, 2017)), at 54–55.

[34] *See* Second Amended Plan § 1.153 (defining "Released Parties").

**F.      The Decline of the Retail Grocery Industry and Tops' Subsequent Bankruptcy**

By Tops' admission, the grocery industry faced significant challenges leading up to Tops' bankruptcy.  Tops disclosed its vulnerability to competitive pressures in its public filings, recognizing that the expansion and sales strategies of competitors posed a risk to Tops' business.[35]  Tops acknowledged the "intense competition" it faced from retail giants like Amazon, and the challenges posed by evolving consumer demands for gourmet, organic, and specialized products.[36]  Tops admitted that market pressures were compounded when the grocery industry encountered drastic "food deflation" in 2016, years after management bought Tops from the Sponsors.[37]  In response to these pressures, major grocers, including A&P, Southeastern Grocers, Lucky's Market, Fairway, and Earth Fare, all filed for bankruptcy between 2015 and 2020.

Tops fell victim to the same pressures, filing for bankruptcy in February 2018.  (Compl. ¶ 1.)  The Trustee was appointed, and a Litigation Trust was created.[38]  The Second Amended Plan granted the Trustee unfettered access to Tops' internal documents.[39]  The Creditors' Committee sought and obtained considerable Rule 2004 discovery from the MS Defendants, in

---

[35] *See, e.g.*, Shamah Decl. Ex. 11 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 30, 2017)), at 3.

[36] Declaration of Michael Buenzow pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (ECF No. 4, "Buenzow Declaration") at ¶¶ 33–37.

[37] *Id.*

[38] *See* Second Amended Plan § 521.

[39] *See id.*, § 521(e), (f) (describing Tops' obligation to provide the Trustee with access to the Company's documents).)

addition to the untold number of documents it received from the Company, all of which the

Trustee subsequently reviewed.[40]

Nearly two years after the Petition Date, on February 12, 2020, the Trustee filed the

Complaint.  The Trustee alleges that the Dividends are avoidable as constructive fraudulent

transfers (Counts I, II, III, and IV) and actual fraudulent transfers (Counts V, VI, VII, and VIII).

The Trustee further alleges that the Directors are jointly and severally liable for illegal dividends

issued in 2012 and 2013 (Counts IX and X), that the Directors breached their fiduciary duties to

Tops (Count XI), and that MSIM aided and abetted that purported breach (Count XII).

## ARGUMENT[41]

I.     **The Court Should Dismiss All of the Claims as Implausible.**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's factual allegations must

"raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 545 (2007).  A complaint cannot rely on bare legal conclusions.  Rather, a plaintiff must

offer "factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  For each of his

claims, the Trustee falls short of this standard.

**A.     Each of the Trustee's claims fails based on the Complaint's implausible insolvency theory.**

The Trustee fails to plausibly allege facts from which this Court can reasonably infer

Tops' insolvency—a prerequisite to each of his claims.  As described below, Tops' alleged

insolvency at the time of each Dividend is central to each count of the Complaint.  Absent

---

[40] *See* Second Interim and Final Fee Application of Morrison & Foerster LLP (ECF No. 814) at 19–22.

[41] Unless otherwise indicated, all citations and quotation marks are omitted.

plausible allegations of insolvency, the Trustee's claims all fail.  In assessing whether the Trustee

has carried his burden, the Court should consider "the full factual picture presented by the

complaint, the particular cause of action and its elements, and the existence of alternative

explanations so obvious that they render plaintiff's inferences unreasonable."  *L–7 Designs, Inc.*

*v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

Under Counts I–IV, the Trustee seeks to avoid the Dividends under New York's

fraudulent transfer statute, New York Debtor and Creditor Law ("D.C.L.") §§ 273–275

(amended Apr. 4, 2020),[42] but offers no plausible facts to suggest that any Dividend was

fraudulently transferred.  A transfer is considered a constructively fraudulent conveyance if it is

made without "fair consideration," and either "(i) the transferor is insolvent or will be rendered

insolvent by the transfer in question, D.C.L. § 273; (ii) the transferor is engaged in or is about to

engage in a business transaction for which its remaining property constitutes unreasonably small

capital, D.C.L. § 274; or (iii) the transferor believes that it will incur debt beyond its ability to

pay, D.C.L. § 275."  *Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 440–41

(Bankr. S.D.N.Y. 2011).  New York courts require a "balance sheet test" to determine solvency

under D.C.L. section 273, wherein a debtor "is insolvent when the present fair salable value of

his assets is less than the amount that will be required to pay his probable liability on his existing

debts as they become absolute and matured."  D.C.L. § 271(1) (amended Apr. 4, 2020); *see also*

*Tese-Milner v. Edidin and Assoc. (In re Operations NY LLC)*, 490 B.R. 84, 97 (Bankr. S.D.N.Y.

2013).  Under D.C.L. section 274, the Trustee must plead facts supporting the allegation that

---

[42] In 2019, the D.C.L. was amended and §§ 271–275 were altered.  *See* N.Y. Legis. 580 § 7 (2019).
However, the amendments, which took effect on April 4, 2020, apply only prospectively.  *Id.* § 7 ("This
act . . . shall not apply to a transfer made or obligation incurred before such effective date.").  Because all
the conduct at issue occurred before April 4, 2020, all references to the D.C.L. herein refer to statute as
enacted before that date.  *Id.*

each of the challenged transactions left Tops with "unreasonably small capital." D.C.L. § 274; *see also In re Operations NY LLC*, 490 B.R. at 98 ("The relevant factors include the transferor's debt to equity ratio, historical capital cushion, and the need for working capital in the transferor's industry."). Finally, D.C.L. section 275 requires proof that "the debtor *intends* or *believes* that it will incur debts that it will be unable to pay as they become due." *In re Operations NY LLC*, 490 B.R. at 98 (emphasis in original).

Counts V–VIII seek to avoid the Dividends as actual fraudulent conveyances under D.C.L. § 276, but again the Trustee offers no plausible facts establishing actual intent. Under D.C.L. § 276, "every conveyance made and every obligation incurred with *actual intent*, as distinguished from intent presumed at law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors." D.C.L. § 276 (amended Apr. 4, 2020) (emphasis added). Claims under D.C.L. § 276 are subject to Rule 9(b)'s heightened pleading standard, which requires that the Trustee "state with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b); *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Tech., Ltd.)*, 337 B.R. 791, 800 (Bankr. S.D.N.Y. 2005).

The remaining claims under Counts IX–XII also rely on the Complaint's implausible insolvency theory. The Trustee's illegal dividend claims (Counts IX and X) hinge on whether Tops was "insolvent or would thereby be made insolvent" at the time of each Dividend. *See* N.Y. Bus. & Corp. Law § 510. Moreover, the Trustee lacks standing to maintain fiduciary duty and aiding and abetting claims without a plauisble allegation of insolvency. *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, 2018 WL 6329139, at *7 (S.D.N.Y. Nov. 30, 2018), *reconsideration denied*, 2019 WL 549380 (S.D.N.Y. Feb. 12, 2019). Because directors' fiduciary duties extend to creditors only after a company becomes insolvent,

"[c]reditors are limited under Delaware law to asserting breach of fiduciary duty claims for conduct that either (1) occurred while the corporation was insolvent, or (2) directly and definitively caused the corporation to become insolvent." *Id.* Therefore, if the Trustee cannot sufficiently allege Tops was insolvent when purported breaches of fiduciary duty occurred, Counts XI and XII must fail.

The Complaint does not offer plausible facts to meet ***any*** of these standards. The Trustee's central premise—that the MS Defendants "rendered Tops insolvent at the time of each of the dividends and led Tops to file for bankruptcy" (Compl. ¶ 4)—defies credulity. For the Court to conclude that this theory is plausible, the Court must find that the Trustee alleged facts sufficient to show that:

- Several of the world's most sophisticated financial institutions invested more than $1.8 billion in an insolvent regional grocery retailer between 2007 and 2018, even though there is no credible allegation that Tops misled any lender; and

- Despite being allegedly insolvent since the 2009 Dividend, Tops sold $30 million in common stock in 2010, operated its business, and successfully refinanced its debt for nearly a decade before filing for bankruptcy; and

- Seven months after the last alleged illegal dividend, six members of Tops' then-management (including Curci, who approved and directly benefitted from every dividend) acquired an insolvent entity for $21 million; and

- For more than four years after the 2013 management buy-out, sophisticated financial institutions continued to lend hundreds of millions of dollars to an insolvent company; and

- Members of Tops' current management misrepresented or misunderstood the Company's solvency when it issued dividends and obtained an ABL in the years after the management buy-out; and

- Tops' 2018 bankruptcy resulted from dividends that had occurred five to nine years earlier and not from the deteriorating retail grocery industry that was crippling Tops' competitors across the country; and

- Tops was insolvent even though it met its statutorily mandated pension contribution obligations; and

-18-

- Tops' contingent withdrawal liabilities foreclosed its ability to ever issue a dividend, regardless of whether those liabilities were reasonably likely to be triggered in 2009 to 2013.

The Trustee has not alleged plausible facts to support any of these conclusions.

**B.      The Complaint does not allege necessary details regarding Tops' financial health.**

Although the Trustee conclusorily asserts that Tops was rendered insolvent by its inability to pay contingent pension liabilities, the Complaint contains no allegations that Tops lacked the ability or intent to meet its financial obligations when it issued the Dividends, or that the Dividends rendered Tops unable to meet its obligations.  The Trustee does not allege that Tops incurred debt that it believed it would be unable to pay, or that it ever defaulted on loans or was otherwise subjected to debt collection proceedings.  Nor does the Trustee claim that Tops lacked the capital to meets its financial obligations, as the Complaint does not address Tops' profitability during the relevant period, its ability to generate net revenue, or its ability and intention to pay its debts and sustain itself.  Without this detailed information, the Complaint fails to adequately plead insolvency and should be dismissed for that reason alone.  *See O'Toole v. Karnani (In re Trinsum Grp., Inc.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011) (dismissing fraudulent conveyance claims because plaintiff failed to plead insolvency even where plaintiff provided net income, net cash flow, declining revenue percentages, and rising debt levels over multiple years).

**C.      The Trustee's conclusory allegations ignore the Company's successful operations between 2007 and 2017.**

The Trustee's failure to provide specific information on Tops' alleged unprofitability and supposed inability to pay its debts is not surprising: the facts demonstrate precisely the opposite. Tops was a fully operational, growing company that successfully accessed the capital markets on attractive terms from 2007 to 2017.

