**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | |
| TOPS HOLDING II CORPORATION, *et al.*, | Chapter 11 |
| Debtors. | Case No. 18-22279 (RDD)<br>(Jointly Administered) |
| ALAN D. HALPERIN, AS THE LITIGATION TRUSTEE FOR THE TOPS HOLDING LITIGATION TRUST, | Adv. Pro. No. 20-08950 |
| Plaintiff, | |
| v. | |
| MORGAN STANLEY INVESTMENT MANAGEMENT, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OF DECISION ON MOTIONS TO DISMISS**

Appearances:

McKOOL SMITH, P.C., by Kyle A. Lonergan, Esq., James H. Smith, Esq., Joshua Newcomer, Esq., Mike McKool, Esq., and Lewis T. LeClair, Esq. for Plaintiff Alan D. Halperin, as the Litigation Trustee for the Tops Holding Litigation Trust.

O'MELVENY & MYERS LLP, by Pamela A. Miller, Esq., Peter Friedman, Esq., Daniel S. Shamah, Esq., and Patrick D. McKegney, Esq. for Defendants Morgan Stanley Investment Management, Inc., Morgan Stanley Capital Partners V U.S. Holdco LLC, Gary Matthews, Eric Kanter, and Eric Fry.

GREENBERG TRAURIG, LLP, by Louis Smith, Esq., Alan J. Brody, Esq., and Matthew F. Bruno, Esq. for Defendants HSBC Equity Partners USA, L.P. and HSBC Private Equity Partners II USA LP.

PATTERSON BELKNAP WEBB & TYLER LLP, by Daniel A. Lowenthal, Esq., for Defendant Begain Company Limited.

ALSTON & BIRD LLP, by Jonathan T. Edwards, Esq., Steven Campbell, Esq., and Evan Glasner, Esq. for Defendant Turbic Inc.

RICHARDS KIBBE & ORBE LLP, by David B. Massey, Esq., Gregory G. Plotko, Esq., and
Rebecca L. Salk, Esq. for Defendants Gregory Josefowicz and Stacey Rauch.

Hon. Robert D. Drain, United States Bankruptcy Judge

## **Introduction[1]**

In late 2007 a group of private investors led by Morgan Stanley, defined below, acquired
the stock of the predecessor of Tops Holding II Corporation, which with its affiliated debtors in
these chapter 11 cases (together, "Tops" or the "Debtors"),[2] before this bankruptcy case owned
and operated 169 supermarkets in upstate New York, northern Pennsylvania, and Vermont[3]
employing about 14,000 people, including over 12,300 union members.[4] The private equity group
paid approximately $300 million for the purchase, although $200 million of such sum plus
transaction fees was funded with secured debt incurred by Tops and only $100 million came from
the investors themselves.[5]

Before the acquisition, Tops' contingent pension plan withdrawal liabilities so concerned
Morgan Stanley that it decreased its offer from $415 million to $300 million when the seller
refused to indemnify the purchasers or otherwise curtail or eliminate the withdrawal liability risk.[6]
In its 2007 internal investment committee memo, Morgan Stanley stated that the primary pension
plan "is significantly underfunded, and we are concerned that this liability . . . would seriously
threaten the financial health of Tops if it were assumed as part of the deal" and, with other pension
plan exposure, likely "scared away" other potential bidders.[7] Tops' pre-acquisition contingent

---

[1] Unless otherwise noted, the facts herein come from the complaint in this adversary proceeding (ECF No. 1-1 (the "Complaint")), which, to the extent not comprising legal conclusions couched as factual allegations, is accepted as true for purposes of the motions to dismiss before the Court. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).
[2] The Debtors are Tops Holding II Corporation, Tops MBO Corporation, Tops Holding LLC, Tops Markets, LLC, Tops Markets II Corporation, Tops PT, LLC, Tops Gift Card Company, LLC, Erie Logistics LLC and TM1, LLC.
[3] Complaint ¶ 34.
[4] Id. ¶ 1.
[5] Id. ¶ 5
[6] Id. ¶¶ 5, 9, 38.
[7] Id. ¶ 37.

pension-related liabilities came from two sources.  First, Tops was the largest participating employer in the United Food & Commercial Workers Local One Pension Plan (the "UFCW Pension Plan") and was responsible for the vast majority of its liabilities.[8]  Because of significant underfunding, the UFCW Pension Plan was in "critical status,"[9] and subject to a legally required rehabilitation plan.[10]  Tops made only the minimum required annual payments to the UFCW Pension Plan thereunder, equaling less than 50% of the annual benefit payment by the Plan, and, notwithstanding those payments, the UFCW Pension Plan's underfunding continued to increase each year after the acquisition.[11]  Second, under a Supply Agreement with C&S Wholesale Grocers, Inc. ("C&S"), Tops indemnified C&S for any pension withdrawal liability under the New

---

[8] Id. ¶ 7.

[9] Id.  In 2006, Congress enacted the Pension Protection Act of 2006 (the "PPA"), Pub. L. 109-280, 120 Stat. 780 (codified as amended in scattered sections of 26 and 29 U.S.C.) to address problems associated with underfunded pension plans.  The law introduced mechanisms to stabilize distressed pension plans and ensure that they remain solvent.  *See Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co., Inc.*, 692 F.3d 127, 130-31 (2d Cir. 2012):

> [T]he PPA includes measures designed to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future.  The statute created two categories for such plans: "endangered" and "critical."  Under the PPA, a pension plan is in critical status if, *inter alia*, it is less than sixty-five percent funded.  ERISA § 305(b), 29 U.S.C. § 1085(b).  If a pension plan falls into critical status, the plan sponsor must notify the participating employers and unions, ERISA § 305(b)(3)(D), 29 U.S.C. § 1085(b)(3)(D), and each participating employer must contribute an additional surcharge of five to ten percent of the contribution amount required under the applicable collective bargaining agreement.  *See* ERISA § 305(e)(7), 29 U.S.C. § 1085(e)(7).

[10] *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 131 (quoting ERISA § 305(e)(3)(A), 29 U.S.C. § 1085(e)(3)(A)):

> Upon a multiemployer pension plan's entry into critical status, the plan's sponsor must adopt a rehabilitation plan to restore the Fund's financial health going forward.  A rehabilitation plan is a plan which consists of –
>> (i) actions, including options or a range of options to be proposed to the [employers and unions], formulated, based on reasonably anticipated experience and reasonable actuarial assumptions, to enable the plan to cease to be in critical status by the end of the [ten-year] rehabilitation period and may include reductions in plan expenditures (including plan mergers and consolidations), reductions in future benefit accruals or increases in contributions, if agreed to by the [employers and unions], or any combination of such actions, or
>> (ii) if the plan sponsor determines that, based on reasonable actuarial assumptions and upon exhaustion of all reasonable measures, the plan can not reasonably be expected to emerge from critical status by the end of the rehabilitation period, reasonable measures to emerge from critical status at a later time or to forestall possible insolvency....

[11] Complaint ¶ 7.

York State Teamsters Conference Retirement Fund/Teamsters Local Pension Fund (the "Teamsters Pension Plan;" with the UFCW Pension Plan, the "Pension Plans").[12]

Over the next six years while Tops not only was under Morgan Stanley's controlling ownership but also its day-to-day control of business decisions,[13] Tops' contingent pension-related withdrawal liabilities grew significantly, from $85 million upon the acquisition to over $515 million in May 2013,[14] the month of the last transfer to the private equity investors challenged by the Complaint. Tops' funded debt, almost entirely secured,[15] also grew, from $227 million after the acquisition to $649 million in May 2013,[16] and Tops severely constrained its investment in its stores,[17] a risky practice in the grocery industry.[18]

Nevertheless, during those six years Tops also paid over $375 million in four dividends to the private equity investors, funded not from operations but from the proceeds of almost entirely secured loans and the curtailment of capital expenses,[19] with Morgan Stanley receiving the lion's share, a handsome rate of return on investment, to say the least.[20] As stated by Tops' CFO, Morgan Stanley's "intent [was] to take every nickel plus" in the dividends.[21]The Complaint contends that each dividend -- along with Tops' contingent pension plan liabilities, increased funded debt, and curtailed capital expenditures -- rendered Tops insolvent and insufficiently capitalized, and that Tops believed that after making each of the dividends, it would not be able to pay its debts, which included the contingent pension liabilities, as they came due.[22]

---

[12] Id. ¶ 6 n.4.
[13] Id. ¶¶ 41-42, 45.
[14] Id. ¶ 11.
[15] Id. ¶¶ 13, 40, 48, 121, 129, 148. 163.
[16] Id. ¶¶ 13, 39
[17] Id. ¶¶ 10, 96-97.
[18] Id. ¶¶ 95, 98.
[19] Id. ¶¶ 65 (2009 dividend), 86 (2010 dividend), 125 (2012 dividend), 167 (2013 dividend).
[20] Id. ¶¶ 3, 12.
[21] Id. ¶ 63.
[22] Id. ¶¶ 4, 15, 62, 82,121, 163.

Tops obtained favorable solvency opinions before the issuance of three of the dividends,[23] but the Complaint contends that those opinions were so flawed in their formulation and on their face, as well as diverging from other evidence in Morgan Stanley and Tops' possession regarding Tops' financial condition, that they not only should be disregarded without appropriate corrections that would show Tops to have been insolvent at the relevant times,[24] but also, in context -- including that Tops took no meaningful measures to address its ever-increasing contingent pension plan liabilities[25] along with Tops' increased borrowing, and capital expenditure reductions -- show that (a) Tops acted with fraudulent intent in issuing the dividends and (b) its directors wrongfully permitted that to happen in 2012 and 2013 when claims against them for such conduct are not time-barred.[26] The same can be said of Tops' payment of the 2010 dividend, based on there being no solvency opinion, proper adjustments to the 2009 solvency opinion for contingent Pension Plan obligations that the 2009 opinion ignored, and Tops' increasing indebtedness between the 2009 and 2010 dividends.[27] Moreover, even disregarding the flaws in the solvency opinions, they, along with Morgan Stanley's own view of what would be a proper post-dividend capital surplus, show that the dividends left Tops with insufficient capital and that Tops believed it would incur debts beyond its ability to pay as they matured.[28]

Having failed to sell their stake in Tops to outside investors in 2012, in large measure because the market was wary of Tops' financial condition, including its contingent pension-related

---

[23] Id. ¶¶ 52 (2009 dividend), 107 (2012 dividend), 151 (2013 dividend). There was no solvency opinion with respect to the issuance of the 2010 dividend nine months after the 2009 dividend. Id. ¶ 72.

[24] Id. ¶¶ 53-55 (2009 dividend), 107-109, 111-116 (2012 dividend), 150-154, 156-158 (2013 dividend).

[25] Id. ¶¶ 91,

[26] Id. ¶¶ 4 (generally), 63-71 (2009 dividend), 122-140 (2012 dividend), 164-181 (2013 dividend).

[27] Id. ¶¶ 76-77, 83-90

[28] Id. ¶¶ 58-60, 61-62 (2009 dividend), 79-80, 81-82 (2010 dividend), 110, 118-119 120-121 (2012 dividend), 160-161, 162-163 (2013 dividend).

liabilities,[29] the private equity investors obtained their last dividend in May 2013[30] (at the same time that management received bonuses ranging from $75,000 to over $2 million)[31] and entered into a Purchase and Sale Agreement, dated December 3, 2013, under which they sold their stock to an entity controlled by Tops' senior management for, according to the Complaint, "a pittance, with Tops itself funding the vast majority of the purchase price"[32] and the management group funding $4.3 million.

Tops filed for protection under the Bankruptcy Code on February 21, 2018.[33]  The Court confirmed Tops' joint chapter 11 plan (the ("Plan") on November 9, 2018, under which it emerged as a reorganized business having shed hundreds of millions of dollars of funded secured debt in return for new, substantially reduced secured debt and all of the equity in the reorganized company, with the exception of reserved equity for a management incentive plan.  As part of its chapter 11 case, Tops also terminated the UFCW Pension Plan and settled its liability to the Teamster's Pension Plan for a modest amount and left over $1 billion in creditor losses.[34]  The Plan established the GUC Litigation Trust (the "Trust") for the benefit of Tops' unsecured creditors,[35] with Alan D. Halperin as trustee and Trust assets including the causes of action based on the payment of the dividends alleged in the Complaint.[36]

---

[29] Id. ¶¶ 2, 99-102.

[30] Id. ¶¶ 3, 12.

[31] Id ¶ 190.

[32] ¶¶ 2, 16, 191. The Purchase and Sale Agreement is attached as Ex. 10 to the Declaration of Daniel S. Shamah in Support of Defendants' Motion to Dismiss ("Shamah Decl."). The Purchase and Sale Agreement's schedule setting forth the purchase price is not attached to Ex. 10.  In § 4.05(b) of the Purchase and Sale Agreement, the purchaser represents and warrants that it has an equity financing commitment from the Principal Management Holders of $4,300,000 and fully negotiated loan documentation from Bank of American, N.A. for $12,300,000, which one infers may aggregate to the purchase price.

[33] The Chapter 11 cases are jointly administered under Case No. 18-22279 (the "Main Case").

[34] See Debtors' Second Amended Joint Chapter 11 Plan of Reorganization (with Technical Modifications) (the "Plan"), attached as Ex. 2 to Order Confirming Debtors' Second Amended Plan (Main Case, ECF No. 765) (the "Confirmation Order"); Disclosure Statement for the Debtor's Second Amended Plan of Reorganization (Main Case, ECF No. 659) (the "Disclosure Statement"); Complaint ¶¶ 17, 192.

[35] Plan §§ 1.92 and 1.95.

[36] Plan §§ 1.93 and 1.149.

The Complaint asserts thirteen claims -- against Morgan Stanley Investment Management Inc. d/b/a Morgan Stanley Private Equity and Morgan Stanley Capital Partners ("MSIM"), Morgan Stanley Capital Partners V U.S. Holdco LLC a/k/a North Haven Capital Partners V U.S. Holdco LLC ("MSCP V Holdco;" together with MSIM, "Morgan Stanley"); HSBC Equity Partners USA, L.P. ("HSBC I"), HSBC Private Equity Partners II USA LP ("HSBC II," and with HSBC I, "HSBC"); Turbic Inc. ("Turbic"); and Begain Company Limited ("Begain;" collectively with Morgan Stanley, HSBC, and Turbic, the "Private Equity Investors"); and Gary Matthews ("Matthews"), Eric Kanter ("Kanter"), Eric Fry ("Fry;" collectively with Matthews and Kanter, the Morgan Stanley Director Defendants"), Greg Josefowicz ("Josefowicz"), and Stacey Rauch ("Rauch;" collectively with the Morgan Stanley Director Defendants and Josefowicz, the "Director Defendants;" and together with the Private Equity Investors, the "Defendants"), to avoid under New York's Debtor and Creditor Law ("NY DCL"),[37] as incorporated by section 544(b) of the Bankruptcy Code, the four dividends to the Private Equity Investors as constructive and intentional fraudulent transfers and to recover them under section 550 of the Bankruptcy Code (Counts I-VIII); for damages, in each case related to the consideration and approval of the 2012 and 2013 dividends, against the Director Defendants under New York's Business Corporation Law ("NY BCL") based on the unlawful authorization of the 2012 and 2013 dividends (Counts IX-X), and claims for damages against the Director Defendants under the NY BCL and New York common law for breach of fiduciary duty (Count XI) and against MSIM for aiding and abetting breach of fiduciary duty (Count XII), as follows:

---

[37] The applicable NY DCL was the version in effect when the dividends were paid. The NY DLC was later amended by enactment of the "Uniform Voidable Transactions Act" on December 6, 2019, effective April 4, 2020, N.Y. Legis. 580 § 7 (2019), including provisions relating to fraudulent transfers such as NY DCL §§ 273-276, but the amendment "shall not apply to a transfer made or obligation incurred before such effective date." *Id. See also Ray v. Ray*, 799 Fed. Appx 29, 31 n.1 (2d Cir. 2020).

| Count | Claim | Defendants | Complaint ¶ |
|---|---|---|---|
| I | Avoidance and Recovery of the 2009 Dividends as Constructive Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273-275) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic | ¶¶ 193-198 |
| II | Avoidance and Recovery of the 2010 Dividends as Constructive Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273-275) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic<br>Begain[38] | ¶¶ 199-204 |
| III | Avoidance and Recovery of the 2012 Dividends as Constructive Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273-275) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic<br>Begain | ¶¶ 205-210 |
| IV | Avoidance and Recovery of the 2013 Dividends as Constructive Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 273-275) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic<br>Begain | ¶¶ 211-216 |
| V | Avoidance and Recovery of the 2009 Dividends as Actual Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic | ¶¶ 217-223 |
| VI | Avoidance and Recovery of the 2010 Dividends as Actual Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic<br>Begain | ¶¶ 224-230 |
| VII | Avoidance and Recovery of the 2012 Dividends as Actual Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic<br>Begain | ¶¶ 231-237 |
| VIII | Avoidance and Recovery of the 2013 Dividends as Actual Fraudulent Transfers (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL § 276) | MSCP V Holdco.<br>HSBC I<br>HSBC II<br>Turbic<br>Begain | ¶¶ 238-244 |
| IX | Damages Against the Director Defendants for Unlawfully Approving the 2012 Dividends (NY BCL §§ 510, 719, and 720) | Matthews<br>Kanter<br>Fry<br>Josefowicz<br>Rauch | ¶¶ 245-250 |
| X | Damages Against the Director Defendants for Unlawfully Approving the 2013 Dividends (NY BCL §§ 510, 719, and 720) | Matthews<br>Kanter<br>Fry | ¶¶ 251-256 |

---

[38] Begain did not receive a 2009 dividend, having bought its Tops stock in 2010. Complaint ¶ 49 n.6.

| Count | Claim | Defendants | Complaint ¶ |
|-------|-------|------------|-------------|
|  |  | Josefowicz Rauch |  |
| XI | Damages Against the Director Defendants for Breach of Fiduciary Duty (NY BCL § 717 and New York Common Law) Related to Approval of the 2012 and 2013 Dividends | Matthews Kanter Fry Josefowicz Rauch | ¶¶ 257-264 |
| XII | Aiding and Abetting the Breach of Fiduciary Duty (New York Common Law) Related to Approval of 2012 and 2013 Dividends | MSIM | ¶¶ 265-271 |

Morgan Stanley and the Morgan Stanley Director Defendants (each of whom was a Morgan Stanley director when serving on Tops' Board;[39] HSBC; Turbic; Begain; and Josefowicz and Rauch have filed motions (the "Motions")[40] to dismiss the claims asserted against them under Fed. R. Civ. P. 12(b)(6), and, where relevant, Fed. R. Civ. P. 9(b), incorporated by Fed. R. Bankr. P. 7012 and 7009, respectively.  HSBC, Turbic, Begain, and Josefowicz and Rauch joined in the

---

[39] Complaint ¶¶ 25-27.

[40] ECF No. 29 (*Notice of Defendants' Motion to Dismiss*); ECF No. 30 (*Memorandum of Law in Support of Defendants' Motion to Dismiss*); ECF No. 31 (*Declaration of Daniel S. Shamah In Support of Defendants' Motion to Dismiss* (the "Shamah Decl.")); ECF No. 32 (*Notice of Defendants HSBC Equity Partners USA, L.P. and HSBC Private Equity Partners II USA LP's Motion to Dismiss*); ECF No. 33 (*Defendants HSBC Equity Partners USA, L.P. and HSBC Private Equity Partners II USA LP's Memorandum of Law In Support of Motion to Dismiss the Complaint*); ECF No. 34 (*Defendant Begain Company Limited's Notice of Motion to Dismiss*); ECF No. 35 (*Memorandum of Law in Support of Defendant Begain Company Limited's Motion to Dismiss for Failure to State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6)*); ECF No. 37 (*Notice of Gregory Josefowicz's & Stacey Rauch's Motion to Dismiss*); ECF No. 38 (*Memorandum of Law In Support of Gregory Josefowicz's and Stacey Rauch's Motion to Dismiss*); ECF No. 39 (*Notice of Defendant Turbic Inc.'s Motion to Dismiss*); ECF No. 40 (*Defendant Turbic Inc.'s Memorandum of Law in Support of Motion to Dismiss*); ECF No. 41 (*Declaration of David B. Massey in Support of Gregory Josefowicz's and Stacey Rauch's Motion to Dismiss* (the "Massey Decl.")); ECF No. 53 (*Memorandum of Law in Further Support of Gregory Josefowicz's and Stacey Rauch's Motion to Dismiss*); ECF No. 54 (*Defendants' Reply Memorandum in Further Support of Defendants' Motion to Dismiss*); ECF No. 55 (*Declaration of Daniel S. Shamah in Support of Defendants' Reply Memorandum in Further Support of Defendants' Motion to Dismiss*); ECF No. 56 (*Defendants HSBC Equity Partners USA, L.P. and HSBC Private Equity Partners II USA LP's Reply Memorandum of Law in Further Support of Motion to Dismiss*); ECF No. 57 (*Reply in Support of Defendant Begain Company Limited's Motion to Dismiss for Failure to State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6)*); ECF No. 58 (*Defendant Turbic Inc.'s Reply Memorandum of Law in Further Support of Motion to Dismiss*); ECF No. 60 (September 2, 2020 letter to Court from Pamela A. Miller, Esq.); ECF No. 63 (September 4, 2020 letter to Court from Kyle A. Lonergan, Esq.); ECF No. 68 (November 10, 2020 letter to Court from Pamela A. Miller, Esq.); ECF No. 69 (November 12, 2020 to Court from Kyle A. Lonergan, Esq.); ECF No. 75 (April 20, 2021 letter to Court from Pamela A. Miller, Esq.); ECF No. 76 (April 21, 2021 letter to Court from Kyle A. Lonergan, Esq.); ECF No. 83 (September 17, 2021 letter to Court from Pamela A. Miller, Esq.); ECF No. 85 (September 22, 2021 letter to Court from Kyle A. Lonergan, Esq.).

following arguments made by Morgan Stanley, in addition to making certain points of their own

in large measure based on their assertedly lesser role than Morgan Stanley and the Morgan Stanley

Directors in the years-long looting scheme alleged by the Complaint:

| Defendant | Joinder in Morgan Stanley's Arguments | Separate Memo of Law/ Other Joinder |
|---|---|---|
| HSBC (in each case as to claims to avoid and recover the dividends to it as fraudulent transfers) | • Time Barred (Counts I-VIII)<br>• Not Plausible (Counts (I-VIII)<br>• Fails to Show Transferee's Fraudulent Intent (Counts V – VIII)<br>• Safe-Harbored by 11 U.S.C. § 546(e) (Counts I, III-V, VII-VIII) | • Conclusory Actual Fraudulent Transfer Claims (Counts V-VIII)<br>• Supplemental 11 U.S.C. § 546(e) argument |
| Turbic (in each case as to claims to avoid and recover the dividends to it as fraudulent transfers) | • Time Barred (Counts I-VIII)<br>• Not Plausible (Counts I-VIII)<br>• Fails to Show Transferee's Fraudulent Intent (Count V-VIII)<br>• Safe-Harbored by 11 U.S.C. § 546(e) (Counts I, III-V, VII-VIII) | • Conclusory Actual Fraudulent transfer claims (Count V-VIII) (Joins in HSBC's arguments)<br>• Supplemental 11 U.S.C. § 546(e) argument |
| Begain (in each case as to claims to avoid and recover the dividends to it as fraudulent transfers) | • Time Barred (Counts II-IV, VI-VIII)<br>• Not Plausible (Counts II-IV, VI-VIII)<br>• Fails to Show Transferee's Fraudulent Intent (Counts II-IV, VII-VIII)<br>• Safe-Harbored by 11 U.S.C. § 546(e) (Counts II-IV, VI-VIII) | • Conclusory Actual Fraudulent Transfer Claims (Counts VI-VIII) (Joins in HSBC's arguments) |
| Josefowicz and Rauch (in each case as to claims for their conduct related to their approval of and Tops' issuance of dividends) | • Unlawful Dividend and Breach of Fiduciary Duty Claims (Counts IX-XI) Time Barred<br>• Unlawful Dividend Claim Safe-Harbored by 11 U.S.C. § 546(e) (Counts IX and X)<br>• Trustee Lacks Standing to Bring Breach of Fiduciary Duty Claim (Count XI) Because Insolvency not Plausible | • Unlawful Dividend Claims (Counts IX and X) Do Not Plausibly Assert Breach of Fiduciary Duty or Insolvency<br>• Exculpation of Duty of Care Claims (Count XI)<br>• Duty of Loyalty/Good Faith Claims (Count XI) Not Plausible |

The Trust opposes the Motions in their entirety.[41]

---

[41] ECF No. 47 (Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss) ("Plaintiff's Br.").

Generally, the Defendants contend that (i) the Trust cannot assert the Complaint's fraudulent transfer claims with regard to the 2009 and 2010 dividends because the Complaint does not identify, as required by section 544(b) of the Bankruptcy Code, a creditor holding an allowable unsecured claim on the bankruptcy petition date with the right to avoid those transfers under applicable law; (ii) the Trust's fraudulent transfer claims in any event are not plausible because the Complaint (a) does not plausibly allege that Tops was insolvent or undercapitalized or rendered insolvent or undercapitalized when any of the dividends were paid, or that Tops paid the dividends with the belief that it would incur debts beyond its ability to pay as they matured, and (b) has not sufficiently pled intent to defraud as to any of the dividends; (iii) the dividends sought to be avoided as fraudulent transfers and that serve as the basis for breach of fiduciary duty and unlawful dividend claims in any event are safe-harbored under section 546(e) of the Bankruptcy Code; (iv) the Trust lacks standing to bring its fiduciary duty and aiding and abetting breach of fiduciary claims because the Complaint does not plausibly allege that Tops was insolvent when the 2012 and 2013 dividends were made; (v) the breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims are time barred; and (vi) as to Josefowicz and Rauch, (a) the Complaint's claims for breach of the fiduciary duty of care are exculpated, (b) the Complaint's claims for breach of the fiduciary duties of loyalty/good faith are not plausible, and (c) the Complaint's unlawful dividend claims should be dismissed because the Complaint does not plausibly allege insolvency or a breach of fiduciary duty in connection the issuance of the dividends.

For the reasons stated below, the Motions are granted in part and denied in part.

## Jurisdiction

The Court has subject matter jurisdiction over this adversary proceeding and the Motions under 28 U.S.C. §§ 157(a)-(b) and 1334(b), the Amended Standing Order of Reference, dated

January 31, 2012, and the reservation of jurisdiction in the Plan and Confirmation Order.  As noted, the Trust was established under the Plan to pursue claims including those in the Complaint, which were primary assets of the Debtors' bankruptcy estates as far as unsecured creditors were concerned.  For purposes of the Court's retention of post-confirmation jurisdiction, this litigation therefore has the necessary close nexus to the Plan and its implementation.[42]

This ruling on the Motions is interlocutory, and therefore any issues regarding the Court's ability to decide claims asserted in the Complaint by a final judgment are not implicated here.[43] Nor is the Court required to state findings of fact or conclusions of law with respect to the Motions.[44]

### Legal Standards on the Motions

**1. Motion to Dismiss for Failure to State a Claim**

When considering a motion under Fed. R. Civ. P. 12(b)(6), the Court must assess the legal sufficiency of the complaint in the light of Fed. R. Civ. P. 8's pleading requirements (and, as applicable, Fed. R. Civ. P. 9(b)), not require the plaintiff to prove those allegations.[45] The Court accepts the complaint's factual allegations as true and must draw all reasonable inferences in the plaintiff's favor.[46]

---

[42] *Cohen v. CDR Creances S.A.S.* (*In re Euro-American Lodging Corp.*), 549 Fed. Appx. 52, 54 (2d Cir. 2015); *1934 Bedford LLC v. Loeb & Loeb, LLP*, 2022 U.S. Dist. LEXIS 60361, at *15-16 (E.D.N.Y. Mar. 31, 2022); *Congregants of Mosdos Chofetz Chaim Inc. v. Mosdos Chofetz Chaim Inc.*, 2021 U.S. Dist. LEXIS 224031, at *6 (S.D.N.Y. Nov. 17, 2021).

[43] *In re Lehman Bros. Hldgs.*, 2019 U.S. Dist. LEXIS 77887, at *38 & n.11 (S.D.N.Y. May 8, 2019); *O'Toole v. McTaggart* (*In re Trinsum Grp., Inc.*), 467 B.R. 734, 738 (Bankr. S.D.N.Y. 2012) ("[B]oth before and after *Stern v. Marshall*, it is clear that the bankruptcy court may handle all pretrial proceedings, including the entry of an interlocutory order dismissing fewer than all of the claims in an adversary complaint. . . .").

[44] Fed. R. Bankr. P. 7052, incorporating Fed. R. Civ. P. 52(a)(3).

[45] *O'Connor v. DL-DW Holdings, L.L.C.* (*(In re Extended Stay, Inc.)*), 2020 Bankr. LEXIS 2128, at *15 (Bankr. S.D.N.Y. Aug. 8, 2020).  *See also Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999) ("A plaintiff, of course, need only *allege*, not *prove*, sufficient facts to survive a motion to dismiss.") (emphasis in the original).

[46] *Ashcroft v. Iqbal*, 556 U.S. at 678; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). An exception to such required acceptance exists where the complaint's factual allegations are clearly contradicted by documents incorporated into the pleadings by reference.  *Microbanc, LLC v. InsprireMD, Inc.*, 2018 U.S. Dist.

Consistent with Rule 8, courts evaluate a Rule 12(b)(6) motion, "based on [t]wo working principles" articulated in *Ashcroft v. Iqbal*, 556 U.S. at 678-79.[47] First, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[48] Thus "[a] pleading that offers labels and conclusions or a formulaic recitation of a cause of action will not do."[49] Instead, the Court must identify the elements of the applicable cause of action[50] and determine whether the complaint states sufficient facts, not legal conclusions, to support it, recognizing that, while Rule 8's pleading standard "does not require detailed factual allegations" and "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era," "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[51]

"Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.' Fed. R. Civ. Proc. 8(a)(2)."[52]

"To be plausible, the complaint need not show a probability of plaintiff's success, but it must evidence more than a mere possibility of a right to relief."[53] Thus, while a plaintiff need not

---

LEXIS 9832, at *14 (S.D.N.Y. Jan. 22, 2018); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007).

[47] *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2012) (internal quotation marks omitted).

[48] *Iqbal*, 556 U.S. at 679.

[49] *Id.* at 678 (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 554, 555 (2007)) (internal quotation marks omitted).

[50] *Id.* at 675.

[51] *Id*. at 678-679 (internal quotation marks and citations omitted).

[52] *Id.* at 679 (citations omitted); *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d at 717-19.

