Pamela A. Miller
Peter Friedman (admitted *pro hac vice*)
Lauren M. Wagner
Amber L. Covucci
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Email: pmiller@omm.com
        pfriedman@omm.com
        lwagner@omm.com
        acovucci@omm.com

Meaghan VerGow
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Email: mvergow@omm.com

*Attorneys for Defendants Morgan Stanley Investment Management, Inc., Morgan Stanley Capital Partners V U.S. Holdco LLC, Gary Matthews, Eric Kanter, and Eric Fry*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>TOPS HOLDING CORPORATION, *et al.*,<br><br>       Debtors. | Chapter 11<br><br>Case No. 18-22279 (SHL)<br>(Jointly Administered) |
| ALAN D. HALPERIN, AS THE LITIGATION TRUSTEE FOR THE TOPS HOLDING LITIGATION TRUST,<br><br>       Plaintiff,<br><br>       v.<br><br>MORGAN STANLEY INVESTMENT MANAGEMENT, INC., *et al.*,<br><br>       Defendants. | Adv. Proc. No. 20-08950 (DSJ)<br><br><br>**MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT OF MORGAN STANLEY DEFENDANTS' SUMMARY JUDGMENT MOTION** |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ................................................................................... 4

I.    The Parties ............................................................................ 4

II.    Background ........................................................................... 5

    A.    The PE Investors' Investment in Tops ........................... 5

    B.    MEPPs and Tops's Pension Obligations ........................ 6

    C.    Tops Expands and Issues Dividends ............................. 9

        1.    *The 2009 Notes and Dividend* ............................ 9

        2.    *The Penn Traffic Acquisition and 2010 Dividend* ...... 11

        3.    *The 2012 Notes and Dividend* .......................... 12

        4.    *The 2013 Notes and Dividend* .......................... 14

        5.    *The Offers to Purchase Tops* ........................... 15

    D.    Tops Undergoes a Management Buyout and Operates Successfully for Years ...................................................... 16

    E.    Tops Touts its Strong Financial Position—and Foots the Bill—in an Arbitration with Teamsters ..................... 17

    F.    Amid Unforeseeable Challenges, Tops Files for Bankruptcy in 2018 ....................................................... 18

STANDARD OF REVIEW ..................................................................... 19

ARGUMENT ....................................................................................... 19

I.    Bankruptcy Code § 546(e) bars the Trustee's fraudulent transfer claims for the 2009, 2012, and 2013 Dividends (Counts I, III, IV, V, VII, and VIII) and illegal dividend claims (Counts IX and X). .............................................................. 19

    A.    Developments in the applicable law and the undisputed facts confirm that the safe harbor applies. ...................... 20

    B.    The NPAs are "securities contracts." ............................. 23

    C.    The Safe Harbor Dividends were "in connection with" the NPAs. ...... 24

        1.    The undisputed facts establish that the Safe Harbor Dividends were related to the NPAs. ................ 24

        2.    The Second Circuit's recent decision in *Boston Generating* confirms that the Safe Harbor Dividends were "in connection with" the NPAs. ...................... 27

    D.    The Safe Harbor Dividends were transfers made "by and to" "financial institutions." .......................................... 29

## TABLE OF CONTENTS
(continued)

Page

1.   The undisputed facts establish that Tops and Cap V were "financial institutions" in connection with the NPAs. ................. 29

E.   Section 546(e) preempts the illegal dividend claims. .............................. 33

II.   The Trustee's constructive fraud claims (Counts I–IV) fail as a matter of law. ................................................................................................................ 34

A.   The Trustee's constructive fraud claims under NYDCL § 273 fail as a matter of law because the Trustee cannot meet his burden of proving insolvency. ................................................................................... 35

B.   Mr. Brown's opinion is invalid because it depends on ████████ ████████████████████████████████████████████████ ████████████████████████████. ......................................... 37

C.   The Trustee cannot salvage Mr. Brown's opinion by asserting that ████████████████████████████. ............................................. 40

D.   The Trustee's only evidence of insolvency relies on interest rate assumptions that were incorrect as a matter of law. ....................... 42

E.   The Trustee cannot prove that the Dividends left Tops with unreasonably small capital. ....................................................... 48

F.   The Trustee's constructive fraud claims under NYDCL § 275 necessarily fail because there is no evidence that the Tops Board subjectively intended or believed that Tops would incur debts beyond its ability to pay them. ............................................... 51

III.   Cap V is entitled to summary judgment on the Trustee's actual fraudulent transfer claims (Counts V–VIII). ........................................................... 52

IV.   The Morgan Stanley Directors are entitled to summary judgment on the fiduciary duty claim (Count XI). ........................................................... 55

V.   The Morgan Stanley Directors are entitled to summary judgment on the illegal dividend claims (Counts IX and X). ............................................ 59

VI.   MSIM is entitled to summary judgment on the aiding and abetting a breach of fiduciary duty claim (Count XII). ......................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*,
  652 F. App'x 19 (2d Cir. 2016) ......................................................................48, 51

*AP Servs. LLP v. Silva*,
  483 B.R. 63 (S.D.N.Y. 2012).........................................................................33, 34

*Bank Leumi USA v. Ehrlich*,
  98 F. Supp. 3d 637 (S.D.N.Y. 2015).....................................................................20

*Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, L.P. (In re Bankr. Est. of Norske Skogindustrier ASA)*,
  629 B.R. 717 (Bankr. S.D.N.Y. 2021).....................................................................30

*Berdeaux v. OneCoin Ltd.*,
  561 F. Supp. 3d 379 (S.D.N.Y. 2021).....................................................................63

*Berman v. Le Beau Inter-America, Inc.*,
  62 B.R. 262 (S.D.N.Y. 1986).................................................................................61

*Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l Corp.)*,
  366 B.R. 318 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*,
  590 F.3d 252 (3d Cir. 2009)...................................................................................31

*Cambria Equity Partners L.P. v. Relight Enters. S.A.*,
  2021 WL 2336984 (Del. Ch. Jan. 5, 2021)............................................................62

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...............................................................................................19

*Chen v. Howard-Anderson*,
  87 A.3d 648 (Del. Ch. 2014)..................................................................................56

*Colorado Fire Sprinklers, Inc. v. Nat'l Automatic Sprinkler Indus. Pension Fund*,
  725 F. Supp. 3d 1248 (D. Colo. Mar. 26, 2024) ...................................................44

*Contemp. Indus. Corp. v. Frost*,
  564 F.3d 981 (8th Cir. 2009), *abrogated on other grounds by Merit Mgmt.*,
  583 U.S. 366 (2018)...............................................................................................34

*Covey v. Commercial Nat. Bank of Peoria*,
  960 F.2d 657 (7th Cir. 1992) .................................................................................38

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Deutsche Bank Tr. Co. Am. v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (In re Tribune Co. Fraudulent Conveyance Litig.)*,
946 F.3d 66 (2d Cir. 2019) .............................................................. *passim*

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ........................................31, 32

*GCIU-Employer Retirement Fund v. MNG Enterprises, Inc.*,
51 F.4th 1092 (9th Cir. 2022) ..............................................................43, 44

*Geron v. Craig (In re Direct Access Partners, LLC)*,
602 B.R. 495 (Bankr. S.D.N.Y. 2019) ....................................................50

*Geron v. Schulman (In re Manshul Constr. Corp.)*,
2000 WL 1228866 (S.D.N.Y. Aug. 30, 2000) ..........................................35

*Globis Partners, L.P. v. Plumtree Software, Inc.*,
2007 WL 4292024 (Del. Ch. Nov. 30, 2007) ..........................................57

*Goldin Assocs., L.L.C. ex rel. SmarTalk Teleservices, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
2003 U.S. Dist. LEXIS 16798 (S.D.N.Y. Sept. 25, 2003) ........................................62

*Gordon v. Kinney (In re Gallagher)*,
417 B.R. 677 (Bankr. W.D.N.Y. 2009) .................................................36

*Holliday v. Credit Suisse Sec (USA) LLC (In re Boston Generating LLC)*,
2024 WL 4234886 (2d Cir. Sept. 19, 2024) ............................................21, 27, 28

*Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*,
2021 WL 4150523 (S.D.N.Y. Sept. 10, 2021) ..........................................27

*Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*,
617 B.R. 442 (Bankr. S.D.N.Y. 2020) .................................................27

*Hurwitz v. Fund Holdings Ltd. (In re GBG USA Inc.)*,
2024 WL 5114996 (Bankr. S.D.N.Y. Dec. 16, 2024) ............................................24

*IIG Glob. Trad. Fin. Fund Ltd v. Int'l Inv. Grp. LLC (In re IIG Glob. Trad. Fund Ltd.)*,
2024 WL 4751276 (Bankr. S.D.N.Y. Nov. 8, 2024) ............................................24

*In re Ampal-Am. Israel Corp.*,
543 B.R. 464 (Bankr. S.D.N.Y. 2016) .................................................56

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re BP p.l.c. Derivative Litig.*,
   507 F. Supp. 2d 302 (S.D.N.Y. 2007)......................................................................56

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024) ..............63

*In re Dole Food Co., Inc. S'holder Litig.*,
   2015 WL 5052214 (Del. Ch. Aug. 27, 2015) ..........................................................62

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ..........................................................61

*In re Micromet, Inc. S'holders Litig.*,
   2012 WL 681785 (Del. Ch. Feb. 29, 2012) ............................................................57

*In re Xonics Photochemical Inc.*,
   841 F.2d 198 (7th Cir. 1988) ..........................................................................38, 48

*Jalbert v. Flom (In re BICOM NY, LLC)*,
   633 B.R. 25 (Bankr. S.D.N.Y. 2021)......................................................................48

*Kelley v. Safe Harbor Managed Acct. 101 LTD*,
   31 F. 4th 1058 (8th Cir. 2022) ..............................................................................24

*Kelley v. Safe Harbor Managed Acct. 101, Ltd.*,
   654 F. Supp. 3d. 850 (D. Minn. 2023)..............................................................26, 27

*Kirschner v. Robeco Cap. Growth Funds (In re Nine W. LBO Sec. Litig.)*,
   87 F.4th 130 (2d Cir. 2023), *cert. denied sub nom. Stafiniak v. Kirschner as*
   *Tr. of NWHI Litig. Tr.*, 2024 WL 2116507 (U.S. May 13, 2024)............................21

*Kramer v. Chin (In re Chin)*,
   492 B.R. 117 (Bankr. E.D.N.Y. 2013)....................................................................36

*Lamonica v. NEDM Payables Corp. (In re Pretty Girl, Inc.)*,
   644 B.R. 298 (Bankr. S.D.N.Y. 2022)....................................................................53

*LaSalle Nat'l Bank v. Perelman*,
   82 F. Supp. 2d 279 (D. Del. 2000)..........................................................................58

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*,
   78 F.3d 30 (2d Cir. 1996)........................................................................................36

*Lenois v. Lawal*,
   2017 WL 5289611 (Del. Ch. Nov. 7, 2017) ..........................................................61

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Lippe v. Bairnco Corp.*,
249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004)................38, 54

*MC Asset Recovery, LLC v. S. Co.*,
2009 WL 10666059 (N.D. Ga. Feb. 5, 2009) ........................................................63

*McGowan v. Ferro*,
859 A.2d 1012 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005)..................................61, 62

*Merit Mgmt. Grp., LP v. FTI Consulting*,
583 U.S. 366 (2018)...........................................................................................28

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995) ............................................................35, 49, 50

*Michigan Paving & Materials Co. v. Operating Engineers Loc. 324 Pension
Fund*,
2024 WL 4525295 (E.D. Mich. July 31, 2024) ....................................43, 44, 45, 46

*Molner v. Reed Smith, LLP (In re Aramid Ent. Fund Ltd.)*,
664 B.R. 9 (Bankr. S.D.N.Y. 2024).................................................................61

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
971 F.2d 1056 (3d Cir. 1992)........................................................................48

*Nat'l Ret. Fund et al. v. Domestic Linen Control Grp.*,
2024 WL 3607316 (S.D.N.Y. July 31, 2024) ......................................................45

*New York Times Co. v. Newspaper & Mail Deliverers' Publishers' Pension Fund*,
303 F. Supp. 3d 236 (S.D.N.Y. 2018)...........................................................44, 45

*Nisselson v. Empyrean Invs. Fund, L.P. (In re MarketXT Holdings Corp.)*,
376 B.R. 390 (Bankr. S.D.N.Y. 2007)...........................................................53

*Nobel Ins. Co. v. City of N.Y.*,
2006 WL 2848121 (S.D.N.Y. Sept. 29, 2006).....................................................34

*Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*,
904 F.2d 588 (11th Cir. 1990) ........................................................................48

*Official Com. of Unsecured Cred. of Quebecor World (USA) Inc. v.
Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
719 F. 3d 94 (2d Cir. 2013), *abrogated on other grounds by
Merit Mgmt.*, 583 U.S. 366 (2018)................................................................24

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Opioid Master Tr. II v. Argos Cap. Appreciation Master Fund LP (In re Mallinckrodt PLC)*,
2024 Bankr. LEXIS 2058 (Bankr. D. Del. Sept. 5, 2024) ...............................................26, 30

*Parklex Assocs. v. Deutsch (In re Deutsch)*,
575 B.R. 590 (Bankr. S.D.N.Y. 2017) ...................................................................................19

*Pension, Hospitalization & Benefit Plan of Elec. Indus. v. ConvergeOne Dedicates Servs., LLC*,
2024 WL 1676176 (S.D.N.Y. Apr. 16, 2024) .........................................................................44

*Pereira v. Farace*,
413 F.3d 330 (2d Cir. 2005).....................................................................................................56

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*,
773 F.3d 411 (2d Cir. 2014).....................................................................................................24

*Quadrant Structured Prods. Co. v. Vertin*,
102 A.3d 155 (Del. Ch. 2014)..................................................................................................58

*Scot. Air Int'l, Inc. v. Brit. Caledonian Grp., PLC.*,
152 F.R.D. 18 (S.D.N.Y. 1993) ...............................................................................................21

*Sharp Int'l Corp. v. State Street Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005)........................................................................................................48

*Silverman v. Paul's Landmark, Inc. (In re Nirvana Res. Inc.)*,
337 B.R. 495 (Bankr. S.D.N.Y. 2006).....................................................................................35

*Smith v. Weinshanker (In re Draw Another Circle)*,
602 B.R. 878 (Bankr. D. Del. 2019) ........................................................................................63

*Sofco Erectors, Inc. v. Trustees of Ohio Operating Engineers Pension Fund*,
15 F.4th 407 (6th Cir. 2021) ........................................................................................... *passim*

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
911 A.2d 362 (Del. 2006) .........................................................................................................56

*Taylor v. Riverside-Franklin Props., Inc. (In re Taylor)*,
228 B.R. 491 (Bankr. M.D. Ga. 1998)......................................................................................47

*Tilden v. Cunningham*,
2018 WL 5307706 (Del. Ch. Oct. 26, 2018) ...........................................................................61

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Tronox Inc. v. Anadarko Pet. Corp. (In re Tronox Inc.)*,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ......................................................................38

*United Mine Workers of Am. 1974 Pension Plan v. Energy West Mining Co.*,
    39 F.4th 730 (D.C. Cir. 2022) ..........................................................43, 44, 46, 47

*United States v. McCombs*,
    30 F.3d 310 (2d Cir. 1994) ......................................................................................52

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
    892 F. Supp. 2d 805 (N.D. Tex. 2012) ...................................................................33

*VFB LLC v. Campbell Soup Co.*,
    2005 WL 2234606 (D. Del. 2005) ............................................................................36

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007) ......................................................................................36

**Statutes**

11 U.S.C. § 101(22)(A) .......................................................................................................30

11 U.S.C. § 101(49) .............................................................................................................23

11 U.S.C. § 546(e) ..........................................................................................................2, 19

11 U.S.C. § 741(7)(A)(i) .....................................................................................................24

11 U.S.C. § 741(7)(A)(vii) ...................................................................................................23

26 U.S.C. § 431(c)(3) ..........................................................................................................46

29 U.S.C. § 1002(37) .............................................................................................................6

29 U.S.C. § 1085(a) ...............................................................................................................7

29 U.S.C. § 1103(a) ...............................................................................................................6

29 U.S.C. § 1301(a)(3) ...........................................................................................................6

29 U.S.C. § 1381(a) ...........................................................................................................7, 8

29 U.S.C. § 1383(a) ...............................................................................................................7

29 U.S.C. § 1393(a)(1) .........................................................................................................42

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

29 U.S.C. § 1393(a)(2)...................................................................................43

29 U.S.C. § 1399(c) ...................................................................................8, 42

29 U.S.C. § 1399(c)(1)(D) ..........................................................................43

N.Y. Legis. 580 § 7 (2019) ...........................................................................34

N.Y.U.C.C. § 4-104(1)(e) ............................................................................31

**Other Authorities**

12 C.F.R. § 229.2 ..........................................................................................32

29 CFR § 4001.2 ...........................................................................................43

5 Collier on Bankruptcy ¶ 548.05[3][a] (Richard Levin & Henry J. Sommer eds.,
16th ed.) ....................................................................................................38

*Customer,* Black's Law Dictionary (11th ed. 2019) .....................................31

Fed. R. Civ. P. 56(a) .....................................................................................19

Fed. R. Evid. 201(b)(2) ................................................................................30

New York Debtor and Creditor Law §§ 273–275 (amended Apr. 4, 2020) ............34, 35

U.S. Department of Treasury, https://www.occ.treas.gov/topics/charters-and-
licensing/financial-institution-lists/national-by-name.pdf ......................30

Defendants Gary Matthews, Eric Kanter, and Eric Fry (the "Morgan Stanley Directors"), Morgan Stanley Investment Management, Inc. ("MSIM"), and Morgan Stanley Capital Partners V U.S. Holdco LLC ("Cap V," and together with the Morgan Stanley Directors and MSIM, the "Morgan Stanley Defendants"), respectfully submit this memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT[1]

Tops's former investors (the "PE Investors") exited Tops in 2013—more than a decade ago.[2] When the PE Investors sold Tops to the Company's longtime management team in 2013, Tops had transformed from the small subsidiary of an international grocery conglomerate into a thriving, independent grocery chain. Tops had grown from $1.6 billion in sales across 71 stores in 2007 to $2.5 billion in sales across 155 stores in 2013. Tops's annual Adjusted EBITDA had improved from ██████████████████████████████, and Tops was an active capital markets participant. Tops's management team invested their own personal savings to purchase a successful and growing business. ***Nearly five years later***, in 2018, Tops filed for bankruptcy.