-19-

The Trustee claims that Tops was insolvent "at the time of the 2009 dividend" (Compl. ¶ 51), and remained insolvent as the Defendants "crippled" the Company through subsequent "massive, illegal dividends" (*id.* ¶ 1). But a company is not presumed insolvent at the time of a transaction simply because it becomes insolvent at some future point. *See In re Trinsum Grp., Inc.*, 460 B.R. at 392 ("The operative reference point for determining insolvency is the time at which the transfer took place. Therefore, insolvency . . . cannot be presumed from subsequent insolvency at a later point in time."). The Complaint ignores that Tops operated for nearly a decade after the 2009 Dividend, and posted increased net sales and gross profits from 2009 to 2013—precisely the period during which Tops issued the Dividends.[43]

In addition, Tops repeatedly accessed independent capital markets to refinance and supplement the Company's debt between 2007 and 2018, and raised $30 million through a common stock offering. Some of the world's most sophisticated financial entities provided $1.8 billion in funding to Tops during this decade, with each successive financing affording more favorable terms for Tops than the last ("Figure 1"):[44]

| Date | Amount | Interest Rate | Secured v. Unsecured | Primary Use(s) | Lender(s) |
|------|--------|---------------|----------------------|----------------|-----------|
| Oct. 2009 | $275 million | 10.125% | Secured | Repay existing debt obligations, increase borrowing capacity, and fund $105 million dividend | Banc of America Securities, Morgan Stanley & Co., and HSBC Securities (USA) |

---

[43] *See, e.g.*, Shamah Decl. Ex. 4 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 27, 2014)), at 16–17, 19–20; Shamah Decl. Ex. 1 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 29, 2012)), at 16; Shamah Decl. Ex. 7 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 31, 2011)), at 18.

[44] *See* Shamah Decl. Exs. 1–5, 11–12.

-20-

| Date | Amount | Interest Rate | Secured v. Unsecured | Primary Use(s) | Lender(s) |
|------|--------|---------------|----------------------|----------------|-----------|
| Dec. 2012 | $460 million | 8.875% | Secured | Refinance existing secured debt at 10.125% and fund $100 million dividend | Merrill Lynch, Morgan Stanley & Co., BMO Capital Markets Corp., and Wells Fargo Securities |
| May 2013 | $150 million | 8.75% | Unsecured | Fund $141.9 million dividend | Merrill Lynch and Morgan Stanley & Co. |
| June 2015 | $560 million | 8% | Secured | Refinance existing secured debt at 8.875% | Merrill Lynch and Wells Fargo Securities |

It is facially implausible that—in the wake of the Great Recession—sophisticated entities so misunderstood Tops' financial condition that they lent $275 million to an insolvent company in October 2009, just a year after Lehman Brothers' demise and four months after General Motors filed the largest industrial bankruptcy in history. And Tops' alleged insolvency in 2009 and 2010 cannot be squared with the purchase of notes in the 2012 and 2013 Notes Offerings by financial institutions, including Merrill Lynch, BMO Capital Markets Corporation, and Wells Fargo Securities, that knew Tops would use a portion of those funds to issue shareholder dividends.

The allegation that Tops was insolvent at the time of the 2010 Dividend is also rendered facially implausible by the Company's ability to (i) issue the Dividend without taking on any concurrent debt, and (ii) raise $30 million in the January 2010 stock issuance a mere six months before the July 2010 Dividend. It is not credible that shareholders would invest $30 million to buy 44,776 shares of stock in an insolvent company. Tops disbursed to shareholders the exact amount of money it raised from shareholders just before the Dividend; because the 2010 Dividend was essentially cash-flow neutral, it cannot have left the Company with insufficient capital to pay its debts as they came due or increased its overall liabilities.

Moreover, the decreasing interest rates for each of Tops' successive debt offerings in 2012 and 2013 (all while the Company publicly disclosed the contingent pension liabilities that allegedly rendered it insolvent) show that Tops' financial condition was growing even stronger. The Court need not credit contradictory allegations that Tops was insolvent in 2009 or 2010 yet still able to obtain multimillion-dollar loans from sophisticated financial institutions to finance dividends in later years. *See Beauvoir v. Israel*, 794 F.3d 244, 248 & n.4 (2d Cir. 2015) (affirming dismissal of complaint whose conclusory allegations were contradicted by facts contained in documents attached to or incorporated by reference in the complaint).

Tops' management's actions after acquiring the Company in December 2013 further refute the Trustee's insolvency claims. On December 30, 2016, three years after the Sponsors sold their interests, Tops represented to Bank of America, N.A that it was solvent.[45] This representation, only fourteen months before Tops' bankruptcy, followed management's decision to issue four dividends to Tops MBO Corporation between 2014 and 2016.[46] The fact that in the years leading up to the Petition Date, Tops' management continued to access capital markets, issue dividends, and publicly represent that it was a solvent company willing and able to repay its debts renders implausible any allegation that the Company was "deeply insolvent" since 2009.

---

[45] *See* Shamah Decl. Ex. 13 (Tops Markets LLC, Second Amended and Restated Credit Agreement (Dec. 30, 2016)) § 5.20.

[46] *See* Shamah Decl. Ex. 11 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 30, 2017), at 54–55 ("On March 31, 2014 and June 30, 2014, the Company paid dividends of $2.4 million and $2.3 million, respectively, to Tops MBO Co[rporation] to fund the quarterly principal and interest payments under the [Tops] MBO Co[rporation] Loan. On September 25, 2014, the Company paid a dividend of $7.9 million to Tops MBO Co[rporation] to fund the repayment of the remaining principal balance and accrued and unpaid interest on the [Tops] MBO Co[rporation] Loan. On January 14, 2016, the Company paid a dividend of $2.0 million to Tops MBO Co[rporation] to fund a dividend to the Company's stockholders.").

*Liquidation Tr. v. Daimler AG (In re Old CarCo, LLC)* is instructive.  There, the court

held that constructive fraudulent conveyance claims were implausible where the trustee's

"allegations ignore[d] the contemporaneous market information concerning the involvement of

other sophisticated parties in the transactions," including "banks, which made available billions

of dollars to" the allegedly insolvent company.  454 B.R. 38, 59–60 (Bankr. S.D.N.Y. 2011),

*aff'd* 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd sub nom.* 509 F. App'x 77 (2d Cir.

2013).  Just so here.  The Trustee's insolvency theory lacks credibility because it relies on a

central assumption that flies "in the face of what everyone believed at that time."  *Potomac LLC*

*v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 352 (Bankr. S.D.N.Y. 2007)

(plaintiff failed to prove insolvency where its "conclusions of insolvency and inadequate capital

d[id] not correlate with the market validation of Iridium's business plans and the positive value

attributed to the business during the relevant period"); *see also VFB LLC v. Campbell Soup Co.*,

2005 WL 2234606, at *31 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007) (finding

that "the most persuasive evidence r[an] directly contrary" to plaintiff's allegations of inadequate

capitalization where "[a]ll of the professionals involved in the Spin-off, as well as independent

third parties that purchased VFI's stock and, later, its bonds, believed that VFI's assets were

adequate to operate the businesses in which it was engaged").

Tellingly, the Trustee *never* alleges that Tops or any Defendant provided false

information or otherwise failed to disclose anything to its sophisticated lenders.  *See In re Old*

*CarCo*, 454 B.R. at 59–60 ("It is implausible that these sophisticated parties, who had access to

the same financial information as Daimler, would invest and rely on the wherewithal of CarCo if

it had been stripped of its assets and were unable to sustain its operations.").  To the contrary, the

contingent pension liabilities at the heart of the Trustee's insolvency allegations were disclosed

-23-

to potential lenders as part of the Notes Offerings.  For that reason alone, the Trustee's claims

fail.  *See id.* ("Moreover, the allegations ignore the contemporaneous market information

concerning the involvement of other sophisticated parties in the transactions . . . . The Trust's

allegations would require an inference that all of these parties were led astray.").

### D.    The Trustee's conclusion that Tops' pension obligations rendered it insolvent for nearly a decade is erroneous and implausible.

A fallacy runs through the heart of the Trustee's theory: that Tops was insolvent because

the Plans were underfunded.  The Trustee's arguments reflect a fundamental misunderstanding

of ERISA, the federal law that governs Tops' obligations to the Plans—both the contributions

Tops was legally required to make to the UFCW Plan and the liability Tops would have incurred

if withdrawal from either Plan had been triggered.  Withdrawal liability is contingent on an

event—withdrawal—which the Trustee does not, and cannot, allege Tops expected to occur as a

result of the Dividends.  The Trustee does not plausibly allege that a withdrawal occurred, was

imminent, or was even likely when the Dividends were issued.  Tops met every obligation to the

Plans that the law required, and the Trustee fails to plausibly allege that Tops' pension liabilities

rendered it insolvent during the relevant period.

### 1.    The Trustee has not adequately alleged that Tops' contingent withdrawal liabilities were "probable" liabilities under New York law.

The Trustee first incorrectly presumes—with no substantiating allegations—that Tops'

potential withdrawal liability was a "probable liability" under New York law.  (Compl. ¶¶ 51, 75,

106, 155.)  As noted above, a "person is insolvent when the present fair salable value of his

assets is less than the amount that will be required to pay his probable liability on his existing

debts as they become absolute and matured."  D.C.L. § 271(1).  New York courts recognize that

a contingent liability is "dependent on some future event that may never happen," *Shelly v. Doe*,

660 N.Y.S.2d 937, 940 (N.Y. Sup. Ct. 1997), *aff'd as modified*, 671 N.Y.S.2d 803 (1998), and

thus "the mere existence of a contingent debt, without more, is insufficient to support a finding that such a debt represented a 'probable liability' within the meaning of Debtor and Creditor Law § 271," *Staten Island Sav. Bank v. Reddington*, 260 A.D.2d 365, 366 (N.Y. App. Div. 1999).

As the governing ERISA rules establish, *see supra* at 11, withdrawal liability is subject to contingencies that trigger the liability and the manner in which the liability, if triggered, is payable. *See, e.g.*, *Baldi v. Samuel Son & Co. Ltd.*, 548 F.3d 579, 582 (7th Cir. 2008) (noting a pension plan obligation as a contingent liability); *CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73*, 162 F.3d 405, 409 (6th Cir. 1998) ("Since this may never occur, it cannot be said that a legal right to payment exists prior to withdrawal."); *In re United Merchants & Mfrs., Inc.*, 166 B.R. 234, 241 (Bankr. D. Del. 1994) ("Only a withdrawal can trigger the contingent right to payment for withdrawal liability."). A debt is not "probable" if it is speculative, *Shelly v. Doe*, 671 N.Y.S.2d 803, 805–06 (N.Y. App. Div. 1998), as is withdrawal liability where no triggering event is identified; *compare Chase Nat. Bank of City of N.Y. v. U.S. Trust Co. of N.Y.*, 260 N.Y.S. 40 (N.Y. App. Div. 1932) (guarantee liability was probable when it was "hopeless" to expect it would not be required). Accordingly, absent *any* allegations about the likelihood that a triggering contingency will occur, Tops' potential withdrawal liability cannot be treated as "probable" in the solvency analysis.