[53] *Nakahata v. New York-Presbyterian Healthcare Sys*., *Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556).

prove its factual allegations at the motion to dismiss stage, to unlock the door to discovery and continued litigation, the complaint's allegations must at least "raise a reasonable expectation that discovery will reveal liability,[54] including in the inferences that it asks the court to make.[55] "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible,"[56] and "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."[57] Thus, "[a] court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."[58] Instead, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."[59]

## 2. Matters that May Be Considered on a Motion to Dismiss

On a Rule 12(b)(6) motion, a court is generally limited to considering allegations contained in the "four corners of the complaint."[60] A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[61] A document is incorporated by reference, however, only if the complaint makes "a clear, definite, and substantial reference to it," and "[m]ere discussion or limited quotation of a document in a complaint does not qualify as incorporation."[62] "Even where a document is not incorporated by

---

[54] *Twombly*, 550 U.S. at 556.
[55] *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 780 F.3d at 718-19.
[56] *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).
[57] *Id.* at 185.
[58] *Id.*
[59] *Twombly*, 550 U.S. at 556 (internal quotation marks and citation omitted).
[60] *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, at *15.
[61] *Id.* (internal quotation marks and citation omitted).
[62] *Lora v. Centralized Mgmt. Serv.*, 2020 U.S. Dist. LEXIS 104058, at *3 (S.D.N.Y., June 12, 2020) (internal quotation marks and citations omitted).

reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document 'integral' to the complaint,"[63] provided that plaintiff had actual notice of the document,[64] there is no dispute as to its relevance, authenticity, or accuracy,[65] and the court is satisfied that the document is in all relevant respects complete.[66] Generally, consideration of such an "integral" document is warranted because it is a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason -- usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim -- was not attached to the complaint,"[67] or the complaint is based on an allegedly fraudulent statement or omission in a document and therefore examination of the document will show whether in fact the statement was made.[68]

A court may also consider "matters of which a court may take judicial notice,"[69] such as public records or other documents where there is "no serious question as to their authenticity."[70] However, it may consider such a document only "to determine *what* statements [it] contain[s], and *not for the truth of the matters asserted* therein,"[71] because where a fact is in issue the latter determination is not appropriate for a motion to dismiss.[72]

---

[63] *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

[64] *Id.*

[65] *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[66] *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *Keyes v. Ayco Co., L.P.*, 2018 U.S. Dist. LEXIS 230973, at *10-11 (N.D.N.Y., May 14, 2018).

[67] *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

[68] *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

[69] *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. at 322. "In the context of bankruptcy litigation, the public records of which the court may take judicial notice include documents filed in a related bankruptcy proceeding, an adversary proceeding and the underlying bankruptcy case." *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, at *16.

[70] *Roth v. Jennings*, 489 F.3d at 509.

[71] *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (emphasis in the original; internal quotation marks and citation omitted).

[72] *Roth v. Jennings*, 489 F.3d at 510 (lower court's view that defendants' statements in SEC filings "should not be contradicted or taken as perjurious . . . . -- although a possible argument to a jury -- was not an appropriate rationale for ruling on a motion under Rule 12(b)(6).").

The Court has spent more than the usual time on issues about the types of documents it can

consider in connection with a motion to dismiss because Morgan Stanley and Josefowicz and

Rauch have filed extensive documents in support of their Motions,[73] and the Trust argues that most

of them are neither incorporated in the Complaint -- indeed not even mentioned in it -- nor

"integral" to it because not relied on by it or necessary to its allegations, that others tell less than

---

[73] The Shamah Decl. attached the following exhibits:

    Exhibit 1 – Tops Holding Corp. Annual Report Form 10-K (Mar. 29, 2012)
    Exhibit 2 – Tops Holding Corp. Purchase Agreement (Oct. 1, 2009)
    Exhibit 3 – Indenture (Dec. 20, 2012) Ex. 4.1 to Tops Holding Corp. Form 8-K
    Exhibit 4 – Tops Holding II Corp. Annual Report Form 10-K (Mar. 27, 2014)
    Exhibit 5 – Indenture (May 15, 2013) Ex. 4.5 to Tops Holding II Corp. Form S-4
    Exhibit 6 – Tops Holding II corp. Offering Memorandum (May 8, 2013)
    Exhibit 7 – Tops Holding Corp. Annual Report Form 10-K (Mar. 31, 2011)
    Exhibit 8 – UFCW Local One Pension Fund Annual Return Form 5500 (Oct. 6, 2010)
    Exhibit 9 – Shareholders Agmt. (Nov. 29, 2013) Ex. 4.7 Form S-4
    Exhibit 10 – Purchase and Sale Agmt. (Nov. 14, 2013) Ex. 10.12 Form S-4
    Exhibit 11 – Tops Holding II Corp. Annual Report Form 10-K (Mar. 30, 2017)
    Exhibit 12 – Indenture (Jun. 10, 2015) Ex. 4.1 to Tops Form 8-K (Jun. 10, 2015)
    Exhibit 13 – Tops Markets LLC Second A&R Credit Agreement (Dec. 30, 2016)
    Exhibit 14 – In re Yahweh Center, Inc. U.S. Motion to Dismiss (Sept. 24, 2018)
    Exhibit 15 – Tops Holding II Corp. Preliminary Offering Memorandum (2012)
    Exhibit 16 – Tops Holding Corp. Offering Memorandum (Oct. 1, 2009)
    Exhibit 17 – Tops Holding II Corp. Reg Statement Form S-4 (Sept. 6, 2013)
    Exhibit 18 – Press Release (Dec. 6, 2012) Ex. 99.2 to Tops Form 8-K (Dec. 6, 2012)
    Exhibit 19 – Tops Holding Corp. Funds Flow Memorandum (Dec. 20, 2012)
    Exhibit 20 – Tops Holding Corp. Funds Flow Memorandum (Oct. 9, 2009)

The Morgan Stanley Defendants assert that the Court may consider the public filings because the Court may take judicial notice of them as relevant matters of public record.  They assert that the Court may consider the "Offering Memorandum" and "Funds Flow Memorandum" because they are integral to the Complaint.  MS MTD at 6 n.4.

The Declaration of David B. Massey in Support of Gregory Josefowicz's and Stacey Rauch's Motion to Dismiss ("Massey Decl.") attached the following exhibits:

    Exhibit 1 – Tops Holding II Corp. Annual Report (Form 10-K) (March 31, 2011)
    Exhibit 2 – Tops Holding Corp. A&R Certificate of Inc. (Jan. 27, 2010)
    Exhibit 3 – Tops Holding II Corp. Certificate of Inc. (May 7, 2013)
    Exhibit 4 – Tops Holding II Corp. Current Report (Form 8-K (October 20, 2010)
    Exhibit 5 – Tops Holding II Corp. Amdmt. No. 1 to Registration Statement
    Exhibit 6 – Tops Holding II Corp. Annual Report (Form 10-K) (March 27, 2014)
    Exhibit 7 – Tops Holding II Corp. Amdmt. No. 1 to Registration Statement

The Josefowicz and Rauch Defendants assert that the Court may consider the public filings because the Court may take judicial notice of them as relevant matters of public record.  JS MTD at 3 n.4.

The Shamah Reply Declaration attached the following exhibits:

    Exhibit 1 – Email from Kanter to Kevin Karrington dated Oct. 5, 2009 re: UFCW Local One Pension Fund – 2009 Valuation
    Exhibit 2 – *Petition for Panel Rehearing and Rehearing En Banc By Plaintiffs-Appellants-Cross-Appellees* in *In re Tribune Company Fraudulent Conveyance Litigation*, 13-3992-cv(L) (Jan. 2, 2020, 2d Cir.)
    Exhibit 3 – Order denying *Petition*.

the whole story and therefore are incomplete, and that others are offered for the purpose of asking the Court to make a ruling on a disputed factual issue.[74] This memorandum of decision discusses specific instances when a Motion improperly cites to such documents, or, alternatively, where a Motion properly cites to extraneous documents, only when it addresses those aspects of the Motions that rely on them and such citations might be material to the outcome.

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided in a Rule 12(b)(6) motion if the defense appears on the face of the complaint.  If it appears from a complaint that the claims are prima facie time-barred, the burden is on the plaintiff to plausibly allege that they fall within an exception to the applicable statute of limitations."[75]

### 3. Rule 9(b)

Fed. R. Civ. P. 9(b), incorporated by Fed. R. Bankr. P. 7009, states that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud. . . .  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." It is well established that Rule 9(b) applies to claims to avoid intentional fraudulent transfers under NY DCL § 276.[76] On the other hand, the overwhelming weight of authority is that Rule 8(a), not Rule 9(b), applies to claims to avoid constructive fraudulent transfers under NY DCL §§ 273-275,[77] for

---

[74] Plaintiff's Br. at 20-21.  Appendix A to the Plaintiff's Br. itemizes Tops' objections to Defendants' exhibits.

[75] *Varbero v. Belesis*, 2020 U.S. Dist. LEXIS 182323, at *7 (S.D.N.Y., Oct. 1, 2020) (internal quotation marks and citations omitted).

[76] *See Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs., Ltd.*), 337 B.R. 791, 801 (S.D.N.Y. 2005), and the cases cited therein.

[77] *Arnold v. First Citizens Nat'l Bank* (*In re Cornerstone Homes, Inc.*), 567 B.R. 37, 50-51 (Bankr. W.D.N.Y. 2017); *Tronox Inc. v. Anadarko Pet. Corp.* (*In re Tronox Inc.*), 429 B.R. 73, 95-96 (Bankr. S.D.N.Y. 2010). Cases holding to the contrary either lump together constructive fraudulent transfer claims with intentional fraudulent transfer claims without recognizing that the former lack a scienter requirement, *Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 115-16 (S.D.N.Y. 2001), or apply to purportedly constructive fraud claims that have an element of scienter.  *Marketxt Hldgs. Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 397 n.75 (S.D.N.Y. 2010).  Here any such issue likely is moot because the Complaint pleads that all the constructive fraudulent transfers also were made with intent to defraud and therefore has pled them with particularity.

breach of fiduciary duty,[78] and for authorizing unlawful dividends under NY BCL § 720.[79] Although the circumstances constituting alleged intentional fraudulent transfers -- the "what," "to whom," "when," and "how" of the transfer, including the consideration for it or lack thereof -- must be pled with particularity,[80] "the degree of particularity required of a bankruptcy trustee may vary depending on whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts,"[81] because often "a trustee is an outsider to the transactions who must plead fraud from second-hand knowledge."[82] Here, the record is not entirely clear as to the extent of discovery available to the Trust before the filing of the Complaint, but it does not appear to have been minimal.

Corporations act only through those who control them under applicable state law -- directors or controlling shareholders -- and therefore it is the intent of those people, acting in such capacity, that must be pled as to the specific transaction at issue.[83]

Rule 9(b) expressly does not require that fraudulent intent be pled with particularity,[84] and the Second Circuit has long recognized that because of the difficulty of proving it, the pleader is allowed "to allege facts that give rise to a strong inference of fraudulent intent."[85] Generally, such an inference "may be established either (a) by alleging facts to show that defendants had both

---

[78] *Beneson v. Fleischman*, 1995 U.S. Dist. LEXIS 6636, at *11 (S.D.N.Y. May 17, 1995) (breach of fiduciary duty).
[79] *Camlin Ltd. v. CMB Additives LLC*, 2012 U.S. Dist. LEXIS 167370, at *6 (E.D.N.Y. Nov. 19, 2012) (unlawful dividends).
[80] *Gordon v. I.M.V. 1290* (*In re Mina*), 2022 Bankr. LEXIS 1887, at *10 (Bankr. N.D.N.Y., July 8, 2022).
[81] *Kirschner v. FitzSimons* (*In re Tribune Co. Fraudulent Conveyance Litig.*), 2018 U.S. Dist. LEXIS 204632, at *19 (S.D.N.Y., Nov. 30, 2018) (citing *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987)) (internal quotation marks omitted).
[82] *Nisselson v. Softbank AM Corp.* (*In re MarketXT Hldgs. Corp.*), 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (internal quotation marks and citation omitted).
[83] *Kirschner v. Large S'holders* (*In re Tribune Co. Fraudulent Conveyance Litig.*), 10 F.4th 147, 160 (2d Cir. 2020), *cert. denied*, 149 S. Ct. 1128 (2022).
[84] *See also Iqbal*, 556 U.S. at 686 ("intent" to be pled "generally" under Rule 9(b), subject to requirements of Fed. R. Civ. P. 8).
[85] *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (superseded on other grounds by statute). Because of the seriousness of a fraud allegation, the Circuit has required a "*strong* inference." *First Capital Asset Mgmt. v. Satinwood*, 385 F.3d 159, 179 (2d Cir. 2004) (emphasis in original).

motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[86] The same approach applies in the intentional fraudulent transfer context,[87] although courts often rely on established "badges of fraud," "i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."[88] At the same time, "[m]otives that are generally possessed by most corporate directors and officers do not suffice to demonstrate fraud," and approval of merely "a risky transaction . . . would arguably support a negligence or constructive fraud claim but not . . . an intentional fraudulent transfer claim.  Indeed, there is nothing unlawful about a company transacting business during unusually difficult financial times in an attempt to prevent its own collapse."[89]

### The Claims

**1.  The Fraudulent Transfer Claims**.

A. <u>Are the Claims to Avoid the 2009 and 2010 Dividends as Fraudulent Transfers Time-Barred, Thereby Depriving the Trust of Standing</u>?  The Trust brings its fraudulent transfer claims under section 544(b) of the Bankruptcy Code, which provides, with inapplicable exceptions, "[T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title."[90]  Thus, in addition to pleading the transfers of the dividends -- in each case indisputably a transfer of the Debtor's property -- the Trust must plead, in satisfaction of Rule 8,

---

[86] *Shields*, 25 F.3d at 1128.
[87] *Gordon v. I.M.V. 1290*, 2022 Bankr. LEXIS 1887, at *11.
[88] *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005) (internal quotation marks and citation omitted); *Gordon v. I.M.V. 1290*, 2022 Bankr. LEXIS 1887, at *11-12.
[89] *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th at 162 (internal quotation marks and citations omitted).
[90] 11 U.S.C. § 544(b)(1).

that (a) as of the bankruptcy petition date[91] there was a least one holder of an allowable unsecured

claim (b) that had the ability to avoid the challenged transfer "under applicable law," that is,

applicable non-bankruptcy transfer-avoidance law. Without the existence of such a creditor, the

Trust would lack standing to pursue the claim.[92] With such a creditor, however, the Trust can

pursue the claim not only for the benefit of that creditor, who may have only a small claim to

satisfy, but also for the benefit of all unsecured creditors.[93]

"It is not necessary that the claim held by that creditor at the bankruptcy filing be identical

to the one held at the time of the fraudulent conveyance,"[94] or, under some applicable fraudulent

transfer laws, that the creditor even have had a claim at the time of the transfer, only that the

petition date creditor could avoid the transfer under applicable non-bankruptcy law.  For example,

by their plain terms NY DCL §§ 274 - 276 provide that the types of transfers described therein are

fraudulent as to future creditors as well as to creditors at the time of the transfer,[95] and some

creditors can avoid a constructive fraudulent transfer under NY DCL § 273 even if the debt in

existence at the time of the transfer was replaced by new debt.[96]

---

[91] Under 11 U.S.C. § 108(a), if a limitations period governing a claim is unexpired when its bankruptcy is filed (*i.e.*, the claim would have been timely as of the bankruptcy petition date), the trustee or debtor in possession may commence the subject action before the later of (a) the end of the non-bankruptcy limitations period and (b) two years after the bankruptcy case is filed. The Complaint initiating this adversary proceeding was filed on February 12, 2020 [ECF No. 1], within two years of the bankruptcy petition date, February 21, 2018 [Main Case ECF No. 1].

[92] *Silverman v. Sound Around, Inc.* (*In re Allou Distribs.*), 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008).

[93] *Moore v. Bay*, 284 U.S. 4, 5 (1931); 11 U.S.C. § 550(a) (once transfer is avoided, "the trustee may recover, for the benefit of the estate" the property transferred or its value); 5 Collier on Bankruptcy ¶ 544.06[4] (16th ed. 2022).

[94] *In re RCM Global Long Term Capital Appreciation Fund*, 200 B.R. 514, 523 (Bankr. S.D.N.Y. 1996) (internal quotations marks and citations omitted); *see also In re Allou Distribs.*, 392 B.R. at 34 ("[A] triggering creditor must be the *same creditor* on both the Transfer Date and the Petition Date, but need not hold the *same claim* at these two essential points in time.") (emphasis in the original).

[95] NY DCL § 274 (transfer leaving "an unreasonably small capital, is fraudulent as to creditors and other persons who become creditors during the continuance of such business or transaction"), NY DCL § 275 (transfer incurred when the person making the transfer "intends or believes that he will incur debts beyond the ability to pay as they mature, is fraudulent as to both present and future creditors"), NY DCL § 276 (transfer made with actual intent "to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors").

[96] *Geron v. Craig* (*In re Direct Access Partners, LLC*), 602 B.R. 495, 516 (S.D.N.Y. 2019) ("rolling accounts"). Debts to United States governmental entities are treated as debts owing to the United States as a whole. *In re Whimsey, Inc.*, 221 B.R. 69,72-74 (S.D.N.Y. 1998).

Tops' bankruptcy petition date was February 21, 2018. The applicable limitations period to avoid a fraudulent transfer under the NY DCL, which the parties agree would be the applicable transfer-avoidance law, generally is six years from the date of the transfer.[97]

The claims to avoid the 2012 and 2013 dividends, which were paid in December 2012 and May 2013, respectively,[98] facially are not time-barred, as the dividends were paid within six years of the petition date. The same holds true for claims to avoid all four of the dividend issuances under NY DCL §§ 274-276. The Defendants have not challenged the Complaint's allegations that there was at least one holder of an allowed unsecured claim that had the ability on the petition date to avoid those transfers.[99] In any event, such a general pleading suffices at this stage in the litigation.[100]

Pointing to New York's six-year limitations period, the Defendant's contend, though, that the October 2009 and July 2010 dividends cannot be avoided under NY DCL § 273 because they are time-barred on the face of the Complaint. The Trust responds that the general six-year limitations period is not the only applicable period to bring a claim under NY DCL § 273, however. The Trust alleges the Internal Revenue Service ("IRS"), specifically named in the Complaint as holding an unsecured claim against Tops on the bankruptcy petition date, at that time had the

---

[97] NY CPLR §§ 213(1), (8); *Jaliman v. D.H. Blair & Co. Inc.*, 105 A.D.3d 646, 647, 964 N.Y.S.2d 112 (1st Dep't. 2013) ("New York law provides that a claim for constructive fraud is governed by the six-year limitation set out in CPLR 213(1), and that such a claim arises at the time the fraud or conveyance occurs.") (citation omitted); *Varbero v. Belesis*, 2020 U.S. Dist. LEXIS 182323, at *16 ("Pursuant to N.Y. C.P.L.R. 213(8), the statute of limitations for actual fraud is 'the greater of six years from the date the cause of action accrued or two years from the time plaintiff or the persons under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it.") (quoting *Gutkin v. Siegal*, 85 A.D.3d 687, 926 N.Y.S.2d 485, 486 (1st Dep't. 2011)) (internal quotation marks and citations omitted).
[98] Complaint ¶ 12.
[99] Id. ¶¶ 209, 215, 236, 243.
[100] *45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts, LLC*), 599 B.R. 730, 742-43 (Bankr. S.D.N.Y. 2019); *Picard v. Avellino* (*In re Bernard L. Madoff Inv. Sec. LLC*), 557 B.R. 89, 120 (Bankr. S.D.N.Y. 2016); *see also Mendelsohn v. Kovalchuk* (*In re APCO Merchant Servs., Inc.*), 585 B.R. 306, 315 n.12 (Bankr. E.D.N.Y. 2018) (plaintiff may plead existence of qualifying creditor generally and prove that existence at trial). *See generally Varbero v. Belesis*, 2020 U.S. Dist. LEXIS 182323, at *7 (statute of limitations may be raised at motion to dismiss only if the defense appears on the face of the complaint).

21

ability to avoid the 2009 and 2010 dividends under "applicable law" for purposes of section 544(b) of the Bankruptcy Code[101] because the IRS has the benefit of a separate limitations period that would extend NY DCL 273's reach-back to the transfers.

The Private Equity Investors contend, though, that, notwithstanding the plain terms of section 544(b)(1), the Trust cannot, however, assert the IRS's avoidance rights under "applicable law." They argue, first, that because the longer limitations period applying to the IRS derives from the doctrine of *quod nullum tempus occurrit regi* (or "no time runs against the king"), under which the United States is not bound by state statutes of limitation, the Trust -- obviously not a federal entity -- cannot appropriate it. The *nullum tempus* doctrine enables the IRS to avoid fraudulent transfers that occurred outside of applicable state law limitations periods, provided that it was enforcing a public right or the public interest absent a clear showing of contrary congressional intent.[102] Relying on the logic of *Wagner v. Ultima Homes, Inc.* (*In re Vaughan Co., Realtors*),[103] the Private Equity Investors contend that those restrictions on the doctrine preclude anyone using it except the federal government, that is, that the Trust is not pursuing a public right or public interest and that congressional intent to incorporate the doctrine into section 544(b) is not clear.[104]

*In re Vaughan* has been cogently criticized by several courts, however, (a) as being contrary to the plain meaning of section 544(b), which establishes congressional policy to provide, for the benefit of the estate, the avoidance claim of *any* triggering creditor "under applicable law" and (b) for not recognizing, in any event, that fulfilling the IRS's ability to collect a tax from the transferee of a taxpayer for the benefit of all unsecured creditors in the equitable operation of the bankruptcy

---

[101] Complaint ¶¶ 197, 203, 222, 229. *See* IRS Proof of Claim No. 8 (asserting unsecured priority claim in the amount of $417,890.49, and unsecured general claim in the amount of $87,442.34).

[102] *United States v. Spence*, 2000 U.S. App. LEXIS 29122, at *10-11 (10th Cir., Nov. 15, 2000), discussing *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *Bledsoe v. Flamingo Props., LLC* (*In re Musselwhite*), 2021 Bankr. LEXIS 2609, at *26 (Bankr. E.D.N.C., Sept. 23, 2021).

[103] 498 B.R. 297 (Bankr. D. N.M. 2013).

[104] *Id.*, at 304-06.

law is in the public interest. [105] Indeed, *Vaughan* has been rejected by every other court considering

the issue, now a long list.[106] I agree with those decisions; for the Private Equity Investors' argument

to prevail, section 544(b)(1) would need to be amended by adding to its final clause "provided,

that only the state law limitations period shall apply." Thus, the Trust is correct that if the IRS

qualifies as a triggering creditor under section 544(b), the Trust has standing to seek to avoid the

2009 and 2010 dividends under NY DCL § 273 as incorporated by that section of the Bankruptcy

Code.

The Private Equity Investors further argue, however, that if, as the Court has concluded,

the Trust could use the IRS as a triggering creditor under section 544(b), the IRS' fraudulent

transfer claim under NY DCL § 273 would be time-barred in any event. They contend that the

relevant provision of the Internal Revenue Code by its plain terms does not give the IRS the right

to pursue a fraudulent transfer made before the underlying tax was assessed and that the Complaint

does not allege that the 2009 and 2010 dividends occurred after any such assessment. This

argument, however, misconstrues the statue and the case law applying the *nullum tempus* doctrine.

The Trust concedes that the *nullum tempus* doctrine is limited by 26 U.S.C. § 6502, which

provides in relevant part,

---

[105] *See, e.g.*, *Maxus Liquidating Trust v. YPF S.A.* (*In re Maxus Energy Corp.*), 2022 Bankr. LEXIS 1748, at *116-
18 (Bankr. D. Del., June 22, 2022); *Williamson v. Smith* (*In re Smith*), 2022 Bankr. LEXIS 1533, at *13-18 (Bankr.
D. Kan., June 2, 2022); *Hillen v. City of Many Trees, LLC* (*In re CVAH, Inc.*), 570 B.R. 816, 835 (Bankr. D. Idaho
2017); *Mukamal v. Citibank N.A.* (*In re Kipnis*), 555 B.R. 877, 882 (Bankr. S.D. Fla. 2016); *Ebner v. Kaiser* (*In re
Kaiser*), 525 B.R. 697, 713-14 (Bankr. N.D. Ill. 2014).

[106] *In re Maxus Energy Corp.*, 2022 Bankr. LEXIS 1748, at *116; *see also*, in addition to the several contrary
decisions cited by *Vaughan*, 498 B.R. at 303, *Pereira v. Omansky* (*In re Omansky*), 2022 Bankr. LEXIS 2535, at
*28-29 (Bankr., S.D.N.Y. Sept. 15, 2022); *In re Smith*, 2022 Bankr. LEXIS 1533, at *16-17; *Gordon v. Webster* (*In
re Webster*), 629 B.R. 654, 674 (Bankr. N.D. Ga. 2021); *Mitchell v. Zagaroli* (*In re Zagaroli*), 2020 Bankr. LEXIS
3111, at *4-9 (Bankr. W.D.N.C. Nov. 3, 2020); *Murphy v. ACAS, LLC* (*In re New Eng. Confectionary Co.*), 2019
Bankr. LEXIS 2281, at *5-6 (Bankr. D. Mass. July 19, 2019); *Vieira v. Gaither* (*In re Gaither*), 595 B.R. 201, 208-
210 (Bankr. D.S.C. 2018); *Shearer v. Tepsic* (*In re Emergency Monitoring Techs., Inc.*), 347 B.R. 17, 19 (Bankr.
W.D. Pa. 2006); *Osherow v. Porras* (*In re Porras*), 312 B.R. 81, 97 (Bankr. W.D. Tex. 2004); R. Stephen McNeill,
"Avoiding the Unavoidable: A Practitioner's Guide to Federal Governmental Creditor Fraudulent Conveyance
Actions," 92 Am Bankr. L.J. 335, 346 ("McNeil") ("[A]ny limitations on § 544(b) likely will need to be crafted by
Congress, not the courts.").

(a) Length of period.  Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun --

(1) within 10 years after the assessment of the tax . . . . If a timely proceeding in court for the collection of a tax is commenced, the period during which such tax may be collected by levy shall be extended and shall not expire until the liability is satisfied or becomes unenforceable.

The Trust correctly contends, though, that neither the *nullum tempus* doctrine nor section 6502(a) require the imposition of an assessment before the commencement of an action to avoid the transfer or that the assessment have preceded the transfer for it to be avoidable. The IRS's right to avoid a taxpayer's fraudulent transfer stems from the *nullum tempus* doctrine, which flows from its status as a claimant, not from section 6502(a), which does not even address the IRS's time to avoid a fraudulent transfer.

Instead, section 6502(a) establishes two separate time limits for the IRS to enforce its rights to collect a tax.  First, as set forth in the introductory clause to the section, the assessment of the tax must have been timely. Second, if the tax was timely assessed, under section 6502(a)(1) the IRS has ten years to collect on it or proceed in court to collect, including to seek to avoid a fraudulent transfer.  As for the first limitation, the general rule is that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed)."[107] That is, the first step to triggering the time to assess is the taxpayer's filing of a return; the IRS's filing of a return under 26 U.S.C. § 6020(b), does not start the period to run.[108]  In addition, the Internal Revenue Code has at least 15 specified

---

[107] 26 U.S.C. § 6501(a).
[108] 26 U.S.C. § 6501(a), (b)(3).

exceptions to the general three-year rule, including to permit the IRS to proceed in court without an assessment.[109]

But more importantly, it is the IRS's status as a creditor at the time of the transfer (or as a future creditor, depending on the applicable fraudulent transfer statute) that gives it standing to avoid a fraudulent transfer, *not* the assessment. "[T]he IRS's status as a creditor of the debtor is not dependent on the assessment of the tax" at all.[110] In other words, "Reading all of these provisions together suggests that the IRS need not assess the tax to qualify as a triggering creditor for purposes of § 544(b),"[111] only that after an assessment it has ten years to commence suit.[112]

The Private Equity Holders' citation of two decisions to the contrary is not persuasive. In *Luria v. Thunderflower, LLC* (*In re Taylor Bear, & Whitaker Mortg. Corp.*),[113] the court stated merely that "[t]he Court is unaware of case law permitting the IRS to avoid transfers made prior to the original taxpayer assessment" and, therefore, withheld summary judgment and permitted the parties to "revisit this issue."[114] Presumably the result would have changed if the court had been informed of the many cases (see, e.g. n.112 above) that in fact permit just such a result. *Kittery*

---

[109] 26 U.S.C. § 6501(c), (e)(1)(A). *See also* 26 U.S.C. § 6501(f), (h), (j), (k), and (m). *See also Finkel v. Polichuk* (*In re Polichuk*), 506 B.R. 405, 428-30 (Bankr. E.D. Pa. 2014) (denying defendants summary judgment based on insufficient evidence that assessment period had run).

[110] McNeill, 92 Am. Bankr. L.J. at 353 (citing, in n.126, *United States v. Green*, 201 F.3d 251, 257 (3d Cir. 2000) ("The United States is considered a creditor from the date when the obligation to pay income taxes accrues"); *United States v. Evans*, 513 F. Supp. 2d 825, 834 (W.D. Tex. 2007); *In re Polichuk*, 506 B.R. at 426 ("Federal income taxes, assessed or not, that are due and owing fall within the concept of a 'claim' in bankruptcy.")).

[111] *Id.* at 353.

[112] *See, e.g.*, *Leighton v. United States*, 289 U.S. 506, 506-09 (1933) (IRS's claim to recover from shareholder transferees of taxpayer not time-barred; transfer occurred in 1921 while IRS was a creditor; assessment occurred in 1926); *United States v. Henco Hldg. Corp.*, 985 F.3d 1290, 1293 (11th Cir. 2021) (IRS's claim to avoid fraudulent transfers not time-barred although assessment occurred over a decade after the transfers); *United States v. Geniviva*, 16 F.3d 522, 525 (3d Cir. 1994) (IRS's claim to recover 1981 transfer not time-barred where IRS was a creditor when transfer was made and 1985 assessment was timely); *United States v. Fernon*, 640 F.2d 609, 612 (5th Cir. 1981) (IRS's claim to avoid 1965 fraudulent transfer brought within ten years after timely 1968 assessment not-time barred). Thus the transfer could take place well before ten years before the commencement of the suit and the suit could still be timely.

[113] 2018 Bankr. LEXIS 3019 (Bankr. M.D. Fla,. Sept. 28, 2018).

[114] *Id.* at *18.

*Point Partners, LLC v. Bayview Loan Servicing LLC* (*In re Kittery Point Partners, LLC*),[115] also cited by the Private Equity Investors, assumed, based on its reading of 27 U.S.C. § 6502(a)(1), that the IRS's tax assessment triggered its right to avoid a transfer and that the automatic stay precluded such an assessment.[116] As discussed above, however, while it is the timely assessment that starts the limitations period running, it is the IRS's status as a creditor in connection with the transfer that triggers its right to avoid the transfer.[117]

Although not raised by the Private Equity Holders, for the sake of completeness the Court also has considered the effect of a second provision of the Internal Revenue Code that addresses the IRS's rights against transferees of taxpayers (which, after all, is the right that gives the IRS status as a triggering creditor under section 544(b)). 26 U.S.C. § 6901 provides in relevant part,

> (a) Method of Collection. The amounts of the following liabilities shall . . . be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:
>
> (1) Income, estate and gift taxes. (A) Transferees. The liability, at law or in equity, of a transferee of property --
>
> (i) of a taxpayer in the case of a tax imposed by [26 U.S.C. §§ 1 et seq.] . . . in respect of the tax imposed by [26 U.S.C. §§ 1 et seq.]. . . .
>
> (c) Period of limitations. The period of limitations for assessment of any such liability of a transferee. . . shall be as follows:
>
> (1) Initial transferee. In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor. . . except that if, before the expiration of the period of limitation for the assessment of the liability of the transferee, a court proceeding for the collection of the tax or liability in respect thereof has been begun against the initial transferor or the last preceding transferee, respectively, then the period of limitation for assessment of the liability of the transferee shall expire 1 year after the return of execution in the court proceeding.