The Trustee is trying to blame the Morgan Stanley Defendants for this event. But the undisputed facts show that neither bankruptcy nor insolvency were anywhere on the radar for Tops in 2013 and for years after. Indeed, members of Tops's management testified under oath in arbitration proceedings in 2015 that ████████████████████████████████

---

[1] Citations to "SOUF ¶" refer to the Morgan Stanley Defendants' separately filed Statement of Undisputed Facts. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the SOUF. Citations to "Ex. __" refer to exhibits to the Declaration of Pamela A. Miller submitted contemporaneously herewith.

[2] The "PE Investors" refers to Cap V, HSBC Equity Partners USA, L.P., HSBC Private Equity Partners II USA LP, Turbic, Inc., and Frank Curci. Begain Company Limited became one of the PE Investors in January 29, 2010, and so references to the "PE Investors," includes, at the relevant times, Begain Company Limited. (SOUF ¶¶ 4, 7, 15, 22 & n.5, 23.)

████████████████████████████████████████. Even more telling, Holly Etlin, the

Trustee's own expert in this case, testified under oath in 2015 that ███████████████████

██████████████████████████████████████████

But between 2015 and 2018, unprecedented food price deflation rocked the grocery

industry, and the unexpected costs of that same arbitration hobbled Tops. Those unforeseeable

events caused Tops to file for bankruptcy. Now, the Trustee seeks to recapture dividends Tops

issued during the PE Investors' ownership on the hindsight theory that Tops—contrary to the

contemporaneous understanding of the Company's investors, management, lenders, auditors,

solvency analysts, and unions, ██████████████████████—was openly insolvent

for a ***nine-year*** period leading up to its bankruptcy filing. The factual record developed after

intense and expansive discovery undermines the Trustee's claims at every turn. But, most

importantly for present purposes, all of the Trustee's claims rest on legal errors that foreclose

them as a matter of law.

To begin, the safe harbor in Bankruptcy Code § 546(e)—by its plain language, and as

construed by the Second Circuit—bars most of the Trustee's claims against the Morgan Stanley

Defendants, including six of the Trustee's eight fraudulent transfer claims and both unlawful

dividend claims. The safe harbor prohibits a trustee from recovering transfers made by a debtor

in connection with securities contracts made by or to financial institutions. Three of the

dividends the Trustee seeks to claw back are protected by the safe harbor because Tops issued

the dividends in connection with notes purchase agreements (securities contracts) whose

proceeds funded the dividends, and the dividends were made by and to financial institutions.

And because the safe harbor applies, the Trustee's two state-law illegal dividend claims are

preempted and therefore fail.

The Trustee's constructive fraudulent transfer and illegal dividend claims against the Morgan Stanley Defendants also fail because the Trustee cannot prove that Tops was insolvent during the PE Investors' ownership of Tops. Contemporaneous evidence reflects irrefutable evidence of solvency, including three solvency opinions by reputable outside firms, the assessments of independent credit ratings agencies, and undisputed testimony and evidence from the banks that underwrote Tops's notes after conducting extensive due diligence on Tops's financial condition. In an effort to surmount that undisputed factual evidence, the Trustee proffered an expert to opine that Tops's potential withdrawal liability relating to multiemployer pension plans ("MEPPs") rendered Tops insolvent. But the Trustee's insolvency argument is fatally flawed because it relies on discount rate assumptions that several courts of appeals have rejected *as a matter of law*. And the Trustee's expert failed to adhere to the principle, recognized by the Court in this case, that potential contingent liabilities—such as withdrawal liability—must be discounted to reflect their uncertainty. The Trustee's experts have distanced themselves entirely from the Trustee's only other insolvency theory—that the dividends left Tops with unreasonably small capital—and the Trustee can point to no evidence to support that supposition. Tops was solvent through 2013, exactly as everyone—including one of the Trustee's own experts—believed at the time.

The undisputed evidence also forecloses the showing of knowledge or illicit intent needed to create a triable issue on the Trustee's remaining claims for actual fraudulent transfer, breach of fiduciary duty, and aiding and abetting.[3] There is no contemporaneous evidence from any source suggesting that Tops was insolvent at the time of the dividends. Tops's assets and

---

[3] The Trustee's actual fraudulent transfer claims for the 2009, 2012, and 2013 Dividends (Counts V, VII, VIII) are brought under New York Debtor-Creditor Law through Bankruptcy Code § 544 and are subject to dismissal under § 546(e) as well. *See* 11 U.S.C. § 546(e).

liabilities, including its pension obligations, were all openly disclosed.  The Morgan Stanley Defendants did not knowingly or intentionally make any Tops-related decisions with a belief that the Company was insolvent, would be rendered insolvent, or would be unable to service its future debt obligations.

The Trustee's answers to the undisputed facts are inflammatory rhetoric, legally flawed theories and, in some instances, adherence to allegations that were disproven in discovery.  None of this can carry the Trustee to trial.  The Trustee's claims against the Morgan Stanley Defendants all fail as a matter of law, and the Morgan Stanley Defendants are entitled to summary judgment.

## BACKGROUND

### I.    The Parties

At all relevant times, Tops was a supermarket retailer headquartered in Williamsville, New York, and incorporated in Delaware.  (SOUF ¶ 1.)  Tops filed a voluntary petition for Chapter 11 relief on February 21, 2018 and emerged from bankruptcy as an operating entity in November 2018.  (*Id.*)  Plaintiff Alan D. Halperin is the Trustee of the Litigation Trust, which was created pursuant to § 5.21 of the *Second Amended Joint Chapter 11 Plan of Reorganization of Tops Holding II Corporation and its Affiliated Debtors* and the Litigation Trust Agreement among the Debtors and the Trustee.  (*Id.* ¶ 2.)

Defendant Cap V is a Delaware corporation that, along with its affiliated funds, was a majority investor in Tops between 2007 and 2013.  (*Id.* ¶ 4.)[4]  Employees in Morgan Stanley Private Equity ("MSPE"), Morgan Stanley's private equity business-line, oversaw Cap V's

---

[4] The Morgan Stanley Private Equity entity that was part of the initial investment in Tops in 2007 was Morgan Stanley Capital Partner V Funding LP.  That entity later transferred its holdings to Cap V.  (SOUF ¶ 4 n.4.)

investment in Tops.  (*Id.* ¶ 5.)  HSBC Equity Partners USA, L.P. and HSBC Private Equity Partners II USA LP, Turbic, Inc., and Frank Curci, were also investors in Tops between 2007 and 2013.  (*Id.* ¶¶ 7, 22 & n.5, 23.)[5]

Defendants Gary Matthews, Eric Fry, and Eric Kanter are former directors of Tops's Board of Directors (the "Board").  (*Id.* ¶¶ 8, 10–11.)  Defendants Gregory Josefowicz and Stacey Rauch are former independent directors of Tops's Board.  (*Id.* ¶¶ 12–13.)  Defendant MSIM is a Delaware corporation that employed the Morgan Stanley Directors between 2009 and 2013.  (*Id.* ¶ 3.)

## II.    Background

### A.    The PE Investors' Investment in Tops

From 1991 to 2007, Tops operated as a wholly owned subsidiary of Koninklijke Ahold N.V. ("Ahold").  (*Id.* ¶ 14.)  After multiple rounds of bidding, the PE Investors acquired Tops from Ahold on December 1, 2007, for $310 million.  (*Id.* ¶¶ 18–22.)  Following the acquisition, Gary Matthews and Frank Curci joined Tops's Board.  (*Id.* ¶¶ 8, 25.)  Mr. Matthews, a Managing Director with MSPE, brought significant expertise in the retail industry and in collaborating with management teams.  (*See id.* ¶ 9.)  Mr. Josefowicz joined the Board in 2008, followed by Mr. Kanter and Mr. Fry in 2009, who were a Vice President and Managing Director with MSPE, respectively.  (*Id.* ¶¶ 10–12.)  Mr. Josefowicz had extensive experience in the retail industry, including serving as Chairman of the Borders Group's Board of Directors, and as a Director of Winn-Dixie Stores, Inc.  (*Id.* ¶ 12.)  In October 2010, the Tops Board elected Stacey Rauch as a Director.  (*Id.* ¶ 13.)  Ms. Rauch spent twenty-four years at a consulting firm, including as a

---

[5] As noted above, non-party Begain Company Limited also became one of the PE Investors in January 29, 2010.

leader in the Retail and Consumer Goods Practices and head of the North American Retail and Apparel Practice.  (*Id.*)

The Board asked Mr. Curci, Tops's former Chief Executive Officer, to return as Tops's CEO in 2007.  (*Id.* ¶ 25.)  Mr. Curci and the management team he assembled had decades of experience in the grocery industry.  (*Id.* ¶ 26.)  Mr. Curci stayed on as CEO for over fifteen years—including for six years after Tops's bankruptcy—until he announced his retirement in January 2024.  (*Id.* ¶ 22 n.6.)

**B.    MEPPs and Tops's Pension Obligations**

Tops had a substantial unionized workforce, and historically had pension-related obligations to two multiemployer plans: the UFCW Pension Plan (pursuant to a collective bargaining agreement ("CBA") with the union to which its employees belonged) and the Teamsters Pension Plan (indirectly through a contractual relationship with Tops's grocery supplier, C&S) (collectively, the "Pension Plans" or "Plans").  (*Id.* ¶¶ 69–77.)

Multiemployer plans are commonly used for union workers within a single industry, like grocery stores or trucking companies, and allow workers to continue to accrue benefits even as they move among employers.  Unlike with a single-employer pension plan, the benefit is owed and paid by the plan, not by the employer.  29 U.S.C. § 1301(a)(3).  In a MEPP, participating employers contribute to a collective pool or trust that is managed by the MEPP's trustees.  *Id.* §§ 1002(37); 1103(a).  The contributing employers' obligations are set by their CBAs and by federal law.  (SOUF ¶ 72.)  Multiemployer plans are governed by a board of trustees that has fiduciary responsibilities to protect the MEPP's financial health and oversee disbursement of benefits.  29 U.S.C. § 1103(a).  Multiemployer plans must meet certain threshold funding levels intended to ensure that the plans will be able to pay benefits as they become due, and a plan's trustees are obliged to take certain steps—called "rehabilitation plans"—to improve the plan's

financial health if and when funding falls below those levels.  *Id.* § 1085(a).  Such steps may

include increasing employers' contribution obligations or reducing the benefits that participants

accrue in the future.  (SOUF ¶ 79 n.11.)

When a MEPP is underfunded, there is a risk that participating employers will opt to

cease participation in order to avoid increased funding obligations.  To ensure MEPPs are not left

with substantial funding shortfalls, federal law provides for "withdrawal liability" in the event

that a contributing employer ceases to make contributions to, or withdraws from, a MEPP.  29

U.S.C. §§ 1381(a); 1383(a).  The "withdrawal liability" imposed on a withdrawing employer

represents that employer's share of the plan's underfunding, if any, *at the time of withdrawal*.

29 U.S.C. §§ 1381; 1383(e).  But withdrawal liability can also be estimated while an employer is

still contributing to a plan.  (*See, e.g.*, SOUF ¶ 83.)  That estimate, which calculates a

hypothetical withdrawal liability at a moment in time, will change year-over-year as the plan's

funding status changes and the employer's contribution history changes.  (*Id.* ¶ 296.)  An

estimated withdrawal liability *may never actually be imposed*, because the employer may never

actually withdraw from or cease to contribute to the plan.  29 U.S.C. §1383(a).  That is, an

estimated withdrawal liability only reflects what liability would be imposed if an employer

theoretically withdrew from a plan on the date of the estimate.

An estimated withdrawal liability is not an actual liability that the employer is certain to

pay or that a plan can simply demand from the employer in a lump sum.  Under the plain

language of ERISA, the *payment is contingent on an actual withdrawal*—namely, when an

employer "permanently ceases to have obligations to contribute" to a multiemployer plan, or

"permanently ceases all covered operations."  29 U.S.C. §§ 1381(a); 1383(a).  The employer

becomes obligated to pay "withdrawal liability" only when one of those contingencies occurs.

*Id.* § 1381(a). Plan insolvency may, but does not necessarily, lead to withdrawals. (SOUF ¶ 290.) In addition, while the estimated payment before withdrawal liability is triggered is measured as a lump-sum figure, if an employer actually withdraws, it need not pay the entire withdrawal liability amount at once, but may pay it in yearly installments. 29 U.S.C. § 1399(c).

Tops was a contributing employer to the UFCW Pension Plan for the entire PE Ownership Period and for years after that, until shortly after it filed for bankruptcy. (SOUF ¶ 73.) Tops made ongoing contributions to the UFCW Pension Plan under CBAs with the UFCW District Union Local One. (*Id.* ¶ 74.) Tops's annual contributions ranged from $5.7 million in 2009 to $14.7 million in 2016. (*Id.*) Tops made every required contribution payment and took no steps to withdraw from the UFCW Pension Plan during the PE Ownership Period. (*Id.* ¶¶ 74, 273.)

Tops was not a contributing employer to the Teamsters Pension Plan during the PE Ownership Period. Rather, Tops had contractually agreed in its supply agreements with its supplier, C&S, to cover obligations owed by C&S's then-subsidiary, Erie Logistics, LLC ("Erie Logistics"), which operated several Tops facilities in New York, to the Teamsters Plan. (*Id.* ¶¶ 75–77.) Under the supply agreements with C&S, Tops made payments to C&S, a portion of which covered the pension expenses for the Erie Logistics employees who serviced Tops's stores. (*Id.* ¶ 76.) C&S was required to provide Tops with advance notice if it intended to withdraw Erie Logistics from the Teamsters Pension Plan, and Tops agreed to indemnify C&S if C&S incurred withdrawal liability obligations as a result of Erie Logistics's withdrawal. (*Id.* ¶¶ 77, 104.) There is no evidence that C&S intended to withdraw Erie Logistics from the Teamsters Pension Plan during the PE Ownership Period. (*Id.* ¶¶ 104–05, 142, 161, 193.)

Throughout the PE Ownership Period, Tops made required disclosures in SEC filings that it had possible contingent withdrawal liabilities for each of the Pension Plans, but that it had no intention of withdrawing from the Pension Plans. (*Id.* ¶¶ 160, 192.) Tops made similar disclosures in offering memoranda for the notes it issued during the PE Ownership Period. (*Id.* ¶¶ 139, 157, 191.)

### C.    Tops Expands and Issues Dividends

Tops's financial metrics show that it thrived during the PE Ownership Period. Between 2007 and December 2013, Tops grew from $1.6 billion in sales across 71 stores, to $2.5 billion in sales across 155 stores. (*Id.* ¶¶ 35–36.) Tops's annual Adjusted EBITDA grew ███████ ████████████████████████. (*Id.* ¶ 37.) The Morgan Stanley Defendants and Tops's management worked together to establish independent operations for Tops after it operated for years as a subsidiary of Ahold, including establishing Tops's own employee benefits plan, information technology system, and financial services infrastructure. (*Id.* ¶ 48.) By 2009, and then again in 2010, 2012, and 2013, Tops was able to access the capital markets to raise debt, which was used, in part, to fund dividends (the "Dividends," and each a "Dividend") to its shareholders. (*Id.* ¶¶ 64–65.)

#### 1.    *The 2009 Notes and Dividend*

By fall 2009, Tops had experienced two years of strong financial performance and free cash flow generation under the PE Investors' ownership, even in the midst of a global economic crisis. Tops's Adjusted EBITDA grew from $105.6 million in 2007 to $115 million through the second quarter of 2009. (*Id.* ¶ 94.) And Tops's EBITDA margin improved from ████████ ████████. (*Id.* ¶ 95.) Tops's performance was so strong that the Company had the opportunity to both improve its balance sheet by refinancing existing debt on more favorable terms and return capital to investors.