The Trustee's failure to identify any probability of a triggering event likewise makes it impossible to calculate the value of any "probable liability." In determining whether "probable liability" has rendered a party insolvent, contingent liabilities must be "discounted by the likelihood that the contingency will not occur." *Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 211 (Bankr. S.D.N.Y. 2020); *see also, e.g.*, *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 313 (Bankr. S.D.N.Y. 2013); *United States v. Dreier*, 952 F. Supp.

2d 582, 591 (S.D.N.Y. 2013).  As Judge Posner explained, the contrary proposition "is absurd; it would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent—something no one believes."  *In re Xonics Photochemical Inc.*, 841 F.2d 198, 199 (7th Cir. 1988); *see also Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992) (Opinion of Easterbrook, J.) ("Discounting a contingent liability by the probability of its occurrence is good economics and therefore good law[.]").  Thus, Tops' potential withdrawal liability must be discounted by the likelihood of it not occurring.  And because the Trustee has not alleged *any* foreseeable probability of withdrawal liability occurring at the time Tops issued the Dividends, any "probable liability" calculation is impossible.  Accordingly, the Trustee cannot rely on the contingent withdrawal liability to allege that Tops was insolvent from 2009 to 2013.

### 2.    The Trustee ignores Tops' continued ability to pay any periodic withdrawal liability.

Even if the Trustee had demonstrated the likelihood of withdrawal liability—and he has not—the Trustee has not alleged that Tops had insufficient capital to cover the withdrawal liability it would have allegedly incurred upon the hypothetical withdrawals.  As explained above, under ERISA, withdrawal liability is payable in installments that approximate the withdrawing employer's prior contributions to the plans.  *See* 29 U.S.C. § 1399(c)(2)(C).  Thus, contrary to the Trustee's erroneous suggestion that Tops would have owed a lump-sum obligation rendering it insolvent (Compl. ¶¶ 53–54, 76–77), Tops could have paid its obligations, if any, in installments over a twenty-year period during which it would not have made normal plan contributions.  29 U.S.C. § 1399(c)(2)(C).  The Trustee does not and cannot plausibly allege that Tops would be unable to make those payments.  To the contrary, the Trustee *admits* that

Tops consistently made its regular, ongoing contributions of approximately the same amount. (*See* Compl. ¶ 7); 29 U.S.C. § 1399(c)(1)(B).

Recognizing that Tops never missed a pension obligation, the Trustee dismisses the contributions as "the minimum required annual payments." (Compl. ¶ 7.) But those "minimum" payments were precisely the amount the Plans required. In fact, when the UFCW Pension Plan entered "critical status" and required an increase in Tops' annual contribution, the Company continued to timely satisfy its pension obligations.[47] Any insolvency claim based on Tops' continued ability to meet its pension liabilities is implausible when Tops could and did meet its contribution obligations.

### 3.    The Pension Plans' funding level does not equate to Tops' financial strength.

Given this statutory structure, this Court should ignore the Trustee's attempts to conflate the *Pension Plans'* underfunding with *Tops'* solvency. That the *Plans'* obligations exceeded their assets has no bearing on whether *Tops* was insolvent or unable to pay its debts as they came due. If anything, the Trustee's theory proves too much. A significant number of multiemployer pension plans are underfunded.[48] If the Trustee were correct that an underfunded pension plan equates to the employer's insolvency, most of these companies could likely never declare a dividend (or undertake many other vital and sundry transactions) without running afoul of fraudulent transfer and unlawful dividend laws. This is plainly not the case.

---

[47] (Compl. ¶ 7); *see also* Shamah Decl. Ex. 7 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 31, 2011)), at 26.

[48] *See, e.g.*, *Critical, Critical and Declining, Endangered and WRERA Status Notices*, Dept. of Labor (last visited May 3, 2020), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/critical-status-notices.

### E.     The December 2013 management buy-out undercuts the plausibility of the Trustee's claims.

Similarly, the Trustee's insolvency theory cannot be reconciled with the management buy-out.  In December 2013, just seven months after the 2013 Dividend, Tops MBO Corporation acquired the Company from the Sponsors for just under $21 million.  (Compl. ¶¶ 174, 191.) Management spoke with its wallets, investing more than $4 million of equity into Tops.  This team included Curci, who approved (and profited from) every single dividend and share issuance since 2007.

The Tops MBO Corporation comprised the Company's key executives charged with running Tops, from Curci to the Chief Operating Officer, Chief Financial Officer, General Counsel, and Senior Vice Presidents from Human Resources and Operations.[49]  The Trustee does not allege that any Defendant misled Tops' management or otherwise withheld relevant information to achieve the 2013 sale.  Any such allegation would be frivolous: the Tops MBO Corporation's six principal shareholders, with a combined seventy years at Tops, had each been with the Company since at least 2010.[50]  Those shareholders, including the heads of operations, legal, and finance, had an in-depth understanding of the Company's pension liabilities, debt obligations, financial wherewithal, and whether future growth projections were realistic and achievable.  It is implausible that such sophisticated buyers would have paid $21 million— including more than $4 million of their own money—for an insolvent company with unrealistic and skewed growth projections that they operated outside of bankruptcy for more than four years after their purchase.  *See In re Old CarCo*, 454 B.R. at 59–60.

---

[49] *See* Shamah Decl. Ex. 9 (Tops Holding II Corp., Shareholders Agreement (Nov. 29, 2013), Ex. 4.7 to Tops Holding II Corp., Registration Statement (Form S-4) (Dec. 3, 2013)), at 7.

[50] *See* Shamah Decl. Ex. 1 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 29, 2012)), at 65–66.

The Trustee nonetheless concludes that MSCP V Holdco sold the Company to Tops

MBO Corporation because MSCP V Holdco "knew [it] was not possible" to "engage in an arms-

length transaction with a third party purchaser[.]"  (Compl. ¶ 191.)  But the notion that Tops'

equity holders sought out the most knowledgeable counterparty available—and successfully

executed the sale—because they were unable to trick a third party into acquiring an insolvent

asset defies credulity.  The Second Circuit recognizes (and common sense dictates) that such

contradictory allegations fail to state a claim.  *Beauvoir*, 794 F.3d at 248 & n.4; *see also Iqbal*,

556 U.S. at 679 (noting that the motion to dismiss analysis is a "context-specific task that

requires the [ ] court to draw on its judicial experience and common sense").

The Trustee similarly disparages the management buy-out on the ground that it was "a

tiny fraction of the 2007 purchase price."  (Compl. ¶ 2.)  The Trustee misses the point.

Comparing the 2013 price to the 2007 price is not a plausible allegation of insolvency.

Accepting the Trustee's allegations as true, Tops changed immensely between 2007 and 2013,

having incurred additional debt and, most critically, having provided significant value to

shareholders through the Dividends.  Even then, there was still excess value a willing buyer paid

to a willing seller.

**F.    The Company operated outside of bankruptcy for more than four years after the management buy-out.**

The Complaint skips over a critical chapter in Tops history: the four years after the

management buy-out, during which several large sophisticated lenders refinanced the vast

majority of the Company's debt and Tops continued issuing dividends.  For example, in June

2015, Tops issued $560 million in senior secured notes due in 2022 at an 8% interest rate.[51]  The

---

[51] *See* Shamah Decl. Ex. 11 (Tops Holding II Corp., Annual Report (Form 10-K) (Mar. 30, 2017)), at 22.

Company used the proceeds to redeem $460 million of 8.875% secured notes due in 2017 and to fund a partial tender offer for 8.75% notes due in 2018.[52]  Merrill Lynch and Wells Fargo Securities once again put significant capital at risk to purchase Tops' notes.[53]  It is implausible that sophisticated financial institutions would do so without believing Tops was solvent.  And, as noted above, Tops' new owners (at least one of whom now asserts Tops has been insolvent since 2009) kept issuing dividends from 2014–2016, well after the Sponsors exited the investment and the Directors resigned from Tops.

It is telling that the Complaint has only three sentences describing more than four years of continued operations and sophisticated transactions—to have acknowledged these facts would have undermined the Trustee's flawed insolvency narrative.  (*See* Compl. ¶ 192.)

### G.    The retail grocery industry has suffered dramatic challenges since MSCP V Holdco divested its interests in Tops.

Although the First Day Declaration clearly identified the "Competitive Industry" as a key factor leading to Tops' insolvency,[54] the Trustee omits any reference to the significant challenges the grocery industry faced in the years following the management buy-out in 2013.  *See supra* at 14.  But the Trustee cannot ignore the industry in which Tops operated, particularly because Tops' public filings consistently reflected the impact of industry challenges and the risks they posed to Tops' business in the years before its chapter 11 filing.[55]  The Company faced competition across a number of market segments, including local, regional, national, and

---

[52] *Id.*

[53] *See* Shamah Decl. Ex. 12 (Tops Holding II Corp. Indenture (June 10, 2015), Ex. 4.1 to Tops Holding II Corp., Current Report (Form 8-K) (Jun. 10, 2015)), at 16.

[54] Buenzow Declaration ¶¶ 33–37 (detailing impact of evolving industry pressures on Tops' operations).

[55] *See, e.g.*, Shamah Decl. Ex. 11 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 30, 2017)), at 3.

international supermarket retailers, convenience stores, retail drug chains, restaurants, discount

retailers, online retail giants, and specialty grocers.[56]  Tops competed with these retailers across

various metrics, including store location and conditions, quality of products, price, service,

variety, and ease of access.  Just as this evolving market took a toll on A&P, Lucky's Market,

Fairway, and Earth Fare, it raised the pressure on Tops, likely leading to its inevitable

bankruptcy.

That Tops successfully operated for many years after the Dividends and ultimately

succumbed to these industry realities is fatal to the Complaint: the causal link between a

transaction (such as the Dividends) and a debtor's bankruptcy is broken when a significant

period of time has elapsed between them.  *See In re Trinsum Grp., Inc.*, 460 B.R. at 392; *see also*

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944

(S.D.N.Y. 1995) ("That the company remained viable so long after the LBO strongly suggests

that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the

buyout."); *Daley v. Chang (In re Joy Discovery Corp.)*, 286 B.R. 54 (Bankr. N.D. Ill. 2002)

(holding that "courts will not find that a company had unreasonably low capital if the company

survives for an extended period after the subject transaction").