---

[115] 2018 Bankr. LEXIS 859 (Bankr. D. Me., Mar. 12, 2018), *aff'd on other grounds*, 623 B.R. 825 (B.A.P. 1st Cir. 2021), *aff'd*, 858 Fed. Appx. 386 (1st Cir. 2021).

[116] *Id.* at *29-30.

[117] *See* nn.110-112, above; *see also In re Webster*, 629 B.R. at 677 (analysis of whether IRS's right is time-barred involves consideration of both date of transferor's liability to the IRS and whether assessment was timely, and time bar for either was not so clear on the face of the complaint to warrant dismissal under Rule 12(b)(6)).

Section 6901(a)(i) appears to incorporate for claims against a transferee of a taxpayer-transferor section 6502(a)'s generous post-assessment limitations period for the assessment, payment, and collection from the taxpayer. Thus, because section 6901(c)'s limitations period is triggered by the expiration of the IRS's time to assess Tops and, for the reasons discussed above, one cannot on the face of the Complaint determine that the IRS's time to assess Tops has expired, section 6901(a)(1) does not support dismissal of the Trust's claims to avoid the 2009 and 2010 dividends under NY DCL § 273.[118]

It could be argued, however, that section 6901(c)(1) seems to separately limit the period for assessment of a transferee to one year after the expiration of the period for assessment against the transferor and therefore perhaps require a separate timely assessment of the transferee before commencing the recovery action against it. This argument, though, has been rejected, including by the Supreme Court in interpreting section 6901's predecessor,[119] as well as by the several circuit courts of appeal that have considered the issue.  They have concluded, based on their analysis of section 6901 and Supreme Court precedent, that section 6901 merely supplements, and does not in subsection (c) limit, the IRS's power to avoid a transfer by a taxpayer-transferee for at least ten years after the tax was required to be assessed.[120]

It therefore does not appear from the Complaint and all other matters that the Court can consider in connection with the Motions that the IRS' rights to avoid the 2009 and 2010 dividends

---

[118] *See In re Webster*, 629 B.R. at 677 (assessment of taxpayer starts limitations period for collection, including to seek to avoid a fraudulent transfer; because court cannot determine the time to assess would be on the allegations in the Complaint, Rule 12(b)(6) motion based on untimeliness denied); *see also* n.112, above.

[119] *Leighton v. United States*, 289 U.S. at 509.

[120] *See United States v. Henco Hldg. Corp.*, 985 F.3d at 1298-1305, and the cases cited therein (where there was a timely assessment of tax liabilities against taxpayer-transferor, IRS did not have to separately assess transferee before pursuing fraudulent transfer action); *see also In re CVAH, Inc.*, 570 B.R. at 836-837 (because IRS could commence court proceeding against transferee without making an assessment against it, trustee could exercise its right to do the same under 11 U.S.C. § 544(b)).

under NY DCL § 273 "are prima facie time-barred,"[121] and thus the Private Investor Defendants' statute of limitations defense is, at best for the Defendants, premature at this stage in the litigation.[122]

B. Are the Fraudulent Transfer Claims Plausible?  As noted, the Complaint asserts that the 2009, 2010, 2012 and 2013 dividends can be avoided as constructive fraudulent transfers under NY DCL § 273-275, as well as intentional fraudulent transfers under NY DCL § 276.

i. *The Constructive Fraudulent Transfer Claims*. "Under the DCL, a conveyance by a debtor is deemed constructively fraudulent if it is made without 'fair consideration,' and (*inter alia*) if one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275."[123]

As relevant here, NY DCL § 272 defines "fair consideration" for purposes of NY DCL §§ 273 - 275 as an exchange for a transfer of property of "a fair equivalent therefor, and in good faith." Unless a dividend is a form of compensation for services rendered or property conveyed -- not alleged here -- it is by definition a distribution with respect to an owner's equity interest and therefore a conveyance without fair consideration, indeed without *any* consideration.[124]

---

[121] *Varbero v. Belesis*, 2020 U.S. Dist. LEXIS 182323, at *7; *see also Singleton v. Clash*, 951 F. Supp. 2d 578, 582 (S.D.N.Y. 2013), *aff'd* 558 Fed. Appx. 44 (2d Cir. 2014) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.") (quoting *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989)).
[122] *Id. See also Arnold v. First Citizens Nat'l Bank* (*In re Cornerstone Homes, Inc.*), 567 B.R. at 54; *In re Tronox Inc.*, 429 B.R. at 99.
[123] *In re Sharp Int'l Corp.*, 403 F.3d at 53.
[124] *Graham v. Serafis* (*In re Vill. Red Rest. Corp.*), 2021 Bankr. LEXIS 2377, at *30-31 (Bankr. S.D.N.Y. Aug. 31, 2021); *Pereira v. Equitable Life Ins. Soc'y of the United States* (*In re Trace Int'l Hldgs., Inc.*), 289 B.R. 548, 560 (S.D.N.Y. 2003).

NY DCL § 271 states that a person is "insolvent" "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."  NY DCL § 270 defines "debt" broadly to include "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." Thus section 271 recognizes existing unmatured, unliquidated, and contingent debts as "existing debts" to be included in the calculation of insolvency, provided, however, that on a present value basis[125] they be determined based on the probability of their becoming fixed and matured.[126]  As stated by the Eleventh Circuit, the court should "calculate the present value of the liability -- the expected cost of the liability times the estimated chance of it ever occurring.  Unless either the expected cost or the chances of it occurring are equal to zero (that is the liability is costless, or the chances of it happening are negligible), the estimated value should be more than zero."[127]

Given the nature of the solvency determination, it is well recognized that "insolvency is ordinarily a question of fact,"[128] requiring the court usually to weigh a significant amount of evidence, and thus courts should not dismiss a complaint that contains sufficient facts to permit a plausible inference of insolvency even if the defendant has its own plausible arguments for

---

[125] Insolvency under the NY DCL "is measured from the point at which the transfer took place. . . ."  *Official Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 551 (Bankr. S.D.N.Y. 2015); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 380 (S.D.N.Y. 2003) ("[S]olvency must be gauged at the time of the transfer and not with the benefit of hindsight."), *aff'd*, 99 Fed. Appx. 274 (2d Cir. 2004).

[126] *In re Tronox*, 429 B.R. at 98 n. 15 (internal quotation marks and citation omitted); *see also Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 211 (Bankr. S.D.N.Y. 2020) ([E]ven contingent claims must be considered in determining insolvency discounted by the likelihood that the contingency will not occur.  The amount of any discount, and hence, the question of solvency, presents an issue for trial.") (internal citations omitted). Contingent assets should be similarly valued. *Tae H. Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 612 (S.D.N.Y. 2018).

[127] *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 490 F.3d 1325, 1335 (11th Cir. 2007).

[128] *In re Tronox Inc.*, 429 B.R. at 98 (citing *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 35 (2d Cir. 1996)); *In re Quadrant 4 Sys. Corp. v. Kurapati*, 2020 Bankr. LEXIS 171, at *15 (Bankr. N.D. Ill., Jan. 22, 2020).

solvency.[129] This of course does not mean that a complaint can plead insolvency merely in a conclusory way, simply parroting the statute, or that a claim of insolvency cannot be contradicted by other allegations in or integral to the complaint or can be implausible.[130] "An adequate pleading of insolvency requires some sort of 'balance sheet' information that the Court can use to infer that the corporation's liabilities exceeded their assets at the time the transfers took place."[131] On the other hand, a complaint will not be dismissed because the defendant's allegations of solvency are more probable than the complaint's allegations of insolvency,[132] and a complaint may state sufficient facts that allow the court to draw a reasonable inference of insolvency without "balance sheet specifics."[133]

Lastly, it has long been recognized that if it is undisputed, as here, that the defendant did not provide fair consideration for the transfer, for purposes of a claim under NY DCL § 273 the plaintiff is entitled to a presumption that the transferor was insolvent.[134] Although the Private Equity Investors contend that the Second Circuit overturned this caselaw in *United States v. Watts*,[135] the Court concludes for two reasons that *Watts* did not do so, first because of the unusual

---

[129] *United States SBA v. Feinsod*, 347 F. Supp. 3d 147, 160 n.9 (E.D.N.Y. 2018); *Moriarty v. McCormick* (*In re Postrock Energy Corp.*), 596 B.R. 738, 748-49 (Bankr. W.D. Okla. 2019); *Halperin v. Moreno* (*In re Green Field Energy Servs.*), 2015 Bankr. LEXIS 2914, at *26-27 (Bankr. D. Del. Aug. 31, 2015).

[130] *Jalbert v. Souza* (*In re F-Squared Inv. Mgmt., LLC*), 2019 Bankr. LEXIS 2817, at *43-44 (Bankr. D. Del., Sept. 6, 2019) ("That this element of a constructive fraudulent conveyance is a factual question does not excuse a plaintiff from pleading facts; to so conclude would effectively permit a plaintiff to evade the pleading standard.").

[131] *Innovative Custom Brands, Inc. v. Minor*, 2016 U.S. Dist. LEXIS 8354, at *7-8 (S.D.N.Y., Jan. 25, 2016) (internal quotation marks omitted) (dismissing claim under NY DCL § 273 because complaint did not provide such information and stating, "the Company had more than sufficient funds with which to pay its creditors."). *See also O'Toole v. Karnani* (*In re Trinsum Grp., Inc.*), 460 B.R. 379, 392-93 (Bankr. S.D.N.Y. 2011) (finding complaint did not plead insolvency under NY DCL § 271 where it alleged only net income and net cash flow figures for the time in question without alleging the value of assets and liabilities).

[132] *In re Tronox Inc.*, 429 B.R. at 91 ("It is also quite irrelevant whether Defendants' [solvency] scenario has 'greater plausibility,' as Defendant assert. For pleading purposes, a defendant's rebuttal of a plaintiff's contentions with its own does not entitle the defendant to dismissal of an action.").

[133] *In re F-Squared Mgmt., LLC*, 2019 Bankr. LEXIS 2817, at *44, and the cases cited therein at nn.89-90.

[134] *Geo-Grp. Commns, Inc. v. Chopra*, 2016 U.S. Dist. LEXIS 11808, at *20-21 (S.D.N.Y. Feb. 1, 2016) (applying presumption on motion to dismiss); *Jalbert v. Flom* (*In re Bicomny, LLC*), 633 B.R. 25, 46-47 (Bankr. S.D.N.Y. 2021); *Cheek v. Brooks*, 188 A.D.3d 785, 787, 135 N.Y.S.3d 478 (2d Dep't. 2020); *Matter of Wimbledon Fin. Master Fund, Ltd. v. Bergstein*, 166 A.D.3d 496, 497, 90 N.Y.S.3d 12 (1st Dep't. 2018).

[135] 786 F.3d 152, 165 (2d Cir. 2015).

posture of that decision. In *Watts* the plaintiff claimed that it had a superior interest in property alleged by the United States to be owned by a co-defendant and subject to forfeiture under 18 U.S.C. § 982(a)(2), and, in response, the United States contended that the plaintiff had obtained the property in an avoidable fraudulent transfer.[136] Thus the *defendant/respondent* therefore was asserting a fraudulent transfer claim as a *defense* to the complaint, specifically to the *plaintiff/petitioner's* standing under 21 U.S.C. § 853(a)(2) to challenge an order of forfeiture on the basis of a superior ownership interest.[137] In that clearly distinguishable context, the court held that it was unfair at the motion to dismiss stage to force the petitioner to anticipate the United States' defense and allege facts in its petition disproving the presumption of insolvency.[138] Second, as discussed above, many courts have continued to recognize the presumption after *Watts* in the normal context of a plaintiff alleging a fraudulent transfer claim,[139] including by courts at the motion to dismiss stage and by courts that cited *Watts* for different propositions and thus clearly were familiar with it.[140]

---

[136] *Id.* at 155.

[137] *Id*. at 161-62 (noting that if assignment of the property was void as a fraudulent transfer under New York law, plaintiff would have no cognizable interest in the property subject to the forfeiture order and thus no standing).

[138] *Id*. at 165 ("Because, quite understandably, the Petition contains no allegations defending the solvency of [transferor] in anticipation of the government's challenge, petitioners have received no opportunity to rebut any adverse presumptions that may arise even assuming, *arguendo*, that [transferor's] assignment lacked fair consideration.").

[139] See n.134, above. *See also Saadeh v. Kagan*, 2021 U.S. Dist. LEXIS 203578, at *20 (S.D.N.Y., Oct. 20, 2021), *adopted by* 2021 U.S. Dist. LEXIS 235336 (S.D.N.Y., Dec. 8, 2021), *superseded by* 2022 U.S. Dist. LEXIS 37775 (S.D.N.Y., Mar. 3, 2022) (applying presumption on motion to dismiss); *Varbero v. Belesis*, 2020 U.S. Dist. LEXIS 182323, at *13-14 (same); *Stillwater Liquidating LLC v. CL Recovery Trading Fund III, L.P.*, 2019 N.Y. Misc. LEXIS 5599, at *10-12 (Sup. Ct. N.Y. Cty. Oct. 17, 2019) (same); *In re Omansky*, 2022 Bankr. LEXIS 2535, at *32, *36.

[140] *Tae H. Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 611, 613 (S.D.N.Y. 2018); *Integrity Elecs., Inc. v. Garden State Distribs*., 2016 U.S. Dist. LEXIS 86143, at *24 (E.D.N.Y., June 30, 2016); *McCarthy v. Estate of McCarthy*, 145 F. Supp. 3d 278, 285-86 (S.D.N.Y. 2015); *Cf. C.L. King Assocs. v. Northwestern Mut. Life Ins. Co.*, 2019 U.S. Dist. LEXIS 111234, at *14 (N.D.N.Y., July 3, 2019) (noting that *Watts* "expressed skepticism towards this presumption and declined to give it dispositive weight" but finding complaint's allegations of insolvency plausible in any event).

Although the presumption is rebuttable,[141] including at the motion to dismiss stage,[142] it is a limiting consideration on the Private Equity Holders' ability to contest, in the context of a motion to dismiss, the Complaint's factual allegations of insolvency under NY DCL § 272.

As noted, for a transfer to be avoided under NY DCL § 274, the plaintiff, who may be either a creditor at the time of the transfer or a subsequent creditor, must show that it was made without "fair consideration" and "when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital."  "The DCL does not define 'unreasonably small capital,' but it has been construed as "a financial condition short of equitable insolvency, where one is technically solvent but doomed to fail."[143] Although proof of insolvency is not required under § 274, it supports the cause of action.[144] That is, "[t]hese distinct but related concepts furnish a standard of causation which looks for a link between the challenged conveyance and the debtor's insolvency. Moreover, where the debtor is a corporation, adequacy of capital is typically a major component of any solvency analysis."[145]

Generally the test "is satisfied if at the time of the transaction the debtor had such minimal assets that insolvency was inevitable in the reasonably foreseeable future."[146] "The most important consideration in determining whether a business had unreasonably small capital is whether the business has or can generate resources from its operations or from asset sales to sustain its

---

[141] *Matter of Gronich & Co., Inc. v. Simon Prop. Grp., Inc.*, 180 A.D.3d 541, 542-43, 119 N.Y.S.3d 456 (1st Dep't. 2020), *leave to appeal denied*, 36 N.Y.3d 902 (2020).

[142] *In re Vivaro Corp.*, 524 B.R. at 553 (noting presumption but granting Rule 12(b)(6) motion as to certain allegedly avoidable transfers because only "negative equity" figures were alleged without reference to assets and liabilities).

[143] *C.L. King & Assocs. v. Northwestern Mut. Life Ins. Co.*, 2019 U.S. Dist. LEXIS 111234, at *20 (internal quotation marks and citation omitted).

[144] *Id.*

[145] *Moody v. Security Pac. Business Credit*, 971 F.2d 1056, 1071 (3d Cir. 1992).

[146] *Adelphia Recovery Trust v. FPL Grp., Inc.* (*In re Adelphia Communs. Corp.*), 652 Fed. Appx. 19, 21 (2d Cir. 2016).

operations."[147] "The fact that a business actually survived for a considerable period of time after a challenged transfer is a factor that a court may consider in deciding whether the business had unreasonably low capital at the time of the transfer. However, it is only one of many factors that may be relevant, and is not necessarily controlling."[148] That is, "[t]o determine the reasonably foreseeable financial future of a corporate debtor . . . courts examine an array of factors including the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue. Also relevant are all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period."[149] Thus "unreasonably small capital" for purposes of § 274 is not limited to a train wreck that is imminent because the engineer has fallen asleep; it can also be found where a key support for a trestle has rotted, no one is performing maintenance, and eventually the bridge will collapse.

Unlike with respect to NY DCL § 273's insolvency requirement, if the transfer was made without fair consideration there is no presumption of "unreasonably small capital" under § 274.[150]

Under NY DCL § 275, a transfer without fair consideration is avoidable by present and future creditors if when it was made the transferor "intends or believes that he will incur debts beyond the ability to pay as they mature." The plaintiff thus must show when the challenged transfer was made the transferor had a subjective belief that it was incurring or would incur debts beyond its ability to pay as they matured.[151] This includes a showing, however, that the transferor

---

[147] *In re Bicomny, LLC*, 633 B.R. at 49-50.
[148] *Id.* at 50 (internal citations omitted).
[149] *In re Adelphia Communs. Corp.*, 652 Fed. Appx. at 21 (internal quotation marks and citations omitted).
[150] *In re Vivaro Corp.*, 524 B.R. at 551.
[151] *Silverman v. Paul's Landmark, Inc.* (*In re Nirvana Rest.*), 337 B.R. 495, 509 & n.11 (Bankr. S.D.N.Y. 2006) (contrasting section 275 with objective intent standard of Uniform Fraudulent Transfer Act § 4(a)(2)(ii), which requires proof that the transferor "intended to incur, or believed or *reasonably* should have believed" it would incur, debts beyond the ability to pay as they became due.) (emphasis in original). *See also In re Vill. Red Rest. Corp.*, 2021 Bankr. LEXIS 2377, at *41.

had a "good indication of oncoming insolvency."[152] There is no presumption of such intent when

the transfer was not for fair consideration.[153]

Having carefully reviewed the Complaint and the matters extraneous to the Complaint that

are properly considered in the context of a motion to dismiss, the Court has determined as

discussed below that none of the constructive fraudulent transfer claims should be denied as

conclusory, self-contradictory, or implausible.

a. The 2009 Dividend. In addition to the allegations discussed in the introduction to this

memorandum of decision regarding (a) Morgan Stanley's grave concern, reflected in its

negotiations leading to the $300 million purchase price, about Tops' contingent Pension Plan

withdrawal liabilities,[154] with respect to the UFCW Pension Plan directly and by indemnity with

respect to the Teamsters Pension Plan, (b) the "critical status" of the UFCW Pension Plan, for

which Tops was the largest participating employer, responsible for the majority of its liabilities,

(c) Tops never making more than the minimum required annual payments to the UFCW Pension

Plan and never taking any meaningful measures to address its contingent withdrawal liability, (d)

---

[152] *Grace Plaza of Great Neck, Inc. v. Heitzler*, 2 A.D.3d 780, 781, 770 N.Y.S. 421 (2d Dept. 2003). *See also Tae H. Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 620 (S.D.N.Y. 2018) (section 275 satisfied when shown that transferor was aware he would not be able to pay his future debts as a result of the conveyances); 5 Collier on Bankruptcy ¶ 548.05[3][c] (noting that subjective intent required by analogous provision in the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B), "can be inferred where the facts and circumstances surrounding the transactions show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured").

[153] *In re Bicomny*, 633 B.R. at 51.

[154] Lee T. Polk, J.D., 3 ERISA Practice and Litigation § 12:7 (2021):

A few years after its enactment, ERISA was amended by the Multiemployer Pension Plan Amendments Act of 1980[, Pub. L. No. 96-364, 94 Stat. 1208] (MPPAA) which, among other things, created a statutory liability to be imposed on employers that withdraw from an underfunded multiemployer pension plan. This "exit fee" arises from either a partial or complete withdrawal from the plan. Under these withdrawal liability provisions, the employer is assessed an amount related to the employer's share of the plan's unfunded vested liability. In general, the plan's unfunded vested liability is the difference between the value of the plan's assets and the present value of its vested benefit obligations. If the plan has no unfunded vested liabilities, there will normally be no withdrawal liability as a result of a partial or complete withdrawal. The notion underlying withdrawal liability is that employees of a contributing employer will have vested rights to annuity payments far into the future, and if the employer withdraws early, those future annuity payments will not be fully funded by that employer, from an actuarial standpoint. Withdrawal liability is intended to address that deficit.

the debt on Tops' books, and (e) Morgan Stanley's control of Tops, including its day-to-day control of business decisions, the Complaint makes several other non-conclusory allegations that, taken together, plausibly support its contention that when Tops paid $105 million of dividends on October 9, 2009, Tops was insolvent or rendered insolvent, was left with unreasonably small capital, and intended or believed it would be unable to pay its debts as they matured.

The Complaint states that on September 8, 2008, Matthews, Morgan Stanley's lead representative and Chairman of Tops' Board acknowledged that the UFCW Pension Plan would become insolvent and Tops would be forced to incur withdrawal liability.[155] Given the Complaint's further allegation that after the Morgan Stanley acquisition Tops never took meaningful measures to address that ever growing contingent liability,[156] it is plausible to attribute that knowledge to the time of the 2009 dividend and each dividend thereafter. The Complaint also describes the incurrence of $122 million of new funded debt around the time of the 2009 dividend, for a total of $300 million of funded, secured debt,[157] the growth of Tops' contingent Pension Plan withdrawal liability to over $170 million by that time,[158] and that Tops received no consideration for the 2009 dividends.[159]

Lastly, the Complaint describes how Tops retained KPMG to conduct a valuation analysis in connection with the decision to pay the 2009 dividends, which KPMG finished in just over two weeks after it was retained.[160]  As part of its engagement, Tops and KPMG agreed that KPMG would "not in any respect be responsible for the accuracy or completeness of, or have any

---

[155] Complaint  ¶¶ 25, 40.
[156] Id. ¶¶ 63, 91.
[157] Id. ¶ 62.
[158] Id. ¶ 48. Complaint ¶ 62 states that "Tops' after-tax Pension Plan withdrawal liabilities totaled $104 million, including $59 million from the UFCW Pension Plan and an estimated $45 million from the Teamsters Pension Plan . . . with no plan to prevent the UFCW Pension Plan, which was steadily running out of money, from becoming insolvent.").
[159] Id. ¶ 50.
[160] Id. ¶ 52.

obligation to verify" any information provided to KPMG, and that KPMG would "not make an independent appraisal of the assets or liabilities (contingent or otherwise) of the Company."[161]  In its provision of information to KPMG, which, one infers in the light of the foregoing agreement, KPMG never vetted, Tops identified its UFCW Pension Plan-related contingent liability, but omitted the Tops' indemnity of the Teamsters Pension Plan as a contingent liability.[162]  In any event KPMG did not include any of the estimated $45 million of contingent Teamsters Pension Plan liability when it determined that the fair value of Tops' assets exceeded the sum of its liabilities after issuance of the 2009 dividends by $33.4 million.[163] In this regard the Complaint notes that a valuation analysis commissioned from Duff & Phelps in connection with a later dividend issuance included *both* contingent Pension Plan liabilities.[164] Thus it is plausible that Tops was insolvent and that Tops' controlling parties understood that it would not be able to pay its debts in the foreseeable future.

Moreover, KPMG's valuation, even without the contingent Teamster's Pension Plan liability, reflected an equity cushion of only 5.6% after the issuance of the 2009 dividend, while Morgan Stanley had concluded that an equity cushion of 25-30% was required to make a dividend, and the comparable grocery store companies used by KPMG in its valuation analysis had an average equity cushion of 71%.[165] One can reasonably infer the importance of such an equity cushion to Tops based on the low margin nature of the grocery business.[166]

---

[161] Id.

[162] Id. ¶ 53.

[163] Id. ¶¶ 53-54.

[164] Id. ¶ 116.

[165] Id.

[166] Id. ¶ 95 ("For a regional grocer store chain like Tops, capital expenditures were and are its lifeblood and the primary driver of the company's sales.  Tops' CFO insisted that capital expenditures 'be an integral part of [Tops'] strategy' and that 'reduced spending would only succeed in decreasing both sales and profits now and with a multiple effect in the future.'"). *See also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 175 (3d Cir. 2015) (describing retail grocery business as "notorious for low profit margins"); *Karns Prime & Fancy*

b. The 2010 Dividend. Tops issued its second, $30 million dividend just several months later, on July 26, 2010.[167]  It did not commission a valuation analysis in connection with this dividend, which of course also was for no consideration.[168] Along with the facts referenced above, the Complaint permits the inference that the 2009 KPMG valuation analysis, when adjusted to reflect Tops' increased contingent Pension Plan withdrawal liability (now over $290 million)[169] and an additional $75 million of funded debt[170] that increased the outstanding balance of senior secured funded debt to $350 million in July 2010, would show Tops to be even more insolvent than after the 2009 dividend.[171]

Similarly adjusting the 2009 KPMG valuation to reflect the contingent Pension Plan withdrawal liabilities and other increased debt as of July 2010, Tops was left with a 4.6% capital deficit.[172]

Another event occurred before the July 2010 dividend. Tops acquired various assets from The Penn Traffic Company out of bankruptcy (the "Penn Traffic Acquisition").[173]  In addition to increasing Tops' funded debt, the Penn Traffic Acquisition caused Tops' contingent UFCW Pension Plan liability to increase dramatically, Penn Traffic being the second largest participant in the UFCW Pension Plan,[174] such that Tops' 56% share of the unfunded UFCW Pension Plan

---

*Food, Ltd. v. Comm'r*, 494 F.3d 404, 418 (3d Cir. 2007) ("The retail grocery business is a low-margin, cash-intensive endeavor.").
[167] Complaint ¶ 72.
[168] Id. ¶ 74.
[169] Id.
[170] Id. ¶ 76.
[171] Id. ¶¶ 54, 77. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 675 (N.D. Tex. 2011) (court concludes solvency allegation plausible based on prior balance sheet and allegations of worsening performance thereafter. "Only by assuming that Bruno's sporadically attained solvency just before each challenged transaction could one infer that Bruno's was not insolvent for the entire time period.  Such an inference is not so compelling as to overcome the Trustee's theory.").
[172] Complaint ¶ 80.
[173] Id. ¶ 76.
[174] Id.

37

liability rose to 85%.[175]  As discussed below, the Private Equity Holders have made certain arguments that the Complaint's allegations regarding Tops' financial condition before the 2010 dividend are implausible, but they have not argued based on any documents that the Court is able to consider on a Rule 12(b)(6) motion that the Penn Traffic Acquisition increased Tops' value above the increased debt that came along with it, and the Court concludes that the inferences that the Complaint asks be drawn from the 2009 KPMG valuation analysis, as corrected and adjusted to reflect Tops' indebtedness in July 2010, are plausible in the light of the other allegations discussed above notwithstanding its lack of analysis of the value attributable to the Penn Traffic Acquisition, especially in the light of the New York law presumption of insolvency discussed above.

c. The 2012 Dividend. In early 2012 Morgan Stanley decided to try to exit its investment by causing Tops' sale, further determining that if a sale could not be achieved, it would "pursue a dividend recap in 2H 2012" -- that is, if it couldn't sell its equity it would take what it could in the form of a dividend.[176] The sale process failed, in large part because of Tops' contingent Pension Plan liabilities.[177] Only three of thirty-one potential buyers submitted written bids, and those three withdrew by September 2012 because of their view of the Pension Plan liabilities.[178] (The consultant for at least one of those bidders projected contingent withdrawal liability in the aggregate for the UFCW Pension Plan at over $1 billion and for the Teamster's Pension Plan of over $196 million.)[179] Tops' share of that contingent unfunded withdrawal liability as of January 1, 2012 was approximately $299 million for the UFCW Pension Plan and $151 million for the

---

[175] Id.

[176] Id. ¶ 99. See also id. ¶ 103 (quoting a June 2012 Morgan Stanley internal presentation as stating, "In the event a sale is not achievable at an attractive valuation, we want to be ready to launch and pursue a dividend recapitalization.").

[177] Id. ¶ 100.

[178] Id. ¶ 102.

[179] Id. ¶ 101.

Teamsters Pension Plan,[180] and it remained at that aggregate approximately $450 million level in December, 2012,[181] with an after-tax Pension Plan withdrawal liability of $272 million ($181 for the UFCW Pension Plan and $91 million for the Teamsters Pension Plan).[182] By December 2012 Tops' funded debt, used primarily to pay for the dividends, had also grown to at least $484 million in addition to capital lease obligations of $168 million.[183] Further, capital expenditures had been reduced such that Tops was spending significantly less than the two percent of sales that management believed was required to maintain (not improve) its current stores.[184]

On December 20, 2012, Tops nevertheless issued a $100 million dividend to Morgan Stanley and the other Private Equity Investors.[185] Again, of course, the Private Equity Investors provided no consideration for the 2012 dividend.[186]

Along with the facts alleged in the Complaint discussed above, the Complaint again relies on serious flaws in the solvency analysis used to justify the 2012 dividend. This time in connection with its decision to pay the dividend, Tops commissioned Duff & Phelps to conduct a valuation analysis, which it completed in two weeks after its retention.[187] According to Duff & Phelps, the fair value of Tops' assets exceeded the sum of its debt, including its contingent Pension Plan-related debt, by a capital surplus of approximately $68 million.[188] However, as with the Complaint's use of KPMG's 2009 valuation analysis, the Complaint adjusts this conclusion in the light of problems with the formulation of the Duff & Phelps' analysis and its obvious flaws.

---

[180] Id. ¶ 93.
[181] Id. ¶ 104.
[182] Id. ¶ 121.
[183] Id.
[184] Id. ¶ 113.  See also id. ¶¶ 95-98.
[185] Id. ¶ 104.
[186] Id. ¶ 124.
[187] Id. ¶ 107.
[188] Id. ¶ 110.