In October 2009, Tops issued $275 million in secured notes (the "2009 Notes").  It used $33.6 million of the proceeds to repay a warehouse mortgage that was part of the Company's outstanding debt at the time, and $105 million of the proceeds to pay a dividend to shareholders (the "2009 Dividend").  (*Id.* ¶ 96.)  Bank of America Merrill Lynch ("BAML") and Morgan Stanley & Co. ("MS&Co.") underwrote the offering, serving as co-book runners, and in that capacity conducted due diligence of Tops's finances and operations.  (*Id.* ¶ 97.)  MS&Co.'s credit criteria for that offering imposed "a much higher bar than just solvency."  (*Id.* ¶ 99.)

The Offering Memorandum for the 2009 Notes disclosed to potential debt investors that Tops (i) intended to use the 2009 Notes proceeds to pay the 2009 Dividend and repay Tops's existing debt; (ii) was contingently liable for potential withdrawal liability in connection with the two Pension Plans; and (iii) had no intention of withdrawing from the UFCW Pension Plan.  (*Id.* ¶¶ 100–02.)  The Pension Plan disclosures in the Offering Memorandum are consistent with the testimony from Tops's corporate representative that with respect to both Pension Plans, Tops had no intention to withdraw and no notice that C&S intended to withdraw from the Teamsters Pension Plan.  (*Id.* ¶¶ 103–04.)

Before issuing the 2009 Notes and 2009 Dividend, Tops retained KPMG to conduct a valuation of Tops.  (*Id.* ¶ 108.)  KPMG concluded that Tops would have $92 million in net assets after issuance of the 2009 Notes and 2009 Dividend, and found that Tops would likewise have $33.4 million in net assets even deducting in full Tops's ***estimated*** pension plan withdrawal liability from the UFCW Pension Plan from Tops's enterprise value.  (*Id.* ¶¶ 109, 121.)  The Board determined that the 2009 Dividend was "advisable and in the best interests of the Company" and approved the 2009 Dividend during an October 9, 2009 Board meeting.  (*Id.* ¶ 127.)

Mr. Curci testified that he had no concerns that Tops would be able to repay the 2009

Notes because Tops "had improved earnings . . . by a very large percent," and so Tops's "ability

to pay these back was not in doubt." (*Id.* ¶ 106.)

### 2. *The Penn Traffic Acquisition and 2010 Dividend*

In January 2010, Tops executed a strategic acquisition of its nearest competitor, the Penn

Traffic Company and its supermarkets throughout upstate New York and northern Pennsylvania,

for $85 million (the "Penn Traffic Acquisition"). (*Id.* ¶¶ 133–34.)  Tops financed the transaction

through a combination of debt (including a $25 million bridge loan) and a $30 million equity

infusion from Tops's existing shareholders. (*Id.* ¶ 134.)  In February 2010, Tops issued $75

million in secured notes (the "2010 Notes") under the same indenture that governed the 2009

Notes, in part to repay the $25 million bridge loan used to fund the Penn Traffic Acquisition.

(*Id.* ¶ 135.)

In July 2010, Tops issued a $30 million dividend (the "2010 Dividend") to return to the

lender shareholders borrowed capital that had gone unused in the Penn Traffic Acquisition. (*Id.*

¶ 136.)  The Board approved the 2010 Dividend in a Written Consent in Lieu of a Meeting dated

July 23, 2010. (*Id.* ¶ 144.)  The Board "deem[ed] it desirable and in the best interest of the

Company" to issue the 2010 Dividend. (*Id.* ¶ 145.)  Mr. Curci testified that the 2010 Dividend

was a "return of additional capital that the shareholders put in [to Tops] to help effect an

acquisition of the Penn Traffic assets." (*Id.* ¶ 137.)  Mr. Curci explained that the existing

shareholders "contributed $30 million to ensure that [Tops] had adequate funds to effect the

transition and after the transition was done . . . we returned the money back to the shareholders."

(*Id.* ¶ 138.)  At the time of the 2010 Dividend, Tops had no intention to withdraw and no notice

that C&S intended to withdraw from the Teamsters Pension Plan. (*Id.* ¶¶ 141–42.)

Meanwhile, Tops continued to improve its financial metrics. By the end of 2010, Tops operated 128 stores, employed 12,700 people, and generated annual revenue of approximately $2.25 billion. (*Id.* ¶ 41.) Its Adjusted EBITDA was approximately $133.4 million. (*Id.* ¶ 42.) By the end of 2011, Tops's revenue had increased to approximately $2.36 billion and its Adjusted EBITDA had increased to $144.3 million. (*Id.* ¶ 43.)

### 3. *The 2012 Notes and Dividend*

Tops continued expanding in 2012. In October 2012, Tops acquired twenty-one supermarkets in eastern New York and Vermont from Grand Union Markets. (*Id.* ¶ 44.) By the end of 2012, Tops operated 149 stores, employed 13,400 people, and generated annual revenue of approximately $2.37 billion. Its Adjusted EBITDA was approximately $145.9 million. (*Id.* ¶ 47.)

Given its continued strong free cash flow generation, in December 2012, Tops was able to engage in another dividend recapitalization transaction, issuing $460 million in secured notes (the "2012 Notes") to redeem all of the outstanding 2009 Notes and 2010 Notes, refinance the 2009 Notes and 2010 Notes at a lower interest rate, and pay shareholders a $100 million dividend (the "2012 Dividend"). (*Id.* ¶ 149; *see id.* ¶ 65 & table.) BAML and MS&Co. again served as underwriters and conducted due diligence of Tops. (*Id.* ¶ 151.) BAML's corporate representative testified that BAML conducted "a very thorough analysis of [Tops's] historical and projected financial performance" as part of BAML's due diligence, and concluded that Tops was solvent and could service the 2012 Notes. (*Id.* ¶ 152.)

The Offering Memorandum for the 2012 Notes disclosed that Tops (i) intended to use the 2012 Notes proceeds to pay the 2012 Dividend and redeem existing debt; (ii) was contingently liable for potential withdrawal liability in connection with the two Pension Plans; and (iii) had no intention of withdrawing from the UFCW Pension Plan. (*Id.* ¶¶ 155–57.) The Pension Plan

disclosures in the Offering Memorandum are consistent with the testimony from Tops's corporate representative in this case that, with respect to both Pension Plans, Tops had no intention to withdraw and no notice that C&S intended to withdraw from the Teamsters Pension Plan.  (*Id.* ¶¶ 159–61.)

Before issuing the 2012 Notes and 2012 Dividend, Tops retained Duff & Phelps to provide a valuation analysis.  (*Id.* ¶ 162.)  Duff & Phelps testified that in determining Tops's liabilities for the purposes of its valuation, Duff & Phelps deployed a ███████████████

███████████████████████████████████████

███████████████████████.  (*Id.* ¶¶ 168–70.)  That is, Duff & Phelps chose for analytical purposes to deduct tens of millions of dollars from Tops's net enterprise value for potential pension liabilities ***even though*** Tops had no actual intention of withdrawing from the UFCW Pension Plan, and there was no evidence that the obligation to indemnify C&S for a withdrawal from the Teamsters Pension Plan would be triggered.  Duff & Phelps concluded that after giving effect to the 2012 Notes and 2012 Dividend, and assuming that contingent withdrawal liabilities associated with both of the Pension Plans had been triggered as of the day of Duff & Phelps's valuation, Tops still had a capital surplus of $68.4 million.  (*Id.* ¶ 167.)  Tops's Chief Financial Officer, William Mills, presented Duff & Phelps's analysis to the Board, and advised the Board that Tops's surplus/net profit was sufficient to declare the 2012 Dividend, and the Board unanimously concluded that the Dividend was "advisable" and "in the best interests of the [C]ompany."  (*Id.* ¶¶ 171–73, 175–76.)

Mr. Curci testified that the 2012 Notes issuance was in Tops's best interest because the notes were issued to refinance Tops's existing debt which "allowed [Tops] to reduce [its] interest rate, extend [its] maturities, and be able to return some value to [its] shareholders."  (*Id.* ¶ 158.)

He also testified that the related 2012 Dividend was prudent: "[Tops was] in a strong financial condition, [was] continuing to grow and create free cash flow, and [Tops's management] knew that [Tops] would be able to satisfy all [the 2012 notes obligations]." (*Id.*)

### 4.   *The 2013 Notes and Dividend*

Tops's strong performance continued into 2013.  In May 2013, Tops Holding II Corporation, a newly-formed parent corporation of Tops, which had no assets other than the equity of its subsidiaries, issued $150 million of notes (the "2013 Notes") and paid shareholders a $141.9 million dividend (the "2013 Dividend").  (*Id.* ¶¶ 1 n.4, 183.)  The 2013 Notes were unsecured and were structurally subordinated to Tops's other liabilities, ***including potential pension withdrawal liability***.  (*Id.* ¶ 184.)  In other words, purchasers of the 2013 Notes understood that in order to be able to pay down the 2013 Notes by their 2018 maturity date, Tops would need to successfully manage its already-existing funded debt (including the 2012 Notes), and that any pension-related liability would be senior to the 2013 Notes—implying the 2013 Notes buyers did not believe withdrawal liability to be likely at least before 2018.  MS&Co. and BAML again served as co-book runners for the transaction.  (*Id.* ¶ 185.)  MS&Co.'s corporate representative testified in this case that MS&Co. again performed "comprehensive diligence," of Tops and concluded that Tops was "absolutely" solvent in 2013.  (*Id.* ¶ 188.)

The Offering Memorandum for the 2013 Notes disclosed that Tops (i) intended to use the 2013 Notes proceeds to pay the 2013 Dividend; (ii) was contingently liable for potential withdrawal liability in connection with the two Pension Plans; and (iii) had no intention of withdrawing from the UFCW Pension Plan.  (*Id.* ¶¶ 189–91.)  The Pension Plan disclosures in the Offering Memorandum are consistent with the testimony from Tops's corporate representatives in this case that with respect to both Pension Plans, Tops had no intention to

withdraw and no notice that C&S intended to withdraw from the Teamsters Pension Plan.
(*Id.* ¶¶ 192–93.)

Before issuing the 2013 Notes and 2013 Dividend, Tops retained Houlihan Lokey to provide a valuation analysis.  (*Id.* ¶ 196.)  For the purposes of determining Tops's liabilities for its opinion, Houlihan Lokey ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████.  (*Id.* ¶¶ 205–06.)  Houlihan Lokey concluded that after giving effect to the 2013 Notes and 2013 Dividend, Tops had between $179.7 million and $237.5 million in capital surplus.  (*Id.* ¶ 207.)  Representatives from Houlihan Lokey presented an overview of the analysis to Tops's Board, and legal counsel from Shearman & Sterling discussed with the Board the legal requirements necessary to declare the 2013 Dividend.  (*Id.* ¶ 210.)  The Board also heard a presentation from management that concluded that Tops had the "amount of surplus and/or net profits" under the Delaware General Corporation Law to declare the Dividend.  (*Id.* ¶ 212.)  The Board concluded that the 2013 Dividend was "advisable" and in the "best interests of the company."  (*Id.* ¶ 213.)

Mr. Curci testified that he voted in favor of the 2013 Dividend because he "believed it was the right thing to do," based on "the financial condition of the company and [its] ability to repay this debt."  (*Id.* ¶ 214.)  He explained that Tops "was continuing to grow and perform well," and the issuance would not constrain the Company's ability to pay any necessary CapEx or perform its obligations with respect to the Pension Plans.  (*Id.*)

### 5.    *The Offers to Purchase Tops*

During the 2012 and 2013 period, Cap V also considered selling Tops to interested buyers as an alternative monetization method to the 2012 and 2013 Dividends.  Cap V received offers to purchase Tops from two private equity firms—████████████ and Golden Gate, in

-15-

2013—that valued Tops as having positive equity value. (*Id*. ¶¶ 221–22.) Each of ▓▓▓▓ and

Golden Gate desired to consummate a purchase, but ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓, and Golden Gate testified that Cap V pulled out of the deal. (*Id*. ¶ 223–24.)

**D.     Tops Undergoes a Management Buyout and Operates Successfully for Years**

In August 2013, Tops's management, led by Mr. Curci, proposed to purchase Tops from

the PE Investors (the "Management Buyout" or "MBO"). (*Id*. ¶ 225.) In connection with the

MBO, Tops's management conducted a Capital Adequacy Analysis and concluded that Tops had

between $140.9 million and $206.6 million in surplus capital. (*Id*. ¶ 227.) To finance the MBO,

Tops's management team contributed $4.3 million of their own funds and personally guaranteed

a ▓▓▓▓▓▓▓ loan from Bank of America. (*Id*. ¶ 229.) The MBO closed on December 1, 2013.

(*Id*. ¶ 228.) Tops's management team testified that they were excited to invest in what they

viewed as a successful and valuable business. (*Id*. ¶ 226.) ***Not a single member of the***

***management team—all of whom invested their own personal finances—testified that they***

***believed Tops was insolvent at the time of the MBO***. (*See id*. ¶ 231.)

For years after the 2013 Dividend and the MBO, Tops enjoyed strong performance. Mr.

Curci testified that he "[a]bsolutely" believed Tops was a financially healthy company after the

MBO, and adopted Tops's CFO's contemporaneous representation to investors during an

earnings call that Tops "expect[ed] that [its] strong cash generation and ABL facility [would]

provide sufficient liquidity to fund debt service requirements, investments in working capital,

CapEx, acquisitions and other cash requirements." (*Id*. ¶ 233.) In 2016, Tops awarded bonuses

to members of management and raised employees' salaries after issuing a dividend to its

shareholders the year prior. (*Id*. ¶¶ 251–52.) Tops issued dividends to repay the MBO loan,

raised additional debt in the capital markets in 2015, and, more than eighteen months after the PE

Investors' exit, Tops's "improv[ed] metrics" and "increased profitability" earned the Company

an upgraded issuer rating from Moody's in 2015—all hallmarks of a solvent and healthy company.  (*Id.* ¶ 249, 253–55.)

    **E.**    **Tops Touts its Strong Financial Position—and Foots the Bill—in an Arbitration with Teamsters**

Shortly after the MBO closed, on December 22, 2013, Tops acquired Erie Logistics from C&S to enable Tops to handle its own distribution services.  (*Id.* ¶¶ 237–38.)  The concept of bringing Tops's distribution in-house had been considered during the PE Ownership Period, but was not approved or implemented until after the PE Investors exited.  (*Id.*)  Tops's new owners and C&S took steps to structure the transaction in a way that would not trigger a withdrawal from the Teamsters Pension Plan under ERISA.  (*See id.* ¶¶ 239, 244.)  Nevertheless, the Teamsters Pension Plan unilaterally declared that the sale constituted a withdrawal by Erie Logistics, a determination that Tops disputed.  (*Id.* ¶¶ 242, 245.)  Tops's head of Human Resources, who testified in his capacity as Tops's corporate representative in this case, testified that he was "shocked, surprised, [and] angered" by the Teamsters' determination, which he found "irrational."  (*Id.* ¶ 243.)  A protracted and contentious arbitration ensued.  The Teamsters arbitration hearing included twenty-three days of testimony by twenty-six witnesses, and was still unresolved when Tops filed for bankruptcy protection in 2018.  (*Id.* ¶ 245.)

The arbitration focused on Tops's financial condition and ability to meet its obligations to Teamsters as a directly-participating employer.  (*Id.* ¶ 246.)  Holly Etlin, an expert for the Trustee in this action, was retained as an expert by the Teamsters Pension Plan to opine about Tops's financial condition at the time.  (*Id.* ¶ 247.)  In December 2015, Ms. Etlin testified that

███████████████████████████████████████████████████████

████   (*Id.*)  Ms. Etlin affirmed that testimony in her deposition in this case.  (*Id.*)  Tops's management also testified that Tops was in strong financial shape.  In November 2015, Mr.



Curci testified that ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████. (*Id.* ¶ 258.)  That same month, Tops's

Chief Operating Officer, Kevin Darrington, testified that █████████████████

██████████████████████████████████████ (*Id.* ¶ 259.)

The arbitration was a heavy, unexpected financial burden on Tops.  Despite disagreeing

with the Teamsters' assessment of withdrawal, Tops, consistent with ERISA's pay-first-dispute-

later structure for withdrawal liability, was making the required withdrawal liability payments of

$641,000 per month, totaling $27.6 million.  (*Id.* ¶ 248.)  On top of that, Tops held in a separate

account its normal annual contribution to Teamsters—approximately $5 million to $6 million per

year or $16.3 million total—and paid its own and C&S's legal fees, totaling approximately $14

million.  (*Id.*)  Mr. Curci testified that these Teamsters arbitration costs were totally unexpected

at the time of the MBO and when each of the Dividends was approved.  (*Id.*)

### F.    Amid Unforeseeable Challenges, Tops Files for Bankruptcy in 2018

Unprecedented food deflation struck the grocery industry in 2016, reducing sales below

forecasted amounts and reducing profit margins.  (*Id.* ¶¶ 260–61.)  Mr. Curci testified that 2016's

food deflation was not simply the worst he has seen in his forty-plus-year career—it was the only

time he had *ever* experienced food deflation, and Tops had not planned on it.  (*Id.* ¶ 260.)  And,

as discussed above, Tops's ongoing, unanticipated arbitration with Teamsters cost it millions of

dollars.  (*Id.* ¶ 248.)  There is no evidence in the record that any of these challenges could have

been anticipated in 2009, 2010, 2012, or 2013, when Tops issued the Dividends the Trustee

challenges here.