**H.**     **The Trustee's alleged "badges of fraud" do not adequately plead fraudulent intent.**

To the extent the Trustee's actual fraudulent transfer claims are based on Tops' alleged

insolvency at the time of the Dividends, the claims fail because the Trustee has not plausibly

alleged insolvency.  The Trustee's remaining collection of conclusory allegations of actual fraud

---

[56] *Id.*

-31-

do not meet Rule 8's pleading standard, let alone the heightened requirements of Rule 9(b) applicable to an actual fraud claim.

Actual fraudulent transfer claims hinge on whether "there is a *knowing intent . . .* to damage creditors." *In re Actrade Fin. Tech., Ltd.*, 337 B.R. at 809 (emphasis added); *see also Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005) (noting that a creditor must establish "intent to defraud" to "prove actual fraud under § 276"); *Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005) ("[T]he Trustee must establish both the debtor's *and* the transferee's actual fraudulent intent."). The Complaint's direct evidence of Tops' fraudulent intent is little more than an undocumented paraphrase: "In the words of Tops' Chief Financial Offer ('CFO') at the time, Morgan Stanley was intent on taking 'every nickel plus' out of the Company through the dividends." (Compl. ¶ 4). Thus, after obtaining countless documents through Rule 2004 discovery and the cooperation of the reorganized debtor, the Trustee repeatedly relies on this undated quote attributed to an unnamed Tops executive as the direct evidence of Tops' knowing intent to defraud its creditors in 2009, 2010, 2012, and 2013. (*See* Compl. ¶¶ 4, 63, 83, 122.) Such conclusory allegations are insufficient under Rule 9(b), which requires that a plaintiff "allege with some specificity the acts constituting the fraud." *In re Actrade Fin. Tech., Ltd.*, 337 B.R. at 800; *see also Liquidation Tr. v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010) ("There is no justification to relax the particularized standard required for intentional fraud claims" where "Rule 2004 discovery was conducted" and the trustee had "access to other interested parties" before filing the complaint).

Nevertheless, the Trustee alleges that Tops' requisite "intent can be further inferred from several traditional 'badges of fraud,'" including that (i) the Dividends were paid to insiders,

(ii) the Dividends lacked consideration, (iii) the Dividends were not in the ordinary course of

business, (iv) Tops was insolvent at the time of each Dividend, (v) MSCP V Holdco, along with

the other Sponsors, retained the possession, benefit, and use of the funds from each Dividend,

and (vi) each Dividend was a step in an ongoing scheme to extract as much value as possible at

the expense of the Company and its creditors.  (Compl. ¶¶ 63–69, 83–89, 122–28, 164–70.)

While courts acknowledge that "badges of fraud" may be used to establish intent to "hinder,

delay, or defraud" creditors, the Trustee still must offer "specific allegations setting forth such

badges of fraud" or "otherwise implicating the defendant in intentional wrongdoing against

creditors."  *In re Actrade Fin. Tech. Ltd.*, 337 B.R. at 809.  The Trustee fails to do so.

Instead, the Trustee's alleged badges of fraud largely reiterate the same broad allegation

that the MS Defendants strong-armed the Company into making fraudulent solvency claims,

issuing improper dividends, and expanding its crippling debt obligations.  (Compl. ¶¶ 4, 191.)

Indeed, the Trustee alleges that Tops CEO "Curci was beholden to, and served at the pleasure of,

Morgan Stanley," and that "Curci viewed [Board member] Matthews as his boss and his role at

the Company as fulfilling the needs and objectives of Morgan Stanley."  (*Id.* ¶ 43).  But even

accepting Curci's unsubstantiated view as true for purposes of this motion, Tops' purported

fraudulent intent when issuing the Dividends is fatally undermined by the Company's *own*

*actions* after the 2013 buy-out.  Under Curci's leadership, Tops publicly declared its continued

solvency, issued multiple dividends, and expanded its debt obligations for *another four years*

during which Curci was clearly *not* beholden to Matthews or Morgan Stanley.  *See supra* at 13.

Thus, accepting the Trustee's allegations as true, the nefarious actions reflecting Tops'

fraudulent intent to defraud its creditors from 2009 until 2013 continued years after the Company

was no longer simply "fulfilling the needs and objectives" of the MS Defendants.  Again, this defies common sense.

A badge of fraud's existence is "merely circumstantial evidence and does not constitute conclusive proof of actual intent."  *In re Actrade Fin. Tech., Ltd.*, 337 B.R. at 809.  For example, the Trustee asks the Court to infer fraudulent intent from the fact that the Dividends were paid to insiders, lacked consideration, and were outside the ordinary course of business.  These allegations generically describe every shareholder dividend ever issued.  To survive a motion to dismiss, the Trustee must allege a "strong showing of circumstantial evidence," not merely rely on a rote collection of badges.  *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *17 (S.D.N.Y. Nov. 13, 2009); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1229–30 (C.D. Cal. 2012) (granting motion to dismiss where badges of fraud, "viewed holistically," did not give rise to an inference of actual intent).

Finally, the Trustee's unsupported assertion that MSCP V Holdco "controlled and manipulated" respected third-party valuation analysts into providing "superficial and conflicting solvency analyses" rings hollow for four reasons.  (Compl.¶ 15.)  *First*, the Trustee does not allege that any of Tops' many sophisticated lenders reviewed or relied on the third-party solvency findings as part of their internal underwriting process when lending hundreds of millions of dollars.  *Second*, despite suggesting that certain solvency opinions did not reflect the existing pension obligations (Compl. ¶ 53), those obligations *were* publicly disclosed in SEC filings.  Thus, the Trustee has not, and cannot, allege that the valuation analysts were unaware of the pension obligations.  *Third*, Tops' Board, including Curci, continued to approve all debt transactions and dividends based on a robust understanding of Tops' financial standing at the time of each valuation analysis.  And *fourth*, after MSCP V Holdco exited the stage, Tops'

-34-

management represented that Tops was solvent *for at least three more years and continued to issue dividends.*

## II.    The Court Should Dismiss the Trustee's Fraudulent Transfer Claims Against MSCP V Holdco (Counts I–VIII) and the Illegal Dividend Claims (Counts IX and X) Against the Directors.

### A.    The Trustee's claims to avoid the 2009 and 2010 Dividends as fraudulent transfers (Counts I, II, V, and VI) are time-barred.

The Trustee seeks to avoid the 2009 and 2010 Dividends as constructive and actual fraudulent transfers under New York's fraudulent transfer statute, N.Y. D.C.L. sections 273–276, and Bankruptcy Code section 544.  But under those statutes, the Trustee can only recover transfers that occurred after February 21, 2012, *i.e.*, six years before the Petition Date.  *See* N.Y. C.P.L.R. § 213 (six-year limitations period).  This limitation period reflects "careful" legislative "balances between the need for an equitable result for the debtor and its creditors, and the need for finality."  *Picard v. Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423 (2d Cir. 2014).  The 2009 and 2010 Dividends occurred before the six-year period preceding the Petition Date, so the fraudulent transfer claims related to these Dividends (Counts I, II, V, and VI) should be dismissed as time-barred.

### B.    The Trustee cannot rely on the IRS as a "golden" or "triggering" creditor to avoid New York's six-year statute of limitations.

Section 544(b) of the Bankruptcy Code authorizes a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."  11 U.S.C. § 544(b)(1).  The Bankruptcy Code thus allows a trustee to step into the shoes of an actual existing creditor—often referred to as the "triggering" or "golden" creditor—who could avoid an allegedly fraudulent transfer "under applicable nonbankruptcy law."  *Mendelsohn v. Kovalchuk (In re APCO Merch. Servs., Inc.)*, 585 B.R. 306, 313 (Bankr. E.D.N.Y. 2018).  Section 544(b) "is most often used to

recover transfers that would be voidable under state law." *Wagner v. Ultima Holmes, Inc. (In re Vaughan Co.)*, 498 B.R. 297, 302 (Bankr. D.N.M. 2013). And "[t]o the extent a trustee seeks to avoid such transfers, the claims are generally subject to state law limitations periods." *Id.*

Here, however, the Trustee contends he can assert New York fraudulent transfer claims to avoid the 2009 and 2010 Dividends, while simultaneously disregarding the applicable New York limitations period. Specifically, the Trustee relies on the existence of a single alleged Tops creditor—the Internal Revenue Service. (*See* Compl. ¶ 197.) The IRS, the Trustee suggests, is a sort of "super creditor" that can rely on an extended ten-year federal limitations period under 26 U.S.C. § 6502(a) while ignoring New York law, and the Trustee can invoke section 544(b) to cloak itself in that right.

Both premises are wrong. The Trustee cannot invoke powers uniquely available to the IRS when the IRS exercises its "sovereign prerogative" to "collect taxes." *See, e.g.*, *United States v. Rodgers*, 461 U.S. 677, 697 (1983). And even if the Trustee's interpretation of section 544(b) were theoretically plausible, no ten-year federal limitations period would apply to the IRS in these circumstances, where the allegedly fraudulent transfers long pre-date the IRS's assessment of tax liability as reflected in its proofs of claim.

       **1.**      **The Trustee is not entitled to cloak himself in immunity available only to the federal government.**

The IRS's freedom from state statutes of limitations is rooted in the *nullum tempus* doctrine, which uniquely immunizes the federal government, *acting in its sovereign capacity*, from state limitations periods. *In re Vaughan*, 498 B.R. at 304; *see United States v. Summerlin*, 310 U.S. 414, 416 (1940). The animating principle behind this public policy exception to the applicability of a state limitations period is "that the public interest should not be prejudiced by

the negligence of public officers, to whose care they are confided." *United States v. Knight*, 39 U.S. 301, 315 (1840).

In keeping with the doctrine's rationale, well-developed limitations exist on the scope of the exemption. Most importantly, the *nullum tempus* doctrine does not apply to a non-sovereign or private activity. For instance, the doctrine is inapplicable when the federal government is not acting in its "governmental capacity," *Dole v. Local 427, IUE*, 894 F.2d 607, 611 (3d Cir. 1990), to assert a public interest as a sovereign, *United States v. Beebe*, 127 U.S. 338, 344 (1888). It does not apply where the federal government is a mere nominal litigant or a conduit for litigation that is principally between private parties. *See id.*; *see also Marshall v. Intermountain Elec. Co.*, 614 F.2d 260, 262 (10th Cir. 1980). And it does not apply when a private litigant seeks, by right of subrogation or assignment, to step into the shoes of a sovereign government and assert claims on the government's behalf. *See, e.g.*, *McCloskey & Co. v. Wright*, 363 F. Supp. 223, 227 (E.D. Va. 1973) ("The law appears to be well-settled … that an assignee of a government claim may not rely upon the government's immunity to the statute of limitations where it is intended to enforce the claim for private benefit.").