According to the Complaint, after proper adjustments, the analysis would show Tops was insolvent by $44 million after the $100 million 2012 dividend.[189]

Like Tops' 2009 engagement of KPMG, Tops agreed that Duff & Phelps would "not independently verify the accuracy or completeness of any provided information, data, advice, opinions or representations, whether obtained from public or private sources, and Duff & Phelps will state that it has not independently verified the accuracy or completeness of such information. Duff & Phelps also will not independently appraise any of the Company's specific assets or liabilities (contingent or otherwise)."[190] In its analysis, Duff & Phelps confirmed that it "[r]elied upon the accuracy, completeness, and fair presentation of all information, data, advice, opinions, and representations . . . provided to it from . . . Company management, and did not independently verify such information."[191]

The "garbage in/garbage out" risk of this approach was reflected in "pro forma" EBITDA adjustments and projections provided to Duff & Phelps by Tops that Tops' auditor could not support, and which Tops' Director of Finance/Budgeting stated should be called "Estimated Numbers To Make Us Look Better."[192] Those pro forma EBITDA projections were materially more aggressive than Tops' prior year's EBITDA notwithstanding declining sales and management's belief that there was no real upside to the earnings of the 21 stores that Tops acquired from Grand Union in October 2012[193] ($150 million combined EBITDA for 2011 vs. the Duff & Phelps analysis' projections, taken from management, of $154 million for 2012, $161

---

[189] Id.
[190] Id. ¶ 107.
[191] Id.
[192] Id. ¶111.
[193] Id. ¶ 113 (noting that these projections assumed, notwithstanding material reductions of capital expense below the amount required to maintain the stores, average same-store sales growth of 1.6% for 2012-2017 when the historical average for 2007-2011 was .8% and, for the newly acquired stores, zero growth for that period).

million for 2013, $166 million for 2014, and $185 million for 2017),[194] which for purposes of a Rule 12(b)(6) motion the Court can reasonably infer was a driver of an unduly high valuation.[195]

Duff & Phelps also applied a 6.0x 12-month multiple to the foregoing flawed EBITDA projections notwithstanding that the implied 12-month acquisition multiple for Tops' October 2021 purchase of 21 Grand Union Stores in an arms-length transaction was 3.2x.[196]  Indeed, the Grand Union transaction was not even included as a precedent transaction in the Duff & Phelps valuation.[197]

In addition, the 2012 valuation was also unduly skewed upward by Duff & Phelps' decision to include in its list of "comparable" companies specialty national chains like Whole Foods and Fresh Market, national retailers like Wal-Mart, and multi-national companies engaged in other businesses like banking, telecommunications, and retail clothing operations and carrying higher EBITDA multiples than the multiples of truly comparable companies.[198] At the same time, Duff & Phelps did not include in its list of comparable companies eight grocery chains that Morgan Stanley used in its internal valuation of Tops, which if they had been used would have decreased Duff & Phelps' EBITDA multiple for Tops by .7x and reduced its value by over $100 million, showing it to be insolvent by $32 million without considering the other flaws discussed above.[199]

---

[194] Id. ¶ 112.

[195] *See generally* Christopher S. Sontchi, Valuation Methodologies: A Judge's View, 20 Am. Bankr. Inst. L. Rev. 1 (hereafter "Sontchi"), 7-10 (2012) (explaining methodology for valuing a business based on its discounted cash flow by applying the firm's earnings before interest, taxes, depreciation and amortization ("EBITDA") to a discount reflecting the weighted cost of capital or equity).

[196] Complaint ¶ 115.

[197] Id.

[198] Id. ¶ 108. *See* Sontchi, 20 Am. Bankr. Inst. L. Rev. at 10-11 (explaining "comparable companies" methodology for valuing a business, based on applying a multiple to the business' EBITDA derived from implied multiple of similar companies based on their EBITDA and their trading range or transaction prices, and noting, "Use of companies that are clearly not comparable will lead to unsupportable conclusions.").

[199] Complaint ¶ 109.

Duff & Phelps' 2012 analysis also showed a capital surplus representing an equity cushion of just 6.9 percent, which, if adjusted by using the EBITDA multiples of the comparable companies used in Morgan Stanley's internal valuation of Tops, would result in that already small equity cushion turning into a capital *deficit* of $44 million.[200] Even without such an adjustment, the 6.9 percent cushion was far lower than the 24-30 percent capital surplus that Morgan Stanley had internally concluded was required to be left after a dividend, and over ten times lower than the capital surplus of the "comparable" companies that Duff & Phelps used for its analysis.[201]

Given all of the foregoing, the Complaint plausibly pleads that the 2012 dividends were constructive fraudulent transfers under NY DCL §§ 273 – 275.

d. The 2013 Dividend. Consistent with its "sale or recap/dividend" strategy discussed above, Tops issued another, $141.9 million dividend to the Private Equity Investors on May 15, 2013, just five months after the $100 million 2012 dividend,[202] again, of course, for no consideration.[203] It also issued another $150 million of senior secured notes,[204] largely to fund the dividend, while its total contingent unfunded Pension Plan withdrawal liability was approximately $450 million.[205]

Although Duff & Phelps had recently provided its valuation analysis in connection with the December 2012 dividend and one can infer therefore was familiar with Tops, a different firm, Houlihan Lokey ("HL") was hired to conduct the valuation analysis for the 2013 dividend,[206] which it completed one week after it was retained.[207] As with the retention of KPMG and Duff &

---

[200] Id. ¶ 110.
[201] Id. ¶ 119.
[202] Id. ¶ 148.
[203] Id. ¶ 166.
[204] Id.
[205] Id. ¶ 148.
[206] Id. ¶ 152.
[207] Id. ¶154.

Phelps, HL's engagement letter stated that it was not responsible for varifying the accuracy of the information that Tops provided it, including the existence and amount of Tops' contingent liabilities.[208]

Again the "garbage in/garbage out" risk inherent in this division of labor materialized in HL's analysis.  Having received the respone "none" to its due diligence question seeking disclosure of "any potential obligations from [Tops'] underfunded muliempoyer pension plans, . . . specifically for [the UFCW Plan]," HL's analysis valued Tops' contingent liabilities at zero.[209] Moreover, after HL requested during its week of work, "3rd party valuations of Tops Holding Corp. and Tops Markets LLC performed in the last 3 years," HL was not provided with the Duff & Phelps analysis, conducted a few months earlier, which had valued Tops' contingent Pension Plan liability.[210] The impact of HL's failure to include the contingent Pension Plan liability is also highlighted by an internal Morgan Stanley presentation from the same month as the 2013 dividend which noted that Pension Plan "[w]ithdrawal liability has increased from [approximately] 100MM to $374MM, representing [approximately] 45% of enterprise value" and that "[because Tops has not frozen these plans, additional benefits continue to accrue," "creat[ing] a major barrier to sale."[211]

As with the prior valuation analyses conducted in connection with the 2009 and 2012 dividends, the Complaint adjusts HL's 2013 analsysis to reflect the omitted Pension Plan contingent liabilities, resulting in the reduction of the approximately $209 capital surplus in HL's valuation to a capital deficit of $63 million.[212] It also notes that if HL had reviewed Duff & Phelp's

---

[208] Id. ¶ 152.
[209] Id. ¶¶ 153-154.
[210] Id. ¶ 185. The Complaint invites one to infer that Duff & Phelps was not retained to conduct the 2013 analysis because, unlike HL, Duff & Phelps did in fact value the Pension Plan contingent liability in its 2012 analysis.
[211] Id. ¶ 170.
[212] Id. ¶ 156.

valuation HL might reasonably have reconsidered its $209 capital surplus conclusion, seeing that it reflected an assumed growth of over $140 million in a few months from Duff & Phelps' $68 million valuation notwithstanding Tops' incurrence during that time of $150 million of additional debt, the projected payment of the $141.9 million 2013 dividend,[213] and no decrease in Tops' contingent Pension Plan liability.[214] Further, the Complaint contends that HL's valuation, like Duff & Phelps', omitted the eight publicly-traded grocery companies used by Morgan Stanely in its internal "comparable companies" analysis of Tops and included companies that were not in fact comparable, thus inflating Tops' value by another $35 million.[215] Finally, HL's valuation used the same unrealistically upwardly skewed adjusted pro forma EBITDA projections as Duff & Phelps' valuation.[216]

As with the prior valuation analyses, the Complaint also states that even under HL's inflated valuation, Tops was left with a capital surplus below both that of HL's "comparable" companies and what Morgan Stanley had concluded was "required" to support a dividend.[217]

The Private Equity Investors argue that the foregoing allegations nevertheless do not state plausible claims under NY DCL §§ 273-275 for the following reasons: (1) while Tops allegedly was insolvent, it was able to borrow hundreds of millions of dollars from sophisticated financial institutions, in 2010 it sold $30 million in common equity to Begain, and senior management purchased the Private Equity Investors' shares in December 2013 millions of dollars; (2) Tops did not file for relief under the Bankruptcy Code until 2018, having borrowed more money after the May 2013 dividend, and the real reason it sought bankruptcy protection was a general deterioration

---

[213] Id. ¶¶ 154, 174.
[214] Id. ¶ 156.
[215] Id. ¶ 157.
[216] Id. ¶ 158.
[217] Id. ¶ 161.

in the grocery industry during the intervening period; (3) after the December 2013 management buy-out, Tops issued more dividends, to its new manager-owners, who represented in public filings that it was solvent; and (4) Tops' Pension Plan liabilities were not probable for purposes of determining insolvency under NY DCL § 271 because they were only contingent and thus should be disregarded in the "insolvency" and "unreasonably small capital" analyses.

Certain of these defenses -- the management shareholders' subsequent receipt of dividends, their representations of Tops' solvency at that time, and the general state of the grocery industry -- clearly are not properly considered at this stage in the litigation in the light of the types of extraneous documents that the Court can take into account and the extent that it can consider them. Indeed, the Complaint's references to Tops' purchase of stores in 2010 out of another grocer's bankruptcy, as well as published decisions in the bankruptcy cases of other grocery chains in the 2000s,[218] highlight that the industry was troubled well before the Debtors' 2018 bankruptcy filing, including during the period of the challenged dividends.  But, in any event, the role that the dividends played in Tops' inability to pay its debts and ultimate bankruptcy, and the foreseeability of that outcome, as well as the credibility of management's statements regarding Tops' financial condition, are evidentiary issues not properly decided on a Rule 12(b)(6) motion given the Complaint's factual allegations discussed above.

Similarly, the Private Equity Investors' contention that Tops' contingent Pension Plan liability should not be included in the "insolvency" and "unreasonably small capital" analyses is

---

[218] *See, e.g.*, *In re Bruno's Supermarkets, LLC*, 2009 Bankr. LEXIS 1366, at *2-4 (Bankr. N.D. Ala., Apr. 27, 2009) (first bankruptcy 1998-2000; second bankruptcy filed February 5, 2009); *In re Grand Union Co.*, 266 B.R. 621, 622-23 (Bankr. D.N.J. 2001) (October 3, 2000 chapter 11 petition date); *In re Winn-Dixie Stores, Inc.*, 418 B.R. 475, 476 (Bankr. M.D. Fla. 2009) (February 21, 2005 chapter 11 petition date); *Grocery Haulers, Inc. v. A&P* (*In re A&P*), 467 B.R. 44, 48 (S.D.N.Y. 2012), *aff'd*, 508 Fed. Appx. 63 (2d Cir. 2013) (first A&P chapter 11 case filed December 12, 2010); *Halkias v. A&P* (*In re A&P*), 618 B.R. 57, 61 (S.D.N.Y. 2020) (second A&P chapter 11 case filed July 19, 2015), *aff'd*, 850 Fed. Appx. 811 (2d Cir. 2021); *In re ADI Liquidation, Inc.*, 2015 Bankr. LEXIS 1611, at *3 (Bankr. D. Del., May 5, 2015) (Sept. 9, 2014 chapter 11 petition date for food distributor).

premature. The Complaint states sufficient facts, including Morgan Stanley and third parties' views about the nature and extent of those contingent liabilities to have plausibly alleged that those debts had material probable value notwithstanding that neither a payment default nor a withdrawal from the Pension Plans had occurred when the dividends were paid. In particular, the discrepancies in the three outside valuation analyses' treatment, or not, of Tops Pension Plan liability, compared to how other third parties and Morgan Stanley looked at it, highlight that it is plausible that a material portion of that contingent liability coming due was probable when each transfer was made.[219]  Determining the properly valued amount of such liabilities therefore ultimately will involve an evidentiary assessment not only of the Pension Plans' contingent claims themselves, but also a determination of the likelihood that Tops, having paid hundreds of millions of dollars in dividends, having incurred hundreds of millions of dollars of additional funded debt, and having materially decreased capital expenses beyond management's view of what was prudent, could meet its projections and pay its debts in the foreseeable future, as well as the likelihood that Tops would have to pay on its indemnity of C&S's Teamsters Pension Plan liability.[220] The Complaint clearly puts the Private Equity Investors on notice in a non-conclusory way of the types of evidentiary inquiries that will be involved. That the Private Equity Investors may have made their own plausible case that the contingencies triggering Tops' Pension Plan liabilities would foreseeably not occur at the relevant times does not defeat the Complaint's plausible case that, to

---

[219] *See, e.g.*, *Reynolds v. Behrman Capital IV L.P.*, 2022 U.S. Dist. LEXIS 8550, at *8-9, *25-26 (N.D. Ala., Jan. 18, 2022) (on motion under Fed. R. Civ. P. 15 with respect to fraudulent transfer complaint, court discounts solvency opinion based on dispute over information provided to issuer of opinion and opinion's omission of significant contingent liabilities and reasonably foreseeable changes in transferor's business).

[220] *See Richter v. CC-Palo Alto, Inc.*, 2017 U.S. Dist. LEXIS 156724, at *16 n.3 (N.D. Cal., Sept. 25, 2017) ("[T]here is no feasible way for the court to value contingent liabilities in a 'real world' way on a motion to dismiss.").

the contrary, they would[221] and, because of the magnitude of those contingent liabilities, render Tops insolvent, left with unreasonably small capital, or likely to be unable to pay its debts as they matured.

The Private Equity Investors' last two arguments similarly question the Complaint's premise that the challenged dividends either left Tops insolvent or at too great a risk of default. How, they ask, could Tops have been or been rendered insolvent, have been left with unreasonably small capital, and was likely not to be able to pay its debts as they came due if it continued in existence for several years after the challenged dividends? Moreover, how could the Complaint's constructive fraudulent transfer allegations be plausible in the light of material equity investments in Tops in 2010 and, several months after the last challenged dividend, in December 2013, and how could those allegations be plausible in the face of hundreds of millions of dollars of loans to Tops throughout the period at issue? Who would invest in an insolvent or under-capitalized company, and who would lend to one?

The ability to ask such questions generally does not render the causes of action implausible, however. Most courts that have considered the lapse of time between a challenged transfer and a default or a bankruptcy have done so only (a) when weighing a claim based on insufficient capital (b) in the context of assessing all the evidence after a trial.[222] At least two courts have held that such a lapse of time was a basis for dismissing a complaint's unreasonably small capital claim, but

---

[221] See nn.130-131, above. *See also Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 675 (N.D. Tex. 2011) (that Complaint also might lead to inference that it undervalued its assets, does not undermine contrary plausible inference of insolvency).

[222] *See, e.g., Butch v. Opus LLC (In re Opus East LLC)*, 698 Fed. Appx. 711, 715, 717-18 (3d Cir. 2017); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995), and the cases cited therein; and *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002). *Cf. Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 399 (S.D. Tex. 2008) (while length of time a corporation survives after a challenged transfer is an important factor in the unreasonably small capital assets analysis, other evidence at trial showed that transferor was doomed to failure).

in each case the complaint was almost wholly conclusory.[223] Here, instead, the Complaint has made sufficient non-conclusory allegations for the Trust to be permitted to be put to its proof.[224]

The same may be said of the Private Equity Investors' argument based on the existence of the two equity investments and third-party loans. Here, the first, $30 million equity investment, by Begain in 2010, was not a public offering; we do not know yet the information available to Begain, or what representations Morgan Stanley or Tops made to it.[225] Nor do we know the level of Begain's sophistication, nor do not have its own investment analysis, although we do know that its investment shortly followed the first, $100 million dividend, which had within two years recouped the Private Equity Investors' out-of-pocket investment in Tops and shortly preceded the second dividend. Under circumstances where ignorance and greed could plausibly have colored Begain's investment judgment, the fact of its investment cannot serve as a proxy for solvency and reasonable capitalization that makes the Complaint's allegations regarding the 2010 dividend implausible. To treat a private equity investment like this as rendering implausible the risk of the issuer's insolvency would cast our equity markets in an Oz-like the emerald glow.

---

[223] *Intracoastal Capital, LLC v. Sharp* (*In re Blue Earth, Inc.*), 2019 Bankr. LEXIS 3193, at *21-22 (B.A.P. 9th Cir., Oct. 2, 2019), *rev'd on other grounds*, 836 Fed. Appx. 564, 566 (9th Cir. 2020) (indeed, the trustee seemed to have relied primarily on the allegation that the transferor subsequently engaged in borrowing to *support* his claim); *Tese-Milner v. Edidin & Assocs.* (*In re Operations NY LLC*), 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013) (after court noted that "[t]he relevant factors include the transferor's debt to equity ratio, historical capital cushion, and the need for working capital in the transferor's industry," it found no facts alleged that the transferor was insolvent and no analysis of transferor's cash flow and ability to generate cash).

[224] *See, e.g., Holiday v. K Road Power Mgmt., LLC* (*In re Boston Generating LLC*), 617 B.R. 442, 477 (Bankr. S.D.N.Y. 2020), *amended on reconsideration on other grounds*, 2018 Bankr. LEXIS 1770 (Bankr. S.D.N.Y. June 15, 2018)) (noting that in the light of the transferor's not filing for chapter 11 relief until four years after the challenged transaction and third-party loans, the plaintiff may have a difficult time proving its claims, but based on the complaint's allegations they were not implausible). *See also Tronox Inc. v. Kerr McGee Corp.* (*In re Tronox Inc.*), 503 B.R. 239, 298 (Bankr. S.D.N.Y. 2013) (fact that the transferor survived for several years after the challenged transaction was considered, but in the light of other trial evidence was not dispositive.)

[225] Begain's Motion states at page 5 that "Begain initially invested in Tops at the recommendation of Morgan Stanley. . . ." Even if it had been a public offering, one would have to carefully weigh the disclosure documents to determine whether they were adequate in highlighting the risks of undercapitalization/insolvency.

48

Much the same can be said of senior management's investment in the December 2013 buyout, which appears to have mimicked, writ small, the Private Equity Investors' 2007 leveraged acquisition. As discussed above, it appears that the management group committed only $4.3 million of its own funds to the acquisition. That may seem like a large sum, but the Complaint alleges that in addition to his receipt of $1.54 million of dividends between 2009-2013, Curci, the leader of the management group, was paid a $1 million bonus in connection with the 2009 dividend, a $2,108,019.04 bonus in connection with the 2012 dividend, and a $2,224,200 bonus in connection with the 2013 dividend -- that is, more than the entire 2013 management group investment[226] -- while other members of management also received bonuses in connection with the 2009 dividend ranging from $135,000 to $500,000, in connection with the 2012 dividend ranging from $6,000 and $1 million, and in connection with the 2013 dividend ranging from $75,000 and $1.25 million.[227]   Defendants may argue that those payments just illustrate Tops' financial health, but in the context of the other allegations in the Complaint, they also plausibly suggest that the management group might view the purchase price as a fair trade for the opportunity to continue to receive outsized returns, one way or the other, regardless of the potential harm to unsecured creditors.   Moreover, even without such a reason, retaining a senior job, now under one's own control, would be a strong motive for such an equity investment by management – apparently the only available buyers for Tops -- especially in a troubled industry.   And indeed Tops emerged from bankruptcy with largely the same management team under a Plan that not only provided them with a release covering, among other things, liability for the dividends that they received, but also set aside equity in the reorganized company for a management incentive plan.[228]

---

[226] Complaint ¶¶ 49, 64, 71, 73, 105, 144, 146, 149, 188.

[227] Id. ¶¶ 71, 146, 190.

[228] Plan (Main Case ECF 765.2) at ¶¶ 5.13 (officers of reorganized debtors), 5.15 (assumption of Current Employee Arrangements, as modified), 5.16 (management incentive plan), and 1.153 and 10.6 (releases).

Similarly, the rationale for, and information supporting, the hundreds of millions of dollars of loans to Tops during the period at issue cannot at this stage render the Complaint's constructive fraudulent transfer allegations implausible. This argument generally is not raised at this stage in the litigation.[229] Two of the four cases cited by the Private Equity Investors as "instructive" for the proposition that sophisticated financial institutions' willingness to lend to Tops renders the Complaint's allegations of insolvency implausible are simply inapplicable,[230] and *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*[231] and *VFB LLC v. Campbell Soup Co.*,[232] also cited by the Private Equity Investors, followed lengthy trials on the merits.

Moreover, when considered at trial this defense requires a nuanced, fact-based analysis. For example, as noted above almost all of Tops' funded debt after the Private Equity Investors' acquisition was senior secured. Credit analysis focuses on the risk of non-payment of the proposed loan, which may or may not include handicapping whether the borrower is, or may foreseeably become, insolvent. The risk of non-payment is why lenders insist on collateral and the pricing of their loans; that risk may be quite different than the risks faced by unsecured creditors, including those like the Pension Plans, holding contingent claims: secured loans by their very nature may pay out in full, with interest, even if the borrower is insolvent.[233] And, of course, credit assessments

---

[229] *But see Reynolds v. Behrman Capital IV L.P.*, 2022 U.S. Dist. LEXIS 8550, at *10-11 (fact of loans to transferor not a basis to find proposed amended complaint futile because court could not consider information provided to lenders); *In re Boston Generating LLC*, 617 B.R. at 477 (citing *LaMonica v. CEVA Group (In re CIL Ltd.)*, 582 B.R. 46, 108-09 (Bankr. S.D.N.Y. 2018)) (involvement of independent third parties, such as financial firms and "sophisticated lenders," is only relevant for purposes of implausibility defense when the third parties had access to all relevant information).

[230] *Beauvoir v. Israel*, 794 F.3d 244, 248 (2d Cir. 2015), was neither a fraudulent transfer case nor involved consideration of third-party lending, while *Liquidation Tr. v. Daimler AG (In re Old CarCo, LLC)*, 454 B.R. 38, 55-60 (Bankr. S.D.N.Y. 2011), *aff'd* 2011 U.S. Dist. LEXIS 134539 (S.D.N.Y., Nov. 22, 2011), *aff'd* 509 Fed. Appx. 77 (2d Cir. 2013), addressed reasonably equivalent value, not insolvency, when it concluded that taking judicial notice of the transferor's obtaining access to a $12 billion credit facility was proper to show the additional consideration for the allegedly less-than-fair-value transfer that the complaint had omitted.

[231] 373 B.R. 283 (Bankr. S.D.N.Y. 2007).

[232] 2005 U.S. Dist. LEXIS 19999 (D. Del., Sept. 13, 2005), *aff'd* 482 F.3d 624 (3d Cir. 2007).

[233] *See In re Tronox Inc.*, 503 B.R. at 298 ("Defendants' reliance on [transferor's] ability to issue $450 million in debt does not deserve any weight in the solvency analysis. The debt that [transferor] issued was secured, . . . and the

have been known to be wrong, especially if the information upon which they are based is incomplete or incorrect.[234] Again, we cannot assess here all the information available to Tops' lenders when they conducted their credit analyses or those analyses themselves. It is plausible, given the senior secured status of almost all the loans, that the lenders assumed they were being appropriately compensated notwithstanding the risk that those more junior in the capital structure would not be paid their debts. Nor can one conclude that any margin for error in such analyses assumed that Tops would in the future further cut capital expenses and issue more large dividends. In such circumstances the fact that the loans were made does not render the Complaint's allegations implausible, only that the Trust may not ultimately prove, in the face of such facts combined with others, that Tops was not insolvent of undercapitalized at the relevant times.

Thus the Court concludes that the Private Equity Investors' Motions to dismiss the Complaint's constructive fraudulent transfer claims, Counts I-VIII, on plausibility grounds should be denied.

*ii. The Intentional Fraudulent Transfer Claims.*  The Complaint also alleges that each of the four dividends was an intentional fraudulent transfer under NY DCL § 276, which states, that "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

---

sophisticated lenders who bought this debt well knew they would come first in any bankruptcy or liquidation of the enterprise."). *See also* Irina Fox, "Article:  Protecting All Corporate Stakeholders:  Fraudulent Transfer Law as a Check on Corporate Distributions," 44 Del. J. Corp. L. 81, 101, 108 (2020) (hereafter "Fox") (concluding, after noting that "Moody's Investors Service usually downgrades companies after debt-funded dividends are paid, recognizing the negative impact on a company's financial performance," and listing examples of bankruptcies following upon debt-funded dividends, "In instances where the dividend is funded with debt, the danger of insolvency is very high.").

[234] *In re Tronox Inc.*, 503 B.R. at 298-99, in which the court discounted the probative effect of the transferor's issuance of unsecured bonds "which would share in any liquidation on a par with the legacy liability creditors," and public stock beyond the fact that the sales were difficult even though they took place in a market of "irrational exuberance, because plaintiff "convincingly demonstrated that the projections on which the IPO was based were inflated, sell-side projections," similar to the projections alleged in the Complaint to have been inflated at Morgan Stanley's direction). *See also In re Boston Generating LLC*, 617 B.R. at 477.

The section allows a party "to avoid transactions which have the purpose or effect of removing property from a debtor's estate which should properly be used to repay creditors."[235]

The Complaint pleads the facts of the dividends (the date, amount, transferor, and recipient of each dividend, as well as the lack of any consideration therefor) with the particularity required by Fed. R. Bankr. P. 7009, incorporating Fed. R. Civ. P. 9(b). The Private Equity Investors' Motions instead address, in two ways, whether the Complaint pleads the requisite intent.

First, Begain, HSBC, and Turbic's pleadings require one to ask whose fraudulent intent must be shown. They allege that in addition to pleading the transferor's fraudulent intent, one must plead the transferee's and assert that the Complaint fails to do so for them, in contrast to Morgan Stanley. There is some difference of opinion in the case law about this issue,[236] and I confess that I bear some blame for that, having once cited, without analysis, earlier precedent for the proposition that the transferee's intent also must be shown.[237] Clearly I was wrong then.[238] As well explained by *Gowan v. Patriot Grp., LLC* (*In re Dreier LLP*),[239] the plain terms of NY DCL § 276 refer to conveyances "made," not "made and received," with actual intent to defraud either present

---

[235] *In re Boston Generating LLC*, 617 B.R. at 472 (citations omitted).

[236] *See generally Pereira v. Urthbox, LLC* (*In re Try the World, Inc.*), 2021 Bankr. LEXIS 2140, at *60 (Bankr. S.D.N.Y., Aug. 9, 2021).

[237] *Picard v. Taylor* (*In re Park S. Sec., LLC*), 326 B.R. 505, 517 (S.D.N.Y. 2005) (citing *Manhattan Inv. Fund., Ltd. v. Bear Stearns, Sec.* (*In re Manhattan Inv. Fund, Ltd.*), 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002).

[238] I will note that, of the two cases relied on by *In re Manhattan Inv. Fund, Ltd.* (and thus in *Picard v. Taylor*) for the proposition that the transferee's intent must be established, *Sullivan v. Messer* (*In re Corcoran*), 246 B.R. 152, 161 (E.D.N.Y. 2000), itself relied on decisions that did not construe NY DCL § 276 but, instead, the defense under NY DCL § 278 assertable by a transferee who takes for fair consideration and in good faith, and *Gentry v. Kovler* (*In re Kovler*), 249 B.R. 238, 243 (Bankr. S.D.N.Y. 2000), was later corrected by the same judge in *Gentry v. Kovler* (*In re Kovler*), 329 B.R. 17, (2005), to limit consideration of the transferee's fraudulent intent to claims where either (a) the transferor was solvent, (b) there was adequate consideration, or (c) the plaintiff seeks recovery of attorneys fees under NY DCL § 276-a, which specifically requires such a showing. *See also Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou Grp, LLC*), 396 B.R. 810, 826 n.5 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part on other grounds*, 439 B.R. 284 (S.D.N.Y. Sept. 17, 2010) (where Judge Hardin again corrected his first *Kovler* opinion by stating that only the transferor's intent must be shown).

[239] 452 B.R. 391 (Bankr. S.D.N.Y. 2011).

or future creditors.[240] Moreover, the legislature clearly knew how to specify a requirement of showing the transferee's intent when it wanted to, as it did in NY DCL § 276-a's provision for a plaintiff's recovery of attorney's fees and in the affirmative defense under NY DCL § 278(1) available to a bona fide purchaser for value who took without knowledge of the fraud.[241]

The Second Circuit has apparently recognized that NY DCL § 276 requires only that the transferor's intent be alleged:  "To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor,"[242] in which case "the conveyance will be set aside regardless of the adequacy of the consideration given."[243] A number of courts have stated that this is the "better" or "majority" view,[244] but frankly there no longer should be any confusion about this issue: the statute and case law in this Circuit require proof only of the transferor's fraudulent intent.

As discussed above, to allege fraudulent intent, the pleader is allowed to allege facts giving rise to a strong inference of such intent,[245] which "may be established either (a) by alleging facts that show the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[246]  In a claim to avoid an intentionally fraudulent transfer,

> plaintiffs may rely on badges of fraud -- circumstances so commonly associated with fraudulent transfers that their presence give rise to an inference of intent.  The badges of fraud include: a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business;

---

[240] *Id.* at 432-33. *Dreier* located the original basis for decisions that required a showing of the transferee's intent in the first *Kovler* opinion, *id.* at 430, noting, further, that Judge Hardin corrected that ruling in his second *Kovler* opinion, but correctly observing that unfortunately "by that time the proverbial horse had left the barn." *Id.* at 431.

[241] *Id.* at 433-34.

[242] *In re Sharp Int'l Corp.*, 403 F.3d at 56 (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995), which contrasted NY DCL § 276 with the "good faith" element of NY DCL § 272's definition of "fair consideration" that looks to the transferee's good faith).

[243] *Sharp Int'l*, 403 F.3d at 56 (internal quotation marks and citation omitted).

[244] *See* in addition to the cases cited by *Dreier*, *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Secs. LLC*), 2011 U.S. Dist. LEXIS 97647, at *17-18 (S.D.N.Y., Aug. 31, 2011); *In re Try The World, Inc.*, 2021 Bankr. LEXIS 2140, at *60; *Geron v. Craig* (*In re Direct Access Partners, LLC*), 602 B.R. 495, 539 (Bankr. S.D.N.Y. 2019); *Barnard v. Albert* (*In re Janitorial Close-Out City Corp.*), 2013 Bankr. LEXIS 523, at *16 n.6 (Bankr. E.D.N.Y., Feb. 8, 2013).

[245] *See* n.85 above.

[246] *See* n.86 above.

inadequacy of the consideration . . . and retention of control of the property by the transferor after the conveyance.[247]

"The presence or absence of any single badge of fraud is not conclusive. The proper inquiry is whether the badges of fraud are present, not whether some facts are absent.  Although the presence of a single factor, i.e. a badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."[248] "Of course, each alleged 'badge of fraud' must be judged in the context of other evidence and in the light of what reasonable implications can be drawn from it in a particular case. They are not items to be considered in a vacuum, as though the presence of one or more factors automatically shows a fraudulent intent."[249]

The Trust adequately pleads intentional fraud pursuant to NY DCL § 276.  First, the Complaint pleads *direct* evidence of intent to defraud by alleging that Tops (and the Morgan Stanley Director Defendants and other Morgan Stanley personnel who controlled it) manipulated the third-party valuations used to support each dividend.  The Complaint alleges that Tops and Morgan Stanley knew (i) the solvency analyses justifying each dividend were facially and materially inconsistent with one another, (ii) the solvency analyses were materially inconsistent

---

[247] *In re Boston Generating LLC*, 617 B.R. at 472-73 (quoting *Techno-Comp. Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 745 (E.D.N.Y. 2015). *See also Gordon v. I.M.V. 1290* (*In re Mina*), 2022 Bankr. LEXIS 1887, at *12-13 (Bankr. W.D.N.Y., Jul. 8, 2022) (listing (i) "a close relationship among the parties to the transaction; (ii) a questionable or hasty transfer not in the ordinary course of business; (iii) the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor; (iv) the chronology of the events and transactions under inquiry; (v) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (vi) whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation was incurred"); *In re Our Alchemy, LLC*, 2019 Bankr. LEXIS 2906, at *16-17 (Bankr. D. Del., Sept. 16, 2019 ("badges of fraud" include "(1) the relationship between the debtor and the transferee; (2) consideration for conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction.") (internal quotation marks and citation omitted). As noted by *Arcabascio*, "the flip side of these badges of fraud is that their absence -- or evidence that fair consideration was paid, the parties dealt at arms-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control -- would constitute evidence that there was no intent to defraud." 130 F. Supp. 3d at 745 (internal quotation marks and citation omitted).