On February 21, 2018, almost five years after the 2013 Dividend, Tops filed for Chapter

11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York.

(*Id.* ¶ 262.)  On February 12, 2020, the Trustee filed this lawsuit.

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this Court by

Bankruptcy Rule 7056, summary judgment must be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *Parklex Assocs. v. Deutsch (In re Deutsch)*, 575 B.R. 590, 596–97 (Bankr. S.D.N.Y. 2017)

(quoting Fed. R. Civ. P. 56(a)).[6]  Once the movant makes this initial showing, the non-moving

party must provide evidence of a genuine issue of fact to oppose the motion successfully.  *Id.* at

597.  Summary judgment should be granted if a rational trier of fact, taking the record as a

whole, could not find for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986) (requiring summary judgment where "the nonmoving party has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof").

## ARGUMENT

**I.    Bankruptcy Code § 546(e) bars the Trustee's fraudulent transfer claims for the 2009, 2012, and 2013 Dividends (Counts I, III, IV, V, VII, and VIII) and illegal dividend claims (Counts IX and X).**

Bankruptcy Code § 546(e) bars the Trustee's actual and constructive state law fraudulent

transfer claims for the 2009, 2012, and 2013 Dividends (the "Safe Harbor Dividends") and

preempts the Trustee's illegal dividend claims.  Under § 546(e), a trustee may not avoid a

"transfer . . . in connection with a securities contract," made "by or to (or for the benefit of)" a

qualifying entity, including a "financial institution."  11 U.S.C. § 546(e).  In deciding whether

---

[6] Unless otherwise indicated, all internal citations and quotations have been omitted.

the safe harbor applies, the Court must address three straightforward questions: (i) was there a "securities contract," (ii) were the Safe Harbor Dividends paid "in connection with" those contracts, and (iii) were the Safe Harbor Dividends paid "by or to (or for the benefit of)" a "financial institution." *Id.* The undisputed facts demonstrate as a matter of law that all three elements are met:

1) The Notes Purchase Agreements (the "NPAs") through which Tops sold the notes that funded the Safe Harbor Dividends were "securities contracts;"

2) The Safe Harbor Dividends were paid "in connection with" the NPAs; and

3) Tops, the transferor of, and Cap V, the recipient of, the Safe Harbor Dividends were both "financial institutions" by virtue of being customers of their agent banks.

For these reasons, and as described below, the Court should grant summary judgment on Counts I, III, IV, V, VII, VIII, IX, and X.

### A.   Developments in the applicable law and the undisputed facts confirm that the safe harbor applies.

As a threshold matter, Judge Drain's prior ruling that the safe harbor did not prevent these claims from proceeding past the pleading stage does not foreclose granting summary judgment. *See* ECF No. 972 (the "Motion to Dismiss Opinion" or "MTD Op.").[7] A decision at the motion to dismiss stage does not bind the Court on summary judgment. *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015) ("Because of the divergent standard of review applicable to motions to dismiss and motions for summary judgment, the law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of

---

[7] While Judge Drain concluded based on the record before him that the safe harbor did not apply, he did not reach the issue whether the illegal dividend claims were preempted. MTD Op. at 59 n.276.

fact have been raised which survive summary judgment.").  More importantly, in the two years

since the Motion to Dismiss Opinion, there have been significant and dispositive new

developments in the facts and the law.  *Scot. Air Int'l, Inc. v. Brit. Caledonian Grp., PLC.*, 152

F.R.D. 18, 24–25 (S.D.N.Y. 1993) ("The law of the case is a discretionary rule of practice" and

"does not preclude a court from reconsidering its prior opinions, especially in light of an

intervening change of controlling law [and] the availability of new evidence.").

The law in the Second Circuit developed considerably in the last several years and

provides dispositive authority here.  At the dismissal stage, the Court did not have the benefit of

the Second Circuit's decisions applying the safe harbor under similar circumstances in *Nine

West*[8] and *Boston Generating*.[9]  As described below, each of those opinions clarifies the scope of

the safe harbor and strongly undermines key premises in the Motion to Dismiss Opinion.

In addition, while Judge Drain considered a limited set of documents submitted with the

Morgan Stanley Defendants' motion to dismiss, the parties have since taken extensive discovery

on the Safe Harbor Dividends.[10]  That discovery revealed key undisputed evidence including the

transaction documentation, investor presentations, ratings agency presentations, and deposition

testimony from participants in the transactions—including the Morgan Stanley Directors,

---

[8] *Kirschner v. Robeco Cap. Growth Funds (In re Nine W. LBO Sec. Litig.)*, 87 F.4th 130,
149 (2d Cir. 2023), *cert. denied sub nom. Stafiniak v. Kirschner as Tr. of NWHI Litig. Tr.*, 2024
WL 2116507 (U.S. May 13, 2024).

[9] *Holliday v. Credit Suisse Sec (USA) LLC (In re Boston Generating LLC)*, 2024 WL
4234886 (2d Cir. Sept. 19, 2024).

[10] In his Motion to Dismiss Opinion, Judge Drain held that he could consider at the dismissal
stage the 2009 Notes Purchase Agreement (ECF No. 31-2), a press release to Tops's 2012 Form
8-K (ECF No. 31-18), the 2009 Funds Flow Memorandum (ECF No. 31-20), the 2012 Funds
Flow Memorandum (ECF No. 31-19), the 2009 Offering Memorandum, and the 2012 Offering
Memorandum.  He considered these materials only for the propositions that Tops used notes to
fund the Safe Harbor Dividends, and the proceeds of the notes were transferred from Tops's
bank account to Cap V's bank account.  MTD Op. at 61–62.

Independent Directors, Tops's CEO and CFO, Tops's shareholders, the financial firms that underwrote the debt issuances (the "Underwriters"), and Tops's third-party financial advisors. Testimony from all of these parties and non-parties supports this motion.

It is undisputed that Tops conducted three separate "dividend recapitalizations" issuing notes (the "Notes") to fund each of the Safe Harbor Dividends:[11]

| Notes | Dividend |
|---|---|
| **October 9, 2009 Dividend Recapitalization** | |
| 2009 Notes: Tops Holding Corporation issued $275 million in senior secured notes bearing an annual interest of 10.125% due in October 2015 | 2009 Dividend: Tops issued a $105 million dividend to shareholders |
| **December 20, 2012 Dividend Recapitalization** | |
| 2012 Notes: Tops Holding Corporation and Tops Markets, LLC issued $460 million in senior secured notes bearing an annual interest rate of 8.875% due in 2017 | 2012 Dividend: Tops issued a $100 million dividend to shareholders |
| **May 15, 2013 Dividend Recapitalization** | |
| 2013 Notes: Tops Holding II Corporation issued $150 million in senior notes. They bore an interest rate of 8.750/9.500% due in 2018[12] | 2013 Dividend: Tops issued a $141.9 million dividend to shareholders |

There is also no dispute that each dividend recapitalization comprised the following steps:

**Step 1:** Tops issued the Notes to raise money from investors. Those Notes were issued for the purpose described in each Offering Memorandum of raising money to fund the Safe Harbor Dividends to Tops's shareholders. (*See, e.g.*, SOUF ¶¶ 101, 129, 155, 178, 190, 216.)

---

[11] SOUF ¶ 65 & table.

[12] Cash interest on the 2013 Notes accrued at the 8.75% rate per year and the PIK Interest (payment-in-kind interest) on the notes accrued at a 9.50% rate per year. (SOUF ¶ 183.)

**Step 2:** Through the NPAs, Underwriters purchased the Notes from Tops and sold them

to investors.  (*Id.* ¶¶ 128, 177, 215.)

**Step 3:** The Underwriters who sold the Notes wired proceeds from the sale of those

Notes to Tops's bank account at Bank of America.  (*Id.* ¶¶ 130, 179, 217.)

**Step 4:** Tops instructed Bank of America to wire a portion of the Notes proceeds (the

Safe Harbor Dividends) to Tops's shareholders.  In the case of Cap V, those

proceeds were transferred to Cap V's Citibank account.  (*Id.* ¶¶ 131, 180, 219.)

## B.    The NPAs are "securities contracts."

The NPAs are undisputably securities contracts.  The Bankruptcy Code defines a

"security" to include various types of debt, including a "note."  11 U.S.C. § 101(49) ("The term

'security' includes note, stock, treasury stock," etc.).  The Notes issued under the NPAs were

therefore "securities."

The Bankruptcy Code defines a "securities contract" broadly to include any "contract for

the purchase, sale, or loan of a security," and "any other agreement or transaction that is similar

to an agreement or transaction referred to in this subparagraph."  *Id.* §§ 741(7)(A)(i), (vii).  The

Second Circuit has held that the Code's definition is "capacious[]" and should be interpreted

"with extraordinary breadth."  *Deutsche Bank Tr. Co. Am. v. Merrill Lynch, Pierce, Fenner &

Smith, Inc. (In re Tribune Co. Fraudulent Conveyance Litig.)*, 946 F.3d 66, 81 (2d Cir. 2019).

There is no doubt that the NPAs are securities contracts because the NPAs were the instruments

through which Tops sold, and the Underwriters purchased, the Notes.[13]  Judge Drain agreed.  *See*

---

[13] *See, e.g.*, SOUF ¶ 128 & Ex. 142 (2009 Notes Purchase Agreement) at -7669 ("The [2009 Notes] will be issued [by Tops] pursuant to an indenture," and "are to be offered and sold to or through the Initial Purchasers [Morgan Stanley & Co. Incorporated, Bank of America Securities LLC, and HSBC Securities (USA) Inc.]").)  The NPAs for the Notes that funded each of the 2012 Dividend and the 2013 Dividend contain similar language.  (SOUF ¶¶ 177, 215.)

MTD Op. at 62 (noting that various types of debt, including the issuance of notes generally fit within 11 U.S.C. § 741(7)(A)(i)'s broad definition of "securities contract").  Judge Drain's ruling is consistent with numerous other courts that have held that a contract for the purchase and sale of debt qualifies as a securities contract.  *See, e.g.*, *Official Com. of Unsecured Cred. of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F. 3d 94, 98–99 (2d Cir. 2013), *abrogated on other grounds by Merit Mgmt.*, 583 U.S. 366 (2018) (holding contract to purchase or redeem notes was a "securities contract" under § 546(e)); *see also Kelley v. Safe Harbor Managed Acct. 101 LTD*, 31 F. 4th 1058, 1067 (8th Cir. 2022) (affirming district court's holding that a note purchase agreement was a "securities contract" under § 546(e) and emphasizing that the Code defines "securities contract" "expansively" and with "extraordinary breadth").

## C.    The Safe Harbor Dividends were "in connection with" the NPAs.

### 1.    The undisputed facts establish that the Safe Harbor Dividends were related to the NPAs.

The undisputed facts also establish that the Safe Harbor Dividends were made "in connection with" the NPAs.  Under § 546(e), a transfer is made "in connection with a securities contract" if it is "related to or associated with the securities contract."  *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 422 (2d Cir. 2014).[14]  The

---

[14] To the extent Judge Wiles in *IIG Glob. Trad. Fin. Fund Ltd v. Int'l Inv. Grp. LLC (In re IIG Glob. Trad. Fund Ltd.)*, 2024 WL 4751276 (Bankr. S.D.N.Y. Nov. 8, 2024) and *Hurwitz v. Fund Holdings Ltd. (In re GBG USA Inc.)*, 2024 WL 5114996 (Bankr. S.D.N.Y. Dec. 16, 2024) implied that a transfer is not safe harbored if the transfer is not ***itself*** a securities contract, that holding is in direct tension with both the plain language of the statute and with Second Circuit precedent.  Judge Wiles implicitly acknowledged that tension by relying on Judge Drain's reasoning in his Motion to Dismiss Opinion—reasoning that the Second Circuit subsequently repudiated in *Boston Generating*.

Second Circuit has emphasized that § 546(e) sets a "low bar for the required relationship

between the securities contract and the transfer sought to be avoided." *Id.*

The Safe Harbor Dividends easily clear the Second Circuit's "low bar":

- The Safe Harbor Dividends were undisputably a component part of three "dividend recapitalization transactions" under which debt was issued, at least in part, to fund dividends.[15]

- There is no dispute that Tops's Board approved the Safe Harbor Dividends in conjunction with the Notes, and that each respective Notes offering occurred on or about the same day as the Safe Harbor Dividend that it funded.[16]

- The NPAs and Offering Memoranda expressly reference the Safe Harbor Dividends, stating that proceeds from the Notes would be used to pay distributions to shareholders.[17]

- The third-party financial advisors that performed valuation analyses of Tops before the Safe Harbor Dividends explicitly considered the impact that ***both*** the Notes ***and*** the Safe Harbor Dividends would have on Tops's value, and defined ***both*** the Notes ***and*** the Safe Harbor Dividends as one "Transaction."[18]

---

[15] *See, e.g.*, SOUF ¶ 65–66; *see also* SOUF ¶ 198 & Ex. 51 (R. Rosenberg Dep. Tr.) at 109:1–109:19 (explaining that ███████████████████████████████████████
██████████████████████████████).

[16] SOUF ¶¶ 125, 130–31, 172, 179–80, 211, 217–19.

[17] *See, e.g.*, *id.* ¶ 129 & Ex. 142 (2009 Notes Purchase Agreement) at -7686 (explaining that the 2009 Notes would be used in the manner described by the "Pricing Disclosure Package" which incorporated the 2009 Offering Memorandum, which states "[T]he proceeds from the issuance of the [Notes] . . . will be used, in part . . . to pay a distribution to the Company's shareholders"); SOUF ¶ 100 & Ex. 158 (2009 Offering Memorandum) at -7982 (describing "distribution to shareholders" of $105 million); *see also, e.g.*, SOUF ¶¶ 178, 216.

[18] SOUF ¶ 110 & Ex. 141 (KPMG Opinion); *id.* ¶ 162 & Ex. 129 (D&P Deck); *id.* ¶ 207 & Ex. 155 (Houlihan Lokey Opinion); *see, also e.g.*, SOUF ¶ 109 & Ex. 121 (KPMG Engagement Letter) at -1256 ("In connection with our engagement we will prepare a valuation analysis . . . after giving effect to the Company's . . . issuance of [the 2009 Notes] . . . and the Company's . . . distribution to its shareholders (together, the 'Transaction').").

- And the Underwriters who sold the Notes effectively testified that they knew that the NPAs and Notes offerings were related to the Safe Harbor Dividends because their very purpose was to fund the Safe Harbor Dividends.[19]

This factual backdrop compels the conclusion that the Safe Harbor Dividends were "related to" the NPAs. *See Kelley v. Safe Harbor Managed Acct. 101, Ltd.*, 654 F. Supp. 3d 850, 855 (D. Minn. 2023) ("Given the 'low bar' needed to find a connection between the transfers and the Note Purchase Agreement, the Court concludes that no reasonable jury could find that the transfers . . . were not related to the Note Purchase Agreement," because "no facts . . . support an inference that the transfers at issue were for a reason other than the existence of the Note Purchase Agreement."); *see also Nine West*, 87 F.4th at 150 (finding that in a two-step leveraged buyout, payments to shareholders in exchange for cancelling their shares were made to "effectuate" the relevant securities transaction, and thus subject to the safe harbor).

Even the Trustee's own Complaint concedes that the Notes were issued "in order to" fund the Safe Harbor Dividends. *See, e.g.*, Am. Compl. ¶ 8 ("Tops issued [the 2012 Notes] in order to pay [the 2012 Dividend] to Morgan Stanley and the Private Equity Investors."). Since, as the Trustee alleges, the Notes were issued under the NPAs "in order to" fund the Safe Harbor Dividends, the Safe Harbor Dividends **must be** "related to" or "associated with" the NPAs. Concluding that something was done "in order to" facilitate something else but that the two are not "related to" or "associated with" eviscerates plain English and flies in the face of common sense. That should end this inquiry. *See Opioid Master Tr. II v. Argos Cap. Appreciation Master Fund LP (In re Mallinckrodt PLC)*, 2024 Bankr. LEXIS 2058 at *38 (Bankr. D. Del. Sept. 5, 2024) (applying the safe harbor and holding that a plaintiff's allegation that a transfer was

---

[19] *See, e.g.*, Ex. 45 (L. Faggiano Dep. Tr.) at 108:23–109:19 (explaining that a "dividend recap" involves a "debt offering" that "recap[s] the . . . capital structure on the balance sheet" and is "used in part to pay a dividend to shareholders").

made "in connection with" a securities contract precluded any argument otherwise); *see also Kelley*, 654 F. Supp. 3d at 855 (finding under "common sense," that a transfer that was made for no other reason but for the existence of a securities contract, was "in connection with" the securities contract).