For precisely the same reasons, the Trustee—a non-governmental actor pursuing a private action for the benefit of many, many parties in interest other than the IRS[57]—should not be permitted to invoke powers that would be uniquely available to the IRS when acting in its governmental capacity to assert sovereign interests. Nothing in section 544(b) hints at such a

---

[57] The IRS claim constitutes only 0.0088% of claims in this restructuring. The approximate value of allowed claims in this case is $1.3 billion. *See* Order of Judge Drain, Approving Disclosure Statement (ECF No. 660) at 29. The aggregate value of allowed IRS claims totals $115,114.31. *See* Internal Revenue Service, Proof of Claim 1039 (Form 410) (Sept. 19, 2018) (*available at* https://dm.epiq11.com/case/top/claims); Internal Revenue Service, Proof of Claim 1040 (Form 410) (Sept. 19, 2018) (*available at* https://dm.epiq11.com/case/top/claims); Internal Revenue Service, Proof of Claim 348 (Form 410) (Jun. 27, 2018) (*available at* https://dm.epiq11.com/case/top/claims).

-37-

dramatic expansion of the *nullum tempus* doctrine.  To the contrary, Congress designed section

544(b) "to incorporate state law, not subordinate it."  *In re Vaughan*, 498 B.R. at 305; *see also In

re Truong*, 285 F. App'x 837, 839 (3d Cir. 2008) ("Section 544(b)(1) is a vehicle in which a

trustee may recover fraudulently transferred assets of the debtor's property under a state's

fraudulent conveyance laws."); H.R. Doc. No. 137, 93rd Cong., 1st Sess., at 30 (1973) (noting

that section 70(e) of the Bankruptcy Act, from which section 544 was derived, gives the trustee

"the rights under *state law* of any actual creditor or creditors . . .") (emphasis added).  Yet the

Trustee's argument, if accepted, would routinely subordinate state law because "[t]he IRS holds

an unsecured claim in a substantial portion of bankruptcy cases," *In re Vaughan*, 498 B.R. at

305—including virtually every high-profile case currently pending before this Court.[58]

Permitting a trustee to invoke the *nullum tempus* doctrine by stepping into the shoes of the IRS

would thus "eviscerate [the state law] look back period in most bankruptcy cases," *id.*, turning

section 544(b) on its head.  *See Butner v. United States*, 440 U.S. 48, 52–57 (1979) ("[I]n a

properly administered scheme in which the basic federal rule is that state law governs," "unless

some federal interest requires a different result," disputes between a bankruptcy trustee and other

parties over a state-law remedy "should be resolved by reference to state law.").

The Trustee's reading of section 544(b) likewise cannot be reconciled with Bankruptcy

Code section 548.  *See In re Rose*, 318 B.R. 771, 774 (Bankr. S.D.N.Y. 2004) (each Bankruptcy

Code provision should be interpreted "in context with and by reference to the whole statute";

"the preferred meaning of a statutory provision is one that is consonant with the rest of the

---

[58] *See e.g.*, *Sears Holdings Corporation,* Case No. 18-23538, List of Creditors (*available at* https://ecf.nysb.uscourts.gov/cgi-bin/login.pl); *DPH Holdings Corp., et al,* Case No. 05-44481, List of Creditors (*available at* https://ecf.nysb.uscourts.gov/cgi-bin/login.pl); *The Great Atlantic & Pacific Tea Company, Inc*., Case No. 15-23007, Claims Listing (*available at* https://cases.primeclerk.com/aptea/Home-ClaimInfo); *Windstream Holdings, Inc.,* Case No. 19-22312, Claims Listing (*available at* http://www.kccllc.net/windstream/creditor/cdb/24661119/).

-38-

statute"). Section 548, which creates a federal analog to state fraudulent conveyance actions,

expressly establishes a *two-year* federal lookback period for fraudulent transfer claims brought

for the benefit of the estate. *See* 11 U.S.C. § 548(a)(1) ("[T]he trustee may avoid any transfer . . .

of an interest of the debtor . . . or any obligation . . . incurred by the debtor, that was made or

incurred on or within 2 years before the date of the filing of the petition" and was actually or

constructively fraudulent). Yet because the IRS is a creditor in so many bankruptcies, adopting

the Trustee's *nullum tempus* argument would create (under section 544(b)) a ten-year federal

lookback period for fraudulent conveyance claims in nearly all bankruptcies. Had Congress

intended that result, it would have simply written a longer lookback period *into section 548*, the

Code provision that establishes a federal lookback period. The conclusion that Congress had no

intention to let trustees use a ten-year limitations period applicable only to the IRS is

underscored by section 548(e)(1). There, Congress actually created a ten-year limitations period

on fraudulent transfer cases involving abusive trusts. *See* 11 U.S.C. § 548(e)(1) (trustee may

look back ten years to avoid an actual fraudulent transfer by the debtor to a trust of which it is the

beneficiary). "[W]here Congress knows how to say something but chooses not to, its silence in

controlling." *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1394 (11th Cir. 2000).

Section 544(b) should not be construed to authorize, *sub silentio*, a ten-year federal lookback

period that Congress deliberately declined to enact outside of one very specific instance in

section 548.

    *In re Vaughan* is also instructive. There, the court rejected the interpretation of section

544(b) the Trustee urges here, ruling that a bankruptcy trustee cannot stretch the *nullum tempus*

doctrine to avail itself of a longer statute of limitations. "The Court does not believe that

Congress, by enacting Section 544(b), intended to vest sovereign powers in a bankruptcy trustee

and thereby immunize her from the strictures of state law in the pursuit of her private interests."
*In re Vaughan*, 498 B.R. at 304–05.  That construction of Section 544(b) "would pervert the
purpose of *nullum tempus,* which is to immunize the *federal government* from certain state
laws." *Id.* at 305.

Notably, the federal government has rejected a trustee's invocation of *nullum tempus*,
urging a bankruptcy court to "decline to hold that [the trustee] may use § 544(b) to step into the
shoes of the United States by bringing claims belonging to the IRS and to side-step the normal
statute of limitations provided by the [state fraudulent transfer law]."[59]  A contrary holding, the
United States explained,

> would be inconsistent with § 548 of the Bankruptcy Code, other
> federal statutes, the Constitution's exclusive delegation of collection
> authority to the IRS, and the policy behind exempting the United
> States from state statutes of limitations.  The fact that § 544(b) does
> not expressly limit the availability of government causes of action
> does not militate towards a different result.  Again, Congress does
> not "hide elephants in mouse holes."[60]

This Court should not permit the Trustee to invoke federal law to usurp federal authority
and ignore state law, directly contrary to the United States' own interpretation of section
544(b).[61]

---

[59] *See* Shamah Decl. Ex. 14 (United States' Motion to Dismiss, *In re Yahweh Center, Inc.*, No. 16-bk-04306-5 (E.D.N.C. Sept. 24, 2018)), at 10–17.

[60] *Id.*

[61] To be sure, other courts have reached a different conclusion.  *See, e.g.*, *In re Kipnis*, 555 B.R. 877, 881–83 (Bankr. S.D. Fla. 2016); *In re Kaiser*, 525 B.R. 697, 709 (Bankr. N.D. Ill. 2014); *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I)*, 365 B.R. 293, 299–306 (Bankr. D.D.C. 2006).  But these decisions are far less persuasive than the position urged by the United States and adopted by the *Vaughan* court.  They fail to grapple with the well-settled limitations on the *nullum tempus* doctrine, ignore the direct conflict with § 548, pre-date the United States' articulation of its own position that a trustee cannot step into the shoes of the IRS, and pay little heed to the sheer number of cases in which the IRS is a creditor.  Further, these decisions largely ignore the plain language of Internal Revenue Code section 6502 and fail to contemplate a situation where, as here, the contested transfers occurred many years prior to the earliest identified IRS assessment.

### 2. The Trustee has not adequately alleged the IRS could bring fraudulent transfer claims based on the 2009 and 2010 Dividends.

Even if the Trustee could invoke for himself a limitations period available only to the IRS, it would not matter here. The Trustee (like other estate representatives who have advanced this argument) presumably relied on 26 U.S.C. § 6502(a) in alleging that the IRS is entitled to act as a "triggering creditor" that can look back to avoid the 2009 and 2010 transactions. But section 6502(a) does not provide the IRS with a ten-year lookback period from *the date of the alleged fraudulent transfer*. Rather, section 6502(a) gives the IRS ten years from *the date of assessment* in which to initiate a tax collection action. Put another way, the IRS's unique limitations period does not let it look backwards to transactions that occurred before an assessment is made; it simply allows the IRS ten years to sue a party after making a tax assessment against it. *See* 26 U.S.C. § 6502(a)(1) ("Where the assessment of any tax imposed by this title has been made within the period of limitation applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun . . . within 10 years after the assessment of the tax . . . "). Section 6502(a) does not say anything about how far back *prior to* the assessment the IRS can look in unwinding fraudulent transfers.

Here, the 2009 and 2010 Dividends occurred many years prior to the earliest IRS assessment—June 2016—identified in the IRS's proofs of claims filed in the Tops bankruptcy case.[62] Indeed, there is no allegation that the IRS was a creditor at the time of the 2009 and 2010 Dividends; the proofs of claims indicate it became a creditor only in 2013. There is thus no

---

[62] Internal Revenue Service, Proof of Claim 1039 (Form 410) (Sept. 19, 2018) (*available at* https://dm.epiq11.com/case/top/claims) (based on taxes assessed on 06/06/2016, 01/16/2017, 10/02/2017, and 07/02/2018); Internal Revenue Service, Proof of Claim 1040 (Form 410) (Sept. 19, 2018) (*available at* https://dm.epiq11.com/case/top/claims) (based on taxes assessed on 01/30/2017, 09/19/2016, 09/25/2017 and 07/02/2018); Internal Revenue Service, Proof of Claim 348 (Form 410) (Jun. 27, 2018) (*available at* https://dm.epiq11.com/case/top/claims) (based on taxes assessed on 10/23/2017).

special federal limitations period that would apply to the IRS for the 2009 and 2010 Dividends—

let alone one that the Trustee could assert on behalf of creditors.  *See Luria v. Thunderflower*

*LLC (In re Taylor, Bean & Whitaker Mortg. Corp.)*, 2018 WL 6721987, at *6 (Bankr. M.D. Fla.

Sept. 28, 2018) ("The Court is unaware of case law permitting the IRS to avoid transfers made

prior to the original taxpayer assessment (or, alternatively, prior to accrual of the tax liability).");

*see also Kittery Point Partners, LLC v. Bayview Loan Servicing LLC (In re Kittery Point*

*Partners, LLC)*, 2018 WL 1613573, at *11 (Bankr. D. Me. Mar. 12, 2018) (same).