[248] *In re Our Alchemy, LLC*, 2019 Bankr. LEXIS 2906, at *17 (internal quotation marks and citation omitted).

[249] *Geron v. Craig* (*In re Direct Access Partners, LLC*), 602 B.R. 495, 544 (Bankr. S.D.N.Y. 2019).

54

with Morgan Stanley's internal valuations, (iii) the overlooked Pension Plan liabilities had a devastating impact on Tops' value, and, starting no later than September 8, 2008, if not from the commencement of the Private Equity Investors' investment,[250] Tops and Morgan Stanley were well aware of the dire condition of the UFCW Pension Plan and knew it would become insolvent, and (iv) Tops' projections upon which the 2012 and 2013 solvency analyses relied, were admittedly unrealistic ("Estimated Numbers to Make Us Look Better").[251] These allegations are supported by several direct allegations that Tops, controlled by Morgan Stanley, drained Tops of its cash to pay the dividends with the intent of defrauding Tops' creditors:   (i) as Tops' management stated and enabled, Morgan Stanley intended to take "every nickel plus" out of Tops through dividends,[252] (ii) as Tops' management stated and enabled, Morgan Stanley restricted Tops' capital expense spending to unsustainably low levels because Morgan Stanley held Tops' cash "near and dear to [its] dividend heart,"[253] capital expenditures not being a key driver of valuation, only of limited sustainability,[254] and (iv) Tops' senior management told the Chairman of the Board of Trustees of the UFCS Pension Plan in December 2012 that Tops was prohibited from issuing new debt to shore up that Plan although within days thereafter Tops issued $460 million of senior secured notes to facilitate the payment of the 2012 dividend,[255] (v) Morgan Stanley and the Morgan Stanley Director Defendants believed that an equity cushion of at least 25-30% was required to issue dividends, but even under the flawed and inconsistent solvency analyses that Tops used to justify the dividends, Tops was left each time with far less than such a cushion,[256] and (vi) Morgan Stanley and the Morgan Stanley Director Defendants knew that the

---

[250] Complaint ¶¶ 8, 9, 25, 40.
[251] Id. ¶¶ 111-112, 158.
[252] Id. ¶¶ 63, 83, 122.
[253] Id. ¶ 96.
[254] Id. ¶¶ 95-96.
[255] Id. ¶ 8.
[256] Id. ¶¶ 59, 80, 119, 161.

comparable companies used in the valuation analyses used to justify the 2012 and 2013 dividends were materially dissimilar to Tops and did not include eight comparable companies that Morgan Stanley used in its own valuation analysis.[257]

The Trust has also alleged at least six different badges of fraud for each dividend, including that the dividends at issue were not ordinary, but, rather, large, funded by debt issuances and capex reductions, issued irregularly, in two cases issued just several months after a prior dividend and, in the case of the 2013 dividend, issued following a failed sale strategy as an alternative and questionable way to "monetize" the investment. The Complaint also describes a company completely under the control of the primary recipient of the dividends. And, of course, the Complaint pleads that the dividends were made for no consideration while Tops was insolvent or rendered insolvent.

The Private Equity Investors' respond by (i) essentially ignoring the Complaint's direct evidence of intent, (ii) noting that *other* badges of fraud, such as a transaction done in secret, are lacking, and (iii) questioning whether the making of a dividend should ever be viewed as a badge of fraud.  As for the second argument, as noted above, badges of fraud should be analyzed in totality with all the facts and under the broader rubric of whether (a) motive and the opportunity to commit fraud and (b) strong circumstantial evidence of conscious misbehavior or recklessness have been shown.  The contrast between the decision cited by the Private Equity Investors for their third argument, *Lippe v. Bairnco Corp.*,[258] and the present matter highlights the point.  First, *Lippe* was a decision on summary judgment, not on a motion to dismiss.  Second, the court found that there was no evidence to permit a jury to find insolvency at any of the relevant times;[259] "[n]o

---

[257] Id. ¶¶ 109, 157  The Trust also cites Complaint ¶¶ 41-46, 63, 83, 96, 122.
[258] 249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd* 99 Fed. Appx. 274 (2d Cir. 2004).
[259] *Lippe*, 249 F. Supp. 2d at 378-81.

reasonable jury could find that there was anything suspicious or questionable about the transfers here,"[260] including, that "defendants have presented extensive, largely uncontradicted evidence that defendants engaged in the transactions in good faith;"[261] there was no basis to question the independent investment banking firm's opinion of the fairness of the consideration paid for the original, spin-off transfer;[262] and a reasonable jury could only find that the subsequent "dividends were approved by the board . . . in consultation with attorneys and investment bankers, based on dividends paid by comparable companies and a policy adopted [at the start of the nine-year period that dividends were issued]."

As noted by *Lippe*, while a dividend is made for no consideration to a party with a close relationship to the transferor, one cannot deny that "it is a generally accepted practice for a corporation to pay dividends to its shareholders"[263] and thus there is always a risk that this badge of fraud could prove too much.  Unlike the facts as determined in *Lippe*, however, Tops' actions and motivations under Morgan Stanley's control -- of course only as alleged by the Complaint -- are not those that one would expect directors and officers to take under the circumstances.[264] It would turn fraudulent transfer law on its head to determine that a transfer to insiders for no consideration while the transferor was or was rendered insolvent could nonetheless not be intentionally in fraud of creditors simply because it was a dividend.[265]

*iii. Are the 2009, 2012, and 2013 Dividends Protected by the Safe Harbor of 11 U.S.C. § 546(e)?*

---

[260] *Id.* at 377-78, 382.
[261] *Id.* at 381.
[262] *Id.* at 383.
[263] *Id.* at 384.
[264] *In re Tribune Fraudulent Conv. Litig.*, 10 F.4th at 162.
[265] *See Reynolds v. Behrman Capital IV L.P.*, 2022 U.S. Dist. LEXIS 8550, at *18-19 (N.D. Ala., Jan. 18, 2022) (motion to dismiss intentional fraudulent transfer claim where court found dividend recapitalization satisfied badges of fraud in addition to there being direct evidence of fraudulent intent); *Michaelson v. Farmer* (*In re Appleseed's Intermediate Holdings, LLC*), 470 B.R. 289, 300 (D. Del. 2012).

The Defendants contend that the 2009, 2012 and 2013 dividends are excepted from avoidance under the "safe harbor" provisions of 11 U.S.C. § 546(e), which provides:

> (e) Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.[266]

"Section 546(e) thus affords 'a complete defense to [the specified types of] avoidance claims brought by a Trustee,' if the requirements of the particular exemption are satisfied."[267]  Under section 546(e)'s plain terms, to fit within the safe harbor, the transfer[268] must be (i) a specified qualifying transaction, including "a transfer . . . in connection with a securities contract" that (ii) is "made by or to (or for the benefit of)" a qualifying participant, including a "financial institution."[269]  "Securities contract" is defined in section 741(7) of the Bankruptcy Code to include "a contract for the purchase, sale, or loan of a security" and "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph,"[270] a broad definition.[271]

---

[266] 11 U.S.C. § 546(e).

[267] *Crescent Resources Litig. Trust ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 471 (W.D. Tx. 2013) (quoting *In re Olympic Natural Gas Co.*, 294 F.3d 737, 740 (5th Cir. 2002)).

[268] It is not disputed that the dividends were transfers of Tops' funds falling within the definition of "transfer" in 11 U.S.C. § 101(54).

[269] *See also In re Nine West LBO Secs. Litig.*, 482 F. Supp. 3d 187, 197 (S.D.N.Y. 2020) ("Put simply, the safe harbor applies were two requirements are met: (1) there is a *qualifying transaction* (i.e., there is a 'settlement payment' or a 'transfer payment. . . made in connection with a securities contract) and (2) there is a *qualifying participant* (i.e., the transfer was "made by or to (or for the benefit of) a . . . financial institution.") (emphasis in the original).

[270] 11 U.S.C. § 741(7)(A)(i) and (vii).

[271] *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418-19 (2d Cir. 2014), *cert. denied*, 576 U.S. 1044 (2015).

Importantly, in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,[272] the Supreme Court determined that where there was a string of related transactions, one of which, involving an intermediary, might fall into section 546(e)'s the safe harbor, "the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid,"[273] not the intermediary transfer. "If a trustee properly identifies an avoidable transfer, . . . the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power, where that limit is defined by reference to an otherwise avoidable transfer, as is the case with § 546(e)."[274]

Section 546(e)'s safe harbor is an affirmative defense, but it can be raised in the context of a motion to dismiss if the complaint and other documents that the Court can consider establish it and "where the facts are not in dispute, or where there is already a sufficiently detailed factual record to decide whether the applicable statutory definitions are met, such that the application of Section 546(e) presents a straightforward question of statutory interpretation of the type that is appropriately resolved on the pleadings."[275]

The Defendants contend that the 2009, 2012, and 2013 dividends qualify under section 546(e) as "safe harbored" transfers,[276] in that (i) they were made in connection private offerings for the notes, the proceeds of which were used, in part, to fund each dividend, and such offerings

---

[272] 138 S. Ct. 883 (2018).

[273] *Id.* at 888. Accordingly, even if the component parts A→B→C of a transfer by A →D that a trustee seeks to avoid might be safe-harbored, if the A→D transfer does not meet section 546(e)'s criteria it will not be safe-harbored. *Id.*

[274] *Id.* at 894-95. Although there was a Circuit conflict over whether the safe harbor applies if the intermediate transaction involved a transferee acting as a mere conduit, the Court granted certiorari to resolve the "proper application of the § 546(e) safe harbor" *id.*at 892, and clearly *Merit*'s analysis is based on the wording and context of the statute, not a "mere conduit" theory.

[275] *Bankr. Estate of Norske Skogindustrier ASA v. Cyrus Capital Partners*, 629 B.R. 717, 759 (Bankr. S.D.N.Y. 2021) (internal quotation marks and citation omitted); *see also In re John Lofts LLC*), 599 B.R. at 749 (affirmative defense under section 546(e) prematurely raised in motion to dismiss as not "clearly established on the face of the complaint") (internal quotation marks and citation omitted).

[276] They do so as a defense not only to the Trust's fraudulent transfer claims but also, on preemption grounds, to the Trust's unlawful dividend claims against the Directors. Because, as discussed below, the Court concludes that the safe harbor does not apply, no further preemption analysis is required.

were "securities contracts" as defined in 11 U.S.C. § 741(7); and (ii) they were transfers by a qualifying "financial institution" as defined in 11 U.S.C. §§ 101(22)(A) because they were made by Tops from its bank to the Private Equity Investors' banks, which, the Defendants contend, were acting as either Tops' or the Private Equity Investors' agents or custodians for the banks' customers and therefore under section 101(22)(A) of the Bankruptcy Code Tops and/or the Private Equity Investors are "financial institutions." They make this latter point based on section 101(22)(A) of the Bankruptcy Code, which defines "financial institution" as used in section 546(e) as "a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity *and, when any such* Federal reserve bank, receiver, liquidating agent, conservator or *entity is acting as agent or custodian for a customer* (whether or not a "customer", as defined in section 741) *in connection with a securities contract (as defined in section 741) such customer*." (Emphasis added).[277]

In support of the foregoing factual allegations, Defendants submit an October 1, 2009 note purchase agreement for $275 million of senior secured notes; an incomplete December 20, 2012 indenture for $460 million of senior secured notes; an incomplete May 15, 2013 indenture for $150 million of senior unsecured notes; an incomplete offering memorandum for the $150 million senior secured notes; an incomplete offering memorandum for the $460 million of senior secured notes; an incomplete offering memorandum for the $275 million of senior secured notes; a press release in connection with the offering of the $460 million senior secured notes; a "Funds Flow Memorandum" detailing the contemplated use of the net proceeds of the $460 million senior

---

[277] 11 U.S.C. §101(22)(a). *See also Deutsche Bank Trust Co. Ams. v. Large Private Ben. Owners* (*In re Tribune Co. Fraudulent Conveyance Litig.*), 946 F.3d 66, 78 (2d Cir. 2019) (transferor was a qualifying entity under 11 U.S.C. §§ 546(e) and 101(22)(A) because it retained a financial institution to act as its agent to receive and make the challenged payments),

secured notes comprising the redemption by Tops of its remaining outstanding senior secured notes in the sum of $377,268,937 and Tops' payment of the 2012 dividends to the Private Equity Investors; and a "Funds Flow Memorandum" detailing the contemplated use of the net proceeds of the $275 million senior secured notes and a separate $30 million credit extension to Tops entities comprising Tops' repayment of various existing debts, Tops' payment of the 2009 dividends to Private Equity Investors, and Tops' payment of various transaction fees.[278]

The Complaint does not reference any of these documents, but it states that (i) "[t]o finance the [2009] dividend, Morgan Stanley had Tops simultaneously issue $275 million of senior secured notes," (ii) "[t]o finance the [2012] dividend, Morgan Stanley had Tops issue $460 million of senior secured notes," and (iii) "[t]o finance the [2013] Dividend, Tops simultaneously issued $150 million of senior secured notes," [279] and, further, states that the 2009, 2010, 2012, and 2013 dividends "were not made from cash flow generated by operations of the Company . . . [but] instead with debt issued by the Company."[280]

For the reasons discussed earlier in this Memorandum of Decision, to the extent the foregoing exhibits to the Shamah Declaration are complete in all relevant respects,[281] the Court can consider them in a Rule 12(b)(6) context insofar as they reflect the use of some of the proceeds of the 2009, 2012, and 2013 notes offerings to fund payment of the 2009, 2012, and 2013 dividends, but only because the parties agree on that point for purposes of the Motions. The parties also appear to agree for purposes of the Motions that the proceeds of the 2009 and 2012 notes offerings were transferred as set forth in the two Flow of Funds Memoranda, including from, apparently,

---

[278] Shamah Decl. Exs. 2, 3, 5, 6, 15, 16, 18, 19, and 20, respectively.

[279] Complaint ¶¶ 48, 104, and 148, respectively.

[280] Id. ¶ 11, 65,125, and 167.

[281] The Complaint's references to the note offerings are not enough to incorporate them wholesale, *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004), and all the transaction documents have not been provided; thus the note offering transaction documents remain incomplete in relevant respects.

one of the book running managers into Tops' bank account listed therein and thereafter by Tops

from its bank account into the Private Equity Investors' listed bank accounts.[282]  It is worth noting

at this point that any sort of paying agent or custodial agreement for any party to the dividends (or,

for that matter, the notes offerings) such as those that were before the courts in the Circuit's most

recent *Tribune* decisions[283] and in *Nine West*[284] and *Boston Generating*[285] was not offered to the

Court, however.

    a.  <u>The notes offerings are not qualifying transactions for purposes of the Complaint,</u>

<u>because the Trust is seeking to avoid the dividends, not the notes offerings</u>. While the Trust

disputes the point, the Court accepts for purposes of this Memorandum of Decision that the three

private notes offerings whose proceeds were used in part to fund the 2009, 2012, and 2013

dividends were "securities contracts" for purposes of 11 U.S.C. § 546(e).  As noted, the Bankruptcy

Code defines "security" broadly, including various types of debt such as privately placed notes,[286]

and the issuance of such notes in return for the loan proceeds would generally fit within 11 U.S.C.

§ 741(7)(A)(i)'s broad (indeed circular) definition of a "securities contract."[287]

    What clearly is not a "settlement payment" in respect of a securities contract for purposes

of section 546(e), however, is a dividend, and because it is the 2009, 2012, and 2013 dividends

that the Complaint seeks to avoid (transfers A→D), not the issuance of the private notes (transfers

A→B), *Merit Mgmt.* requires that they not be safe-harbored under section 546(e). A dividend is a

---

[282] Shamah Exs. 19 and 20.

[283] 946 F.3d at 78-79; 10 F.4th at 176 (contracts, including agency/depository agreement, were integral to complaint and therefore could be considered although not referenced in it because they set forth the relationship between the transferor and its agent in effectuating the transfers).

[284] 482 F. Supp. 3d at 196.

[285] 617 B.R. at 452-53, 487-88.

[286] 11 U.S.C. § 101(49)(A)(i).

[287] *See Official Comm. of Unsecured Creditors of Quebecor World (U.S.A.) Inc.  v. Am. Life Ins. Co.* (*In re Quebecor World (U.S.A.) Inc.*), 719 F.3d 94, 98 (2d Cir. 2013), *overruled in part on other grounds*, *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. at 883  (private placement notes were "securities," and their payment or redemption was a securities contract for purposes of 11 U.S.C. § 546(e)).

one-way payment; Tops received nothing in exchange for the 2009, 2010, 2012, and 2013 dividends,[288] whereas a "settlement" in the context of the securities industry "refers to the completion of a securities transaction"[289] and a "settlement payment" is "an *exchange* of money or securities that completes a securities transaction."[290] Thus, standing alone, the dividends would not constitute settlement payments for purposes section 546(e).[291] And, as noted by the district court in *Appleseed's*, anticipating *Merit Mgmt.* by several years, even if section 546(e) were to apply to a related transaction "in this multifaceted transaction, the dividend would not automatically be exempt as well.[292]

The Private Equity Investors argue, however, that the dividends are safe-harbored because they were not standalone transfers, but, rather, only one element of an integrated transaction that started with the safe-harbored issuance of the private notes and concluded with the dividends.  This is a difficult argument to make in the light of *Merit Mgmt.*, and indeed it was rejected in *Greektown Litig. Trust v. Papas (In re Greektown Hldgs., LLC)*,[293] where -- on remand after *Merit Mgmt.* abrogated *QSI Hldgs., Inc. v. Alford (In re QSI Hldgs.)*[294] -- the court determined that *Merit Mgmt.* precluded, for purposes of section 546(e), the application of the "step transaction doctrine that provides that interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction,"[295] if defendants rely on a component part of

---

[288] *Michaelson v. Farmer (In re Appleseed's Intermediate Hldgs, LLC)*, 470 B.R. at 302.
[289] *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 337 (2d Cir. 2011) (internal quotation marks and citation omitted).
[290] *Id.* (emphasis added).
[291] *Id. See also Global Crossing Estate Representative v. Alta Partners Hldgs. LDC (In re Global Crossing, Ltd.)*, 385 B.R. 52, 56 n.1 (Bankr. S.D.N.Y. 2008).
[292] *Id.  See also Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Hldgs., LLC )*, 426 B.R. 488, 500 (Bankr. D. Del. 2010).
[293] 621 B.R. 797 (Bankr. E.D. Mich. 2020).
[294] 571 F.3d 545 (6th Cir. 2009).
[295] *In re Greektown Hldgs*, 621 B.R. at 808 (internal quotation marks and citation omitted),

the sequence instead of the transfer sought to be avoided.[296] Again A→D must be shown to fit

within the safe harbor if the plaintiff is seeking to avoid transfer D; showing A→B is safe-harbored

is unavailing because section 546(e) applies to "'a transfer that *is*' either a 'settlement payment'

or made 'in connection with a securities contract.' Not a transfer that involves. Not a transfer that

comprises. . . . In other words, to qualify for protection under the securities safe harbor, § 546 (e)

provides that the otherwise avoidable transfer itself be a transfer that meets the safe harbor

criteria."[297]

Nevertheless, the Private Equity Investors argue that the reasoning of *In re Boston

Generating*[298] compels section 546(e)'s safe harbor to apply here.   In *Boston Generating*, an

operating company and its holding company incurred $2.1 of secured and mezzanine loans, a

portion of which was to be used to finance (a) an approximately $975 million tender offer for a

stock and warrant buyback and (b) approximately $35 million of dividends.[299] The loan proceeds

were deposited in the operating obligor's US Bank National Association bank account, with the

portion comprising the Leveraged Recap Transaction payments then transferred to the holding

company obligor's bank account at Bank of America, and then to a different holding company

obligor bank account with the Bank of New York[300] (which was denominated to act, and acted as

the holding company's depositor and agent for making the payments to the shareholders).[301]

Clearly the transfers from the holding company's Bank of New York account to redeem

the stock and buy back the warrants would fall within the Bankruptcy Code's definitions of a

settlement payment and securities contract:  a transfer of cash in exchange for the redeemed stock

---

[296] *Id.* at 819-21.
[297] *Merit Mgmt.*, 138 S. Ct. at 894 (emphasis in the original).
[298] 617 B.R. 442 (Bankr. S.D.N.Y. 2020), *aff'd sub nom. Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 U.S. Dist. LEXIS 173359 (S.D.N.Y., Sept. 13, 2021).
[299] 617 B.R. at 454-557.
[300] *Id.* at 456, 457.
[301] *Id.* at 452-53, 456-57.

and warrants.[302] To avoid that result, the plaintiff trustee asserted that he was seeking to avoid only a *prior* transfer, by the operating company to the holding company's Bank of America account.[303] The bankruptcy court found, instead, that the applicable transfer, or "overarching transfer," was the *last* transfer to the stockholders and warrant holders in exchange for their stock and warrants (or the penultimate transfer to the Bank of New York account for their benefit) and, therefore, that the first prong of the safe harbor defense -- a qualifying transaction -- was satisfied.[304]

The bankruptcy court went on to hold, moreover, that the $35 million dividend payment also was a qualifying transaction, notwithstanding that it recognized that a "true dividend," as not being in exchange for anything, would not be a qualifying transaction,[305] because the dividend "was not an isolated dividend paid in the ordinary course" but, rather, paid "as part of an integrated transaction . . . to settle [the holding company's] repurchase of its members shares."[306]

How can *Boston Generating*'s two rulings be reconciled with *Merit Mgmt.*? With respect to the tender offer for the stock and warrants, *Boston Generating* could be said to rest on any of three different rationales.  The first clearly would be consistent with *Merit*, namely that while the plaintiff sought to pick an intermediate step in the transaction to avoid as a fraudulent transfer, thus trying to fit within *Merit Mgmt.*, his basis for avoidance of that step depended on his ability to avoid the *last* step in the transaction, which was safe-harbored.  In other words, the transfer to the holding company obligor would not be avoidable as a fraudulent transfer *but for* the subsequent transfer to the shareholders and warrant holders in return for their stock and warrants. It was only that "overarching" transfer that was the true target of avoidance. The court in *Giuliano v. Schnabel*

---

[302] *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d at 337.
[303] *In re Boston Generating LLC*, 617 B.R. at 484-85.
[304] *Id.* at 485-87.
[305] *Id.* at 493.
[306] *Id.*

(*In re DSI Renal Hldgs, LLC*)[307] took such an approach where the plaintiff trustee was able to avoid a transfer only if the multiple step transaction were collapsed.

> [T]he collapsing of the Restructurings multiple integrated transactions does not preclude [defendant's] use of the securities safe harbor.  Rather . . it serves to assist its application. . . . [T]he first step of the section 546(e) analysis is to identify the relevant transfer so that a determination may be made as to whether the covered transaction and entity criteria of the securities safe harbor are met. Here the Trustee took advantage of the collapsing doctrine when he identified the relevant transfers. . . . Rather than focusing on the single step of the Restructuring in which DSI Renal Holdings transferred to CDSI I all of its Renal Shares, the Trustee has linked the Restructuring's multi-steps together, examined their significance, and has pursued the Defendants for an 'overarching transfer' -- their alleged receipt of the Renal Shares as represented by the CDSI I stock,

which was safe-harbored.[308] Arguably a similar rationale underlies *SunEdison Litig. Trust v. Seller Note, LLC* (*In re SunEdison, Inc.*),[309] in which the plaintiff also sought to avoid an intermediate step in a multi-step transaction instead of the last one (which would have been safe-harbored) and then to recover from the ultimate recipients of the intermediate, avoided transfer under 11 U.S.C. § 550.[310] The court disagreed:  "While *Merit* defined the relevant transfer as the overarching transfer that the trustee seeks to avoid, it does not follow that the trustee can escape the reach of the safe harbor by seeking to avoid an intermediate transfer between non-qualifying participants and sue the qualifying participants of the true overarching transfer as subsequent transferees."[311]

The second possible rationale for *Boston Generating*'s application of the safe harbor to the stock and warrant buyback is more problematic, namely that the transaction documents were so interdependent by their own terms that there really were no intermediate steps to the transaction,

---

[307] 617 B.R. 496 (Bankr. D. Del. 2020).
[308] *Id.* at 507.
[309] 620 B.R 505 (Bankr. S.D.N.Y. 2020).
[310] *Id.* at 511.
[311] *Id.* at 513.

including the intermediate step that the plaintiff sought to avoid, before the last, safe-harbored

transfers.  Certain passages in *Boston Generating* indeed highlight the interlocking provisions of

the underlying contracts.[312]  The district court's affirmance also stated that "Notably, the Tender

Offer was conditioned upon [the obligors'] receipt of financing as contemplated by the Leveraged

Recap Transaction,"[313] and the two senior credit facility agreements and the mezzanine credit

facility "required" [the operating company obligor] to use a portion of the proceeds to "fund the

Distribution and Tender Offer of [the holding company obligor]."[314] Three recent decisions appear

to have applied or at least considered this rationale -- one finding that it justified the dividend

payments to be safe-harbored,[315] and two considering it seriously enough to hold that the facts

were not sufficiently clear to warrant granting a motion to dismiss on such a basis.[316]

This "integrated by agreement" rationale presents two problems in the light of *Merit Mgmt.*,

however.  First, it raises a line-drawing problem.  Clearly the transaction in *Merit* involved

---

[312] *Boston Generating*, 617 B.R. at 456 (noting that the Second Lien Credit Agreement provided that "The proceeds of the Loans shall be available (and the borrower agrees that it shall use such proceeds) solely . . . (iii) to fund the Distribution and the Tender Offer of [the holding company obligor. . . ." and the Mezzanine Agreement contained a similar covenant.

[313] *Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 U.S. Dist. LEXIS 173359, at *5.

[314] *Id.* at *6, 7.

[315] *In re Nine West LBO Secs. Litig.*, 482 F. Supp. 3d at 204-05 ("Here, as in *Boston Generating*, the accumulated dividend payments were tied to the restricted shares and paid as part of the settlement of the Merger Agreement. *See* Merger Agreement § 4.3 (holders of restricted shares shall receive 'an amount in cash, for each Restricted Share, equal to the Per Share Merger Consideration plus any unpaid dividends that have accumulated on such Restricted Share. . . .'"). Rather remarkably, however, *Nine West* does not cite *Merit Mgmt.* in connection with its "integrated transaction" discussion.

[316] *See Miller v. Black Diamond Cap. Mgmt., L.L.C.* (*In re Bayou Steel Bd Hldgs., L.L.C.*), 2022 Bankr. LEXIS 2130, at *23-26 (Bankr. D. Del. Aug. 3, 2022) (holding that the relationship between the challenged distribution and a conceded securities contract that the defendants argued expressly contemplated the distribution but that did not appear on its face to require it "requires further factual development"); *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, at *284-85 (holding that it was premature to determine that a dividend was not part of an integrated set of agreements comprising a safe-harbored LBO transaction:  "It is not at all clear on the face of the documents that the Preferred Dividend Payments were made to complete the LBO Transaction.").  It is worth noting that *Extended Stay* also did not discuss *Merit Mgmt.* in connection with its consideration of the "integrated transaction" doctrine but did cite *Crescent Res. Litig. Trust. v. Duke Energy Corp.*, 500 B.R. at 473-76, for the proposition, which, contrary to the later *Merit* decision looked at all the steps in an integrated transaction, not the dividend at the end of it. 2020 Bankr. LEXIS 2128, at *284. Similarly, *Bayou Steel* cites *Boston Generating*, *Crescent*, *Bechwald Cap. Advisors, LLC v. Papas*, 584 B.R. 161, 172, 182 (E.D. Mich. 2018), which was vacated and on remand determined in *Greektown Hldgs.* to have been abrogated by *Merit Mgmt.*, as discussed above, but not *Merit Mgmt.* 2022 Bankr. LEXIS 2130, at *25, n.114.

multiple, if interrelated steps, yet the Supreme Court expressly separated the steps to focus on the last one, which the plaintiff sought to avoid.  It did not inquire into how closely linked the steps were in the drafting of the various documents, and one can see the clear potential for abuse if one turned the focus away from the avoidable transfer, as required by *Merit*, to the drafting linkages between or among the steps leading up to it.[317] Such line drawing, which could easily rise to a nearly metaphysical dimension (one in three, three in one), also is to be avoided when applying a statute like section 546(e) designed as a blunt instrument to protect the securities markets.[318]

Secondly, this "integrated by documentation" approach runs the risk of being confused with the fraudulent transfer avoidance doctrine in which "[i]n equity, substance will not give way to form . . . . Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications."[319] Of course this "integrated in fact" principle applies to avoidance, but unless it is invoked to avoid a transfer, as in *In re RSI Renal*, it should not, after *Merit Mgmt.*, justify collapsing a transaction for purposes of section 546(e)'s safe harbor.[320]

Yet that "integrated in fact" argument is the third possible rationale for *Boston Generating* and perhaps the only possible rationale for its dismissal of the plaintiff's claim to avoid the $35 million dividend. As noted, that dividend was at the end of the transfer chain, not an intermediate

---

[317] Imagine, for example, that a multi-step transaction's documents included a provision that $50 million of the $200 million of proceeds of a safe-harbored step of the transaction shall be donated to the Society to Prevent Vaccinations because it was the controlling shareholder's favorite charity.  Is there any doubt that the $50 million transfer should not be safe-harbored?

[318] *Enron Creditors Recovery Corp v. Alfa, S.A.B. de C.V.*, 651 F.3d at 336 (declining a reading of section 546(e) that "would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium").

[319] *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (internal quotation marks and citations omitted).