**2.      The Second Circuit's recent decision in *Boston Generating* confirms that the Safe Harbor Dividends were "in connection with" the NPAs.**

The Second Circuit's recent decision in *Boston Generating* repudiates the key rationale underlying Judge Drain's conclusion that the Safe Harbor Dividends were not made "in connection with" the NPAs, and confirms that the "in connection with" element is satisfied here. 2024 WL 4234886.  The leveraged recapitalization at issue in *Boston Generating* and the dividend recapitalizations here are strikingly similar.  As here, *Boston Generating* involved a dividend payment that was part of a larger corporate finance transaction.  In order to fund a leveraged recapitalization, the debtors there entered into three credit facilities.  *Id.* at *2.  The credit facilities required the debtors to use the loan proceeds to fund the distributions that the Trustee sought to avoid, including a $35 million dividend to shareholders (the "BG Dividend"). *Id.*  At the same time, the debtors used the funds from the credit facilities to finance a tender offer to purchase members' shares.  *Id.*  Both the Bankruptcy Court and the District Court held that the BG Dividend was safe harbored because it occurred in connection with the tender offer, which the courts held was a securities contract.[20]

In the Motion to Dismiss Opinion, Judge Drain expressly "decline[d] to follow" the District Court's decision in *Boston Generating*.  MTD Op. at 69.  He criticized *Boston*

---

[20] *See Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC),* 617 B.R. 442 (Bankr. S.D.N.Y. 2020); *Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*, 2021 WL 4150523, at *6 (S.D.N.Y. Sept. 10, 2021).

*Generating*'s reasoning that if a transfer is a step in an integrated transaction at the "heart of the case," then a dividend paid "in connection with and 'in anticipation of'" a securities contract in the transaction is a safe-harbored transfer. *Id.* He held that "collapsing" a transaction in that manner to invoke the safe harbor risked improper application of the fraudulent transfer avoidance doctrine that "substance will not give way to form," and would be inconsistent with the Supreme Court's ruling in *Merit Mgmt. Grp., LP v. FTI Consulting*, 583 U.S. 366 (2018). *Id.* At the time of the Motion to Dismiss Opinion, the District Court's decision in *Boston Generating* was on appeal to the Second Circuit, but had not yet been decided, and therefore the Second Circuit's endorsement of *Boston Generating*'s rationale was not clear.

Beyond declining to follow *Boston Generating*, Judge Drain also implored Congress to "act[]," to "restrict" expansive readings of the safe harbor (*see* MTD Op. at 72–73), presumably to make clear that his reading of the safe harbor was preferable to the one adopted by the Bankruptcy Court and District Court in *Boston Generating*.

Judge Drain's invitation has gone unanswered by Congress. The Second Circuit has acted though—and decisively rejected Judge Drain's view of the statute. The Second Circuit's recent affirmance of *Boston Generating* confirms that the Safe Harbor Dividends here, like the BG Dividend, meet the "in connection with" requirement. The Second Circuit followed the plain language of the safe harbor that Judge Drain "decline[d] to follow," and held that the District Court's opinion was "thorough and well-reasoned." *Boston Generating*, 2024 WL 4234886, at *2. The Second Circuit reasoned that the debtor's credit facilities that funded the tender offer (a securities contract) "expressly contemplated that the proceeds of the loans would be used to fund" the BG Dividend, and that one of the debtors "would transfer the proceeds . . . for that exact purpose." *Id.* In addition, "all of the parties to the Leveraged Recap Transaction . . . knew

that [the debtor] would transfer a portion of its loan proceeds to achieve the goal of the

Leveraged Recapitalization." *Id.* Acknowledging that relationship, the Second Circuit affirmed

that the BG Dividend was paid "in connection with" a securities contract. *Id.*

The Second Circuit's reasoning directly applies here because the issuance of the Safe

Harbor Dividends were even more connected with their corresponding NPAs than the BG

Dividend was with the securities contract in that case. The Safe Harbor Dividends were issued

"in connection with" "securities contracts" because the Notes that Tops issued and sold through

the NPAs were undertaken for the very purpose of funding the Safe Harbor Dividends. *See*

*supra* at I.C. Just as in *Boston Generating*, it is undisputed that the parties involved in

facilitating the issuance of the Notes (i.e., the Underwriters, financial advisors, Tops's

shareholders, and Tops) expressly contemplated that a portion of the NPA proceeds would be

transferred to shareholders to achieve the goal of completing the dividend recapitalizations. *See*

*id.* In fact, the Second Circuit's reasoning applies with even greater force here because in *Boston*

*Generating*, the ancillary credit facility documentation and not the securities contract (the tender

offer) mentioned the BG Dividend, while here, the NPAs themselves—which are the triggering

securities contracts—explicitly reference the Safe Harbor Dividends. (SOUF ¶¶ 129, 178, 216.)

Applying the undisputed facts to the standard reiterated in *Boston Generating*, as a matter of law

the Safe Harbor Dividends were made "in connection with" the NPA proceeds that funded them.

**D.    The Safe Harbor Dividends were transfers made "by and to" "financial institutions."**

**1.    The undisputed facts establish that Tops and Cap V were "financial institutions" in connection with the NPAs.**

Finally, the undisputed facts establish that the Safe Harbor Dividends were paid "by or

to" a "financial institution." The Bankruptcy Code defines a "financial institution" to include a

"customer" of a "commercial or savings bank," that is "acting as agent" for the customer, "in

connection with a securities contract." 11 U.S.C. § 101(22)(A).[21]  In *Tribune*, the Second Circuit

held that the statute's plain language must be given its ordinary meaning, and that an entity is a

"financial institution" for § 546(e) purposes if it is the customer of a nationally chartered bank

that was acting as the entity's agent for the purpose of the transfer at issue.  946 F.3d at 77–80;

*see also Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, L.P. (In re Bankr.*

*Est. of Norske Skogindustrier ASA)*, 629 B.R. 717, 757–59 (Bankr. S.D.N.Y. 2021) ("*Merit* left

open the question of whether the safe harbor would apply where, for example, [a transferor or

transferee] is a [financial institution] by virtue of being a customer of a financial institution" but

"[a]fter *Merit*, the Second Circuit in *Tribune* found that the safe harbor does apply in such

situations").  That is the case here:  Tops and Cap V each were financial instutions because they

were customers of nationally chartered banks—Bank of America and Citibank—which acted as

their respective agents in connection with the NPAs and the Safe Harbor Dividends.[22]  *See*

*Tribune*, 946 F.3d at 78 (holding national bank that debtor hired to act as a depository for sums

used to carry out a leveraged buyout was the debtor's agent, and the debtor was the bank's

customer).

---

[21] The requirement in § 101(22)(A) that such financial institution act "in connection with a
securities contract," is satisfied for the same reasons discussed in Section I.C. above.  *See Opioid
Master Trust II*, 2024 Bankr. LEXIS 2058, at *14–15, n.14.

[22] There is no dispute that Bank of America and Citibank are nationally chartered banks.
Bank of America, N.A. and Citibank, N.A., are each registered with and licensed by the Office
of the Comptroller of Currency as a "National Bank," *See National Banks Active as of
10/31/2024*, Office of the Comptroller of Currency, U.S. Department of Treasury,
https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-
name.pdf (last visited December 19, 2024). The Court may take judicial notice of bank
registration information provided by the Office of the Comptroller of Currency's website as its
accuracy cannot reasonably be questioned.  FED. R. EVID. 201(b)(2) ("The court may judicially
notice a fact that is not subject to reasonable dispute because it can be accurately and readily
determined from sources whose accuracy cannot reasonably be questioned.").

***Tops was Bank of America's customer, and Cap V was Citibank's customer:*** There can be no dispute that Tops was a customer of Bank of America and Cap V was a customer of Citibank because Tops and Cap V maintained bank accounts at Bank of America and Citibank, respectively. (SOUF ¶¶ 130–132, 179–80, 217–19); *see Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020) (holding funds were financial institutions under § 546(e) by virtue of holding accounts with a bank, reasoning that an "account holder is a 'customer' of the bank under U.S. law" and quoting N.Y.U.C.C. § 4-104(1)(e) which defines a "customer" as "any person having an account with a bank or for whom the bank has agreed to collect items[.]"); *see also Customer,* Black's Law Dictionary (11th ed. 2019) (a "customer" includes "a buyer or purchaser of goods or services.").

***Bank of America and Citibank were agents in connection with the NPAs:*** Similarly, there can be no dispute that the banks acted as agents of Tops and Cap V. Bank of America acted as Tops's agent in connection with the NPAs by receiving the NPA proceeds and then wiring a portion of those proceeds to Tops's shareholders in accordance with Tops's instructions. (SOUF ¶¶ 130–132, 179–80, 217–19.) An agency relationship is established by (i) "evidence that one person—the principal—has allowed another to act on his or her behalf, subject to his or her control," and (ii) "evidence of consent by the other person—the agent, to so act." *See* MTD Op. at 70. A bank's effectuation of a wire transfer pursuant to a customer's express instructions establishes the quintessential agency relationship. *See, e.g.*, *Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 323 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*, 590 F.3d 252 (3d Cir. 2009) (holding the "financial institution" requirement that a "Federal Reserve Bank . . . or entity is acting as agent or custodian for a

customer . . . in connection with a securities contract" is satisfied when "a payment is made by wire transfer," particularly since "federal regulations require that a wire transfer must be performed by a bank; [and] thus, a wire transfer must be made through a financial instution."); *see also* 12 C.F.R. § 229.2 (defining a "wire transfer" as "an unconditional order to a bank to pay a fixed or determinable amount of money to a beneficiary upon receipt or on a day stated in the order, that is transmitted by electronic or other means through Fedwire, the Clearing House Interbank Payments System, or other similar network, between banks, or on the books of a bank."). Similarly, Citibank was Cap V's agent in receiving the wired Safe Harbor Dividends (i.e., a portion of the NPA proceeds) into Cap V's Citibank account. (SOUF ¶¶ 132, 219, 180.)

*Fairfield Sentry* is particularly instructive. There, the court held that certain feeder funds were financial institutions under § 546(e) because they were customers of Citco Bank "who acted as their agents in connection with" a securities contract pursuant to which redemption payments were made, because Citco Bank paid the redemptions in accordance with the funds' instructions. 2020 WL 7345988, at *7. The court reasoned that it was "implausible to infer that Citco Bank made the redemption payments to specific redeemers in specific amounts absent the funds' directions to do so," and "Citco Bank accepted those directions by executing the redemption payments." *Id*. The same logic applies here. Bank of America acted on Tops's behalf in wiring the Safe Harbor Dividends to shareholders, and no reasonable factfinder could find that Bank of America could have disbursed those funds without receiving Tops's instructions. Tops was required to use a bank to effectuate the wires, and Tops instructed Bank of America as to the amount, timing, and recipient of the wires. Similarly, Cap V required Citibank to accept the wire transfers of the Safe Harbor Dividends on its behalf.

*Tribune* is likewise on point.  There, in connection with a leveraged buyout transaction, Tribune borrowed funds to refinance existing debt and cash out shareholders, and hired Computershare to act as its "Depositary" in connection with the leveraged buyout tender offer. 946 F.3d at 72, 78.  The Second Circuit held that Computershare was a financial institution because it was a trust company and a bank, and that Tribune was a financial institution by virtue of being Computershare's customer because it had "manifested its intent to grant authority to Computershare by depositing the aggregate purchase price for the shares with Computershare and entrusting Computershare to pay the tendering shareholders." *Id.* at 80.  That is precisely the case here.  Just as in *Tribune*, Tops "manifested its intent" to grant authority to Bank of America by depositing the proceeds of the Notes offering with Bank of America and entrusting Bank of America to wire the proceeds to shareholders in accordance with Tops's instructions, just as Cap V entrusted Citibank to receive the Dividends on its behalf.

### E. Section 546(e) preempts the illegal dividend claims.

Section 546(e)'s safe harbor likewise bars the Trustee's state law illegal dividend claims. Section 546(e) preempts state-law claims that have the same effect as a fraudulent transfer claim that would otherwise be barred by §546(e).  *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012).  Here, the Trustee's illegal dividend claims seek the same relief as the fraudulent transfer claims for the 2012 Dividend and 2013 Dividend—the claw back of those Dividends.  *See* Am. Compl. ¶¶ 295, 301 (seeking joint and several liability for the "full amount" of the 2012 Dividend and the 2013 Dividend).  For this reason, courts have found state-law illegal (or unlawful) dividend claims are barred by § 546(e), reasoning that permitting such claims would frustrate the Congressional purpose behind § 546(e) and undermine the statute's protections.  *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 825 (N.D. Tex. 2012) (holding plaintiff's state law unlawful dividend claim was preempted by § 546(e) because

allowing the claim, which sought to recover cash payments subject to § 546(e)'s safe harbor, would "render Section 546(e) meaningless"); *Contemp. Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), *abrogated on other grounds by Merit Mgmt.*, 583 U.S. 366; *Nine West*, 87 F.4th at 150 (holding § 546(e) preempted unjust enrichment claims); *AP Servs. LLP*, 483 B.R. at 71 (same).

## II.    The Trustee's constructive fraud claims (Counts I–IV) fail as a matter of law.

Irrespective of the safe harbor, the Morgan Stanley Defendants are also entitled to summary judgment as to Counts I–IV, which seek to avoid the Dividends as constructively fraudulent under New York Debtor and Creditor Law ("NYDCL") §§ 273–75 (amended Apr. 4, 2020),[23] because the Trustee cannot demonstrate a triable issue on those claims.[24]  To survive summary judgment, the Trustee must identify valid evidence capable of meeting his burden of persuasion, something he cannot do given the undisputed record.  The expert opinions he relies on are invalid as a matter of law, and the evidence he otherwise needs simply does not exist.

---

[23] In 2019, the NYDCL was amended and §§ 271–75 were altered effective April 4, 2020. *See* N.Y. Legis. 580 § 7 (2019).  The amendments, however, apply only prospectively. *Id.* Accordingly, because all of the conduct at issue occurred before April 4, 2020, all references to the NYDCL herein refer to the statute as enacted before that date.

[24] Judge Drain's determination at the pleadings stage that the Trustee had plausibly alleged these claims is—like Judge Drain's determination on the safe harbor—not binding at the summary judgment stage. *See, e.g.*, *Nobel Ins. Co. v. City of N.Y.*, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) ("[A]s a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment following discovery . . . [t]he law of the case doctrine . . . does not preclude this Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss.").  Accordingly, Judge Drain's Motion to Dismiss Opinion does not preclude the Court from granting the Morgan Stanley Defendants' summary judgment motion.

**A.    The Trustee's constructive fraud claims under NYDCL § 273 fail as a matter of law because the Trustee cannot meet his burden of proving insolvency.**

The Trustee's claims under NYDCL § 273—which provides that a transfer may be deemed constructively fraudulent where the transferor is insolvent or is rendered insolvent by the transfer—fail because the Trustee cannot meet his burden of proving that Tops was insolvent at the time of, or as the result of, the Dividends.

Under NYDCL § 273, the burden of persuasion remains with the Trustee as the party challenging the conveyances. *See Silverman v. Paul's Landmark, Inc. (In re Nirvana Res. Inc.)*, 337 B.R. 495, 505 (Bankr. S.D.N.Y. 2006); *see also Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 WL 1228866, at *53 (S.D.N.Y. Aug. 30, 2000). And, though a presumption of insolvency applies—and so the Defendants bear an initial burden of production—when no consideration was paid for the challenged transfer (as with a dividend), Defendants need only show "some evidence" of solvency to overcome that burden and shift the burden back to the Trustee. *See In re Nirvana*, 337 B.R. at 505 ("The party defending the conveyance need only come forward with some evidence of solvency to rebut the presumption[.]"); *In re Manshul Const. Corp.*, 2000 WL 1228866, at *53; *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 938 (S.D.N.Y. 1995).

Here, the burden is squarely on the Trustee to prove insolvency because the record contains substantial contemporaneous evidence that Tops was solvent at the time of the challenged Dividends. That evidence includes solvency reports from established independent third-party valuation firms for the majority of the Dividends and extensive evidence reflecting the willingness of financially sophisticated Underwriters to purchase and sell Tops's Notes on favorable terms with full knowledge of Tops's financial condition, Tops's withdrawal liability

estimates, and the corresponding Dividends.  (SOUF ¶¶ 119–21, 128, 168–69, 177, 206–07, 215.)

To meet his burden, the Trustee must do more than merely question the Morgan Stanley Defendants' evidence of solvency; he must present ***affirmative evidence*** capable of establishing insolvency.  *See Kramer v. Chin (In re Chin)*, 492 B.R. 117, 128–29 (Bankr. E.D.N.Y. 2013) (plaintiff must present "contrary probative evidence, such as a valuation or the Debtor's financial records. . . .  [U]nsupported nitpicking of the record is not adequate grounds to disregard the Defendant's uncontradicted and admissible evidence."); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34–35 (2d Cir. 1996) (putting forward affirmative evidence of insolvency); *cf. Gordon v. Kinney (In re Gallagher)*, 417 B.R. 677, 683–84 (Bankr. W.D.N.Y. 2009) (in the absence of affirmative evidence, the court made reasonable assumptions and inferences and found the Trustee did not meet his burden).