> **C.     The Trustee's fraudulent transfer claims for the 2009, 2012, and 2013**
> **Dividends (Counts I, III, IV, V, VII, and VIII) and illegal dividend claims**
> **(Counts IX and X) are barred under Bankruptcy Code section 546(e).**

The majority of the fraudulent transfer claims (Counts I, III, IV, V, VII, and VIII) are

also barred under Bankruptcy Code section 546(e)'s safe harbor.  Under section 546(e), a trustee

may not avoid a "transfer . . . in connection with a securities contract," made "by or to (or for the

benefit of)" a qualifying entity, including a "financial institution."  11 U.S.C. § 546(e).  Section

546(e) applies to the fraudulent transfer claims for the 2009, 2012, and 2013 Dividends (the

"Safe Harbor Dividends") because the Safe Harbor Dividends were each issued in connection

with a corresponding Notes Offering, and thus were transfers made by and to financial

institutions in connection with securities contracts.  And since section 546(e) preempts state-law

claims that have the same effect as a fraudulent transfer claim that would otherwise be barred by

section 546(e), the illegal dividend claims (Counts IX and X) asserted under New York law

should be dismissed, too.

1.      **The Safe Harbor Dividends were "transfers in connection with a securities contract."**

At the time Tops issued each of the Safe Harbor Dividends,[63] Tops conducted three separate Notes Offerings that funded each of the Safe Harbor Dividends.  Each of the Notes Offerings was a "securities contract," and each of the Safe Harbor Dividends was thus issued "in connection with" a securities contract.

- ***The notes were securities.***  The Bankruptcy Code defines a "security" to include various types of debt, including notes.  *See* 11 U.S.C. § 101(49)(A).  The notes issued in connection with each Notes Offering were "securities."

- ***The Notes Offerings were "securities contracts."***  The Bankruptcy Code defines a "securities contract" broadly to include any "contract for the purchase, sale, or loan of a security," and "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." *Id.* §§ 741(7)(A)(i), (vii).  The Offering Memorandum for each Notes Offering describes a "purchase" by investors of notes issued by Tops.[64]  Each Notes Offering was therefore a "securities contract" because it involved the purchase and sale of debt instruments.  *See, e.g., Official Comm. of Unsecured Cred. of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F.3d 94, 98–99 (2d Cir. 2013) (holding contract to purchase or redeem notes was a "securities contract" under section 546(e)), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting*, 138 S. Ct. 883, 200 L.Ed.2d 183 (2018).

- ***The Safe Harbor Dividends were made "in connection with a securities contract."***  Under section 546(e), a transfer is made "in connection with a securities contract" so long as it is in some way "'related to' or 'associated' the securities contract." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d  at 421.  Section 546(e) sets a "low bar for the required relationship between the securities contract and the transfer sought to be avoided." *Id.* at 422.  The Safe Harbor Dividends clear this "low bar" because Tops issued each Safe Harbor Dividend in connection with a different Notes Offering.  Tops' public filings show that the purpose of the Notes Offerings was, in part, to fund the issuance of each Safe

---

[63] The 2010 Dividend was likely also a transfer made in connection with a securities contract.  If the Court permits the fraudulent transfer claims to proceed, Defendants intend to show that the $30 million 2010 Dividend was issued in connection with the 2010 $30 million share issuance that preceded it.

[64] *See* Shamah Decl. Ex. 6 (Tops Holding II Corp., Offering Memorandum (May 8, 2013)), at ii ("[Tops Holding Corporation and Tops Markets, LLC] have submitted this offering memorandum confidentially to a limited number of qualified institutional buyers . . . . so that they can consider a purchase of the notes"); Shamah Decl. Ex. 15 (Tops Holding II Corp. Preliminary Offering Memorandum (2012)), at ii (same); Shamah Decl. Ex. 16 (Tops Holding Corp. Offering Memorandum (Oct. 1, 2009)), at ii (same).

Harbor Dividend.[65]  The Safe Harbor Dividends and the Notes Offerings were
issued simultaneously, and a significant portion of the proceeds of each Notes
Offering was used to pay each Safe Harbor Dividend.  (*See* Compl. ¶¶ 8, 48, 148.)
Courts have found that dividends paid as part of an integrated securities
transaction satisfy the "in connection with" standard.  *See Crescent Res. Litig. Tr.
v. Duke Energy Corp.*, 500 B.R. 464, 471–76 (W.D. Tex. 2013) ($1 billion
transferred from subsidiaries to parent as "distribution or dividend" was
"settlement payment" and transfer "in connection with a securities contract"
because payment was part of integrated transaction to sell parent's equity-security
holdings in subsidiaries).

### 2.    The Safe Harbor Dividends were transfers made by and to a "financial institution."

The Bankruptcy Code defines "financial institution" to include a "customer" of a

"commercial or savings bank" or "trust company" that is "acting as agent" for the customer "in

connection with a securities contract."  11 U.S.C. § 101(22)(A).  The Second Circuit recently

held that an entity is a "financial institution" for section 546(e) purposes if it is the customer of a

nationally chartered bank that was acting as the entity's agent for the purposes of the transfer at

issue.  *See In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 77–80 (2d Cir. 2019),

*pet. for rehearing or rehearing en banc denied*, ECF No. 13-3992 (2d Cir. Feb. 6, 2020).  That is

precisely the case here:

*Tops was a financial institution*.  Tops was a financial institution for each of the Safe

Harbor Dividends because it received the proceeds of the 2009, 2012, and 2013 Notes Offerings

---

[65] *See* Shamah Decl. Ex. 17 (Tops Holding II Corp. *et al.*, Registration Statement (Form S-4) (Sept. 6, 2013)), at 40 ("On May 15, 2013, we issued $150.0 million of unsecured notes . . . . The proceeds from these notes were issued to pay a $141.9 million to our shareholders")); Shamah Decl. Ex. 18 (Tops Holding Corp., Press Release (Dec. 6, 2012), Ex. 99.2 to Tops Holding Corporation, Current Report (Form 8-K) (Dec. 6, 2012)), at 1 ("Tops Holding Corporation . . . and Tops Markets . . . announced today that they intend to offer approximately $460 million in aggregate principal amount of senior secured notes due 2017.  The net proceeds from this offering . . . are expected to be used . . . to pay a dividend to the Company's shareholders"); Shamah Decl. Ex. 7 (Tops Holding Corp., Annual Report (Form 10-K) (Mar. 31, 2011)), at 46 ("Effective October 9, 2009, the Company issued $250.0 million of 10.125% Senior Secure Notes due in 2015 . . . . The proceeds from the Senior Notes . . . were utilized to . . . pay a dividend to the Company's owners")).  The Court may take judicial notice of Tops' public filings, which are relevant matters of public record.  *See supra* note 4.

into its Bank of America account.[66]  The Safe Harbor Dividends were then paid out to shareholders from the same Bank of America account.[67]  Tops was therefore Bank of America's "customer," and Bank of America was Tops' "agent."  *See In re Tribune*, 946 F.3d at 78 (holding national bank that debtor hired to act as a depositary for sums later used to carry out a leveraged buyout was debtor's agent, and debtor was bank's customer under section 546(e)).

*MSCP V Holdco was a financial institution*.  MSCP V Holdco was a financial institution for each of the Safe Harbor Dividends because it received its share of the Safe Harbor Dividends' proceeds (paid out from the 2009, 2012, and 2013 Notes Offerings proceeds from Tops' Bank of America account) into MSCP V Holdco's Citibank account.[68]  MSCP V Holdco was therefore Citibank's "customer," and Citibank was MSCP V Holdco's "agent."  *See In re Tribune*, 946 F.3d at 78.

---

[66] *See* Shamah Decl. Ex. 19 (Tops Holding Corp., Funds Flow Memorandum (Dec. 20, 2012)), at 1 (describing flow of funds from the 2012 Notes Offering, and showing "TRANSFER OF NET PROCEEDS OF NOTES" of $449.6 million would be made to Tops' Bank of America account upon the closing of the 2012 Notes Offering); Shamah Decl. Ex. 20 (Tops Holding Corp., Funds Flow Memorandum (Oct. 9, 2009)), at 1 (describing flow of funds from 2009 Notes Offering, and showing $105 million "[p]ayment to Tops Holding Corp" would be remitted to Tops' Bank of America account upon the closing of the 2009 Notes Offering).  Bank of America is registered with and licensed by the Office of the Comptroller of Currency as a "National Bank."  *See National Banks Active as of 4/30/2020*, Office of Comptroller of the Currency, U.S. Department of the Treasury, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-name.pdf (last visited May 11, 2020).

[67] *See* Shamah Decl. Ex. 20 (Tops Holding Corp., Funds Flow Memorandum (Oct. 9, 2009)), at 2 (describing payment of the 2009 Dividend to shareholders); Shamah Decl. Ex. 19 (Tops Holding Corp., Funds Flow Memorandum (Dec. 20, 2012)), at 3 (describing payment of the 2012 Dividend from "[Tops'] accounts to its shareholders").

[68] *See* Shamah Decl. Ex. 20 (Tops Holding Corp., Funds Flow Memorandum (Oct. 9, 2009)), at 2–3 (showing remittance of a portion of the 2009 Dividend to MSCP V Holdco's Citibank account); Shamah Decl. Ex. 19 (Tops Holding Corp., Funds Flow Memorandum (Dec. 20, 2012)), at 3 (showing remittance of a portion of the 2012 Dividend to MSCP V Holdco's Citibank account).  Citibank, N.A. is registered with and licensed by the Office of the Comptroller of Currency as a "National Bank."  *See National Banks Active As of 4/30/2020*, Office of Comptroller of the Currency, U.S. Department of the Treasury, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-name.pdf (last visited May 11, 2020).

**3.     The New York illegal dividend claims are likewise barred by section 546(e).**

Section 546(e) also bars the Trustee's illegal dividend claims.  Section 546(e) preempts

state-law claims that have the same effect as a fraudulent transfer claim that would otherwise be

barred by section 546(e).  *See In re Tribune*, 946 F.3d at 90.  Here, the Trustee's illegal dividend

claims seek the same relief as the fraudulent transfer claims—the claw back of the 2012 and

2013 Dividends.  This is not a permissible end-run of section 546(e)'s broad sweep.  For this

reason, several courts have found illegal (or unlawful) state-law dividend claims barred by

section 546(e), reasoning that permitting such claims would frustrate Congress' purpose behind

section 546(e) and render the statute's protection hollow.  *See, e.g.*, *U.S. Bank N.A. v. Verizon

Commun'cns Inc.*, 892 F. Supp. 2d 805, 825 (N.D. Tex. 2012) (holding plaintiff's state law

unlawful dividend claim was preempted by section 546(e) because allowing the claim, which

sought to recover cash payments subject to 546(e)'s safe harbor, would "render Section 546(e)

meaningless"); *Contemporary Indus. Corporation v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009),

*abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting*, 138 S. Ct. 883, 200

L.Ed.2d 183 (2018); *cf. AP Servs. v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (holding section

546(e) preempted unjust enrichment claims).  The same result follows here.