[320] Although I disagree with the Defendants' "integrated by agreement" rationale, their section 546(e) argument nevertheless could also be denied on the basis that the documents that can be considered with the Motions do not clearly establish such integration. *In re Bayou Steel Bd. Holdgs., L.L.C.*, 2022 Bankr. LEXIS 2130, at *23-26; *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, at *284-85.

step, and as the court recognized also was not in and of itself a qualifying transfer because it was not in exchange for anything.[321]    Nevertheless, the bankruptcy court found that it was safe-harbored because it was "part of an integrated transaction" that in another step of the transaction contained a safe-harbored step, the stock/warrant buyback.[322] The district court opinion affirming the bankruptcy court even more loosely used this "integrated in fact" rationale to support the dismissal of the dividend avoidance claim: the "heart of the case" was the leveraged recap transaction; because the dividends were paid in connection with and "in anticipation of" that concededly safe-harbored transaction, they, too, were safe-harbored.[323] This rationale, which pretty clearly turns *Merit Mgmt.* on its head, is the only one of *Boston Generating*'s three rationales that would work for the Defendants, since they rely on an intermediate step, the private notes issuances, to safe-harbor the dividends.  I decline to follow it.

b. The parties' banks are not agents or custodians for purposes of section 546(e). The lack of a qualifying transaction is not the only reason why the 2009, 2012, and 2013 dividends are not safe-harbored.  The Defendants also have not sufficiently identified a qualifying recipient under section 546(e), the second, separate requirement of its safe harbor. As noted, they have not identified an agency or custody agreement between (a) a financial institution, as defined in section 101(22)(A) of the Bankruptcy Code, and (b) either (i) Tops (which, if it were the customer of such a financial institution under an agency or custody agreement would itself be deemed a financial institution under section 101(22)(A)), or any of the Private Equity Investors (which similarly would be swept in as financial institutions under section 101(22)(A) if they were the customer of

---

[321] 617 B.R. at 493.

[322] *Id.*

[323] *Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 U.S. Dist. LEXIS 173359, at *12, *26-27 ("[T]hat the distribution occurred prior to the purchase of the units or was a dividend to all members, is of no import."). This rationale also would permit the safe harboring of the "integrated" donation discussed in n.317 above.

such a financial institution), or, for, that matter, any of the noteholders, under such an agency or custody agreement.

They instead rely simply on the Flow of Funds Memoranda that show proceeds of the private notes were intended to be deposited in 2009 and 2012 into Tops' bank accounts and from there into the Private Equity Investors' bank accounts. However, without more, a bank account holder's relationship with its bank is merely a creditor-debtor relationship: "As a general rule, the relation between a bank and its depositor is that of debtor and creditor, not of agent and principal. The money deposited becomes part of the bank's general funds, and it impliedly contracts to pay the depositor's checks to the amount of his credit, but in discharging its implied obligation it pays its own money as a debtor, not its depositor's money as an agent."[324]

That debtor-creditor relationship contrasts with a principal-agency relationship, which "is established by evidence that one person -- the principal -- has allowed another to act on his or her behalf, subject to his or her control, and evidence of consent by the other person – the agent -- to so act."[325] For example, the account holder's agent in *Royal Arcanum Hosp.* was not the holder's bank but, instead, the account holder's authorized signatory for making withdrawals.[326] In contrast, in *Tribune*, the transferor, as customer, retained a separate agent to act as "Depository" in connection with an LBO tender offer to receive, hold, and distribute the tender offer funds that the

---

[324] *Kings Premium Service Corp. v. Manufacturer's Hanover Trust Co.*, 115 A.D.2d 707, 708-09, 496 N.Y.S.2d 524 (2d Dep't. 1985) (internal quotation marks and citations omitted); *see also Royal Arcanum Hosp. Assn. of King County, Inc. v. Herrnkind* 113 A.D.3d 672, 673, 978 N.Y.S.2d 355 (2d Dep't. 2014); *Curtis-Shanley v. Bank of America*, 109 A.D.3d 634, 635, 970 N.Y.S.2d 830 (2d Dep't. 2013), *app. dismissed* 22 N.Y.3d 1133 ("In general, the relationship between a bank and its customer is not a fiduciary one, but rather one of creditor and debtor; lower court properly granted defendant summary judgment since the plaintiff failed to establish the existence of some other agreement, and the plaintiff's argument that his status as a depositor created a fiduciary duty is unsupported by law."); *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 640 (E.D.N.Y. 2000).
[325] *Zeus Constr. Servs., LLC v. Fame Constr. Inc.*, 60 Misc. 3d 13, 19, 78 N.Y.S. 864 (2d Dep't. 2018). *See also Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 106 A.D.3d 47, 58 (2d Dep't. 2013).
[326] 113 A.D.3d at 673.

trustee sought to avoid.[327] Similarly, in *Nine West*, the transferor entered into a Paying Agent Agreement with a financial institution for the purpose of receiving and distributing the merger consideration to shareholders,[328] so that the plaintiff was relegated to contending that under the agreement the financial institution was not acting as an actual agent but, instead, as a "non-agent contractor."[329]

It is even more unlikely that either the bank that received the private note consideration used to pay the dividends here or the banks that received the dividends were "custodians" of Tops and the Private Equity Investors, respectively, for purposes of section 101(22)(A) of the Bankruptcy Code. Unlike "agent," the term "custodian" is separately defined in the Bankruptcy Code,[330] and by its plain terms that definition clearly would not apply to a depositor/bank relationship.[331] Even if one were to ignore section 101(11)'s definition of "custodian," without additional documentation, absent here, a depositor into a bank account loses any interest in the

---

[327] 946 F.3d at 79-88,

[328] 482 F. Supp. at 192-93.

[329] *Id.* at 195. This is not to say that is some situations someone purported to be an agent actually may be only a "mere intermediary contracted for the purpose of effectuating a transaction." *In re Greektown Hldgs, LLC*, 621 B.R. at 827. *See also* Peter v. Marchetti, "Article: Section 546(e) Redux -- the Proper Framework for the Construction of the Terms Financial Institution and Financial Participant Contained in the Bankruptcy Code After the U.S. Supreme Court's Holding in *Merit*," 43 Cardozo L. Rev. 1107, 1161 (Feb. 2022) (concluding that "The text, structure, legislative history, and policy underlying section 101(22), Section 546(e), the other Safe Harbors, and the overall Code support the conclusion that Congress did not intend the Customer Language to apply to garden-variety Redeeming Shareholders. Instead, Congress intended it to apply to securities lenders in [a]gent[ed] [securities loan transactions] so that Agent Banks would not be liable under revived Guarantees.").

[330] 11 U.S.C. § 101(11).

[331] *See In re Greektown Hldgs.*, 621 B.R. at 835-841 (explaining why intermediary was not a "custodian" for purposes of section 101(22)(A). *Cf.* Thomas E. Plank, "Article: Custodian or Note: Scrivener's Error in Bankruptcy Code Safe Harbor," 38 Emory Bankr. Dev. J. 51, 75, 91 (2022) (contending that 11 U.S.C. § 101(11)'s definition of "custodian" should not apply to the use of that term in section 101(22)(A) for purposes of section 546(e) but acknowledging that it should apply only to an entity that actually holds the securities at issue or underlying collateral for a customer, which would not be the case in a bank account relationship). It should be noted that *Tribune* defined "customer," which also is a required relationship under section 101(22)(A), as "someone who buys goods or services," or "a person . . . for whom a bank has agreed to collect items," 946 F.3d at 79, clearly not the hallmarks of the normal bank account holder's creditor/debtor relationship where the depositor gives up any specific interest in the deposited funds.

deposited funds, having only a creditor/debtor relationship with the bank as opposed to a custodial relationship.[332]

Therefore for the second, alternative reason that the Motion does not identify a qualifying participant, the safer harbor of section 546(e) does not apply.

(As this is my last opinion before retiring from the bench, perhaps I can be indulged in asking, *why* Congress has put the courts to all this parsing and hair splitting over (a) whether a transaction is one or many and, if many, has the avoidable transaction has been properly identified, or (b) whether there is a qualifying participant that is a proper customer, agent, or custodian.  After all, at issue here is a transaction whereby, after encumbering a privately held company's assets with privately issued debt, a handful of sophisticated private equity investors took massive dividends that, as asserted by the Complaint, left the pension plans of thousands of workers and hundreds of creditors holding the bag. Only the veracity of that last assertion – that is, whether Tops was insolvent or rendered insolvent by the dividends -- not whether the dividends are safe-harbored, should be at issue.  *The avoidance of these dividends and the loans that funded them would have <u>no</u> effect on the public securities markets, the ostensible purpose for section 546(e).*[333] On the other hand, the transfer avoidance provisions of the Bankruptcy Code are of fundamental importance, "help[ing] implement the core principles of bankruptcy,"[334] and go back to the enactment of the Statute of 13 Elizabeth in 1571.[335] Given the importance of fraudulent transfer law in bankruptcy cases, Congress should act to restrict *to public transactions* its current overly

---

[332] *Kings Premium Service Corp. v. Manufacturers Hanover Trust Co.*, 115 A.D.2d at 708-09. *See also Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1307 (S.D.N.Y. 1989) ("A bank . . owns the money that it holds; the bank depositors are merely bank creditors, not the owners of the money on deposit.").

[333] *See Petr. v. BMO Harris Bank, N.A.* (*In re BWGS, LLC*), 2022 Bankr. LEXIS 2315, at *11-14 (Bankr. S.D. Ind., Aug. 18, 2022) (describing origins and purpose of the safe harbor).

[334] *Merit Mgmt.*, 138 S. Ct. at 888.

[335] *See* Douglas A. Baird, <u>The Unwritten Law of Corporate Reorganizations</u>, Cambridge University Press 2022, at x ("The judge is bound by a coherent set of unwritten principles that derive from a statute of Parliament passed in 1571.").

broad free pass in section 546(e) that has informed the playbook of private loan and equity participants to loot privately held companies to the detriment of their non-insider creditors with effective impunity. This is no trivial matter. "By the third quarter of 2017, PE funds paid themselves $15.31 billion in debt-funded dividends, which was nearly equal to the total for all of 2016.  As of November of 2018, more than $30 billion in borrowed funds was paid out by companies to their PE owners.  Studies show that 25% of 481 large Chapter 11 filings over six years (from mid-2011 through mid-2017) were by PE-owned companies.  In 2017, 30% of Chapter 11 filers were owned by PE funds."[336] There is little doubt that the same playbook has been followed since the dates of the foregoing analyses and will continue to be followed unless Congress acts.)

### 2.  The Unlawful Dividend Claims

A.  Are Unlawful Dividend Claims Timely?  The parties dispute what limitations period applies to the Trust's claims against the Director Defendants under NY BCL § 719[337] for their having authorized the 2012 and 2013 dividends in contravention of NY BCL § 510. The Director Defendants contend that such claims are subject to a three-year statute of limitations under NY CPLR § 214(2) (providing a three-year limitations period to an action brought "to recover upon a liability, penalty or forfeiture created or imposed by statute . . .") and therefore are untimely given the 2018 filing of the Complaint.  The Trust is correct, however, that the six-year limitations period under NY CPLR § 213(7) applies to a claim brought by a corporation against its former directors

---

[336] Fox, 44 Del. J. Corp. L. at 83-4 (internal citations omitted).

[337] NY BCL § 719(a)(1) provides, "Directors of a corporation who vote for or concur in [the declaration of any dividend . . . to the extent that it is contrary to the provisions of paragraphs (a) and (b) of section 510] shall be jointly and severally liable to the corporation for the benefit of its creditors or shareholders, to the extent of any injury suffered by such persons, respectively, as a result of such action."  The Complaint also cites NY BCL § 720, subjection (b) of which states, "An action may be brought for the relief provided in . . . paragraph (a) of section 719 . . . by a corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof . . . " Under the Plan, the Trust was assigned Tops' claims, including its unlawful dividend claim; it is acting here as the corporation's assignee, not as a bankruptcy trustee.

under NY BCL § 719 for issuing unlawful dividends under NY BCL § 510, because the legislature

specified that section to govern claims of a corporation against present or former directors to

enforce a liability such as the liability "to the corporation"[338] ensuing upon the issuance of an

unlawful dividend.[339]

By its plain terms, the three-year limitation period under NY CPLR § 214(2) does not apply

to claims covered by NY CPLR § 213: "The following actions must be commenced within three

years: . . . (2) an action to recover upon a liability, penalty or forfeiture created or imposed by

statute *except as provided in sections 213 and 215*."[340] And NY CPLR § 213(7) clearly addresses

the Trust's claims against the Director Defendants more specifically than section 214, because it

provides that the six-year statute applies to "an action by or on behalf of a corporation against a

present or former director, officer, or stockholder . . . to enforce a liability."[341]  "This section

'supplants all other statutes of limitation potentially applicable to a suit on a corporation's claim

against its director, officer, or shareholder.'"[342]  Because NY CPLR § 213(7) encompasses the

payment of the illegal dividends claims at issue, which are claims under the plain terms of NY

BCL § 719(a) "of the corporation," the more general limitations period outlined in CPLR § 214(2)

does not apply.[343]

*Lippe* cited *Purves v. ICM Artists, Ltd.*,[344] for the contrary proposition that, notwithstanding

NY CPLR § 213(7), a three-year statute of limitations applies, and the Director Defendants rely

---

[338] NY BCL § 719(a), quoted at n.314 above.
[339] *See Lippe v. Bairnco Corp.*, 230 B.R. 906, 913 (S.D.N.Y. 1999).
[340] NY CPLR § 214(2) (emphasis added).
[341] CPLR § 213(7).
[342] *Lippe v. Bairnco Corp.*, 230 B.R. at 913 (quoting *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 742 (S.D.N.Y.1997)); *see also Steinfeld v. Richard A. Eisner & Co.* (*In re Gen. Vision Servs.*), 2006 Bankr. LEXIS 480, at *8 (Bankr. S.D.N.Y., Mar. 13, 2006) ("Section 213(7) carves out a special statutory period for a specific class of plaintiffs and defendants, and supplants any other governing limitations period.").
[343] *Lippe v. Bairnco*, 230 B.R. at 913-14.
[344] 119 B.R. 407 (S.D.N.Y. 1990).

on that decision.  *Purves'* rationale for this conclusion, though, was based on the court's belief that

claims brought by a bankruptcy trustee under NY BCL § 720(b) are not brought on behalf of the

corporation but, rather, under a separate statute.[345]    As noted above, however, the Trust was

assigned *Tops'* claims under NY BCL § 719 under the Plan; it does not need to rely on having any

bankruptcy trustee status under NY BCL § 720(b), therefore.  It should be noted, moreover, that

*Purves'* has also been aptly criticized as not even stating the correct rule for a bankruptcy trustee.[346]

B. Do the Unlawful Dividend Claims Require Pleading Breach of Fiduciary Duty? Josefowicz

and Rauch also move to dismiss the Complaint's unlawful dividend claims on the theory that the

Trust must plead their breach of a fiduciary duty in authorizing or concurring in the dividends'

issuance.  This argument is based, however, only on the statement, appearing in a decision by the

Supreme Court of New York, Suffolk County, that NY BCL § 720 "permits an action to be brought

against directors or officers to compel an accounting for their violation of fiduciary duties. . . ."[347]

What these Director Defendants ignore is that the same court also noted that the complaint at issue

failed to state a cause of action for the improper declaration of a dividend under NY BCL § 510 or

other actions that might give rise to liability under section 719 because it did not allege that any

payments were made while the corporation was insolvent or made insolvent.[348] Clearly the case

stands only for the proposition that NY BCL § 719 (and the standing accorded by NY BCL § 720)

encompasses many types of wrongdoing, including but not limited to an accounting for breach of

---

[345] *Id.* at 411.

[346] *FDIC v. Bober*, 2000 U.S. Dist. LEXIS 2147, at *10-11 (S.D.N.Y., Feb. 29, 2000) (noting that the plain language of section 213(7) is not limited to derivative actions, as the practice commentary relied upon by *Purvis* stated, but covers any action "brought by or on behalf of a corporation"); *In re Argo Communs. Corp.*, 134 B.R. 776, 787-88 (Bankr. S.D.N.Y. 1991) ("Based on the plain language of § 213(7), the same statute of limitations must apply when a corporation asserts its own cause of action and when a shareholder asserts the same cause of action on the corporation's behalf.  Consistent with this interpretation, the statute encompasses both actions 'by' and those 'on behalf of' a corporation" including by a bankruptcy trustee asserting a corporation's claim under section 720(b)).

[347] *Gillette v. Sember*, 34 Misc.3d 1220(A), 950 N.Y.S.2d 491 (Suf. Cty. 2012)

[348] *Id.*

fiduciary duty. By their plain terms, NY BCL §§ 510 and 719 impose joint and several liability

against directors merely if they "vote for or concur in"[349] the declaration of any dividend "when

currently the corporation is insolvent or would thereby be made insolvent, . . ."[350] or when the

dividend is not paid out of the corporation's "surplus" or not otherwise as permitted by NY BCL

§ 510(b).[351] There is no additional requirement for liability on these grounds that the director have

breached a fiduciary duty. Indeed, violations of NY BCL § 719 are not even subject to exculpation

under NY BCL § 402(b).[352]

The Director Defendants' Motions to dismiss the Trust's claims against them that they are

jointly and severally liable under NY BCL §§ 510 and 719(a)(1) for the shortfall to creditors caused

by the 2012 and 2013 dividends should be denied.[353]

### 3.  The Breach of Fiduciary Duty Claims Related to 2012 and 2013 Dividends

A. <u>The Trust Has Standing</u>, As noted above, under the chapter 11 Plan Tops assigned the

breach of fiduciary duty claims asserted in the Complaint to the Trust for the benefit of creditors.

Given that limitation, the Motions argue that the Trust lacks standing on the basis that the

Complaint does not plausibly plead insolvency at the time of the alleged breaches, which generally

---

[349] NY BCL § 719(a).

[350] NY BCL §§ 719(a)(1), 510(a).

[351] *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 792 F.Supp.2d 645, 652 (E.D.N.Y. 2011).

[352] *Spizz v. Eluz* (*In re Ampal-American Isr. Corp.*), 543 B.R. 464, 473-74 (Bankr. S.D.N.Y. 2016).

[353] No one has argued that Del. Gen. Corp. L. § 174 applies to the Director Defendants' authorization of the dividends (although the Trust's failure to specifically identify that section did not waive the claim if the Complaint set forth sufficient facts to support it. *Newman v. Silver*, 713 F.2d 14, 15, n.1 (2d Cir. 1983)). Based on the Court's reading of the Complaint, it sufficiently sets forth a claim under that section if it, rather than NY BCL §§ 510 and 719-720, apply to the authorization of the dividends. Section 174 "makes directors personally liable for the declaration of an unlawful dividend." *Quadrant Structured Prod. Co. v. Verlin*, 192 A.3d 155, 201 (Del. Ch. 2014). Section 174(a) states, "In case of any wilful or negligent violation of . . . § 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend . . . , to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid . . . , with interest from the time such liability accrued." Section 173 states, "No corporation shall pay dividends except in accordance with this chapter." Under Del. Gen. Corp. L. § 102(b)(7)(iii), liability under section 174 is not subject to exculpation. *Growe v. Bedard*, 2004 U.S. Dist. LEXIS 23746, at *40 (D. Me., Nov. 23, 2004). *See generally IT Grp. Inc. V. D'Aniello*, 2005 U.S. Dist. LEXIS 27869, at *56-58 (D. Del., Nov. 15, 2005). Unlike claims for breach of the duty of good faith, moreover, section 174(a)'s plain terms apply to merely a negligent violation of section 173.

coincide with the determinations to pay the 2012 and 2013 dividends.[354] This argument derives from the proposition of Delaware law that, while corporate directors owe fiduciary duties to the corporation, "when a corporation becomes insolvent, 'its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.' Accordingly, 'the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.' (emphasis in the original). Under Delaware law, a creditor's standing to maintain a derivative action against a corporation's directors arises at the precise moment that the corporation passes from solvency to insolvency."[355] The same holds true under New York law: "[O]nce a corporation is insolvent, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of the creditors. . . . New York courts refer to this principle as the 'trust fund doctrine,' by virtue of which the officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors."[356]

Here, however, the Court has already found that the Complain has plausibly alleged Tops' insolvency during the times when the 2012 and 2013 dividends were authorized. Therefore the Motion's objection based on the Trust's alleged lack of standing should be denied.

B. Are the Breach of Fiduciary Duty Claims Timely? The Motions contend that the Complaint's breach of fiduciary duty claims, arising in connection with the December 2012 and May 2013 dividends, are governed by Delaware law, including Delaware's three-year statute of

---

[354] *See Kirschner v. FitzSimons* (*In re Tribune Fraudulent Conveyance Litig.*), 2018 U.S. Dist. LEXIS 204623, at *24 (S.D.N.Y., Nov. 30, 2018), *reconsideration denied*, 2019 U.S. Dist. LEXIS 22785 (S.D.N.Y., Feb. 12, 2019).
[355] *Id.*, at *20-21 (quoting and citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)).
[356] *United States v. Feinsod*, 347 F. Supp. 3d 147, 160 (E.D.N.Y. 2018) (internal quotation marks and citation omitted). *See also Official Committee of Unsecured Creditors v. Sabine Oil & Gas Corp.* (*In re Sabine Oil & Gas Corp.*), 562 B.R. 211, 230 (S.D.N.Y. 2016) (under New York law, fiduciaries of an insolvent corporation owe duties to creditors, derivative of those owed to the corporation, to "exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity.").

limitations for such claims found in 10 Del. C. § 8106(a),[357] and therefore are time-barred given

Tops' February 21, 2018 bankruptcy petition date. The Trust contends, to the contrary, that NY

CPLR § 213(7)'s six-year limitations period applies.[358] This dispute therefore requires a choice of

law analysis because the two state's statutes of limitations are in actual conflict.[359]

Where no significant policy calling for the imposition of federal choice of law rules exists,

bankruptcy courts must apply the choice of law rules of the forum state,[360] here the choice of law

rules of New York. Generally, New York applies the "internal affairs doctrine" to determine the

applicable law governing breach of fiduciary duty claims: the law of the state of incorporation

generally controls the substantive aspects of breach of fiduciary duty claims related to corporate

governance.[361] Asserting that the two Tops entities that paid the 2012 and 2013 dividends (Tops

---

[357] *Lenoir v. Heinig*, 2020 Del. Ch. LEXIS 388, at * (Del. Ch., Jan. 12, 2021) ("It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.") (internal quotation marks and citation omitted).

[358] For the same reasons as discussed above regarding the applicability of NY CPLR § 213(7) instead of NY CPLR § 214(4) to the Complaint's unlawful dividend claims, NY CPLR § 213(7), being the more specific statute, should apply here if the issue is governed by New York law. *In re Wonderwork, Inc.*, 626 B.R. at 110); *Roslyn Union Free Sch. Dist. v. Barkan*, 16 N.Y.3d 643, 650-51 (2011) (section 213(7) applies to all actions by the corporation against former officers or directors with no differentiation between legal and equitable claims).

[359] *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006).

[360] *In re Gaston & Snow*, 243 F.3d 599, 601-02 (2d Cir. 2001). *Cf. Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 190-91 (2d Cir. 2012) (where, unlike here, action was originally filed in a different state that the current forum, bankruptcy court must apply choice of law rules of the original forum).

[361] *In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 307-08 (S.D.N.Y. 2007) (observing that New York courts have almost universally adopted the internal affairs doctrine when faced with a choice of law inquiry in derivative actions alleging breach of fiduciary duty); *see also Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.2 (2d Cir. 1980); *In re Wonderwork, Inc.*, 611 B.R. at 194.
There nevertheless are decisions by New York courts and courts in this district suggesting that application of the internal affairs doctrine is not automatic and may be subject to certain exceptions. *E.g.*, *Greenspun v. Lindley*, 36 N.Y.2d 473, 477-78 (1975) (rejecting the "automatic application" of the internal affairs rule in the presence of "significant contacts" with a state other than that of incorporation); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (noting that, in some circumstances, New York courts will not follow the internal affairs doctrine when another state has an "overriding interest . . . in the issue to be decided," and applying New York law to breach of fiduciary duty claims against a British Virgin Islands corporation); *In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 180 (S.D.N.Y. 2014) (stating, "the presumption [in favor of applying the law of the state of incorporation] is not irrebuttable; if there is a state with a more significant relationship with the parties and the dispute at issue, the court should apply that state's law" and applying New York law to breach of fiduciary claims against a Delaware corporation) (internal quotation marks and citations omitted). As summarized by the Second Circuit:

The "internal affairs doctrine" -- a species of interest analysis -- provides that the place of incorporation generally has the greatest interest in having its law apply to questions regarding the

78

Holding Corporation and Tops Holding II Corporation, respectively) were Delaware corporations, the Defendants thus contend that Delaware's three-year limitations period controls. (The Defendants have provided sufficient support for their contention that those entities were indeed incorporated in Delaware.[362] They have not provided support that the Court would normally consider in a Rule 12(b)(6) context, however, for the assertion that the 2012 and 2013 dividends were paid by those entities. On the other hand, the Trust has not contended otherwise, stating only that "Others, such as Tops Markets LLC, were incorporated in New York."[363] I therefore have assumed for purposes of this memorandum of decision that these two Delaware entities did in fact pay the dividends, although it is possible that other Tops entities provided the funds and fiduciary duties may be owed to them.)[364]

The Trust correctly notes, however, that most courts applying New York choice of law rules do not apply the internal affairs doctrine to issues regarding the application of statutes of

---

internal affairs of a corporation, such as the relationship between shareholders and directors. Although New York courts reject a per se application of the internal affairs doctrine, they generally apply the law of the place of incorporation unless another state has an overriding interest in applying its own law and a defendant has little contact, apart from the fact of its incorporation, with the state of incorporation.

*Hau Yin To v. HSBC Holdings, PLC*, 700 Fed. Appx. 66, 68-69 (2d Cir. 2017) (internal quotation marks and citations omitted). At this time, the Court generally need not resolve whether to apply the internal affairs doctrine or find that an exception exists. Except as discussed below with respect to the statute of limitations issue, there are no identified substantive differences between New York and Delaware law on the issues raised in the Motions. If anything, there may be some fiduciary duty issues on which New York has yet to be clearly defined. But as some courts have observed, "[w]here New York law is not as robust as Delaware law regarding matters of fiduciary duties, New York courts have looked to Delaware law for guidance." *Lipscomb v. Clairvest Equity Partners Ltd. P'ship* (*In re LMI Legacy Hldgs., Inc.*), 2017 Bankr. LEXIS 1150, at *17 & n.85 (Bankr. D. Del., Apr. 27, 2017) (citing *Fox v. Koplik* (*In re Perry H. Koplik & Sons, Inc.*), 476 B.R. 746, 795 (S.D.N.Y. 2012)). Moreover, the parties have at times together chosen to argue one state's law, at time's the other's, without raising a conflict between them with the exception of the present statute of limitations issue.

[362] Shamah Decl. Exs. 1 and 4 (Tops Holding Corporation's 10-K for fiscal year 2011 and Tops Holding II Corporation's 10-K for fiscal year 2013, the first page of which state that the registrant is incorporated in Delaware).

[363] Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss, at 83 n.58.

[364] The Complaint simply refers to "Tops" as paying the dividends, and neither the Defendants nor the Trust have discussed to which Tops entity or entities the Director Defendants owed the fiduciary duties at issue. If the Court did not conclude that the internal affairs doctrine did not apply to the stature of limitations dispute, this omission might be worth examining. As it is, though, it can await a later date.

limitations, deeming such issues "procedural," not "substantive."[365] Therefore here New York

law will apply to the choice of the applicable statute of limitations even if the substantive law of

Delaware applies to the underlying claim.[366]  In the specific context of breach of fiduciary duty

claims, the clear weight of authority when courts have considered both the New York

"borrowing statute" (the New York choice of law rule under the "procedural" approach to

statutes of limitations) and the internal affairs doctrine has applied the New York borrowing

statute to determine the applicable limitations period.[367]  Cases holding to the contrary applied

statutes of limitations from states of incorporation with little or no reasoning and no discussion

about whether the New York borrowing statute could apply,[368] indicating that the issue was not

raised or would not have changed the result. The Court therefore will apply New York's

borrowing statute, NY CPLR § 202, to the issue.

Under NY CPLR § 202,

---

[365] *Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416 (2010) (citing *Tanges v. Heidelberg N. Am.*, 93 N.Y.2d 48, 54-55 (1999); *Martin v. Dierck Equip. Co.*, 43 N.Y.2d 583, 588 (1978)) (discussing contractual choice of law provisions, and stating that statutes of limitations are deemed to pertain to the remedy of a cause of action rather than the right) (other citations and internal quotations omitted); *Howard Univ. v. Borders*, 2022 U.S. Dist. LEXIS 35792, at *21-22 (S.D.N.Y., Mar. 1, 2022).

[366] *Pereira v. Marshall & Sterling, Inc. (In re Payroll Express Corp.)*, 2005 Bankr. LEXIS 1933, at *46-47 (Bankr. S.D.N.Y., March 30, 2005) (citing *Stafford v. Int'l Harvester*, 668 F.2d 142, 147 (2d Cir. 1981); *Architectronics, Inc. v. Control Sys.*, 935 F. Supp. 425, 431 (S.D.N.Y. 1996)).

[367] *Kravitz v. Binda*, 2020 U.S. Dist. LEXIS 10893, at *38-40 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Kravitz as Tr. of Advance Watch Co., Ltd. v. Binda*, 2020 U.S. Dist. LEXIS 33262 (S.D.N.Y., Feb. 26, 2020) (citations omitted) (applying the internal affairs doctrine to determine substantive law for breach of fiduciary duty claims against corporate officers, but applying the New York borrowing statute to determine the applicable statute of limitations); *Willensky v. Lederman*, 2015 U.S. Dist. LEXIS 8632, at *17-18 n.8 (S.D.N.Y., Jan. 23, 2015) (citing *Aboushanab v. Janay*, 2007 U.S. Dist. LEXIS 71278, at *11 n.2 (S.D.N.Y., Sept. 26, 2007)); *Baena v. Woori Bank*, 2006 U.S. Dist. LEXIS 74549, at *24 (S.D.N.Y., Oct. 11, 2006); *Norman v. Elkin*, 2007 U.S. Dist. LEXIS 72725, at *9-10 (D. Del., Sept. 26, 2007); *Potter v. Arrington*, 11 Misc.3d 962, 965-66, 970-71, 810 N.Y.S.2d 312 (Sup. Ct. Monroe Cty. 2006).

[368] *See, e.g.*, *In re Navidea Biopharms. Litig.*, 2019 U.S. Dist. LEXIS 221211, at *7-8 (S.D.N.Y., Dec. 26, 2019) (court did not consider "substantive/procedural" distinction, citing only *Walton v Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980), a case standing for the general proposition that the internal affairs doctrine applies to fiduciary duty claims but did not have before it a statute of limitations issue); *Barbara v. Marinemax, Inc.*, 2012 U.S. Dist. LEXIS 171975, at *25-26 (E.D.N.Y., Dec. 4, 2012) (same); *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 143-44 (S.D.N.Y. 2001) (same); *Clark v. Nevis Capital Mgmt., LLC*, 2005 U.S. Dist. LEXIS 3158, at *60 (S.D.N.Y., Mar. 2, 2005) (parties agree on choice of law); *Casita, L.P. v. Glaser*, 26 Misc.3d 1240(A), 907 N.Y.S.2d 436, 2010 (Sup. Ct. N.Y. Cty. 2010) (same).

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

In other words, the statute "borrows the statute of limitations of the jurisdiction where the claim arose, if shorter than New York's, to determine whether the action was timely filed, unless the plaintiff was a New York resident at the time that the claim accrued,"[369] in which case the New York limitations period will apply. Therefore, the Court must determine (i) whether the breach of fiduciary duty claims accrued in favor of a resident of New York State, and, if not (ii) in which state the breach of fiduciary duty claims accrued, although "[i]f the claimed injury is an economic one, the cause of action typically accrues 'where the plaintiff resides and sustains the economic impact of the loss'"[370] and thus the plaintiff's[371] residence in either instance should be determined.