The Trustee cannot meet that burden.  His sole "evidence" supporting insolvency is the opinion of his proffered expert, Marc Brown, who purports to have determined that Tops was ███████████████████████.  (SOUF ¶ 266.)[25]  But Mr. Brown's conclusions depend on ███████████████████████████████████████████████████████████████████████████████████████. (SOUF ¶ 268.)  Mr. Brown ██████████████████████████████████ ███████████████████████████████████████████████

---

[25] That opinion is of limited probative value. *See VFB LLC v. Campbell Soup Co.*, 2005 WL 2234606, at \*13 (D. Del. 2005) ("[C]ontemporaneous evidence of fair market value has the advantage of being untainted by hindsight or post-hoc litigation interests."); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.").

██████████████████████████████████. (*Id.* ¶¶ 267–68, 295.)  To be clear, these withdrawal

liabilities were not assessed against Tops before any of the Dividends, nor did Tops have any

reason to believe they would be assessed at the time of any of the Dividends.  Rather, the

estimates were hypothetical calculations of what the Pension Plans' actuaries thought Tops's

withdrawal liability ***might have*** been if there were withdrawals in the year of the estimate.

(*Id.* ¶¶ 83, 295.)  As explained below, the Trustee cannot establish that the Company was

insolvent at the time of the Dividends based on the actuaries' estimates of potential withdrawal

liability.

       **B.**     **Mr. Brown's opinion is invalid because it depends on** ███████████
████████████████████████.

Mr. Brown's insolvency opinion rests on an illogical and legally invalid premise.  He

treats ███████████████████████████.  Specifically, Mr. Brown identifies

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████.

Mr. Brown's opinion is legally invalid because he did not ██████████████

████████████████████████████████████████████████

████████████████████████████████.  Instead, he simply ██████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████.  (SOUF ¶¶ 267–68.)  In other words,

Mr. Brown ***failed to*** ████████████████████████████████.

That approach is legally—and fatally—flawed. As Judge Drain previously recognized in this case, contingent liabilities ***must*** be "discounted by the likelihood that the contingency [will] not occur." MTD Op. at 29 & n.126. Judge Drain's conclusion is consistent with black letter law. *See Tronox Inc. v. Anadarko Pet. Corp. (In re Tronox Inc.)*, 429 B.R. 73, 98 n.15 (Bankr. S.D.N.Y. 2010) ("[C]ontingent liabilities . . . must be reduced to present value for determining whether debtor is insolvent" and trier of fact must "determine the likelihood that the contingency will occur[.]"); *Lippe v. Bairnco Corp.,* 249 F. Supp. 2d 357, 361, 366, 373 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (granting defendants' motion for summary judgment on fraudulent transfer claims where record showed debtor had positive net worth at relevant times and probability that debtor's liabilities would exceed debtor's assets was believed to be low); *In re Xonics Photochemical Inc.*, 841 F.2d 198, 199–200 (7th Cir. 1988) (explaining that failing to discount liabilities for uncertainty "is absurd; it would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent—something no one believes"); *Covey v. Commercial Nat. Bank of Peoria,* 960 F.2d 657, 660 (7th Cir. 1992) ("Discounting a contingent liability by the probability of its occurrence is good economics and therefore good law."); *see also* 5 Collier on Bankruptcy ¶ 548.05[3][a] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("In calculating insolvency, courts have counted contingent assets and liabilities, so long as the contingency is capable of reasonable estimation" but "contingent liabilities are not valued at their face amount; rather it is necessary to discount it by the probability the contingency will occur and the liability become real" or "by the likelihood that the contingency will occur.").

Here, the Trustee does not and cannot contend that withdrawals ███████████ ███████████—indeed, none of his experts offers that opinion. They rely instead on the

idea that withdrawal would occur as a result of some future plan insolvency, which the Trustee's own pension expert ███████████████████████████. (SOUF ¶ 289, 293–94.) That requires the rejection of Mr. Brown's conclusions as a matter of law, because those conclusions depend on the legally improper assumption that withdrawal liability was ███████████████ ██████████████, in the amount of the Pension Plans' actuary's estimate.

The evidentiary record only confirms the absurdity of Mr. Brown's assumptions: it demonstrates that the withdrawals that Mr. Brown assumed in his calculations ███████████ ███████. (*Id.* ¶¶ 103–04, 141–42, 157, 159–60, 191–92, 273, 274.) No withdrawal from either Pension Plan occurred in the years of the first three Dividends, Tops did not withdraw from the UFCW Pension Plan in 2013, and every Tops witness with knowledge testified that Tops had no intention of withdrawing from the UFCW Pension Plan at the time of the Dividends (or for years afterward).[26] And while the trustees of the Teamsters Pension Plan deemed Erie Logistics to have withdrawn from that Plan in late 2013 (*id.* ¶ 242)—a deemed withdrawal that Tops's owners considered "shock[ing]," and "irrational," and spent years and millions of dollars contesting—there is no evidence that this deemed withdrawal was at all anticipated or foreseeable at the time of 2013 Dividend, (*id.* ¶¶ 243, 248). None of the fact witnesses nor the Trustee's experts have opined otherwise. Yet for every Dividend year, Mr. Brown erroneously ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████.

(*Id.* ¶¶ 267–68.) Because Mr. Brown failed ███████████████████████████

---

[26] And indeed, in the years following the MBO, Tops continued to disclose that it had no intention of withdrawing. (SOUF ¶ 236.)

██████████████████████████████████████████████████████████

████████████████████████ Mr. Brown's insolvency opinion is invalid.

**C.    The Trustee cannot salvage Mr. Brown's opinion by asserting that █████ ████████████████████.**

Nor can the Trustee justify Mr. Brown's ██████████████ by claiming that the Plans

***were projected*** to become insolvent at some point in the future. As the Trustee's own expert

admitted, ██████████████████████████████████████████████. Indeed, the

evidence demonstrates that insolvency was ██████████████. Plan projections are just that—

projections based on assumptions about the future that may or may not prove true. Projected

plan insolvency is based on predictions as to whether a plan's invested assets and future

contributions will be enough to offset future liabilities. But the value of both future assets (e.g.,

investments in the stock market) and future liabilities (e.g., participant mortality) are inherently

uncertain. Invested assets may perform better than expected, and liabilities may be lower if

participants' mortality rates are higher than assumed. (*Id.* ¶¶ 280–83.) In addition, plan

solvency can be affected by factors such as the merger of plans, the addition of new employers to

a multiemployer plan, and government assistance—such as the assistance the Plans received in

2022 and 2023. (*Id.* ¶¶ 264, 287.) It is unsurprising that the Trustee's own expert on pension

liabilities, Mr. Harte, ████████████████████████████████████████

████████████████████





(*Id.* ¶ 289.)  Mr. Brown's ████████████████████ again renders his calculations

invalid as a matter of law.

Even if future insolvency of the Plans was ██████████—and it was not—Mr.

Brown's insolvency opinion would still be legally invalid because ████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████  In fact, the UFCW Pension Plan's

actuary admitted that estimated withdrawal liability reflects a "point in time" calculation for an

employer that withdraws during that year and may be different in a subsequent year.  (*Id.* ¶ 296.)

Indeed, because assumptions about asset performance and interest rates will necessarily fluctuate

between the date of the calculation and the date of a future hypothetical withdrawal, the actuary

for the UFCW Pension Plan testified that he would not estimate ***future*** withdrawal liability to

avoid "people . . . latch[ing] on to a number that may not ultimately come to fruition."

(*Id.* ¶ 297.)

Finally, any effort to justify Mr. Brown's insolvency opinion by suggesting future

withdrawals fails for yet another reason: ██████████████████████████████████

████████████████████████.  (*See id.* ¶¶ 82, 299.)  Mr. Brown's

calculations, however, ████████████████████████████████████████████.

(*Id.* ¶ 299.)[27]

D.    **The Trustee's only evidence of insolvency relies on interest rate assumptions that were incorrect as a matter of law.**

Mr. Brown's insolvency opinion is also invalid as a matter of law for the independent reason that he relied on interest rate assumptions—████████████████████████—that several courts of appeals have held are legally incorrect.  In order to calculate withdrawal liability for employers withdrawing from a multiemployer plan in a current year, the plan's actuary "must determine the present value of future liabilities—how much the fund needs in assets today in order to pay those liabilities in the future." *Sofco Erectors, Inc. v. Trustees of Ohio Operating Engineers Pension Fund*, 15 F.4th 407, 418 (6th Cir. 2021).  "This requires the actuary to make certain assumptions about the income the assets will generate." *Id.*  The interest rate assumption "is critical in withdrawal-liability calculations" because "a lower interest-rate assumption results in higher withdrawal liability." *Id.* at 419.

The plain language of ERISA therefore requires that withdrawal liability be calculated using "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's ***best estimate*** of anticipated experience under the plan."  29 U.S.C. § 1393(a)(1)

---

[27] Even if Tops were assessed withdrawal liability years after the Dividends, it would not have had to pay the entire withdrawal liability amount at once but would have instead had the ability to pay the amount in installments over a matter of years.  29 U.S.C. § 1399(c).  Thus, ██ ████████████████████████████████████████████, Mr. Brown's ████████████████████████████████████████████. (SOUF ¶ 298–99.)

(emphasis added).[28] As courts have recognized, this provision requires that "assumptions reflect the characteristics of the plan," which, in turn, means "the actuary must estimate how much interest the plan's assets will earn based on their anticipated rate of return." *United Mine Workers of Am. 1974 Pension Plan v. Energy West Mining Co.*, 39 F.4th 730, 738 (D.C. Cir. 2022); *see also id.* at 742 ("The discount rate specifically must reflect the interest the plan's assets are projected to earn."); *GCIU-Employer Retirement Fund v. MNG Enterprises, Inc.*, 51 F.4th 1092, 1099–100 (9th Cir. 2022) ("While actuaries may reasonably disagree as to the exact interest rate that best accounts for the plan's experience and anticipated returns, the discount rate assumption cannot be divorced from the plan's anticipated investment returns."); *Sofco Erectors, Inc.* 15 F.4th at 420–23 (holding that actuary's interest rate assumption violated ERISA where it was not based on the plan's "past experiences and future expectations taking into account the plan's asset allocation and expected returns").

Applying these rules, courts have invalidated withdrawal liability calculations where actuaries developed interest rate assumptions using what is referred to by actuaries as ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████.[29] *See Sofco Erectors, Inc.*, 15 F.4th at 421 (rejecting use of

---

[28] Although ERISA states that an actuary may, in the alternative, use assumptions and methods proscribed in regulations of the Pension Benefit Guarantee Corporation ("PBGC") "for purposes of determining an employer's withdrawal liability," 29 U.S.C. § 1393(a)(2), the PBGC has not promulgated any regulations for those purposes, leaving the existing statutory framework as the guiding standard. *Michigan Paving & Materials Co. v. Operating Engineers Loc. 324 Pension Fund*, 2024 WL 4525295, at *3 (E.D. Mich. July 31, 2024) (recognizing same) (citing *Sofco Erectors, Inc.*, 15 F.4th at 420).

[29] A "mass withdrawal" is a form of withdrawal that occurs when "a multiemployer plan terminates by the withdrawal of every employer from the plan, or in which substantially all the employers withdraw from a plan pursuant to an agreement or arrangement to withdraw from the plan." 29 U.S.C. § 1399(c)(1)(D); *see also* 29 CFR § 4001.2.

██████ to calculate withdrawal liability and affirming summary judgment in withdrawing

employer's favor); *see also New York Times Co. v. Newspaper & Mail Deliverers'-Publishers'*

*Pension Fund*, 303 F. Supp. 3d 236, 240, 254–56 (S.D.N.Y. 2018) (rejecting pension fund

actuary's use of ██████ to calculate withdrawal liability for 2012 and 2013 plan years);

*Pension, Hospitalization & Benefit Plan of Elec. Indus. v. ConvergeOne Dedicates Servs., LLC*,

2024 WL 1676176, at *5 (S.D.N.Y. Apr. 16, 2024) (rejecting use of ██████ to calculate

withdrawal liability); *Colorado Fire Sprinklers, Inc. v. Nat'l Automatic Sprinkler Indus. Pension

Fund*, 725 F. Supp. 3d 1248, 1259–60 (D. Colo. Mar. 26, 2024) (rejecting use of ██████ to

calculate withdrawal liability for withdrawal in 2013 and granting summary judgment in favor of

withdrawing employer as to reasonableness of the assumption).  As the Sixth Circuit explained,

the use of the ██████ improperly "dilutes the actuary's best estimate with rates on

investments that the plan is not required to and might never buy, based on a set formula that is

not tailored to the unique characteristics of the plan."  *Sofco Erectors, Inc.*, 15 F.4th at 421.

Likewise, courts have rejected withdrawal liability calculations where actuaries resorted to using

the rates provided by ██████[30] rather than rates ██████████.

*United Mine Workers*, 39 F.4th at 740 (rejecting use of ██████ to calculate withdrawal

liability); *GCIU-Emp. Ret. Fund*, 51 F.4th at 1099–100 (rejecting use of ██████ to calculate

---

[30] The PBGC is a federal corporation established by ERISA that protects pension benefits
for private sector employees.  *See Michigan Paving & Materials Co. v. Operating Eng'rs Loc.
324 Pension Fund*, 2024 WL 4525295, at *2 (E.D. Mich. July 31, 2024).  It administers and
enforces a plan termination insurance program, requiring contributions from single-employer and
multiemployer plans.  *Id.* ████████████████████
██████  These are conservative, near-risk-free rates based on the yield of long-term U.S.
Treasury securities."  *Id.* at *3.  Actuaries use ██████ to calculate withdrawal liability in
the case of mass withdrawals because there is heightened risk associate with a mass withdrawal.
*Id.* at *4.  Using the ██████ "provides a buffer against the underperformance of
the plan's assets despite the complete withdrawal of all participating employers."  *Id.*

withdrawal liability); *Nat'l Ret. Fund et al. v. Domestic Linen Control Grp.*, 2024 WL 3607316, at *6 (S.D.N.Y. July 31, 2024) (rejecting use of ████████ to calculate withdrawal liability); *Michigan Paving*, 2024 WL 4525295, at *11, *13 (rejecting use of ██████ to calculate withdrawal liability and remanding for determination of reasonable discount rate).

Notwithstanding the fact that several courts have rejected those interest rate assumptions as inconsistent with the plain language of ERISA, those are precisely the same interest rates incorporated into Mr. Brown's computations. For example, rather than use the 8% rate it believed to be a "reasonable expectation of long-term future earnings for the fund," (SOUF ¶ 85), the actuary for the UFCW Pension Plan used ███████ approach, ███████ ███████, (*id.* ¶ 87). Mr. Brown then ████████████ ████████████. (*Id.* ¶ 292, 298–99.) The actuary's Rule 30(b)(6) representative testified that the logic behind ██████ was that the pension fund's fiduciaries could hypothetically invest the fund's assets differently if they so choose and that it "balanced the risk of employers leaving [the plan] and what the ongoing impact would be of the fund." (*Id.* ¶ 88.) Courts have expressly rejected such rationales. *See, e.g.*, *Sofco Erectors, Inc.*, 15 F.4th at 421–22 (holding that the desire to transfer risk from plan to a withdrawing employer was not a valid rationale for using a rate that "look[ed] to assets that the fund has not indicated it will ever purchase, rather than the fund's actual portfolio"); *New York Times Co.*, 303 F. Supp. 3d at 255 (rejecting ongoing risk to the plan as rationale for varying from a rate based on plan's anticipated experience). There is no dispute that Mr. Brown's conclusions—the Trustee's sole "evidence" of insolvency—rely on actuarial estimates of liability that incorporated and were inflated by these legally-flawed interest rates. (SOUF ¶ 85, 87, 292, 298–99.)

Turning to the Teamsters Pension Plan, with the exception of its 2009 report,[31] the

Teamsters Pension Plan's actuary *ignored* the pension fund's actual portfolio entirely and simply

used the ███████████████ (SOUF ¶ 92), which "assume[d] nearly risk-free returns,"

*Michigan Paving,* 2024 WL 4525295, at *11.  As the D.C. Circuit explained in *United Mine*

*Workers*, "risk-free rates might be appropriate if a plan were invested in risk-free assets, or

perhaps if it planned to invest the withdrawal liability payments in risk-free assets.  But if the

plan is currently and projects to be invested in riskier assets, the discount rate used to calculate

withdrawal liability must reflect that fact."  39 F.4th at 738.  Here, the Teamsters Pension Plan

was not invested exclusively or almost exclusively in risk-free assets, but instead had sizable

holdings in stocks and other risk-bearing assets.  (SOUF ¶ 93.)  Indeed, those holdings were

sizable enough that the actuary projected a materially higher return rate for the Plan's actual

portfolio elsewhere in its reports.  (*Id.* ¶ 90.)  Specifically, in calculating the Plan's minimum

funding requirements the actuary used a rate of ██████, reflecting the actuary's assumption as to

the expected returns on the Plan's assets.[32]  (*Id.*)  Thus, "using the most conservative rate

possible (██████████) cannot possibly reflect the Plan's past performance and actual

investment portfolio in totality."  *Michigan Paving,* 2024 WL 4525295, at *11.  This is

particularly so where "[t]he minimum funding rate is so drastically different from the withdrawal

liability interest rate because the ██████████ assumes nearly risk-free returns, which do not

reflect the [pension plan's] actual risk profile and investment strategy."  *Id.*  Accordingly, the

---

[31] The Teamsters Pension Plan's actuary, Horizon, calculated estimated withdrawal liability for a hypothetical withdrawal in 2009 using a discount rate assumption of ██████ which reflected the actuary's assumption as to the expected returns on the plan's assets.  (SOUF ¶ 90.)