**III.    The Court Should Dismiss the Illegal Dividend Claims and Fiduciary Duty Claims
        against Matthews, Kanter, and Fry (Counts IX–XI), and the Aiding and Abetting
        Breach of Fiduciary Duty Claims Against MSIM (Count XII).**

**A.     The fiduciary duty and illegal dividend claims (Counts IX to XII) are
        time-barred.**

Faced with Tops' incorporation in Delaware, the Trustee seeks to circumvent Delaware's

shorter statutes of limitations by relying on New York statutes to bring illegal dividend and

fiduciary duty claims for the 2012 and 2013 Dividends.  As discussed below, the Trustee's

illegal dividend (New York law), breach of fiduciary duty (Delaware law), and aiding and

abetting breach of fiduciary duty (Delaware law) claims are all subject to a three-year statute of

limitations.[69]  Because Tops issued the 2012 and 2013 Dividends on December 20, 2012 and

May 15, 2013, respectively, the illegal dividend and fiduciary duty claims for those dividends are

time-barred.  (*See* Compl. ¶¶ 104, 148.)

> **1.      The illegal dividend claims are time-barred under New York law
> (Counts IX and X).**

Illegal dividend claims under N.Y. Bus. & Corp. Law ("BCL") sections 719 and 720 are

subject to a three-year statute of limitations.  *See* N.Y. C.P.L.R. § 214(2) (providing a three-year

limitations period in an action brought "to recover upon a liability, penalty or forfeiture created

or imposed by statute"); *see also Schmidt v. Stone*, 2018 WL 4522082, at *11 (E.D.N.Y. Jan. 29,

2018) ("The statute of limitations in New York applicable to claims brought under BCL § 720 is

three years."); *Purves v. ICM Artists, Ltd.*, 119 B.R. 407, 411 (S.D.N.Y. 1990) (CPLR section

214's three-year statute of limitations governed a bankruptcy trustee's claims brought under BCL

sections 717, 719, and 720).  The Trustee therefore cannot bring a claim under sections 719 or

720 for a dividend issued before February 21, 2015—three years before the Petition Date.  *See*

N.Y. C.P.L.R. § 214(2); 11 U.S.C. §108(a).  Accordingly, the Trustee's illegal dividend claims

in Counts IX and X are untimely and should be dismissed.

> **2.      The fiduciary duty and aiding and abetting claims are time-barred
> (Counts XI and XII).**

The Trustee's fiduciary duty and aiding and abetting claims are time-barred under

Delaware's three-year statute of limitations, pursuant to both the internal affairs doctrine and

---

[69] Any limitations period on a claim by a debtor that would be timely if filed on the debtor's petition
date is tolled, but that tolling only applies if "such period has not expired before the date of the filing of
the petition[.]"  11 U.S.C. §108(a).  Thus, the claims must have been timely as of Tops' February 21,
2018 chapter 11 filing.

New York's borrowing statute. *See* Del. Code Ann. tit.10, § 8106; N.Y. C.P.L.R. § 202. Either way, Counts XI and XII must be dismissed.

*First*, bankruptcy courts generally apply the choice of law rules of the state in which they sit. *See Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 62 (Bankr. S.D.N.Y. 2004). Under New York choice of law principles, Delaware law governs claims for breach of fiduciary duty because Delaware is the state of Tops' incorporation. *See In re Navidea Biopharms. Litig.*, 2019 WL 7187111, at *3 (S.D.N.Y. Dec. 26, 2019); *see also*; *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 2006 WL 278138, at *12 (S.D.N.Y. Feb. 2, 2006) ("New York law generally applies the law of the state of incorporation to decide claims pertaining to the 'internal affairs' of a corporation."); *Clark v. Nevis Capital Mgmt., LLC*, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) (state of incorporation supplies statute of limitations for breach of fiduciary duty counterclaim); *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 143 (S.D.N.Y. 2001) (same); *Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. 962, 986 (E.D.N.Y. 1988) ("Under New York's choice of law rules, the law of the state of incorporation governs issues of corporate fiduciary obligations."), *vacated in part on other grounds sub nom. In re Crazy Eddie Sec. Litig.*, 714 F. Supp. 1285 (E.D.N.Y. 1989). Under Delaware law, breach of fiduciary duty claims are subject to a three-year statute of limitations. *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998) ("It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.") (citing Del. Code Ann. tit.10, § 8106), *aff'd*, 725 A.2d 441 (Del. 1999). Thus, the breach of fiduciary duty claims must be dismissed.

Similarly, "because claims of aiding and abetting a breach of fiduciary duty relate to the internal affairs of a corporation, they are also governed by the law of the state of incorporation."

*Buckley v. Deloitte & Touche USA LLP*, 2007 WL 1491403, at *13 (S.D.N.Y. May 22, 2007)

(collecting cases); *see also Allied Irish Banks, P.L.C.*, 2006 WL 278138, at *12 ("Aiding and

abetting the breach of a fiduciary duty is one such internal affair" generally governed by "the law

of the state of incorporation" under New York law).  As the aiding and abetting "claim[s] in this

case relate[] fundamentally to the conduct of the internal affairs" of Tops, "the law of the state of

incorporation—Delaware—governs."[70]  *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d

123, 129 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000).

     *Second*, even if the internal affairs doctrine did not apply, New York's borrowing statute

dictates that Delaware's statute of limitations applies to the Trustee's fiduciary duty and aiding

and abetting claims.  New York's borrowing statute applies where a non-resident brings a cause

of action that accrued outside New York.  *See* N.Y. C.P.L.R. § 202.  In that circumstance, the

reviewing court "must apply the shorter limitation period, including all relevant tolling

provisions, of either: (1) New York; or (2) the state where the cause of action accrued."  *Stuart v.*

*American Cynamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998).  Here, because the Trustee (as a

successor to Tops) is a non-resident of New York and the fiduciary duty and aiding and abetting

claims accrued in Delaware, Delaware's three-year limitations period applies.

     *Tops is not a New York resident.*  Although the New York borrowing statute does not

define "the term 'resident' of New York . . . [,] published decisions of New York state courts

generally hold that the issue is controlled by the entity's state of incorporation."  *See Interventure*

*77 Hudson LLC v. Halengren*, 2018 WL 2234878, at *7 (N.Y. Sup. Ct. May 16, 2018).  The

---

[70] Even if the Court found that Delaware's three-year statute of limitations applied to the primary
breach of fiduciary duty but not the secondary aiding and abetting claim, both claims must be dismissed.
*See Malone v. Brincat*, 722 A.2d 5, 14–15 (Del. 1998) (aiding and abetting claim requires underlying
breach of fiduciary duty).

Trustee brought the fiduciary duty and aiding and abetting claims in his capacity as a successor

to Tops Holding Corporation and Tops Holding II Corporation, the Delaware corporations that

issued the 2012 and 2013 Dividends.  For purposes of the borrowing statute, Tops Holding

Corporation and Tops Holding II Corporation are residents of Delaware, their state of

incorporation.  *Verizon Directories Corp. v. Continuum Health Partners, Inc.*, 902 N.Y.S.2d 343

(N.Y. App. Div. 2010) ("For purposes of CPLR 202, plaintiff is a 'resident' of, and its cause of

action accrued in, Delaware, the state of its incorporation" regardless of "asserted extensive

presence" in the forum state).  Indeed, Tops' various business contacts with New York,

Pennsylvania, and Vermont are unavailing when deciding residency under New York's

borrowing statute, even where New York is a corporation's primary, "if not exclusive," place of

business.  *Potter v. Arrington*, 810 N.Y.S.2d 312, 314 (N.Y. Sup. Ct. 2006).  This is particularly

true where Tops' Delaware holding companies, with no operations of their own, issued the 2012

and 2013 Dividends challenged here.  *See Gordon v. Credno*, 960 N.Y.S.2d 360, 361 (N.Y. App.

Div. 2013) ("[G]iven the minimal business activities of the corporation, the IAS court correctly

found that the derivative claims plaintiff asserted on behalf of the corporation accrued for

purposes of CPLR 202 in Wyoming, where the corporation was incorporated . . . .").[71]  Thus,

Tops is a Delaware resident for purposes of the borrowing statute.

---

[71] The Litigation Trust and Trustee's individual residencies are irrelevant to the borrowing statute analysis where non-resident Tops assigned the claims at issue. *See Gluck v. Amicor Inc.*, 487 F.Supp. 608, 612 (S.D.N.Y. 1980) ("[I]f the cause of action accrues to a non-resident who later assigns the claim to a New York resident, the borrowing statute will apply.  In other words, the assignor's residence is crucial for purposes of the borrowing statute."); *see also Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002) ("When a bankruptcy trustee sues as a representative of the estate of a bankrupt corporation, it is the residency of the corporation which is applicable").  This ensures that a time-barred debtor cannot avoid applicable statutes of limitations simply by assigning its claims to a trustee. *Portfolio Recovery Assocs. v. King*, 14 N.Y.3d 410, 416 (2010) ("Portfolio, as the assignee of Discover, is not entitled to stand in a better position than that of its assignor."); *IKB Int'l S.A. v. Bank of Am.*, 2014 WL 1377801, at *6 (S.D.N.Y. Mar. 31, 2014), *aff'd sub nom.* 584 F. App'x 26 (2d Cir. 2014) ("The foregoing rule clearly makes sense; were the rule otherwise, a claim otherwise time-barred by virtue of Section 202 could be revived by the simple expedient of

*The fiduciary duty and aiding and abetting claims accrued outside New York.* A "cause of action accrues where the injury is sustained rather than where the defendant committed the wrongful acts." *Williams v. Infra Commerc Anstalt*, 131 F. Supp. 2d 451, 455 (S.D.N.Y. 2001). If the alleged injury is purely economic, the place of injury is usually the state of plaintiff's residence. *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999); *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999).[72] Under this analysis, the fiduciary duty and aiding and abetting claims accrued in Delaware, Tops' state of incorporation and residence, because that is where Tops sustained the alleged economic loss. *Interventure 77 Hudson LLC v. Falcon Real Estate Inv. Co., LP*, 101 N.Y.S.3d 326 (N.Y. App. Div. 2019) (finding the Delaware statute of limitations applied to action alleging fraud and breach of fiduciary duty where injury was purely economic and plaintiffs were incorporated in Delaware).