For a corporate plaintiff, the place of residence could be either its state of incorporation or its principal place of business.[372]  As noted, for purposes of the Motions the Court has assumed that the two entities that paid the 2012 and 2013 dividends were incorporated in Delaware.  On the other hand, the Director Defendants do not contest that Tops maintained its principal place of business in New York. Tops Holding Corporation and Tops Holding II Corporation listed their address as 6363 Main Street, Williamsville, New York 14221 on their 10-Ks.[373]  Furthermore, Tops' chapter 11 petition states that all the Debtors' principal place of business was located at

---

[369] *Holloway v. Holy See*, 537 F. Supp. 3d 502, 507 n.4 (S.D.N.Y. 2021) (citations omitted).

[370] *King*, 14 N.Y.3d at 416 (quoting *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (1999)); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2022 U.S. App. LEXIS 3660, at *4 (2d Cir. Feb. 10, 2022).

[371] Here, because the Trust is bringing the breach of fiduciary duty claims derivatively, the residence of the relevant Tops entities, not of the Trust or the trustee of the Trust, is the proper inquiry.  *In re Wonderwork, Inc.*, 626 B.R. at 111. Similarly, Tops' assignment of the claims to the Trust under the Plan does not change the inquiry from the residence of the relevant Tops entities.  *IKB Int'l S.A. v. Bank of Am. Corp.*, 2014 U.S. Dist. LEXIS 46549, at *13-14 (S.D.N.Y., Feb. 28, 2014), *adopted by* 2014 U.S. Dist. LEXIS 45813 (S.D.N.Y., Mar. 31, 2014).

[372] *Baena v. Woori Bank*, 2006 U.S. Dist. LEXIS 74549, at *18-19.

[373] Shamah Decl. Exs. 1, 4.

6363 Main Street, Williamsville, New York 14221,[374] which the Defendant Directors do not

dispute.

While some courts have found a corporation's residence for purposes of NY CPLR § 202

to be its state of incorporation,[375] most, including the Second Circuit, have focused on the

plaintiff's principal place of business to determine both its residence and where the cause of action

for economic damages accrued,[376] such that "the weight of authority supports use of a

corporation's principal place of business . . . for purposes of the borrowing statute."[377] The Court

agrees with that analysis, as set forth in *Luv N. Care*[378] and *WonderWork*,[379] including how they

distinguished *Verizon Directories*, which held that merely qualifying to do business in New York

would not satisfy NY CPLR §202's residence requirement.[380] Mostly the Director Defendants'

argument rests on *Gordon v. Credno*, which determined that the plaintiff's state of incorporation

was its residence for purposes of section 202 based on "the minimal business activities of the

---

[374] Main Case., ECF No. 1.

[375] *Interventure 77 Hudson LLC v. Halengren*, 2018 N.Y. Misc. LEXIS 1851, at *7 (Sup. Ct. N.Y. Cty., May 14, 2018), *aff'd*, *Interventure 77 Hudson LLC v. Falcon Real Estate Inv. Co.*, 172 A.D.3d 481, 101 N.Y.S.3d 326 (1st Dep't. 2019) ("published decisions of New York state courts generally hold that the [corporation's residency] is controlled by the entity's state of incorporation.") (citations omitted); *Gordon v. Credno*, 102 A.D.3d 584, 585, 960 N.Y.S.2d 360 (1st Dep't. 2013) (finding that the plaintiff's residence under NY CPLR § 202 was its state of incorporation where the plaintiff had "minimal business activities"); *Verizon Directories Corp. v. Continuum Health Partners, Inc.*, 74 A.D.3d 416, 416-17, 902 N.Y.S.2d 343 (1st Dep't. 2010); *Potter v. Arrington*, 11 Misc.3d at 964, 969.

[376] *Luv N' Care, Ltd. v. Goldberg Cohen, LLP*, 703 F. Appx. 26, 28 (2d Cir. 2017) (applying Louisiana's statute of limitations to a malpractice claim where the plaintiff was a Delaware corporation with a principal place of business in Louisiana); *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 494-95 (S.D.N.Y. 2012) (collecting cases, and stating that "[c]ourts within the Second Circuit have consistently held that a business entity's residence is determined by its principal place of business."), *aff'd sub nom. Bank v. Lynch*, 542 Fed. Appx. 81 (2d Cir. 2013); *Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*, 2012 U.S. Dist. LEXIS 19759, at *8-9 (S.D.N.Y. Feb. 14, 2012); *Guzman v. Macy's Retail Holdings, Inc.*, 2010 U.S. Dist. LEXIS 29544, at *30-31 (S.D.N.Y., Mar. 29, 2010); *In re WonderWork, Inc*, 626 B.R. at 111; *Sands Bros. Venture Capital II, LLC v. Park Ave. Bank*, 67 Misc.3d 1216(A), 127 N.Y.S.3d 255 (Sup. Ct. N.Y. Cty. 2020), *aff'd*, 190 A.D.3d 658, 136 N.Y.S.3d 737 (1st Dep't. 2021) (finding that the place of residence was the plaintiff corporation's principal place of business).

[377] *In re Wonderwork, Inc.*, 626 B.R. at 111.

[378] 703 Fed. Appx. at 29 n.1

[379] 626 B.R. at 111.

[380] 79 A.D.3d at 417, 902 N.Y.S.2d 343. *Interventure 77 Hudson* is similarly distinguishable because it applied plaintiff's state of incorporation after determining "there is no evidence that [plaintiffs] have a principal place of business in any one state." 172 A.D.3d at 481, 101 N.Y.S.3d 326.

corporation."[381] Even if one were to follow that holding, however, which, again, is in the minority,

the facts for purposes of the Motions do not require the conclusion that the entities to which the

Director Defendants owed fiduciary duties did not have their primary business activities in New

York or that the primary impact of the losses occasioned by the breaches of those duties was not

in New York. Thus, at best, the Director Defendants' argument creates a factual issue that cannot

be decided on a motion to dismiss, as determining a corporate plaintiff's place of residence for

purposes of CPLR § 202 is generally a fact-specific exercise.[382]

Accordingly, for purposes of NY CPLR § 202 Tops was either a resident of New York at

all relevant times or the issue of Tops' principal place of business in New York at the relevant

times cannot be decided in the context of the Motions.  In either event, the Motions' argument that

the Complaint's fiduciary duty claims are time-barred thus should be denied.

C. <u>Do the Breach of Fiduciary Duty Claims Against Josefowicz and Rauch Satisfy Rule 8</u>?

The Morgan Stanley Director Defendants do not contend that the Complaint's breach of

fiduciary duty claims against them should be dismissed on any other basis.  Josefowicz and Rauch

argue, however, that the breach of fiduciary duty claims against them should be dismissed for two

more reasons: (1) that they are exculpated from claims for breach of the fiduciary duty of care, and

(2) the Complaint's claims against them for breach of the fiduciary duty of loyalty/duty to act in

good faith are either conclusory or not plausible.

*i. Elements of a Claim for Breach of Fiduciary Duty.* In Delaware there are two elements

of a claim for breach of fiduciary duty. The plaintiff must show that (1) the defendant owed a

---

[381] 102 A.D.3d at 585, 960 N.Y.S.2d 360.
[382] *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 651 (1st Dep't. 2012) ("Any ruling on whether the borrowing statute applies would require a factual determination as to the principal residency of [the plaintiff corporation] and its subsidiaries, which is inappropriate on motion to dismiss.") (citations omitted). *See also Rictchie Capital Mgmt., L.C.C. v. JP Morgan Chase & Co.*, 960 F. 3d 1037, 1050-51 (8th Cir. 2020).

fiduciary duty to the plaintiff, and (2) the defendant breached that fiduciary duty.[383]   Under New York law,[384] courts generally require the plaintiff to show "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."[385]

Directors of Delaware corporations have long been said to owe a "triad" of fiduciary duties to the corporation and its shareholders: (1) the duty of care, (2) the duty of loyalty, and (3) the duty to act in good faith.[386]   The duty of care requires directors to "use that amount of care which ordinarily careful and prudent men would use in similar circumstances," and "consider all material information reasonably available."[387]   To hold directors responsible for a breach of the duty of care, "Delaware law requires that directors have acted with gross negligence."[388]   The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[389]   A director must act with "undivided and unselfish loyalty to the corporation," with "no conflict between duty and self-interest."[390]   Loyalty to the corporation also requires the director to act "in the good faith belief that her actions are in the corporation's best interest."[391]   A plaintiff will commonly plead duty of loyalty claims by alleging that the director (1) was self-interested in the transaction at issue, or (2) acted to advance the self-interest of an

---

[383] *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).

[384] The parties disagree on the applicable substantive law governing the breach of fiduciary duty claims; however, as noted above at n.359, if the underlying law of Delaware and New York are not in conflict the Court need not resolve this issue now and is disinclined to do so, particularly given the parties' failure to identify which Tops entities were owed the fiduciary duties at issue or all the Tops entities' state of incorporation.

[385] *United States Fire Ins. Co. v. Raia*, 94 A.D.3d 749, 751, 942 N.Y.S.2d 543 (2d Dep't 2012) (quoting *Rut v. Young Adult Inst., Inc.*, 74 A.D.3d 776, 777, 901 N.Y.S.2d 715 (2d Dep't 2010)).

[386] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[387] *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963); *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000).

[388] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 651 (Del. Ch. 2008).

[389] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[390] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[391] *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003).

interested party from whom they could not be presumed to act independently.[392]  The duty to act

in good faith, while described as part of the "triad," is not "an independent fiduciary duty that

stands on the same footing as the duties of care and loyalty," but, rather, a "subsidiary element of

the duty of loyalty."[393]  Nevertheless, it is often analyzed separately from other duty of loyalty

claims with the focus on whether the fiduciary's challenged conduct was "qualitatively different

from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care

(i.e., gross negligence)."[394]

The fiduciary duties owed by directors under New York law do not materially differ from

those owed under Delaware law -- New York law similarly defines the duties of care, loyalty, and

good faith.[395]  As in Delaware, the duty of loyalty in New York prohibits self-dealing and is

commonly found when the director (1) is self-interested, (2) lacks independence, or (3) acts in bad

faith.[396]

Under the law of both Delaware and New York, courts "evaluate the directors' actions

through the lens of a standard of review . . . to determine whether [they] have met the standard of

conduct imposed by their fiduciary obligations."[397]  The standard of review shifts depending on

the circumstances.  By default, courts apply the business judgment rule, which presumes that "in

---

[392] *Leal v. Meeks* (*In re Cornerstone Therapeutics Inc.*), 115 A.3d 1173, 1179-80 (Del. 2015); *see also Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 Del. Ch. LEXIS 122, at *36-37 (Del. Ch., Aug. 24, 2004) (explaining that self-interest and lack of independence are distinct concepts).

[393] *In re Fedders N. Am., Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[394] *Id.* at 369.

[395] *See Levin v. Nirav Deepak Modi* (*In re Firestar Diamond, Inc.*), 634 B.R. 265, 302 (Bankr. S.D.N.Y. 2021) (discussing both Delaware and New York fiduciary duty law); NY BCL § 717(a).

[396] *See Spizz v. Eluz* (*In re Ampal-American Israel Corp.*), 2020 Bankr. LEXIS 2260, at *17-18 (Bankr. S.D.N.Y., Aug. 25, 2020) ("[A director] may lack disinterestedness not only if she has a direct interest, but also if she is controlled by another who does. The duty of loyalty also forbids an officer from acting in bad faith. The duty to act in good faith in the context of the duty of loyalty proscribes conduct that is not disloyal but is qualitatively more culpable than gross negligence.") (internal quotation marks and citations omitted), and the cases cited therein.

[397] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) (Delaware law); *In re Ampal-American Israel Corp.*, 543 B.R. at 481-82 (New York law).

making a business decision the directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action taken was in the best interests of the company."[398]  However,

if the plaintiff alleges that "corporate fiduciaries stand on both sides of a challenged transaction,

an instance where the directors' loyalty has been called into question, the burden shifts to the

fiduciaries to demonstrate the 'entire fairness' of the transaction."[399]

    *ii. Exculpation.* The Trust alleges that Director Defendants breached their fiduciary

duties of care, loyalty, and good faith by:

    a. Approving the 2012 dividend when they were aware Tops was insolvent, would
       be rendered insolvent, would be left with reasonably small capital, and in doing
       so believed that Tops would incur or intended to incur debts beyond its ability
       to pay as they matured;

    b. Approving or not dissenting from the 2013 dividend when they were aware
       Tops was  insolvent, would be rendered insolvent, would be left with reasonably
       small capital, and in doing so believed that Tops would incur or intended to
       incur debts beyond its ability to pay as they matured;

    c. Approving the 2012 dividend while relying on the Duff & Phelps analysis that
       they knew was critically flawed;

    d. Approving or not dissenting from the 2013 dividend while relying on the HL
       analysis that they knew was critically flawed;

    e. Approving Tops' incurrence of overwhelming debt for the purpose of issuing
       the 2012 and 2013 dividends while not addressing the Pension Plan's distressed
       financial status and while Tops was insolvent;

    f. Permitting the reduction Tops' capital expenditures to levels insufficient to
       maintain or grow the business for the purpose of issuing the 2012 and 2013
       dividends.

    Before analyzing whether the Complaint sufficiently pleads that Josefowicz and Rauch

breached their duty of care, however, one must consider whether they have been exculpated from

---

[398] *In re Orchard Enters.*, 88 A.3d at 33-34 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).
[399] *Avande, Inc. v. Evans*, 2019 Del. Ch. LEXIS 305, at *21 (Del. Ch. Aug.13, 2019) (quoting *Oliver v. Boston Univ.*, 2006 Del. Ch. LEXIS 75, at *77 (Del. Ch., Apr. 14, 2006)).

such a claim.  Section 102(b)(7) of Delaware's General Corporation Law allows a corporation to include in its certificate of incorporation

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective.

Section 102(b)(7) and such exculpatory provisions also apply to claims made where the corporation's creditors have become, based on the corporation's insolvency at the time of the alleged breach, the prime beneficiaries of the directors' exercise of their fiduciary duties.[400]

> Similarly, New York NY BCL § 402(b), allows a corporation to set forth
>
> [A] provision eliminating or limiting the personal liability of directors to the corporation or its shareholders for damages for any breach of duty in such capacity, provided that no such provisions shall eliminate or limit:
>
> > (1)  the liability of any director if a judgment or other final adjudication adverse to him establishes that his acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that he personally gained in fact a financial profit or other advantage to which he was not legally entitled or that his acts violated section 719, or
> >
> > (2)  the liability of any director for any act or omission prior to the adoption of a provision authorized by this paragraph.

Both section 102(b)(7) and section 402(b) were implemented in response to the director and officer insurance liability crisis that followed the Delaware Supreme Court's decision in *Smith v. Van Gorkom*.[401]  By their terms, both ststutes bar corporations from exculpating liability for bad faith,

---

[400] *IT Grp., Inc. v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869, at *40 (D. Del., Nov. 15, 2005).
[401] 488 A.2d 858 (Del. 1985).

intentional misconduct, knowing violation of law, improper personal benefit, and declaration of

an unlawful dividend.

The Tops Holding II Corporation Certificate of Incorporation includes such an exculpation

provision, exculpating directors from claims for breach of the duty of care but not from claims for

(1) breach of the duty of loyalty, (2) acts not in good faith or which involve intentional misconduct

or a knowing violation of law, (3) approval of unlawful dividends under section 174 of Delaware's

General Corporation Law, and (4) transactions from which the director derived any improper

personal benefit:

> To the fullest extent that Delaware Law, as it exists on the date hereof or as it may
> hereafter be amended, permits the limitation or elimination of the liability of
> directors, no director of this Corporation shall be personally liable to this
> Corporation or its stockholders for monetary damages for breach of fiduciary duty
> as a director. Notwithstanding the foregoing, a director shall be liable to the extent
> provided by applicable law: (1) for any breach of the directors' duty of loyalty to
> the Corporation or its stockholders; (2) for acts or omissions not in good faith or
> which involve intentional misconduct or a knowing violation of law; (3) under
> section 174 of Delaware Law; or (4) for any transaction from which the director
> derived any improper personal benefit.[402]

The Tops Holding Corporation Certificate of Incorporation includes a similar exculpation

provision.[403] Both provisions are modelled after section 102(b)(7) of Delaware's General

Corporation Law.

The Court can consider such provisions in the context of a motion to dismiss claims for

breach of fiduciary duty because the defendants' fiduciary duties may be set forth in or modified

by the corporate charter or operating agreement, and so the agreement "should be a point of

---

[402] ECF No. 41-3.
[403] ECF No. 41-2.

departure for a Trustee claiming breaches of fiduciary duties" and considered integral to the complaint.[404]

Section 102(b)(7) "freed up directors to take business risks without worrying about negligence lawsuits" for due care violations.[405]  Since the adoption of section 102(b)(7), Delaware courts have consistently ruled that "a Section 102(b)(7) provision will exculpate Director Defendants from paying monetary damages that are exclusively attributable to a violation of the duty of care."[406]  The Second Circuit, in applying Delaware law, has confirmed that a Section 102(b)(7) provision exculpates Director Defendants from claims based on a breach of the duty of care.

In *Leal v. Meeks* (*In re Cornerstone Therapeutics, Inc.*), the Delaware Supreme Court clarified that "A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct -- be it *Revlon*,

---

[404] *Bond v. Rosen* (*In re NSC Wholesale Hldgs. LLC*), 637 B.R. 71, 84-85 (Bankr. D. Del. 2022) (internal quotation marks and citation omitted). *See also Malpiede v Townson*, 780 A.D.2d 1075, 1091-93 (Del. 2001).

[405] *Malpiede v. Townson*, 780 A.2d at 1095; *see also Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 777 (Del. Ch. 2004) ("One of the primary purposes of § 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies so long as they do so in good faith.  To expose directors to liability for breach of the duty of care for derivative claims of mismanagement asserted by creditors guts this purpose by denying directors the protection of § 102(b)(7) when they arguably need it most.").

[406] *Emerald Partners v. Berlin*, 787 A.2d 85, 92 (Del. 2001); *see also Malpiede*, 780 A.2d at 1079 ("We further affirm the granting of a motion to dismiss the plaintiffs due care claim on the ground that the exculpatory provision in the charter of the target corporation authorized by 8 Del. C. § 102(b)(7), bars any claim for money damages against the Director Defendants based solely on the board's alleged breach of its duty of care."); *Stone*, 911 A.2d at 367 ("a [Section l02(b)(7)] provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty"); *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1181 (Del. 2015) ("Because a director will only be liable for monetary damages if she has breached a non-exculpated duty, a plaintiff who pleads only a due care claim against that director has not set forth any grounds for relief."). *See also In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. Appx. 590, 592-93 (2d Cir. 2009) ("[S]hareholders, pursuant to [Section 102(b)(7)], limited the directors' liability to the full extent permitted by Delaware Law. . . . This sets a higher threshold for the plaintiffs, because pleading a substantial likelihood of personal liability for a breach of good faith or the duty of loyalty requires the plaintiffs to allege different, and more culpable, conduct than necessary for a breach of the duty of due care.").

*Unocal*, the entire fairness standard, or the business judgment rule."[407]  Further, "[w]hen a plaintiff seeks to hold multiple directors protected by an exculpatory provision liable for breach of fiduciary duty, that plaintiff must well-plead a loyalty breach against each individual director; so-called 'group pleading' will not suffice."[408]

One pleads a breach of the duty of loyalty by showing the fiduciary (1) harbored material self-interest, (2) acted to advance the self-interest of an interested party from whom she could not be presumed to act independently, or (3) acted in bad faith.[409]

The analysis on this point is less developed but likely the same under New York law, which faced with an exculpation provision also requires that the plaintiff adequately plead non-exculpated claims.  Although there are no New York cases discussing the pleading requirements for non-exculpated claims as clearly as *Cornerstone*, cases suggest the analysis is the same. For example, *In re Ampal-American Israel Corp.*, stated that to plead around a charter provision consistent with NY BCL § 402(b), the complaint "must contain factual, nonconclusory allegations that implicate one of [the] exceptions" therein, citing, among other cases, *Cornerstone*.[410]

The Trust's breach of fiduciary duty of care claims against Josefowicz and Rauch therefore will not survive unless the Court finds that the Complaint has sufficiently alleged a related non-exculpated claim based on a breach of the duty of loyalty/good faith.[411]

---

[407] *Leal v. Meeks* (*In re Cornerstone Therapeutics, Inc.*), 115 A.3d 1173, 1176 (Del. 2015).

[408] *In re Tangoe, Inc. Stockholders Litig.*, 2018 Del. Ch. LEXIS 534, at *33 (Del. Ch., Nov. 20, 2018) (quoting *Cornerstone*, 115 A.3d at 1179); *Chen v. Howard-Anderson*, 87 A.3d 648, 677 (Del. Ch. 2014) ("The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.") (internal quotation marks and citations omitted).

[409] *Cornerstone*, 115 A.3d at 1179-80.

[410] *In re Ampal-American Israel Corp.*, 543 B.R. at 474 (citing *Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1211 (Del. Ch. 2010).  *See also Lipscomb v. Clairvest Equity Partners L.P.* (*In re LMI Legacy Holdings, Inc.*), 625 B.R. 268, 279-80 (D. Del. 2020) (construing New York law); *Max v. ALP, Inc.*, 203 A.D.3d 580, 581-82, 165 N.Y.S.3d 522 (1st Dep't. 2022).

[411] *Lipscomb v. Clairvest Equity Partners Ltd. P'ship* (*In re LMI Legacy Hldgs., Inc.*), 2017 Bankr. LEXIS 1150, at *16 (Bankr. D. Del., Apr. 17, 2017), *aff'd* 625 B.R. at 268 (D. Del 2020) ("Absent bad faith or financial profit, the existence of such an exculpation clause can form the basis for dismissal of a claim alleging breach of duty of care.");

*iii. Do the Complaint's Non-Exculpated Breach of Fiduciary Duty Claims Satisfy Rule 8?*

The Complaint pleads non-exculpated fiduciary duty claims for breach of loyalty/good faith against Josefowicz and Rauch, namely that each either (i) furthered a material self-interest, (ii) lacked independence from an interested party, or (iii) acted in bad faith, that is, acted beyond gross negligence in in a conclusory fashion, by asserting that the Director Defendants "did not exercise independent or honest judgment,"[412] in authorizing the foregoing conduct. Josefowicz and Rauch contend, however, that it does not plausibly do so in a non-conclusory way.

a. <u>Material Self-Interest</u>. "A director is interested in a transaction if he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders or if a corporate decision will have a material detrimental impact on a director, but not on the corporation and the stockholders."[413] And the financial benefit must be material to the particular director's circumstance, "as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest."[414] Classic examples of director self-interest include a director's appearance on both sides of a transaction and when a director receives a personal benefit from a transaction "not received by the shareholders

---

*Stanziale v. Kahn* (*In re Evergreen Energy, Inc.*), 546 B.R. 449, 561 (Bankr. D. Del. 2016) ("When a duty of care breach is not the *exclusive* claim, a court may not dismiss the duty of care claim based on an exculpatory provision.") (emphasis in the original); *Bridgeport Hldgs. Inc. Liquidating Trust v. Boyer* (*In re Bridgeport Hldgs., Inc.*), 388 B.R. 548, 570-72 (Bankr. D. Del. 2008) (same). *But see IT Grp., Inc. v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869, at *40 ("Once the § 102(b)(7) provision is raised against duty of care claims, that is the end of the case.") (internal quotation marks and citation omitted).

[412] Complaint ¶ 262.

[413] *Friedman v. Wellspring Capital Mgmt., LLC* (*In re SportCo Hldgs., Inc.*), 2021 Bankr. LEXIS 2848, at *16 (Bankr. D. Del., Oct. 14, 2021) (quoting *In re Trados Inc. S'holder Litig.*, 2009 Del. Ch. LEXIS 128, at *22 (Del. Ch., July 24, 2009)) (internal quotation marks omitted). *See also Goldstein v. Dennter*, 2022 Del. Ch. LEXIS 117, at *124 (Del. Ch., Mary 26, 2022) ("Delaware courts are rightly skeptical that director equity creates a disqualifying interest where, as here, the director received the same per-share consideration as all other stockholders.").

[414] *In re SportCo Hldgs., Inc.*, 2021 Bankr. LEXIS 2848, at *16 (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

generally."[415]   In a self-dealing transaction, the fiduciary can receive an improper personal benefit

"in the form of obtaining something of value or eliminating a liability."[416]

The Complaint alleges that the Director Defendants, including Josefowicz and Rauch

"received monetary and other benefits at the expense of Tops and its creditors"[417] Specifically, the

Trust alleges that "[t]he 'independent' directors were also self-interested in the 2012 Dividend and

received compensation from it. Greg Josefowicz received $174,607 and Stacey Rauch received

$12,680 as 'equitable compensation' for the 2012 Dividend."[418] Later, the Complaint describes

these payments as "bonus payments."[419] As for the 2013 dividend, the Trust alleges that "The

'independent' directors also were rewarded with substantial bonuses in connection with approving

the 2013 Dividend -- Greg Josefowicz received a bonus of $172,800 and Stacey Rauch received a

bonus of $150,000."[420]

Josefowicz and Rauch dispute the nature of these payments, however, claiming that they

were received on the same terms as any other shareholder, or here, stock option holder, and

therefore, under the caselaw cited above, that they were not improperly "interested" in the dividend

transactions. They cite Tops Holding II Corporation's 10-K for 2013, which states

> Effective December 28, 2012, following the December 20, 2012 dividend . . . the
> Company awarded payments to holders of stock options under the 2007 Stock
> Incentive Plan in amounts equal to the difference between the per share dividend
> paid to shareholders and the reductions in exercise prices associated with the stock
> options . . . . On May 16, 2013, the Company awarded make-whole payments to
> holders of stock options under the 2007 Stock incentive Plan in amounts of $600
> per stock option, representing the difference between the per share dividend paid to

---

[415] *Pers. Touch Hldg. Corp. v. Glaubach*, 2019 Del. Ch. LEXIS 66, at *51-52 (Del. Ch., Feb. 25, 2019) (quoting *Cede*, 634 A.2d at 362).

[416] *Id.*

[417] Complaint ¶ 263.

[418] Id. ¶ 138. See also id. ¶¶ 105, 123.

[419] Id. ¶ 144. See also id. ¶ 44 ("Morgan Stanley also incentivized and rewarded Josefowicz and Rauch for approving dividends to Morgan Stanley by providing them with substantial bonuses in connection with the dividends.").

[420] Id. ¶ 165. See also id. ¶ 180.

Holding II stockholders and the reduction in the exercise price of the stock options.[421]

They then refer to other SEC filings to identify the stock options that they received upon joining the Board[422] and state that the allegedly "equitable compensation" or "bonuses" received in connection with the two dividends were in fact determined by applying the foregoing formula, applied in the same way as to all other holders of Tops stock options. The Complaint apparently based it allegations regarding the payments at least in part on the same SEC filings, which refer to the payments as "equitable compensation." The Trust also has neither disputed such filings' characterization of the options or the payments in connections with the two dividends or pointed to any omitted provisions in such filings (which were incomplete) that would clarify them. The Court will therefore consider the filings in this Rule 12(b)(6) context and concludes that they render implausible the Complaint's largely conclusory allegations that Josefowicz and Rauch received bonuses in connection with the two dividend issuances that differed from the treatment of other option holders.

This does not entirely resolve the issue, though, because while a director's personal benefit giving rise to self-interestedness is normally measured as one not equally shared with the stockholders, as noted above the perspective changes once the corporation becomes insolvent. As discussed above, upon insolvency the creditors take the shareholders' place as the residual beneficiaries of any increase in value.[423] Thus some courts have stated that a director of an insolvent corporation is interested in a transaction if he receives a personal benefit not shared by

---

[421] Massey Decl. Ex. 6.

[422] Id. Ex. 1, at 80; Ex. 4, at 2 (Rauch stock option); Ex. 4, at 83 (Rauch stock option).

[423] *Gheewalla*, 930 A.2d at 101; *United States SBA v. Feinsod*, 347 F. Supp. 3d 147, 160 (E.D.N.Y. 2018) ("[O]nce a corporation is insolvent, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of the creditors.") (internal quotation marks and citation omitted); *In re Sabine Oil & Gas Corp.*, 562 B.R. at 230 (under New York law, fiduciaries of an insolvent company owe duties to the creditors, derivative of those owed to the corporation, to "exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity") (internal quotation marks and citation omitted).

the insolvent corporation's *creditors*.[424] (This conflict does not exist, however, merely based on the director's ownership of stock. As noted by the Delaware Court of Chancery,

> When directors of an insolvent corporation make decisions that increase or decrease the value of the firm as a whole and affect providers of capital differently only due to their relative priority in the capital stack, directors do not face a conflict of interest simply because they own common stock or owe duties to large common stockholders. Just as in a solvent corporation, common stock ownership standing alone does not give rise to a conflict of interest. The business judgment rule protects decisions that affect participants in the capital structure in accordance with the priority of their claims.)[425]

The Trust therefore argues that Josefowicz and Rauch were "interested" vis a vis the creditors when they received their payments.

It is hard to see, though, how they could be so "interested," and thus should have acted accordingly for the creditors' benefit, without a showing that they either knew or recklessly disregarded that Tops was insolvent.

To support the all-important allegation that Josefowicz and Rauch knew that Tops was insolvent or rendered insolvent by the 2012 dividend, or recklessly ignored those facts, the Complaint alleges only that they "ignored obvious red flags" in the Duff & Phelps analysis.[426] One can infer such red flags, but most, if not all, inferences about them would apply primarily, if not perhaps exclusively, to the *Morgan Stanley Director Defendants* based on Morgan Stanley and those Directors' day-to-day involvement, including regarding Tops' adoption of unrealistic projections and curtailment of capital spending, their and Morgan Stanley's knowledge about the condition of the Pension Plans, their and Morgan Stanley's views about a proper equity cushion,

---

[424] *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 U.S. Dist. LEXIS 10983, at *48-49 (S.D.N.Y. Jan. 23, 2019), *aff'd in part, vacated in part on other grounds sub nom. Kirschner v. Large S'holders* (*In re Tribune Co. Fraudulent Conv. Litig.*), 10 F.4th 147 (2d Cir. 2021) (applying Delaware law, and stating that, "a director of an insolvent corporation is interested in a transaction if he or she receives a personal benefit not shared by all of the insolvent corporation's creditors.") (citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *In re Healthco Int'l, Inc.*, 208 B.R. 288, 303 (Bankr. D. Mass. 1997); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 510 (N.D. Ill. 1988)).
[425] *Quadrant Structured Products*, 115 A.3d at 547-48.
[426] Complaint ¶ 133.

and their and Morgan Stanley's knowledge that Duff & Phelps had ignored several truly comparable companies when conducting its analysis. Thus the Complaint may plead the negligence of Josefowicz and Rauch in connection with approving the 2012 dividends while Tops was insolvent or rendered insolvent, as one might well expect them to have inquired further about the condition of the Pension Plans in the light of the failed sales process, inquired further about the projections in the light of the substantially contemporaneous and much lower projections and valuation multiples for Tops' newly acquired stores,[427] inquired further about the capital expense reductions, and inquired further about discrepancies between the Duff & Phelps analysis and the 2009 KPMG analysis, but not their knowledge or recklessness.