[32] For purposes of determining a pension plan's minimum funding requirements, actuarial assumptions must each be "reasonable (taking into account the experience of the plan and reasonable expectations)," and, "in combination, offer the actuary's best estimate of anticipated experience under the plan."  26 U.S.C. § 431(c)(3).

interest rates used by the Teamsters Pension Plan actuaries to calculate withdrawal liabilities
were incorrect as a matter of law.

It does not matter that the use of the ███████ or incorporation of ███████ was
common practice at the time, or that Tops's owners, management, or others may have taken the
actuaries' work at face value in a different context than this one.  "ERISA does not yield to
Actuarial Standards of Practice; the standards must succumb to the statutory requirements."
*Sofco Erectors, Inc.*, 15 F.4th at 423 (holding that, although actuarial standards permitted actuary
to use either a "discount rate that reflects the anticipated investment return" or one "implicit in
annuity prices," "ERISA requires the former"); *United Mine Workers,* 39 F.4th at 740 (similar).

Nor does it suffice for the Trustee to argue that the Plans were likely to eventually
become insolvent and trigger mass withdrawals in the future, at which point the ███████
would apply.  Even if projections of insolvency could be considered crystal balls (they cannot),
counting a decades-distant future withdrawal liability as a ***present*** corporate liability would, here
again, require a separate adjustment to bring that hypothetical future corporate liability to present
value—████████████████████████.[33]  *See Taylor v. Riverside-
Franklin Props., Inc. (In re Taylor)*, 228 B.R. 491, 502 (Bankr. M.D. Ga. 1998) ("Contingent
assets and liabilities must also be included.  However, to avoid declaring a debtor solvent or
insolvent based on an event that may never happen, the value of such assets or liabilities must be
reduced to present value based on the likelihood that the contingency will occur.") (citing *In re*

---

[33] Although Mr. Brown considered the effects ███████████████████
████████████████████  (SOUF ¶ 295.)  As discussed,
there is no evidence that withdrawal from the UFCW Pension Plan, much less mass withdrawals,
were contemplated or likely at the times of those dividends.  And, in fact, no withdrawal from
the UFCW Pension Plan occurred in any of those Dividend years.

*Xonics Photochemical, Inc.*, 841 F.2d 198, 199–200 (7th Cir.1988); *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 594 (11th Cir. 1990)).  For this additional reason, Mr. Brown's conclusions of insolvency are invalid as a matter of law.  As the Trustee has no other evidence of insolvency, he cannot meet his burden, and the Morgan Stanley Defendants are entitled to summary judgment on the Trustee's § 273 claims.

  **E.**  **The Trustee cannot prove that the Dividends left Tops with unreasonably small capital.**

  The Trustee's claim under NYDCL § 274 provides that a transfer may be deemed constructively fraudulent if, at the time of the transfer, "the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital."  *Sharp Int'l Corp. v. State Street Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005).  There is no presumption of "unreasonably small capital," so the burdens of both production and persuasion are purely on the Trustee.  MTD Op. at 33; *see also Jalbert v. Flom (In re BICOM NY, LLC)*, 633 B.R. 25, 50 (Bankr. S.D.N.Y. 2021).  "[T]he test for unreasonably small capital is reasonable foreseeability."  *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992).  The unreasonably small capital test is only "satisfied if at the time of the transaction the debtor had such minimal assets that insolvency was inevitable in the reasonably foreseeable future."  *Adelphia Recovery Tr. v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*, 652 F. App'x 19, 21 (2d Cir. 2016).

  The Trustee can point to no evidence capable of meeting that standard; none of the thirty-one fact witnesses who testified provided even a shred of evidence to support such a claim, nor does the extensive documentary record.  His experts certainly do not provide such evidentiary support.  Mr. Brown's initial report makes clear that ████████████████████████████ ████████████ (SOUF ¶ 300.)  And while another of the Trustee's experts, David Stowell,

-48-

asserted that ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████. (SOUF ¶ 301.)

As a result, the Trustee's case for unreasonably small capital—beyond his unsupportable

position that Tops was insolvent—largely reduces to the reference "Required equity cushion

~25-30%" in an internal Cap V slide deck regarding alternative strategies for Tops.

(SOUF ¶ 302 & Ex. 128 (2012 Strategic Alternatives Presentation) at -9636.)  That vague

reference, however, cannot establish that Cap V believed that a lower equity cushion was

insufficient for Tops to continue operations, much less that Tops was "doomed to fail."

*MFS/Sun Life Tr.-High Yield Series*, 910 F. Supp. at 944 (unreasonably small capital test "is

aimed at transferees that leave the transferor technically solvent but doomed to fail").  When

asked about the reference to "required equity cushion" in the document, one of its authors, Arthi

Raghavan, explained that lenders may require covenants regarding the equity cushion a company

maintains.  (SOUF ¶ 303.)  Thus, in the context of the document—which expressly addresses the

possibility of a dividend recapitalization and associated financing—the reference to "[r]equired

equity cushion" is naturally read not to refer to Cap V's belief as to the cushion necessary for

Tops to survive for the foreseeable future, but instead to the assumption by someone at Cap V as

to the cushion that lenders might seek as a term for financing.  (*Id.* ¶ 303 & Ex. 128 (2012

Strategic Alternatives Presentation) at -9636.)[34]  That assumption proved inaccurate, as Tops was

---

[34] This is underscored by the other reference to "required equity cushion" in the document,
which states, "[w]hile a Tops dividend recap would provide a near-term monetization event for
[Cap V], breakage costs for existing debt and required equity cushion dictate timing."
(SOUF ¶ 302 & Ex. 128 (2012 Strategic Alternatives Presentation) at -9636.)  As Ms. Raghavan
explained, the terms lenders demand, including any covenants regarding equity cushion, can vary
over time based on broader market conditions.  (SOUF ¶ 303.)

subsequently able to secure necessary financing on favorable terms to issue the 2012 and 2013

Dividends—a strong indication that the Underwriters and lenders involved were comfortable

with Tops's long-term viability at its existing equity cushion.  (SOUF ¶¶ 149, 152, 156, 183,

184, 187.)

The objective evidence, moreover, demonstrates that Tops was not doomed to fail in the

reasonably foreseeable future following the Dividends.  Tops's management believed the

Company was healthy in 2013; ███████████████████████████████

██████████    (*Id.* ¶¶ 215, 233.)  In fact, in the arbitration following the Teamsters assertion of

withdrawal liability, the Trustee's own expert in this case, Holly Etlin, testified in 2015 ███████

████████████████████████████████████████████████████

████    (*Id.* ¶ 247.)  In the years following the MBO in late 2013 (itself a clear sign that those

most intimately familiar with the Company believed in its continued viability), Tops not only

continued operations, it retained the financial wherewithal to issue further dividends, raise

additional debt, award bonuses to management, and receive an upgraded rating from Moody's.

(*Id.* ¶¶ 249–59.)  It was only after experiencing anomalous and unpredicted industry challenges

in 2016 and 2017 and incurring more than $14 million in unanticipated litigation costs related to

a transaction that the PE Investors were not involved in, that Tops eventually filed for

bankruptcy—nearly five years after the last challenged dividend and nine years after the first.

(*See id.* ¶¶ 260–62); *Geron v. Craig (In re Direct Access Partners, LLC)*, 602 B.R. 495, 536

(Bankr. S.D.N.Y. 2019) ("The fact that a business actually survived for a considerable period of

time after a challenged transfer is a factor that a court may consider in deciding whether the

business had unreasonably low capital at the time of the transfer."); *MFS/Sun Life Tr.-High Yield

Series*, 910 F. Supp. at 944 (noting one-year period between transaction and failure of company

as indication of adequate capital and citing other cases for same); *see also id.* ("While a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks."). This record simply does not support a conclusion that any of the Dividends caused Tops to have "such minimal assets that insolvency was inevitable in the reasonably foreseeable future," *In re Adelphia Commc'ns Corp.*, 652 F. App'x at 21, and the Trustee lacks any evidence sufficient to establish otherwise.

      **F.**      **The Trustee's constructive fraud claims under NYDCL § 275 necessarily fail because there is no evidence that the Tops Board subjectively intended or believed that Tops would incur debts beyond its ability to pay them.**

The Trustee also lacks the evidence necessary to prevail on a claim under NYDCL § 275. That statute provides that a transfer is deemed constructively fraudulent if the transferor subjectively believes that the transfer will cause it to incur debt beyond its ability to pay. MTD Op. at 28, 33; *In re Nirvana Res.*, 337 B.R. at 509 & n.11. No presumption of such subjective intent applies, and the Trustee has the burdens of both production and persuasion. *See* MTD Op. at 34.

The Trustee cannot meet those burdens. There are no documents reflecting a belief by anyone on Tops's Board that the Dividends would leave Tops unable to pay its debts. The Board, whether affiliated with Cap V or not, have consistently testified to the contrary. (SOUF ¶¶ 106, 195, 214, 231.) Nor is there circumstantial evidence that the Tops's Board members "could not have reasonably believed that [Tops] would be able to pay its debts as they matured." MTD Op. at 34 n.152. To the contrary, the Board's belief that Tops could meet its obligations was supported by the solvency opinions of three different valuation firms and consistent with the demonstrated beliefs of the sophisticated Underwriter firms that underwrote Tops's debt or purchased that debt on the expectation of being repaid. (SOUF ¶¶ 120–21, 167–68, 207.)

III.    **Cap V is entitled to summary judgment on the Trustee's actual fraudulent transfer claims (Counts V–VIII).**

The Trustee's effort through Counts V through VIII to avoid the Dividends as fraudulent under NYDCL § 276 likewise fails as a matter of law.[35]  To prevail on his claims under § 276, the Trustee must demonstrate by ***clear and convincing evidence*** that Tops engaged in the Dividends with an actual intent to hinder, delay, or defraud creditors.  *See United States v. McCombs*, 30 F.3d 310, 327–28 (2d Cir. 1994).

Although Judge Drain held that the Trustee pleaded fraudulent intent, the undisputed material facts established in discovery show the Trustee cannot survive a summary judgment motion on these facts.  There is, for example, no admissible evidence or testimony to support the Trustee's allegation that Cap V told the president of the UFCW or the chair of the UFCW Pension Plan's board of trustees that Cap V knew the UFCW Pension Plan would "go bankrupt" or that Tops was prohibited from issuing new debt.  (Am. Compl. ¶¶ 8, 40–41.)[36]

The Trustee's reliance on purported flaws in the solvency analyses is similarly misplaced.  As an initial matter, there is no evidence that the solvency analyses were shared with any existing or prospective creditors.  Creditors instead had access to Tops's financial statements, which the Trustee has not claimed were false or misleading.  (SOUF ¶ 63.)  It is thus unclear how purported flaws in the solvency analyses could be considered part of a scheme to hinder, delay, or defraud those creditors.

---

[35] As noted above (*see supra* at n.3), the actual fraudulent transfer claims for the 2009, 2012, and 2013 Dividends are subject to the § 546(e) safe harbor.

[36] When asked during his deposition about the source for these statements, the Trustee testified that he did not conduct witness interviews when investigating the facts supporting the allegations in the Amended Complaint.  (SOUF ¶ 304 & Ex. 29 (A. Halperin Dep. Tr.) at 46:5–9; 48:5–23.)  The Trustee could not explain the source of the allegation that Mr. Matthews said that the UFCW Pension Plan would "go bankrupt."  *Id.* at 90:15–91:21.

And even if the creditors had seen the solvency reports—and they did not—while the
Trustee alleges that the methodologies and comparable companies used by the valuation firms
were supposedly inconsistent with each other and with Cap V's own valuations, the uniform
testimony from the representatives of the valuation firms and by both parties' experts is that
valuations inherently entail judgment calls, and it is by no means unusual for different valuators
to adopt different approaches or varied comparable companies.  (SOUF ¶¶ 122, 170, 206.)  Such
varied approaches are hardly evidence of Cap V's fraudulent intent.

Given this lack of direct evidence, the Trustee has unsurprisingly shifted his principal
focus to so-called "badges of fraud."  *See* ECF No. 207 (Trustee Opp. to MS Defs & HSBC
PMC Ltr. at 4–5); Am. Compl. ¶¶ 64–72; 83–90; 121–27; 189–95.  But, while courts allow
plaintiffs to rely on such circumstantial evidence, the ultimate issue remains whether the Trustee
can clearly and convincingly demonstrate an actual intent to hinder, delay, or defraud creditors.
*Lamonica v. NEDM Payables Corp. (In re Pretty Girl, Inc.)*, 644 B.R. 298, 306 (Bankr.
S.D.N.Y. 2022) ("The burden of proving actual intent is on the party who seeks to set the
conveyance aside, and such intent must be demonstrated by clear and convincing evidence.");
*see also Nisselson v. Empyrean Invs. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390,
401 (Bankr. S.D.N.Y. 2007) (stating that a summary judgment motion cannot be avoided on a
"mere incantation of intent").  The badges that the Trustee asserts do not serve that purpose.  As
discussed above, the Trustee's assertion that Tops was insolvent is unsupported.  Several of the
other purported badges—including that the Dividends were for no consideration, that they were
preceded by debt issuances, and that they went to the owners who controlled the Company[37]—

---

[37] ECF No. (Trustee Opp. to MS Defs & HSBC PMC Ltr.) at 4–5; Am. Compl. ¶¶ 64–72;
83–90; 121–27; 189–95.

are inherent in the commonplace practices of dividend recapitalizations or dividends in general.

*See* MTD Op. at 57 (citing *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd*

99 F. App'x 274 (2d Cir. 2004)); (SOUF ¶ 67 & Ex. 50 (P. Gompers Dep. Tr.) at 81:6–83:3

(noting that dividend recapitalization transactions "are certainly a common and used form of exit

in which realizations are done, at least in part, through financing of a dividend through the

raising of debt"); *id.* at 106:13–107:17 (noting that "leveraged dividend recaps [are] a common

strategy in private equity").)  And the Trustee's assertion that Cap V "had no plan" to address

Tops's "pension hole" ignores that it was the trustees of the Pension Plans, not Tops—and

definitely not Cap V—who had responsibility for addressing any underfunding in their respective

plans—including by adopting rehabilitation plans that increased the contribution required from a

plan's sponsoring employers, as the trustees of the UFCW Pension Plan did.  (SOUF ¶¶ 79–80.)

There is no evidence that anyone thought the Pension Plan withdrawal liabilities would be

triggered at any time, and certainly not over the lifetime of any of the debt being issued in

connection with each Dividend.  There is no evidence that Tops failed to pay the required

contributions during the relevant time period, and it is hardly an indication of fraud that neither

Tops nor Cap V voluntarily contributed more to the Pension Plans than the fiduciaries of the

Pension Plans required.

    The Trustee's other purported "badges of fraud" similarly go nowhere.  While the Trustee

may think that Tops should have made greater CapEx investments, there is no evidence that the

Morgan Stanley Defendants withheld needed CapEx in order to fund the Dividends or to defraud

creditors.  The record evidence, including contemporaneous internal and external

correspondence, instead reflects that Cap V responsibly sought to control expenditures in order

to ensure that any amounts paid by Tops were properly directed to obtain returns.  (SOUF ¶¶ 59–

62.)  Sound cash management is not a sign of fraud, particularly where, as here, the level of

CapEx was reported in each of the Offering Memoranda provided to prospective Tops

debtholders.  (*See id.* ¶ 63.)

The contention that the Morgan Stanley Defendants supposedly "manipulate[d]" the

third-party solvency analyses and "concealed liabilities" again overlooks that Board members,

the Company, and existing and potential creditors had access to materials such as the Offering

Memoranda and financial statements that disclosed every penny of Tops's liabilities, including

Tops's pension obligations and potential withdrawal liabilities to the Pension Plans.  (*See, e.g.,*

*id*. ¶ 102.)  Indeed, it makes no sense to infer an intent to defraud creditors when the components

of the supposed fraud—including Tops's CapEx and pension liabilities—were openly disclosed

to potential investors and creditors to whom Tops was seeking to sell its Notes.  In short, the

Trustee's alleged badges are not, either individually or in total, an indication of fraud, much less

clear and convincing evidence of it.  Given the absence of any direct evidence of fraudulent

intent, Cap V is entitled to summary judgment on the Trustee's actual fraud claims.