Because Tops is a non-resident of New York and assigned the Trustee claims that accrued in Delaware, Delaware's shorter statute of limitations period applies to the fiduciary duty and aiding and abetting claims. *See Williams*, 131 F. Supp. 2d at 455. The claims are therefore time-barred.

## B.   The Trustee lacks standing to bring the fiduciary duty and aiding and abetting breach of fiduciary duty claims (Counts XI and XII).

Even if the fiduciary duty and aiding and abetting claims had been timely, the Trustee would lack authority to bring them. The Second Amended Plan vests in the Trustee the power to

---

assigning it to a party residing in a jurisdiction with a statute of limitations longer than that in the assignor's residence (but shorter than New York's limitation period)."). Regardless, the Litigation Trust was formed in Delaware. *See* Litigation Trust Agreement (ECF No. 721) at 1–2 (establishing Litigation Trust under Chapter 38 of Title 12 of the Delaware Code).

[72] The Litigation Trust and Trustee's individual residences have no bearing on where the economic loss occurred. *See supra* note 71; *see also Gluck*, 487 F. Supp. at 613 (analyzing the claim assignor's residence to determine where an economic loss was suffered).

prosecute any GUC Litigation Trust Causes of Action, which include derivative claims for breach of fiduciary duty that creditors could have brought.[73]  But here, creditors could not have brought a derivative action for fiduciary duty breaches.  It is well-settled that directors' non-contractual fiduciary duties extend to creditors only when a company is insolvent.  *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).  Creditors are therefore limited to bringing breach of fiduciary duty claims for conduct that either "(1) occurred while the corporation was insolvent, or (2) directly and definitively caused the corporation to become insolvent."  *In re Tribune*, 2018 WL 6329139, at *7; *see also In re Tropicana Entm't, LLC*, 520 B.R. 455, 471 (Bankr. D. Del. 2014) (holding a creditor "must allege either that a corporation was insolvent or became insolvent as a result of the misconduct" to bring derivative fiduciary duty claims).  As described above, the Complaint's allegations of insolvency are either conclusory or implausible, and without meeting the standard to plead either that Tops was insolvent during the Directors' alleged misconduct or that their misconduct caused Tops' insolvency, Tops' creditors, and by extension the Trustee, lack standing to bring the fiduciary duty claims.  *See In re Tribune*, 2018 WL 6329139 at *10–11 (dismissing breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims where trustee failed to plead insolvency during period of directors' alleged misconduct).

---

[73] *See* Second Amended Plan §§ 5.21(c), 1.93(c).  The Trustee's breach of fiduciary duty claim is derivative because it alleges the Director Defendants breached their duty to the Company, thereby harming the Company and its creditors.  (Compl. ¶¶ 258, 260, 264); *see also In re Worldcom, Inc.*, 323 B.R. 844, 849 (Bankr. S.D.N.Y. 2005) (explaining that whether a claim is derivative or direct hinges on "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually), and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)").

**C.    The Trustee fails to adequately plead an aiding and abetting claim (Count XII).**

To plead an aiding and abetting breach of fiduciary duty claim, a plaintiff must allege (i) the existence of a fiduciary duty; (ii) a breach of that duty; (iii) knowing participation in the breach; and (iv) damages resulting from the breach.  *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).  The Trustee does not offer plausible allegations that MSIM "knowingly participated in" a fiduciary duty breach or that Tops was damaged as a result of MSIM's conduct.  "The standard for an aiding and abetting claim is a stringent one, one that turns on proof of scienter of the alleged abettor."  *In re Essendant, Inc. Stockholder Litig.*, 2019 WL 7290944, at *17 (Del. Ch. Dec. 30, 2019).  Here, the Trustee does not offer factual allegations from which knowing participation can be inferred.  Instead, he makes bare and vague allegations that, for example, MSIM "arrang[ed] and direct[ed]" flawed capital analyses for the Dividends, "arrang[ed] and direct[ed]" the accumulation of debt for the purposes of issuing the 2012 and 2013 Dividends, and "orchestrat[ed] the reduction of capital expenditures" and "the accrual of hundreds of millions in debt[.]"  (Compl. ¶ 270.)  Similarly, instead of alleging facts explaining how Tops was damaged as a direct result of fiduciary duty breaches, the Trustee makes only the conclusory allegation that "Tops and its creditors suffered damages as a result of MSIM's aiding and abetting of such breaches of fiduciary duties."  (*Id.* ¶ 271.)  These allegations are insufficient to satisfy pleading standards under *Iqbal* and *Twombly*.  *See Iqbal*, 556 U.S. at 678 (denouncing "unadorned" allegations devoid of "factual enhancement"); *Twombly*, 550 U.S. at 570.

**IV.    The Complaint Should be Dismissed with Prejudice Because Any Effort to Replead Would Be Futile.**

If the Court agrees that the Complaint's allegations are insufficient, it should deny any request for leave to replead for two reasons.  First, any amendment would be futile.  There are no additional facts the Trustee could allege that would (i) revise the public record of Tops' access to

capital markets and the challenges the grocery industry faced during and after the relevant period; (ii) alter the mechanics that funded three of the four Dividends from the proceeds of securities contracts; or (iii) change the dates the Dividends were issued and the Complaint filed. *See In re Tribune Co.*, 2019 WL 1771786 at *12 ("Because the Trustee's [constructive fraudulent transfer claims] are barred by Section 546(e), his proposed amendment would be futile."); *see also Brandon v. Musoff*, 2012 WL 135592, at *4 (S.D.N.Y. Jan. 17, 2012) ("Accordingly, when a cause of action falls outside the applicable statute of limitations, dismissal with prejudice is justified."); *Putkowski v. Warwick Valley Cent. Sch. Dist.*, 363 F. Supp. 2d 649, 655 (S.D.N.Y. 2005) ("Ordinarily, I would dismiss with leave to replead. However, plaintiff's . . . claim is clearly barred by the statute of limitations. As a result, I must dismiss the claim with prejudice.").

Second, before filing his Complaint, the Trustee had access to substantial discovery and significant time to research claims. The Trustee was appointed on November 19, 2018 and waited over fifteen months—until less than two weeks before expiration of the two-year periods under Bankruptcy Code sections 108(a) and 546(a)—to file the Complaint. During that time, he had access to information through Rule 2004 discovery and unfettered access to Tops management.[74] Even if the Complaint's defects were hypothetically remediable, there are no late-breaking factual allegations that could conceivably rescue the Complaint. *See Hayden v. Cty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999) ("There is nothing to suggest that appellants could replead in a fashion which would [state a viable claim].").

---

[74] *See supra* note 3.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Complaint with prejudice.

Dated: May 29, 2020

Respectfully submitted,

*/s/ Pamela A. Miller*
Pamela A. Miller
Peter Friedman (admitted *pro hac vice*)
Daniel S. Shamah
Patrick D. McKegney
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email:  pmiller@omm.com
            pfriedman@omm.com
            dshamah@omm.com
            pmckegney@omm.com

*Attorneys for Defendants Morgan Stanley*
*Investment Management, Inc., Morgan*
*Stanley Capital Partners V U.S. Holdco LLC,*
*Gary Matthews, Eric Kanter, and Eric Fry*

## APPENDIX A

## Overview of Claims, Motion to Dismiss Arguments, and Joining Defendants

| Count | Claim | Motion to Dismiss Arguments | Joining Defendants |
|---|---|---|---|
| I | Avoidance of the 2009 Dividend as Constructive Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273–275) | • Argument I.A–H (pp. 15–35)<br>• Argument II.A–C (pp. 35–46) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic |
| II | Avoidance of the 2010 Dividend as a Constructive Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273–275) | • Argument I.A–H (pp. 15–35)<br>• Argument II.A–B (pp. 35–42) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic<br>• Begain |
| III | Avoidance of the 2012 Dividend as a Constructive Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273–275) | • Argument I.A–H (pp. 15–35)<br>• Argument II.C (pp. 42–46) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic<br>• Begain |
| IV | Avoidance of the 2013 Dividend as a Constructive Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273–275) | • Argument I.A–H (pp. 15–35)<br>• Argument II.C (pp. 42–46) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic<br>• Begain |
| V | Avoidance of the 2009 Dividend as an Actual Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | • Argument I.A–H (pp. 15–35)<br>• Argument II.A–C (pp. 35–46) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic |
| VI | Avoidance of the 2010 Dividend as an Actual Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | • Argument I.A–H (pp. 15–35)<br>• Argument II.A–B (pp. 35–42) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic<br>• Begain |
| VII | Avoidance of the 2012 Dividend as an Actual Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | • Argument I.A–H (pp. 15–35)<br>• Argument II.C (pp. 42–46) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic<br>• Begain |
| VIII | Avoidance of the 2013 Dividend as an Actual Fraudulent Transfer (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | • Argument I.A–H (pp. 15–35)<br>• Argument II.C (pp. 42–46) | • MSCP V Holdco<br>• HSBC I, HSBC II<br>• Turbic<br>• Begain |
| IX | Recovery of the 2012 Illegal Dividend (N.Y. BCL §§ 510, 719, and 720) | • Argument I.A–H (pp. 15–35)<br>• Argument II.C (pp. 42–46)<br>• Argument III.A (pp. 46–51) | • Gary Matthews<br>• Eric Kanter<br>• Eric Fry<br>• Greg Josefowicz<br>• Stacey Rauch |

| Count | Claim | Motion to Dismiss Arguments | Joining Defendants |
|:---:|---|---|---|
| **X** | Recovery of the 2013 Illegal Dividend (N.Y. BCL §§ 510, 719, and 720) | • Argument I.A–H (pp. 15–35)<br>• Argument II.C (pp. 42–46)<br>• Argument III.A (pp. 46–51) | • Gary Matthews<br>• Eric Kanter<br>• Eric Fry<br>• Greg Josefowicz<br>• Stacey Rauch |
| **XI** | Breach of Fiduciary Duty Against the Director Defendants (N.Y. BCL § 717 and New York Common Law) | • Argument I.A–H (pp. 15–35)<br>• Argument III.A–B (pp. 46–52) | • Gary Matthews<br>• Eric Kanter<br>• Eric Fry<br>• Greg Josefowicz<br>• Stacey Rauch |
| **XII** | Aiding and Abetting the Breach of Fiduciary Duty Against MSIM (New York Common Law) | • Argument I.A–H (pp. 15–35)<br>• Argument III.A–C (pp. 46–53) | • MSIM |