The Complaint also alleges that the flaws in the HL analysis in connection with the 2013 dividend "were obvious" and the Director Defendants nevertheless recklessly proceeded with the dividend.[428] As with the Complaint's allegations regarding the 2012 dividend, however, most if not all the inferences that one can draw about the Director Defendants' knowledge or recklessness are tied to the Morgan Stanley Director Defendants, not also to Josefowicz and Rauch. It was Morgan Stanley, for example, that responded "None" to HL's request to identify Tops' contingent liabilities,[429] and it was Morgan Stanley that internally listed several comparable companies that HL did not use in its analysis, Morgan Stanley that was intimately involved in Tops' decisions to adopt inflated projections and to reduce capital spending, Morgan Stanley that internally employed a higher equity cushion.  Again, then, one can infer negligence from Josefowicz and Rauch's failure to question management's projections, the curtailment of capital expenses, and HL's' choice not to consider contingent Pension Plan liabilities -- especially in the light of Duff & Phelps

---

[427] See nn. 193 and.196 above.
[428] Id. ¶ 154.
[429] Id. ¶ 153.

having included such liabilities in its analysis just a few months before and the recent failure of the sale process ostensibly because of such contingent liabilities -- but not their knowledge or recklessness as to Tops' insolvency in connection with the 2013 dividend.

Besides arguing -- successfully as noted above -- that the Complaint fails to plead that they were "interested," Josefowicz and Rauch also contend that the Trust does not sufficiently plead that any interest they had in the dividend transaction was "material."   In support of this requirement, they cite *Freedman v. Adams*[430] and *In re Trados*[431] for the proposition that generally the interest at issue must be material to the director, and materiality is assessed based upon the individual director's economic circumstances.

An extensive line of Delaware authority supports that materiality should be assessed in relation to the director-defendant's specific economic circumstances rather than based on a "reasonable director" standard, even at the motion to dismiss stage.[432]  As the Court of Chancery has recently explained,

> For a director to be interested in the transaction, the benefit received by the director and not shared with stockholders must be of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest. Delaware courts apply a subjective 'actual person' standard to determine whether a given director was likely to be affected in the same or similar circumstances.[433]

---

[430] 2012 Del. Ch. LEXIS 74, at *17 (Del. Ch., Mar. 2012).

[431] 2009 Del. Ch. LEXIS 128, at **22 (Del. Ch., Jul. 24, 2009).

[432] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995) ("The subjective standard is consistent with this Court's observation, in *Cede II*, that requiring a shareholder plaintiff to show 'the materiality of a director's self-interest to the given director's independence' was a 'restatement of established Delaware law.'") (quoting *Cede*, 634 A.2d at 363).  *See also Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (explaining that materiality means "the alleged benefit was significant enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest."); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 617 (requiring plaintiffs to show that the composition of each director's stock holdings were "of a sufficiently material importance, in the context of the directors' economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest.").

[433] *Goldstein v. Denner*, 2022 Del. Ch. LEXIS 117, at *112-13 (internal quotation marks and citations omitted).

Several courts have considered whether payments to directors or other benefits in connection with a particular transaction are sufficiently material according to each director's circumstances. In *Goldstein*, in analyzing whether one director was interested in a transaction, the Court of Chancery compared the $72.3 million of total severance benefits he could receive as part of a transaction to his annual salary of $11.6 million.[434] The court found that the complaint adequately alleged that the severance was a material benefit, noting prior decisions that had found a severance payment equivalent to two years of salary was material to an individual,[435] and that "'compensation from one's full-time employment is typically of great consequence to the recipient' and thus is generally material."[436] The *Goldstein* court also rejected the director's argument that, because the severance benefit came from a preexisting agreement, it did not create a conflict.[437] On the other hand, on a motion for summary judgment, the court in *In re MFW S'holders Litig.* found that the plaintiffs had failed to show that a $100,000 fee to an affiliate of the director was material to the director where the plaintiffs acknowledged that she was wealthy, a "big shot," and owned a house in the Hamptons.[438]

In closer cases, it is more difficult to discern the tipping point of materiality for each director, especially at the pleading stage, and "there is no bright-line dollar amount at which . . . fees received by a director become material."[439] While some courts have been fairly strict in dismissing claims where the complaint lacks detailed allegations about a director's whole financial

---

[434] *Id.* at 118-19.

[435] *Id.* at 118 n.24 (citing *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 Del. Ch. LEXIS 1308, at *28 (Del. Ch., Oct. 11, 2019)) (other citations omitted).

[436] *Id.* at 118 (quoting *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006)).

[437] *Id.* at 119-20.

[438] *In re MFW S'holders Litig.*, 67 A.3d 496, 511-12 & n.54 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[439] *Orman v. Cullman*, 794 A.2d at 30.

status,[440] others have allowed such claims to proceed without a detailed showing, particularly where the fees materially exceed what is commonly understood to be a usual and customary director's fee[441] or it is paid for the services that comprise the challenged director's principal occupation.[442] The Trust cites *In re Trados* as an example where a court inferred materiality without requiring allegations of individual directors' personal economic circumstances. But a closer reading of *Trados* shows that the plaintiff alleged that "each of the[] directors was dependent on the preferred stockholders for their livelihood," which led the court to infer that they were interested in pursuing a particular transaction that benefitted such preferred stockholders.[443]

Importantly, courts have more readily found materiality at the pleading stage if the purposes of a director's bonus or fee appeared to incentivize the director to take actions that would benefit others. For example, in *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, a venture capital firm, Oak Hill became the controlling stockholder of ODN Holding Corporation ("ODN").[444] The crux of the complaint was that Oak Hill sought to extract cash preferentially from ODN through a redemption right that it could exercise as to its preferred stock.[445] Relevant here is that one of ODN's directors, Domeyer, who was also ODN's CEO, entered into a compensation agreement that included special bonus payments if ODN achieved a "liquidity event," which was defined to

---

[440] *See Central Laborers' Pension Fund ex re. Goldman Sachs Grp. v. Blankfein*, 34 Misc.3d 456, 931 N.Y.S.2d 835, 848-49 (Sup. Ct. N.Y. Cty. 2011), where the court, applying Delaware law, held that the plaintiffs failed to adequately plead that director fees -- which ranged from $300,000 to $700,000 per year -- were sufficiently material to infer that the directors were impartial, given the lack of financial information provided as to each defendant. That holding applied to one director defendant who allegedly earned $536,000 in annual compensation in her main occupation as a university president: because the plaintiffs did not provide information about her other potential sources of income, the court could not conclude that the fees were material. *Id.* at 848.

[441] *See In re Nat'l Auto Credit S'holders Litig.*, 2003 Del. Ch. LEXIS 5, at *39-42 (Del. Ch. Jan. 10, 2003).

[442] *Orman v. Cullman*, 794 A.2d at 30 (concluding that it would be reasonable to infer that a $75,000 fee would be material to a particular director, especially because "the inference of materiality is strengthened when the allegedly disabling fee is paid for the precise services that comprise the principal occupation of the challenged director.").

[443] *In re Trados Inc. S'holder Litig.*, 2009 Del. Ch. LEXIS 128, at *32-33.

[444] 2017 Del. Ch. LEXIS 67, at *2 (Del. Ch., Apr. 14, 2017).

[445] *Id.* at *64-65.

include the redemption of at least $75 million of preferred stock.[446]  The other directors approved

that compensation package, most of whom were directly tied to Oak Hill.[447]  Domeyer ultimately

approved redemptions totaling $85 million, triggering her receipt of a $587,184 bonus.[448]  The

court analyzed whether Domeyer was interested, based on the bonus potential, in the steps taken

to achieve redemptions and found that she was.[449] That included a finding that $587,184 was

sufficiently large to support an inference of materiality at the pleading stage, "particularly when

the purpose of the bonus appears to have been to incentivize Domeyer to pursue redemptions that

would benefit Oak Hill."[450]

In this case, the Trust alleges that the directors received bonuses ranging from $12,680 to

$174,607 for approving the 2012 and 2013 Dividends.  If one were to accept that these were in

fact bonuses, instead of "make-whole payments" under the formula quoted above, they would

appear as in *Frederick Hsu*, to incentivize the Josefowicz and Rauch to approve the dividends,

which in turn allegedly benefitted Morgan Stanley. The sums are also in the aggregate significant.

Therefore, although the Complaint does not provide detailed financial information regarding the

directors' financial situations, it sufficiently pleads the materiality of the payments.

   b. <u>Lack of Independence</u>. A director's decision is considered to be independent if it is based

on "the corporate merits of the subject" transaction rather than "extraneous considerations or

influences."[451]  To establish a lack of independence, the plaintiff must allege facts raising

"sufficient doubt that a director's decision was based on extraneous considerations or influences,

---

[446] *Id.* at *16-17.
[447] *Id.*
[448] *Id.* at *74.
[449] *Id.* at *73-74.
[450] *Id.* at *74.
[451] *Aronson v. Lewis*, 473 A.2d at 816.

and not on the corporate merits of the transaction."[452]  Lack of independence can be established if

the complaint alleges facts as to create a "reasonable doubt" that through personal or other

relationships "the directors are beholden to the controlling person [or entity]" or "so under their

influence that their discretion would be sterilized."[453]

However, "allegations of mere personal friendship or a mere outside business relationship,

standing alone, are insufficient to raise a reasonable doubt about a director's independence."[454]

Conclusory references to "dominated and controlled directors" also are insufficient.[455]   "It is the

care, attention and sense of individual responsibility to the performance of one's duties, not the

method of election, that generally touches on independence."[456]  Thus, that a director was

"nominated by or elected at the behest of those controlling the outcome of a corporate election"

adds no support to the plaintiff's claims, because "that is the usual way a person becomes a

corporate director."[457]  More is required, such as situations involving family, employment

prospects, and long-standing business relationships, before a complaint will have alleged sufficient

facts to support an inference that the director could not act independently of an interested party.[458]

---

[452] *Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 Del. Ch. LEXIS 122, at *36-37 (Del. Ch., Aug. 24, 2004).

[453] *Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 512 (Del. 2005); *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *Highland Legacy Ltd. v. Singer*, 2006 Del. Ch. 55, at *21 (Del. Ch., Mar. 17, 2006).

[454] *Benihana of Tokyo, Inc.* v. *Benihana, Inc*., 891 A.2d 150, 179 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).

[455] *Aronson v. Lewis*, 473 A.2d at 816.

[456] *Id.*

[457] *Id.*; *see also Weinstein*, 870 A.2d at 512; *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 602 (S.D.N.Y. 2007) ("Any argument that the directors were nominated by or elected at the behest of the controlling person adds nothing.").

[458] *Delaware Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015) ("[P]laintiffs pled not only that the director had a close friendship of over half a century with the interested party, but that consistent with that deep friendship, the director's primary employment (and that of his brother) was as an executive of a company over which the interested party had substantial influence."); *In re Student Loan Corp. Derivative Litig.*, 2002 Del. Ch. LEXIS 7, at *8 (Del. Ch., Jan. 8, 2002) ("[T]he complaint alleges facts that suggest that all four of the affiliated directors have committed their careers to Citigroup," and "each owes his livelihood to Citigroup."); *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. 1999) ("Hudson's business relationship with Huizenga extends back over 30 years. . . . This long-standing pattern of mutually advantageous business relations makes me doubtful that Hudson could impartially consider a demand that Republic file a lawsuit adverse to Huizenga's interests.").

Delaware courts have long held that one should not assume directors are influenced by a controller due to a concern about potentially losing their directorships, unless the controller has actually made retributive threats.[459]  But more recently, the Court of Chancery acknowledged scholarly work on the topic of director independence to suggest: (1) gaining or losing a directorship is generally material to an individual director, and (2) directors could be particularly influenced by entities that regularly are in a position to appoint and reappoint directors, sometimes to multiple boards.[460]  As to one director, the *Goldstein* court went on to hold that the plaintiff had pled sufficient facts to meet the deferential standard under Delaware Chancery Court Rule 12(b)(6), noting that the enhanced scrutiny standard of review applied to the transaction.[461]  Similarly, in a different case, the Court of Chancery took a holistic view of a director's "multiple layers of business connections" with a controlling party, combined with the threat that he might lose his lucrative directorship if he approved a particular action, to find that the Complaint adequately pled the director's lack of independence.[462]

In analyzing directors' independence based on their continued ability to receive directors' fees, some courts have focused on whether the fees exceeded the usual and customary.[463]  Other

---

[459] *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 Del. Ch. LEXIS 14, at *135 (Del. Ch., Jan. 25, 2016).

[460] *Goldstein*, 2022 Del. Ch. LEXIS 117, at *128-32 (citing, among others, Da Lin, "Beyond Beholden," 44 J. Corp. L. 515 (2019) ("Although mere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction.").

[461] *Id.* at 135-36.  However, the court commented that the pleadings would likely not be sufficient to survive a motion to dismiss in the demand excusal context under Delaware Chancery Court Rule 23.1.  *Id.*  And, as other courts have noted, Delaware Chancery Court Rule 12(b)(6) is analogous to, but less exacting than, Fed. R. Civ. P. 12(b)(6).  *Drivetrain, LLC v. EverStream Solar Infrastructure Fund I LP* (*In re SunEdison, Inc.*), 639 B.R. 824, 834 (Bankr. S.D.N.Y. 2022) (quoting *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013) ("The *Twombly/Iqbal* plausibility standard is more rigorous than Delaware's counterpart pleading standard.")).

[462] *In re Oracle Corp. Derivative Litig.*, 2018 Del. Ch. LEXIS 92, at *50-52 (Del. Ch., Mar. 19, 2018) ("In my view, the combined effect of Conrades's business ties and the threat of losing his directorship is to create reasonable doubt that he could impartially consider whether to sue Ellison.").

[463] *Security Police and Fire Professionals of Am. Ret. Fund v. Mack*, 30 Misc.3d 663, 917 N.Y.S.2d 527, 541 (Sup. Ct. N.Y. Cty. 2010) (applying Delaware law and finding that directors' annual stipends ranging from $325,000 to $376,733 did not establish lack of independence because they were not alleged to materially exceed usual and

101

cases suggest that directors' fees are more likely to be material to an individual whose principal

occupation is serving as director.[464] As with interestedness, analysis of independence is based on

a subjective "actual person" standard rather than an objective "reasonable director" standard.[465]

So, too, materiality comes into showing a lack of independence.[466]

> The plaintiff must allege that the director in question had ties to the person whose
> proposal or actions he or she is evaluating that are sufficiently substantial that he
> or she could not objectively discharge his or her fiduciary duties. In other words,
> the question is whether, applying a subjective standard, those ties were material, in
> the sense that the alleged ties could have affected the impartiality of the individual
> director. [Delaware] law requires that all the pled facts regarding a director's
> relationship to the interested party be considered in full context in making the,
> admittedly imprecise, pleading stage determination of independence.[467]

Put differently, the Court begins with the presumption that all directors are independent,[468] such

that "the allegations must be sufficient to demonstrate a *substantial reason* to find that a director

cannot make a decision with only the best interests of the corporation in mind."[469]

The Complaint alleges that Director Defendants were "not truly 'independent' directors,

but in fact were beholden to, and controlled by, Morgan Stanley and acted at Morgan Stanley's

direction to advance Morgan Stanley's interest in approving the Dividends.[470]  In support of these

general, conclusory allegations, the Trust pleads that Morgan Stanley placed all of the Director

---

customary directors' fees) (citing *Orman v. Cullman*, 794 A.2d at 29 n.62).  *See also Central Laborers' Pension Fund ex re. Goldman Sachs Grp. v. Blankfein*, 931 N.Y.S.2d at 848 (considering whether directors' fees, "as generous as they appear[ed] to be," were anything other than usual and customary).

[464] *Orman*, 794 A.2d at 30 ("Although not determinative, the inference of materiality is strengthened when the allegedly disabling fee is paid for the precise services that comprise the principal occupation of the challenged director.").

[465] *Orman*, 194 A.2d at 24; *Cinerama*, 663 A.2d at 1167.

[466] *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled in part on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[467] *United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1060-61 (Del. 2021) (internal quotation marks and citations omitted).

[468] *Samuels v. CCUR Holdings, Inc.*, 2022 Del. Ch. LEXIS 119, at *16-17 (Del. Ch., May 31, 2022) (citing *Frederick Hsu Living Tr.*, 2016 Del. Ch. LEXIS 150, at *61-62).

[469] *Id.* at *18 (quoting *Teamsters Local 237 Additional Sec. Ben. Fund v. Caruso*, 2021 Del. Ch. LEXIS 188, at *38 (Del. Ch. Aug. 31, 2021)) (emphasis in original).

[470] Complaint ¶¶ 44, 137.

Defendants, including Josefowicz and Rauch on Tops' Board and had "sole and absolute direction to remove them if they failed to follow Morgan Stanley's directives."[471]  The Trust also pleads that Josefowicz and Rauch's "careers were solely focused on serving on Boards, and meeting Morgan Stanley's needs on the Tops' Board would mean the possibility of Morgan Stanley appointing them to other Boards"[472]

Based on the foregoing caselaw, these limited allegations are insufficient to prove Josefowicz' and Rauch's lack of independence.

c. <u>Acted in bad faith</u>. Delaware courts have identified three non-exhaustive examples of bad-faith conduct:

> [1] the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, [2] the fiduciary acts with the intent to violate applicable positive law, or [3] the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[473]

It was long held that to establish a claim of bad faith the plaintiff must show "[1] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [2] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[474]  The Delaware Supreme Court has since rejected the proposition that a plaintiff must plead that the defendant made a decision "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith,"[475] however, and stated that it disagrees with the statement that "a plaintiff in

---

[471] Id. ¶137.
[472] Id.
[473] *In re Oracle Corp. Derivative Litig.*, 2018 Del. Ch. LEXIS 92, at *33 (Del. Ch. Mar. 19, 2018) (quoting *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 67 (Del. 2006)).
[474] *In re MeadWestvaco Stockholders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (citations omitted); *see also Buchwald Cap. Advisors LLC v. Schoen* (*In re OPP Liquidating Co.*), 2022 Bankr. LEXIS 651, at *24 (Bankr. D. Del., Mar. 14, 2022) (quoting *In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*, 2016 Del. Ch. LEXIS 79, at *23 (Del. Ch., May 20, 2016)).
[475] *Goldstein v. Denner*, 2022 Del. Ch. LEXIS 117, at *114 (Del. Ch. May 26, 2022).

this context must plead facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith. . . ."[476] Thus the complaint need not rule out any possibility for the Directors' conduct other than bad faith.[477]

In any event, though, the plaintiff must establish that the targeted director had the requisite scienter. It is not enough to say, in hindsight, that the director should have known that projections or other data were wrong -- the plaintiff must demonstrate what the directors knew it.[478] Moreover, absent a showing of actual knowledge or intent, directors do not act in bad faith when they rely on outside experts to assist their decision-making.[479] "As long as a board attempts to meet its duties, no matter how incompetently, the directors did not consciously disregard their obligations."[480] These general requirements are similar to those under New York law.[481]

Given the Court's earlier analysis of the Complaint's allegations regarding Josefowicz and Rauch's lack of knowledge, and thus lack of intent, therefore, the Complaint does not allege, except in a conclusory way, that they intentionally disregarded their fiduciary obligations, a critical omission from the Trust's contention that they breached their duty of good faith.[482]

---

[476] *Kahn v. Stern*, 2018 Del. LEXIS 114, at *1-2 (Del. Mar. 15, 2018). *See also Voigt v. Metcalf*, 2020 Del. Ch. LEXIS 55, at *66 (Del. Ch. Feb. 10, 2020) ("[T]o plead a claim that [the defendant] did not act in good faith, [the plaintiff] must plead facts supporting an inference that [the defendant] did not reasonably believe that the . . . transaction was in the best interests of the [Company].")

[477] *Goldstein*, 2022 Del. Ch. LEXIS 117, at *114; *Firefighters' Pension Sys. v. Presidio, Inc.*, 251 A.3d 212, 276-77 & n.19 (Del. Ch. 2021).

[478] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 Del. Ch. LEXIS 28, at *44-45 (Del. Ch., Jan. 31, 2013).

[479] *See Tilden v. Cunningham*, 2018 Del. Ch. LEXIS 510, at *37, 2018 WL 5307706 (Del. Ch., Oct. 26, 2018) (dismissing bad faith claim where the directors relied on an outside financial advisor and the plaintiff did not plead that the "Board actually knew [the third-party advisor] had manipulated its financial analysis"); *Lenois v. Lawal*, 2017 Del. Ch. 784, at *52-53, 2017 WL 5289611 (Del. Ch. Nov. 7, 2017) (dismissing bad faith claim where directors relied on financial advisor's analysis and explaining "[p]laintiff has not adequately alleged that Director Defendants acted with knowledge that the financial advisor's opinion was false"); *In re Bear Stearns Litig.*, 23 Misc.3d 447, 463, 879 N.Y.S.2d 709 (Sup. Ct. N.Y. Cty. 2008) (citing *Disney*, 906 A.2d at 64-65) ("A showing of gross negligence alone, including the failure to ascertain the available material facts, will not suffice").

[480] *Chen v. Howard-Anderson*, 87 A.3d 648, 683 (Del. Ch. 2014).

[481] *United States Small Business Admin. v. Feinsod*, 347 F. Supp. 3d 147, 163 n.14 (E.D.N.Y. 2018) (collecting New York cases on bad faith requirements and stating that Delaware law would not produce a different result).

[482] Delaware courts separately recognize claims of bad faith against directors for failure to exercise adequate oversight, commonly called *Caremark* claims. To succeed on a *Caremark* claim, the plaintiff must show

### 4. The Aiding and Abetting Breach of Fiduciary Duty Claims Against MSIM

A. <u>MSIM's Argument that the Complaint's Aiding and Abetting Breach of Fiduciary Duty Claims Are Time-Barred Also Should Be Denied</u>.

MSIM's argument that Delaware's three-year statute of limitations applies to the aiding and abetting breach of fiduciary duty claims against it was based on the same reasons that Defendants argued the Complaint's breach of fiduciary duty claims were time-barred, because that "[t]he statute of limitations for each aiding and abetting claim is determined by the underlying tort."[483] The Defendants' argument for a three-year statute of limitations to apply to the underlying breach of fiduciary duty claims having been found unavailing, however, MSIM's argument also should be denied.[484]

B. <u>Does the Aiding and Abetting Breach of Fiduciary Duty Claim Satisfy Rule 8?</u>

---

the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.

*Stone v. Ritter*, 911 A.2d at 370. "In short, to satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it." *Marchand v. Barnhill*, 212 A.3d 805,821 (Del. 2019). Where the plaintiff is unable to plead the failure to make the required good faith effort to put a reasonable compliance and reporting system in place, Delaware courts have dismissed *Caremark* claims even though illegal or harmful company activities escaped the directors' detection. *Id.* (collecting cases). "Simply alleging that a board incorrectly exercised its business judgment and made a 'wrong' decision in response to red flags . . . is insufficient to plead bad faith." *Melbourne Municipal Firefighters' Pension Trust Fund*, 2016 Del. Ch. LEXIS 114, at *26 (Del. Ch., Aug. 1, 2016) (citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009)).

[482] *Iqbal*, 556 U.S. at 683 (holding that conclusory statements regarding petitioners' discriminatory state of mind were insufficient without supporting factual allegations). Here, the Complaint has not alleged a *Caremark* claim of bad faith against either Josefowicz or Rauch.

[483] *E.g. Canosa v. Ziff*, 2019 U.S. Dist. LEXIS 13263, at *30-31 (S.D.N.Y. Jan. 28, 2019) (quoting *Marketxt Hldgs. Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 393 (S.D.N.Y. 2010)).

[484] Given MSIM's limited argument, the Court does not need to decide the additional issue raised by the Trust that the internal affairs doctrine may not apply, in any event, to an aiding and abetting breach of fiduciary duty claim and New York's "interests analysis" would, instead. *See generally Okimoto v. Youngjun Cai*, 2015 U.S. Dist. LEXIS 68295, at *10 (S.D.N.Y., May 21, 2015); LaSala v. Bank of Cypris Pub. Co. Ltd., 510 F. Supp. 2d 246, 266 n.7 (S.D.N.Y. 2007)

MSIM also contends that the claim that it aided and abetted Director Defendants' breach of their fiduciary duties with respect to the 2012 and 2013 dividends should be dismissed as either conclusory or implausible.

To establish a claim for aiding and abetting a breach of fiduciary duty under Delaware law, the plaintiff must show "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the [non-fiduciary] defendants, and (iv) damages proximately caused by the breach."[485] "'Knowing participation" is the critical element.[486] 'Knowing participation' in [a fiduciary's] breach requires that the third party act with knowledge that the conduct advocated or assisted constitutes such a breach.  Therefore, if the third party knows that the board is breaching its duty and participates in the breach by misleading the board or creating an informational vacuum, then the third party can be liable for aiding and abetting"[487] "The standard for an aiding and abetting claim is a stringent one, one that turns on proof of scienter of the alleged abettor."[488] However, "the advisor is not absolved from liability simply because its clients' actions were taken in good-faith reliance on misleading and incomplete advice tainted by the advisor's knowing disloyalty."[489]

MSIM does not contest here that Director Defendants breached their fiduciary duties to Tops.  Its contention that the Complaint does not sufficiently plead damages proximately caused

---

[485] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (citation omitted); *see also Cargill Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008). New York applies a similar standard: the plaintiff must allege "that there was a breach of fiduciary duty by another, the defendant had actual knowledge of the breach, the defendant knowingly induced or participated in the breach, and that the plaintiff suffered damages as a result of the breach." *Kraus USA, Inc. v. Magarik*, 2020 U.S. Dist. LEXIS 83481, at *35 (S.D.N.Y., May 12, 2020).

[486] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 836 (Del. Ch. 2011).

[487] *Morrison v. Berry*, 2020 Del Ch. LEXIS 200, at *25 (Del. Ch., June 1, 2020) (internal quotation marks omitted), citing *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 849-50 (Del. 2015) and arising in the scope of a *Revlon* change in control context.

[488] *In re Essendant, Inc. Stockholder Litig.*, 2019 Del. Ch. LEXIS 1404, at *36 (Del. Ch., Dec. 30, 2019).

[489] *Sing v. Attenborough*, 137 A.3d 151, 153 (Del. 2016).

by such breach is belied by the Complaint's allegations, which the Court finds plausible, that the dividends, including the 2012 and 2013 dividends, and Tops' related incurrence of debt and curtailment of capital expenditures "rendered Tops insolvent at the time of each of the dividends and led Tops to file for bankruptcy, leaving the Company's creditors with over $1 billion in losses."[490]

MSIM also argues, however, that the Complaint fails to plead MSIM's knowing participation, as required by the caselaw discussed above, in any breach of fiduciary duty. At one level, this argument is unavailing, too. The Complaint pleads several ways in which "Morgan Stanley" had the requisite scienter in participating in or contributing to Defendant Directors' breaches of fiduciary duty based on "Morgan Stanley's" day-to-day control of Tops, including with respect to decisions to cut capital expenditures, to ignore Tops' Pension Plan exposure, and to fund the 2012 and 2013 dividends, as well as its intensive involvement in the Duff & Phelps and HL analyses supporting the dividends, which the Complaint pleads "Morgan Stanley" knew were deeply flawed and for which "Morgan Stanley" knowingly provided false information (such as "Morgan Stanley's" alleged direction to Tops to adopt clearly flawed projections[491] and control of the flow of false or incomplete information to the two consultants).[492]

But except to describe MSIM as "do[ing] business as Morgan Stanley Private Equity and Morgan Stanley Capital Partners . . . for its private equity business," and stating that "Morgan Stanley Private Equity operates as part of MSIM's Merchant Banking Division and makes private equity and equity-related investments on a global basis;" Morgan Stanley Capital Partners manages "a middle market equity platform;" and Morgan Stanley "issued a press release stating:

---

[490] Complaint ¶ 4.
[491] Id. ¶ 132
[492] Id. ¶¶ 142, 153.

'Morgan Stanley Private Equity announced today that it will acquire Tops Markets, LLC,'[493] the Complaint does not sufficiently allege that MSIM itself engaged in any of the foregoing activity. Instead, it defines "Morgan Stanley" as including MSIM and MSCPV Holdco[494] (MSCPV Holdco presumably being the actual controlling shareholder in Tops and the "Morgan Stanley" recipient of the dividends) and states that the Morgan Stanley Director Defendants were also Managing Directors at either Morgan Stanley Private Equity[495] or Morgan Stanley Capital Partners.[496] As noted, it then alleges throughout that "Morgan Stanley" engaged in wrongful activity without differentiating which Morgan Stanley entity did so or whether the activity referred to was conducted by the Morgan Stanley Director Defendants in such capacity or in their capacity as officers of MSIM. The only exceptions to this are found in paragraphs 268 – 270 of the Complaint. However, paragraph 268 states only that MSIM "controlled" the Director Defendants without explaining who at MSIM did so and how it did so; paragraph 270 states in a conclusory way that "MSIM knew of the Director Defendants' breaches of fiduciary duties to Tops and provided substantial assistance to those breaches;" and paragraph 270 lists some of ways MSIM provided such "substantial assistance and/or encouragement" without, again, pleading how MSIM, as opposed to MSCPV Holdco or the Morgan Stanley Director Defendants acting in such capacity (each of which had their own fiduciary duties to Tops) did so. This does not satisfy Fed. R. Civ. P. 8[497] and therefore requires that the Complaint's aiding and abetting claim against MSIM should be dismissed.

### Conclusion

---

[493] Id. ¶ 19.
[494] Id. introductory paragraph.
[495] Id. at ¶¶ 25 and 26 (Matthews and Fry).
[496] Id. at ¶ 27 ( Kanter).
[497] Lumping these defendants together, which is "generally impermissible," is not excused even by analogy to the "group pleading doctrine" because that doctrine does not also encompass allegations of scienter. *In re Platinum-Beechwood Litig.*, 2019 U.S. Dist. LEXIS 62745, at *35 (S.D.N.Y., Apr. 11, 2019).

Based on the foregoing, the Court grants the Motions as to (a) Count XI to the extent that it asserts any claims for breach of fiduciary duty against Josefowicz and Rauch and (b) Count XII, asserting a claim against MSIM for aiding and abetting breach of fiduciary duty.  The Trust shall have 30 days from the date of this Memorandum of Decision to file a motion under Fed. R. Bankr. P. 7015, incorporating Fed. R. Civ. P. 15, for leave to amend the Complaint, which motion shall attach the proposed form of first amended Complaint marked to show changes from the Complaint.  If such a motion is not filed by such date, the foregoing dismissal shall be with prejudice.  The Motions are otherwise denied.  Counsel for the Trust shall promptly email an order consistent with this memorandum of decision to chambers, copying counsel for the Defendants.

Dated:  White Plains, New York
        October 12, 2022                          /s/Robert D. Drain
                                            Hon. Robert D. Drain
                                            U.S. Bankruptcy Judge

*In May of this year, someone stalked and shot thirteen shoppers and workers in a Tops store in Buffalo, New York.  I am sure that all the parties to the present dispute join me in wishing the survivors strength, peace, and dedication.*