## IV.    The Morgan Stanley Directors are entitled to summary judgment on the fiduciary duty claim (Count XI).

Count XI asserts that the Morgan Stanley Directors breached fiduciary duties of care and

loyalty.  (Am. Compl. ¶¶ 303–10.)  As Judge Drain recognized in the Motion to Dismiss

Opinion, however, Delaware law expressly allows a corporation to include provisions in its

certificate of incorporation shielding fiduciaries from liability for alleged breaches of the duty of

care.  *See* MTD Op. at 87–90; Delaware GCL § 102(b)(7).[38]  And, as Judge Drain further

---

[38] Because Tops was incorporated in Delaware, Delaware, rather than New York, law
governs the Morgan Stanley Directors' fiduciary responsibilities.  MTD Op. at 78 (stating that
New York courts apply the "internal affairs doctrine" to hold that "law of the state of
incorporation generally control the substantive aspects of breach of fiduciary duty claims related

acknowledged, the Tops and Tops II certificates of incorporation each contained such a provision:

> To the fullest extent that under the General Corporation Law of the State of Delaware . . . permits the limitation or elimination of the liability of directors, no director shall be personally liable to this Corporation or its stockholders for money damages for breach of fiduciary duty as a director.

MTD Op. at 88 (citing ECF Nos. 41-2, 41-3).  This provision "makes it abundantly clear that directors are shielded from liability for breaches of the duty of care." *Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir. 2005).  Accordingly, to prevail on Count XI, the Trustee must show that the Morgan Stanley Directors breached their duty of loyalty or good faith.  MTD Op. at 90; *Chen v. Howard-Anderson*, 87 A.3d 648, 685 (Del. Ch. 2014) (stating that where directors are exculpated for breaches of the duty of care, plaintiff must show that they "were motivated by a non-stockholder-related influence").[39]

The Trustee cannot meet that requirement.  The Trustee cannot prove that the Morgan Stanley Directors breached any duty of loyalty to the Company and its shareholders.[40]  Although the Trustee asserts that it was a fiduciary breach to approve the 2012 and 2013 Dividends and to

---

to corporate governance."); *In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 308 (S.D.N.Y. 2007) (recognizing, in applying New York's choice of law rules, that "courts in almost every instance when faced with a choice of law inquiry in derivative actions alleging a breach of fiduciary duty have applied the internal affairs doctrine").  In any event, New York law similarly allows corporations to exculpate directors for alleged breaches of case, as Judge Drain also recognized.  MTD Op. at 87, 90 (citing NYBCL § 402(b)).

[39] *See also In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 474 (Bankr. S.D.N.Y. 2016) (noting that NYBCL § 402(b), exculpation clauses may "protect[] directors against claims for breach of the duty of care but not breach of the duty of loyalty" and that there is an exception for bad faith).

[40] Under Delaware law, there is not an independent duty to act in good faith.  Rather, the requirement to act in good faith "is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty."  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006).

cause Tops to incur debt to fund them, Am. Compl. ¶ 306, the Morgan Stanley Directors did not

receive those Dividends, nor did their stakeholders receive them, on a disproportionate basis

which is the essence of a breach of duty of loyalty claim.  (SOUF ¶¶ 148, 158, 175, 213–14.)

Approval of dividend payments to shareholders is not an act of disloyalty to those same

shareholders.  *See, e.g.*, *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at

*8 (Del. Ch. Nov. 30, 2007) (finding that accelerated vesting and subsequent cashing out of

options did not create a conflict of interest "because the interests of the shareholders and

directors are aligned in obtaining the highest price" and it was "not a personal financial benefit

not equally shared by the stockholders").  To be sure, the Morgan Stanley Directors received

carried interest in connection with Cap V—that is, compensation tied to Cap V's profitability.

(SOUF ¶ 6.)  But such compensation only aligned the Morgan Stanley Directors' interests with

those of shareholders:  The Morgan Stanley Directors benefitted when Cap V financially

benefitted, and, because the Dividends were distributed to shareholders equitably, Cap V did not

disproportionally benefit.  *See In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *13

(Del. Ch. Feb. 29, 2012) (rejecting argument that directors had conflicted interest where

directors' accelerated vesting of stock as a result of stock sale transaction aligned directors'

interests with those of shareholders to seek highest share price); (SOUF ¶ 130–31, 179–80, 217–

19; Ex. 132 (2009 Funds Flow Memorandum); Ex. 122 (2010 Funds Flow Memorandum); Ex.

112 (2012 Funds Flow Memorandum); Ex. 14 (2013 Funds Flow Memorandum)).  It is thus

unsurprising that there is no evidence that the Morgan Stanley Directors did anything with

respect to the Dividends or related Notes to impermissibly advantage themselves.

       Nor can the Trustee establish a breach of loyalty to shareholders in connection with

Tops's CapEx.  Deposition testimony and contemporaneous emails reflect that the Morgan

Stanley Directors sought to control spending in order to ensure that expenditures were reasonably directed toward maximizing Company returns—to the benefit of shareholders. (SOUF ¶¶ 59–61.)  There is no evidence that they limited expenditures for any other reason, much less any self-serving one.

And any claim that the Morgan Stanley Directors breached a duty to creditors likewise fails because the Trustee cannot establish that the Morgan Stanley Directors owed any such duties during their tenures.  "Under Delaware law, officers and directors of a corporation generally do not owe a fiduciary duty to the creditors of the corporation unless the corporation is insolvent." *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 290 (D. Del. 2000) (granting defendants' motion for summary judgment on breach of fiduciary duty claim for alleged duties owed to creditors on the basis that the corporation was "not insolvent when [it] paid dividends after the note sales"); *see also Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 184 (Del. Ch. 2014) ("A transfer of value from a solvent subsidiary to the holder of 100% of the equity cannot give rise to a fiduciary wrong.").  And, as addressed previously, the Trustee cannot prove that Tops was insolvent at the time of the challenged Dividends or, for that matter, before the end of the Morgan Stanley Directors' time on the Board.  If Tops was solvent, members of its Board were absolutely entitled to issue dividends to shareholders.

Accordingly, because the Trustee cannot establish any breach of loyalty and the Morgan Stanley Directors are exculpated from any liability for supposed breaches of care, summary judgment should be entered in favor of the Morgan Stanley Directors on Count XI.

**V.    The Morgan Stanley Directors are entitled to summary judgment on the illegal dividend claims (Counts IX and X).**

As noted above, the illegal dividend claims for the 2012 and 2013 Dividends are preempted by the application of § 546(e).  But the claims also fail for at least two additional, independent reasons.

First, the Trustee cannot prove a violation of New York's dividend statute, NYBCL § 510, as he must for his illegal dividend claims to succeed.  Section 510 provides that a corporation may pay dividends "except when currently the corporation is insolvent or would thereby be made insolvent, or when the declaration, payment or distribution would be contrary to any restrictions contained in the certificate of incorporation."  NYBCL § 510(a).  NYBCL § 719 provides, in relevant part, for liability against directors who declare dividends contrary to § 510. *Id.* § 719(a)(1).  And § 720 authorizes suit for the relief provided in § 719. *Id.* § 720(b). Because the Trustee does not allege that the 2012 and 2013 Dividends violated Tops's certificates of incorporation, his illegal dividend claims rest on the proposition that Tops was insolvent at the time of, or rendered insolvent by, the 2012 or 2013 Dividends.  As discussed above, the Trustee cannot support that proposition.  *Supra* at II.A.

Second, although § 719 generally establishes liability for directors who authorize dividends for insolvent companies (or dividends that result in insolvency), § 719(e) qualifies that general provision by providing that a "director shall not be liable under [§ 719] if, in the circumstances, he performed his duty to the corporation under paragraph (a) of section 717." NYBCL § 719(e).  Section 717(a), in turn, sets forth a director's obligation to act "in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances"—that is, a director's fiduciary duties. *Id.* § 717(a).  Thus, while

§ 719(a) establishes liability against directors for various acts, § 719(e) insulates directors who act in accordance with their fiduciary duties from potential liability.[41]

Section 719(e) is fatal to Counts IX and X because the Trustee cannot establish that the Morgan Stanley Directors breached their fiduciary duties.  He cannot prove bad faith or a breach of loyalty for the reasons discussed in connection with his breach of fiduciary claim.  *Supra* at IV.  Nor is there evidence to conclude that the Morgan Stanley Directors breached a duty of care in approving the 2012 and 2013 Dividends.  While the Trustee has criticized the length of the director meetings in which the Dividends were approved, the length of a board meeting is not a sufficient basis to infer a lack of care on the part of the Morgan Stanley Directors, who extensively monitored Tops on an ongoing basis outside the formal Board meetings.[42]  The Tops Directors, moreover, implemented a robust process that entailed not only their own review but also the input of counsel and reliance on Tops's management and third-party valuation firms who continue to stand by the validity of their valuations.[43]  Section 717 explicitly authorizes such

---

[41] Although Judge Drain concluded in his Motion to Dismiss Opinion the motions to dismiss that § 719 "encompasses many types of wrongdoing" beyond breaches of fiduciary duty, MTD Op. at 75–76, he did not address the application of § 719(e) or § 717.  Thus, he did not address whether, although § 719(a) provides liability for a broader range of conduct than fiduciary breaches, § 719(e) nonetheless insulates fiduciaries who adhere to their fiduciary responsibilities—as it expressly does.

[42] For example, Tops's CFO, William Mills, testified that Morgan Stanley played an active role in Tops and he communicated with them at least every other week.  (SOUF ¶ 34.)  Cap V also issued quarterly valuations of Tops.  (*See, e.g.*, *id.* ¶ 33.)

[43] *See* SOUF ¶¶ 123–25, 172–75, 209–11.

reliance,[44] and courts have recognized such reliance as affirmative evidence of prudence.[45] For

this additional reason, the Trustee's illegal dividend claims fail as a matter of law.

## VI. MSIM is entitled to summary judgment on the aiding and abetting a breach of fiduciary duty claim (Count XII).

Finally, because the Trustee cannot show that the Morgan Stanley Directors breached any

fiduciary duties, *see supra* at IV., he necessarily cannot prove that MSIM aided and abetted any

such breaches. *See Molner v. Reed Smith, LLP (In re Aramid Ent. Fund Ltd.)*, 664 B.R. 9, 77

(Bankr. S.D.N.Y. 2024) (holding that where the complaint "fails to plausibly allege that the

named Defendants owed fiduciary duties [], [plaintiff's] claim for aiding and abetting breach of

fiduciary duty necessarily fails"); *see also McGowan v. Ferro*, 859 A.2d 1012, 1041–42 (Del.

Ch. 2004) (granting summary judgment on aiding and abetting claims where underlying breach

claims were dismissed at summary judgment), *aff'd*, 873 A.2d 1099 (Del. 2005).

But the aiding and abetting claim also independently fails because the Trustee cannot

prove another crucial element of the claim: MSIM's ***knowing*** participation in a breach in either

---

[44] NYBCL § 717(a) (providing that directors are "entitled to rely on information, opinions, reports or statements including financial statements and other financial data" prepared by (1) officers or employees of the corporation; (2) counsel, public accountants or other persons the director believes competent to advise on relevant matters; or (3) "a committee of the board upon which he or she does not serve . . . as to matters within its designated authority"); *Berman v. Le Beau Inter-America, Inc*., 62 B.R. 262, 268 (S.D.N.Y. 1986) (holding directors had the right to rely on the financial statements of the corporation's accountants, the reports of their highly qualified attorneys, and the approvals by their bank lenders for the transactions at issue).

[45] *See Tilden v. Cunningham*, 2018 WL 5307706, at *17 (Del. Ch. Oct. 26, 2018) (dismissing bad faith claim where directors relied on outside financial advisor because plaintiff did not plead that the "Board actually knew [the third-party advisor] had manipulated its financial analysis[.]"); *Lenois v. Lawal*, 2017 WL 5289611, at *18 (Del. Ch. Nov. 7, 2017) (dismissing bad faith claim where directors relied on financial advisor's analysis and explaining "[p]laintiff has not adequately alleged that Director Defendants acted with knowledge that the financial advisor's opinion was false"); *see also In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011) (noting that Delaware law is "not designed to subject directors . . . to personal liability for failure to predict the future and to properly evaluate business risk" where directors relied on audit committee to be informed of business risks).

2012 or 2013.  *See McGowan v. Ferro*, 859 A.2d at 1041 (describing elements of claim for breach of fiduciary duty, including "knowing participation in the breach by a defendant who is not a fiduciary").  In fact, Judge Drain originally dismissed the aiding and abetting claim because the Trustee failed to plead MSIM's "knowing participation" in the alleged breach—a "critical element" of any aiding and abetting claim.  *See* MTD Op. at 107–08.  Tellingly, the Amended Complaint failed to add a single allegation that MSIM knowingly participated in any breach and the claims are pled in only the most conclusory fashion.  Not surprisingly, there has been no evidence to support the Trustee's conclusory allegations.

To prove "knowing participation," the Trustee would need to prove both that MSIM acted with "knowledge that the conduct advocated or assisted constituted a breach," and that MSIM provided "substantial assistance" to the breach.  *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015).  The former requirement "imposes a stringent standard," requiring proof of "scienter" or "an illicit state of mind."  *Cambria Equity Partners L.P. v. Relight Enters. S.A.*, 2021 WL 2336984, at *12 (Del. Ch. Jan. 5, 2021).  Proving an alleged abettor "could" or "should have known" is not enough.  *See, e.g.*, *Goldin Assocs., L.L.C. ex rel. SmarTalk Teleservices, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2003 U.S. Dist. LEXIS 16798, at *36 (S.D.N.Y. Sept. 25, 2003) (holding that allegations must give rise to an inference that defendants actually knew that they were acting in furtherance of a breach of duty, not that they should or could have known).

The Trustee cannot satisfy that stringent standard here.  Any claim of fiduciary breach necessarily hinges on Tops having been insolvent at that time of the Dividends and the Morgan Stanley Directors owing duties to Tops's creditors.  *See supra* at 59–60.  But even assuming the Trustee could prove such insolvency (he cannot), the Trustee has not identified a single piece of

evidence that anyone at MSIM *actually knew* that Tops was insolvent at any time prior to the

MBO.  The Amended Complaint includes only conclusory statements that MSIM knew "that the

dividends were issued when the Company was insolvent," MSIM knew "about, directed and

facilitated the exponential growth of [Tops's] liabilities," and knew that Tops's Pension Plan

obligations "rendered Tops insolvent"—all of which are insufficient to establish a claim.  (Am.

Compl. ¶¶ 11, 13, 142.)  Thus, the Trustee cannot prove that MSIM knew of any breach.  *See*

*MC Asset Recovery, LLC v. S. Co.*, 2009 WL 10666059, at *22 (N.D. Ga. Feb. 5, 2009) ("Where

a defendant has no knowledge that a company is insolvent, and thus does not know that fiduciary

duties are even owed to creditors, let alone that they were breached, the 'knowing participation'

element of an aiding and abetting claims is not satisfied.").

There is likewise no evidence that MSIM provided "substantial assistance" to any breach.

"Substantial assistance, by definition, implies active participation or affirmative action."  *Cred*

*Inc. Liquidation Trust v. Uphold HQ Inc. et al. (In re Cred Inc.)*, 650 B.R. 803, 828 (Bankr. D.

Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024); *see also Berdeaux v. OneCoin Ltd.,* 561 F. Supp.

3d 379, 416 (S.D.N.Y. 2021) (noting that substantial assistance means that "'[b]ut-for' causation

is insufficient; aider and abettor liability requires the injury to be a direct or reasonably

foreseeable result of the conduct").  As a matter of law, the Morgan Stanley Directors cannot be

said to have aided and abetted their own alleged breaches.  *Smith v. Weinshanker (In re Draw*

*Another Circle)*, 602 B.R. 878, 905 (Bankr. D. Del. 2019) ("Delaware law generally prohibits

aiding and abetting claims against parties that already stand in direct fiduciary relationships. This

is because wrongful conduct on the part of the fiduciary would give rise to direct liability for a

breach of duty, rather than secondary liability on the theory of aiding and abetting.").  And the

Trustee cannot prove that anyone else at MSIM took any action that substantially assisted in a

breach.  There is, for example, no evidence that the third-party financial advisors were unduly influenced by MSIM; no evidence that MSIM pressured Mr. Matthews, Mr. Kanter, and Mr. Fry to approve the Dividends; no evidence that MSIM improperly limited Tops's CapEx; and no evidence that MSIM actively prevented the Tops Board or management from addressing Tops's liabilities.

The Trustee, in short, cannot satisfy either prong of the "knowing participation" requirement of an aiding and abetting claim.  For this additional reason, MSIM is entitled summary judgment on the Trustee's aiding and abetting claim.

## CONCLUSION

For the foregoing reasons, the Morgan Stanley Defendants respectfully request that the Court grant the Morgan Stanley Defendants' summary judgment motion.

Dated:  December 20, 2024

Respectfully submitted,

/s/ *Pamela A. Miller*
Pamela A. Miller
Peter Friedman (admitted *pro hac vice*)
Lauren M. Wagner
Amber L. Covucci
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
Email: pmiller@omm.com
       pfriedman@omm.com
       lwagner@omm.com
       acovucci@omm.com

Meaghan VerGow
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
Email: mvergow@omm.com

*Attorneys for Defendants Morgan Stanley*
*Investment Management, Inc., Morgan*
*Stanley Capital Partners V U.S. Holdco LLC,*
*Gary Matthews, Eric Kanter, and Eric Fry*