Pamela A. Miller
Peter Friedman (admitted *pro hac vice*)
Lauren M. Wagner
Amber L. Covucci
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Email: pmiller@omm.com
       pfriedman@omm.com
       lwagner@omm.com
       acovucci@omm.com

Meaghan VerGow
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Email: mvergow@omm.com

*Attorneys for Defendants Morgan Stanley Investment
Management, Inc., Morgan Stanley Capital Partners
V U.S. Holdco LLC, Gary Matthews, Eric Kanter, and
Eric Fry*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| TOPS HOLDING CORPORATION, *et al.*, | Case No. 18-22279 (SHL) (Jointly Administered) |
| Debtors. | |
| ALAN D. HALPERIN, AS THE LITIGATION TRUSTEE FOR THE TOPS HOLDING LITIGATION TRUST, | Adv. Proc. No. 20-08950 (DSJ) |
| Plaintiff, | |
| v. | **OPPOSITION TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT** |
| MORGAN STANLEY INVESTMENT MANAGEMENT, INC., *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STANDARD OF REVIEW ..................................................................................... 2

ARGUMENT ................................................................................................. 3

I.    The Court Should Deny the Trustee's Motion for Summary Judgment on the Section 546(e) Defense Because the Defense Bars the Fraudulent Transfer Claims for the Safe Harbor Dividends As a Matter of Law. ................... 3

    A.    Judge Drain's safe harbor ruling is not law of the case. ........................... 3

    B.    The Trustee's Motion does not overcome the undisputed evidence establishing that the safe harbor applies. ................................................. 6

        1.    The NPAs are "securities contracts." ............................................ 6

        2.    The Safe Harbor Dividends were "in connection with" the NPAs. ................................................................................ 7

            A)    Merit is inapposite ............................................................. 8

            B)    A dividend can be safe harbored. ................................... 10

            C)    The Safe Harbor Dividends need not be "integrated" into the NPAs. ................................................ 14

            D)    The intended use of the Notes proceeds is relevant. ........ 15

        3.    The Safe Harbor Dividends were transfers made "by and to" financial institutions. ........................................................... 17

            A)    Second Circuit precedent confirms that Tops and Cap V were financial institutions. ................................... 18

            B)    The undisputed facts support that Tops and Cap V were financial institutions. ............................................ 21

    C.    The Trustee's congressional intent argument does nothing to change the result. .................................................................................. 25

II.    The Court Should Deny Summary Judgment on the Statute of Limitations Defense. ............................................................................................... 26

III.    The Court Should Deny Summary Judgment on the Morgan Stanley Defendants' Other Affirmative Defenses. ............................................................. 33

    A.    The UFCW Pension Plan's receipt of federal funds is relevant to the Trustee's claims. .............................................................................. 33

    B.    The Morgan Stanley Defendants' laches defense is viable. .................... 37

    C.    The Trustee must be held to his word that he seeks only the return of the Dividends. .................................................................................. 42

CONCLUSION ............................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................2

*Astra USA, Inc. v. Bildman*,
    375 F. App'x 129, 133 (2d Cir. 2010) ....................................................40

*Bank Leumi USA v. Ehrlich*,
    98 F. Supp. 3d 637 (S.D.N.Y. 2015).....................................................3, 6

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Morgan Stanley Mortg. Cap., Inc.*,
    2013 WL 3146824 (S.D.N.Y. June 19, 2013) .........................................23

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y.1994)........................................................36

*Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l Corp.)*,
    366 B.R. 318 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*,
    590 F.3d 252 (3d Cir. 2009)...................................................................22

*Buchwald Cap. Advisors, LLC v. Papas, et. al (In re Greektown)*,
    621 B.R. 797 (Bankr. E.D. Mich. 2020) .................................................15

*Cantor v. Perelman*,
    2006 WL 318666 (D. Del. 2006) ............................................................38

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................2

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)................................................................................25

*Creative Copier Servcs. v. Xerox Corp.*,
    2005 WL 2175138 (D. Conn. Sep. 2, 2005) .............................................2

*Crescent Res. Litig. Tr. v. Duke Energy Corp.*,
    500 B.R. 464 (W.D. Tex. 2013)..............................................................12

*Crown Paper Co. v. Fort James Co. (In re Crown Vantage, Inc.)*,
    2006 WL 2348850 (N.D. Cal. Aug. 11, 2006) ........................................16

*Damage Recovery Sys., Inc. v. Tucker*,
    2005 WL 388597 (D. Del. Feb. 2, 2005) .................................................38

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Delbrueck & Co. v. Mfrs. Hanover Tr. Co.*,
  609 F.2d 1047 (2d Cir. 1979)...............................................................23

*Deutsche Bank Tr. Co. Ams. v. Large Priv. Ben. Owners (In re Tribune Co.
  Fraudulent Conv. Litig.)*,
  946 F.3d 66 (2d Cir. 2019) . (MS. Mot. at 31–33.)....................................... *passim*

*Doe v. Nat'l Ramah Comm'n Inc.*,
  2018 WL 4284324 (S.D.N.Y. Sept. 7, 2018)...........................................5

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
  2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)...................................22, 23

*In re Firestar Diamond, Inc.*,
  643 B.R. 528 (Bankr. S.D.N.Y. 2022)...................................................32

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019)...............................................................5

*Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*,
  450 B.R. 414 (Bankr. S.D.N.Y. 2011)...................................................26

*In re Glob. Crossing Ltd.*,
  385 B.R. 52 (Bankr. S.D.N.Y. 2008)...................................................12

*Gonzales v. U.S. (In re Silver)*,
  303 B.R. 849 (10th Cir. BAP 2004).....................................................31

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989).......................................................................38

*Holliday v. Credit Suisse Sec. (USA) LLC*,
  2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021)...........................................9, 10, 24

*Holliday v. Credit Suisse Sec. (USA) LLC (In re Bos. Generating LLC)*,
  2024 WL 4234886 (2d. Cir. Sept. 19, 2024) .......................................... *passim*

*Holliday v. K Rd. Power Mgmt., LLC (In re Bos. Generating LLC)*,
  617 B.R. 442 (Bankr. S.D.N.Y. 2020)...................................................11

*Hurwitz v. Fund Holdings Ltd. (In re GBG USA Inc.)*,
  2024 WL 5114996 (Bankr. S.D.N.Y. Dec. 16, 2024)..................................... *passim*

*IIG Glob. Trad. Fin. Fund Ltd v. Int'l Inv. Grp. LLC (In re IIG Glob.)*,
  2024 WL 4751276 (Bankr. S.D.N.Y. Nov. 8, 2024) ..................................... *passim*

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Johnson v. Holder*,
  564 F. 3d 95 (2d Cir. 2009)........................................................................4

*Kelley v. Opportunity Fin., LLC (In re Petters Co., Inc.)*,
  550 B.R. 438 (Bankr. D. Minn. 2016) ......................................................28

*Kelley v. Safe Harbor Managed Acct. 101, Ltd.*,
  654 F. Supp. 3d 850 (D. Minn. 2023)................................................16, 17

*Kirschner v. Robeco Cap. Growth Funds (In re Nine W. LBO Sec. Litig.)*,
  87 F.4th 130 (2d Cir. 2023), *cert. denied sub non. Stafiniak v. Kirschner as Tr.
  of NWHI Litig. Tr.*, 2024 WL 2116507 (U.S. May 13, 2024).........................*passim*

*Klaper v. Cypress Hills Cemetery*,
  2014 WL 1343449 (E.D.N.Y. Mar. 31, 2014)............................................6

*Liu v. SEC*,
  591 U.S. 71 (2020)....................................................................................38

*Maxwell v. U.S. (In re Horizon Grp. Mgmt.)*,
  617 B.R. 581 (Bankr. N.D. Ill. 2020) ......................................................33

*Mendelsohn v. Kovalchuk (In re APCO Merch. Servs., Inc.)*,
  585 B.R. 306 (Bankr. E.D.N.Y. 2018)......................................................28

*Merit Mgmt. Grp. V. FTI Consulting, Inc.*,
  583 U.S. 366 (2018) (Breyer, J.), ......................................................*passim*

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006)....................................................................................10

*Miller v. Fallas (In re J&M Sales Inc.)*,
  2022 WL 532721 (Bankr. D. Del. Feb. 22, 2022) ...................................27

*Monterey Bay Military Housing, LLC v. Ambac Assurance Corp.*,
  2021 WL 4173929 (S.D.N.Y. Sept. 14, 2021)..........................................38

*New Era Publ'ns Int'l v. Henry Holt & Co., Inc.*,
  873 F.2d 576 (2d Cir. 1989)......................................................................39

*NextWave Pers. Commc'ns, Inc. v. FCC (In re NextWave Pers. Commc'ns, Inc.)*,
  235 B.R. 305 (Bankr. S.D.N.Y. 1999), *rev'd, FCC v. NextWave Pers.
  Commc'ns, Inc. (In re NextWave Pers. Commc'ns, Inc.)*, 200 F.3d 43 (2d Cir.
  1999) ........................................................................................................36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nobel Ins. Co. v. City of New York*,
  2006 WL 2848121 (S.D.N.Y. Sept. 29, 2006).......................................................................3, 4

*Official Com. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am.*
  *United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
  719 F.3d 94 (2d Cir. 2013), *abrogated on other grounds by Merit Mgmt. Grp.,*
  *LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018)..............................................................6, 8, 17

*Ogilvy Group Sweden, AB v. Tiger Telematics, Inc.*
  2006 WL 547785 (S.D.N.Y. Mar. 7, 2006) ...............................................................................39

*Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt*
  *PLC)*,
  2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024)...............................................................28, 33

*Orr v. Kinderhill Corp.*,
  991 F.2d 31 (2d Cir. 1993)........................................................................................................10

*Petr. v. BMO Harris Bank, N.A.*,
  95 F.4th 1090 (7th Cir. 2024) ...................................................................................................26

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)...................................................................................................................39

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  773 F.3d 411 (2d Cir. 2014)................................................................................................ *passim*

*In re Quorum Health Corp.*,
  2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023)..................................................................26

*Rapf v. Suffolk Cnty.*,
  755 F.2d 282 (2d Cir. 1985).......................................................................................................39

*Rice v. First Energy Corp.*,
  339 F. Supp. 3d 523 (W.D. Pa. 2018).......................................................................................32

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  476 B.R. 715, 721–22 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L.*
  *Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) ...............................................................25

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  2018 Bankr. LEXIS 828 (Bankr. S.D.N.Y. Mar. 22, 2018) .......................................................6

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  655 B.R. 149 (Bankr. S.D.N.Y. 2023) ......................................................................................40

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Smith v. Interstate Mgmt. Co. LLC*,
    2022 WL 4537947 (S.D.N.Y. Sept. 28, 2022).............................................................................2

*Stanziale v. CopperCom, Inc. (In re Conex Holdings, LLC)*,
    518 B.R. 792 (Bankr. D. Del. 2014) ......................................................................................32

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
    580 U.S. 405 (2017)...............................................................................................................9

*SunEdison Litig. Tr. v. Seller Note, LLC*,
    2020 WL 6395497 (Bankr. S.D.N.Y. Nov. 2, 2020) ...............................................................15

*In re Tops Holding II Corp.*,
    7:18-bk-22279 (Bankr. S.D.N.Y.) .........................................................................................3

*In re Tops Holding II Corp.*,
    7:22-cv-9450-NSR (S.D.N.Y.), ECF No. 10 ............................................................................5

*Transp. Workers Union of Am., Loc. 100, AFL-CIO v. N.Y.C. Transit Auth.*,
    341 F. Supp. 2d 432 (S.D.N.Y. 2004), *appeal dismissed and remanded*, 505
    F.3d 226 (2d Cir. 2007)........................................................................................................41

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
    464 B.R. 606 (Bankr. S.D.N.Y. 2012)...............................................................................36, 37

*UMG Recording, Inc. v. Escape Media Grp., Inc.*,
    2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014)........................................................................2

*Weinman v. Fid. Cap. Appreciation Fund (In re Integra Realty Res., Inc.)*,
    198 B.R. 352 (Bankr. D. Colo. 1996) ....................................................................................12

*Whitehurst v. 230 Fifth, Inc.*,
    998 F. Supp. 2d 233 (S.D.N.Y. 2014)....................................................................................44

*Wimberly v. Experian Info. Sols.*,
    2021 U.S. Dist. LEXIS 18748 (S.D.N.Y. Feb. 1, 2021) ...........................................................6

*Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.)*,
    178 B.R. 938 (Bankr. S.D.N.Y. 1995)....................................................................................28

*Zuckerman v. Metro. Museum of Art*,
    928 F.3d 186 (2d Cir. 2019)..................................................................................................41

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Statutes**

11 U.S.C. § 101(22)(A)...................................................................................17, 18, 19, 20

11 U.S.C. § 502(a) ...........................................................................................................27

11 U.S.C. § 544................................................................................................................27, 28

11 U.S.C. § 546(e) ...................................................................................... *passim*

11 U.S.C. § 550................................................................................................................36

26 U.S.C. § 6901..............................................................................................................30, 31

**Regulations**

12 C.F.R. § 229.2.............................................................................................................22

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)........................................................................24

IRS, Internal Revenue Manual § 4.11.52.2(1) (Dec. 16, 2021),
    https://www.irs.gov/irm/part4/irm_04-011-052 ....................................................31

## PRELIMINARY STATEMENT

The Morgan Stanley Defendants' summary judgment motion established that Bankruptcy Code Section § 546(e) bars the Trustee's fraudulent transfer claims for the 2009, 2012, and 2013 Dividends. The Trustee's motion for summary judgment on that defense confirms the myriad legal and factual flaws in his effort to avoid the safe harbor. Undisputed facts and binding Second Circuit law don't just preclude summary judgment for the Trustee—they establish beyond dispute that the safe harbor applies.

The Trustee also seeks to overcome the statute of limitations defense for the fraudulent transfer claims challenging the 2009 and 2010 Dividends by availing himself of the IRS's 10-year limitations period. But he has not demonstrated that he meets the requirements for stepping into the IRS's shoes. The IRS's 10-year limitations period does not apply because the IRS has no allowable claim against the debtor that paid the 2009 and 2010 Dividends—Tops Holding LLC. Nor does the IRS have an allowable claim against Tops Holding LLC's successor and parent entity, Tops Holding II Corporation, because the claim against that entity, signed under penalty of perjury, is for zero dollars and zero cents ($0.00). Because the IRS has no allowable claim against Tops Holding II Corporation or Tops Holding LLC, the Trustee cannot step into the IRS's shoes as a triggering creditor to assert claims based on the 2009 and 2010 Dividends.

Finally, the Trustee's effort to obtain summary judgment on what he calls Defendants' "Miscellaneous Asserted Defenses" is also flawed. His internally contradictory arguments regarding laches and speculative damages are contrary to law and to his own Amended Complaint. And the Trustee cannot avoid evidence and argument regarding the significance of the massive influx of federal funds into the retirement plans—whose supposed "inevitable insolvency" is the entire basis of the Trustee's claims—by labelling the Morgan Stanley

Defendants' defense on the issue "double recovery" and then claiming that that specific doctrine does not apply.

Rather than draw all inferences in favor of the Morgan Stanley Defendants, as required at summary judgment, the Trustee ignores compelling evidence substantiating the Morgan Stanley Defendants' affirmative defenses because he would rather exclude facts undermining his theory of the case. As shown below, given that the Morgan Stanley Defendants establish that the § 546(e) safe harbor applies, and substantiate their remaining affirmative defenses with undisputed facts, the Court should deny summary judgment to the Trustee on these defenses.

## STANDARD OF REVIEW

A court may grant summary judgment dismissing an affirmative defense only where "a non-moving party fails to introduce any evidence sufficient to support an essential element of the defense." *UMG Recording, Inc. v. Escape Media Grp., Inc.*, 2014 WL 5089743, at *18 (S.D.N.Y. Sept. 29, 2014). A movant's request for summary judgment dismissing an affirmative defense must therefore be denied "if an affirmative defense is supported by evidence from which a reasonable jury could find the defense applicable." *Smith v. Interstate Mgmt. Co. LLC*, 2022 WL 4537947, at *9 (S.D.N.Y. Sept. 28, 2022). Evidence supporting an essential element of an affirmative defense should be construed in a light most favorable to the non-moving defendant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 317–18 (1986); *see also Creative Copier Servcs. v. Xerox Corp.*, 2005 WL 2175138, at *1 (D. Conn. Sep. 2, 2005) ("When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986))).

# ARGUMENT[1]

## I.    The Court Should Deny the Trustee's Motion for Summary Judgment on the Section 546(e) Defense Because the Defense Bars the Fraudulent Transfer Claims for the Safe Harbor Dividends As a Matter of Law.

The MS Motion established that the Morgan Stanley Defendants, and not the Trustee, should be granted summary judgment on the Bankruptcy Code § 546(e) defense because the Safe Harbor Dividends were transfers made in connection with securities contracts and were made by and to financial institutions.  (MS Mot. at 19–33.)  The Trustee's arguments to the contrary are riddled with errors of fact and law.  Under § 546(e)'s plain language and applicable Second Circuit precedent, the undisputed facts mandate application of the safe harbor as a matter of law.

### A.    Judge Drain's safe harbor ruling is not law of the case.

As an initial matter, the Trustee is wrong that the Court is bound by Judge Drain's prior ruling on the safe harbor as "law of the case."  (Trustee Mot. at 9–12.)  A decision at the motion to dismiss stage does not bind the Court at summary judgment.  *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015) ("[T]he law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of fact have been raised[.]"); *see also Nobel Ins. Co. v. City of New York*, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) (because "a ruling in favor of a plaintiff on a motion to dismiss does not address the

---

[1] All references to "AP ECF No. __" refer to docket entries in this adversary proceeding. All references to "Bankr. ECF No. __" refer to docket entries in In re Tops Holding II Corp., 7:18-bk-22279 (Bankr. S.D.N.Y.).  All capitalized terms not otherwise defined herein shall have the same meanings as in the Morgan Stanley Defendants' Motion for Summary Judgment (AP ECF No. 234, the "MS Motion" or "MS Mot.").  "SOUF" refers to the Morgan Stanley Defendants' Statement of Undisputed Material Facts (AP ECF No. 235).  The Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (AP ECF No. 242) is referred to as the "Trustee's Motion" or "Trustee Mot."  All references to "Smith Ex. __" refer to exhibits to the Declaration of James H. Smith (AP ECF No. 242-3).  Unless otherwise noted, emphasis is added and internal quotation marks omitted.

merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment following discovery").  And the law of the case doctrine "does not rigidly bind a court to its former decisions"; rather, a court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law." *Johnson v. Holder*, 564 F. 3d 95, 99 (2d Cir. 2009).  Put simply, the Court can ***always*** revisit its prior rulings.  Here, the Second Circuit's intervening decisions in *Nine West*[2] and *Boston Generating III*[3]—not to mention the development of an extensive factual record that conclusively establishes the safe harbor—warrant revisiting Judge Drain's decision now.  (MS Mot. at 21.)[4]

The reason that motion to dismiss rulings do not control under the law of the case doctrine is because they are issued without a full factual record—and the facts matter.  *See Nobel*, 2006 WL 2848121, at *4.  Here, the parties' extensive discovery into the transactions—including documents and testimony from more than a dozen witnesses who worked on them—resulted in undisputed evidence confirming that the safe harbor applies.  (MS Mot. at 21–22.) Against that evidence, the Trustee's self-serving assertion that there are no "different material facts" (Trustee Mot. at 12) is risible.

As important as the developments in the factual record are the Second Circuit's multiple subsequent decisions interpreting § 546(e), including both *Nine West* and *Boston Generating III*.

---

[2] *Kirschner v. Robeco Cap. Growth Funds (In re Nine W. LBO Sec. Litig.)*, 87 F.4th 130 (2d Cir. 2023), *cert. denied sub non. Stafiniak v. Kirschner as Tr. of NWHI Litig. Tr.*, 2024 WL 2116507 (U.S. May 13, 2024) ("*Nine West*").

[3] *Holliday v. Credit Suisse Sec. (USA) LLC (In re Bos. Generating LLC)*, 2024 WL 4234886 (2d. Cir. Sept. 19, 2024) ("*Boston Generating III*").

[4] The fact that other courts have cited Judge Drain's opinion in the context of motions to dismiss in no way establishes that the decision is law of this case.  (*See* Trustee Mot. at 11 (citing *IIG Glob. Trad. Fin. Fund Ltd v. Int'l Inv. Grp. LLC (In re IIG Glob.)*, 2024 WL 4751276 (Bankr. S.D.N.Y. Nov. 8, 2024) and *Hurwitz v. Fund Holdings Ltd. (In re GBG USA Inc.)*, 2024 WL 5114996 (Bankr. S.D.N.Y. Dec. 16, 2024)).)

Implicitly acknowledging that the Second Circuit's decision in *Boston Generating III* is fatal to

his motion, the Trustee suggests that the decision is non-binding because it is a summary order.

But this Court is permitted to consider *Boston Generating III* as both salient and persuasive

authority because it sets forth the Second Circuit's very broad interpretation of the safe harbor's

"in connection with" provision—the key legal issue before this Court.  *See, e.g.*, *Force v.*

*Facebook, Inc.*, 934 F.3d 53, 66 n.21 (2d Cir. 2019) ("We are, of course, permitted to consider

summary orders for their persuasive value, and often draw guidance from them in later cases.");

*Doe v. Nat'l Ramah Comm'n Inc.*, 2018 WL 4284324, at *6 n.8 (S.D.N.Y. Sept. 7, 2018)

(following a Second Circuit summary order and reasoning that "[s]ummary orders are,

nevertheless, considered persuasive authority").[5]  More generally, the decision reinforces the

Second Circuit's broad application of the safe harbor and its instruction that the safe harbor must

be applied according to its terms—which are expansive.  *See infra* Section I.C.

---

[5] The Trustee's other arguments in support of applying the Motion to Dismiss Opinion misrepresent the scope of that opinion.  The Trustee claims, for example, that "Judge Drain told Defendants exactly what evidence they needed" to support that Tops and Cap V were financial institutions, *i.e.*, a "paying agent or custodial agreement."  (Trustee Mot. at 10.)  That is incorrect.  Judge Drain made no ruling on evidence "needed" to establish that Tops and Cap V were financial institutions.

In addition, the Trustee misleadingly claims that Judge Román, who denied leave to appeal the Motion to Dismiss Opinion, concluded that Judge Drain was "best-equipped to conduct such an inquiry," and "judiciously did so in its detailed and well-researched opinion."  (Trustee Mot. at 10.)  The Trustee ignores that Judge Román held that the question whether the safe harbor applies was not appropriate for appeal because it is a "fact-intensive inquiry."  *In re Tops Holding II Corp.*, 7:22-cv-9450-NSR (S.D.N.Y.), ECF No. 10.  And Judge Román's comment that Judge Drain was "best-equipped" to address whether the factual allegations at the dismissal stage supported the application of the safe harbor simply reinforces that this Court is best equipped at this juncture to apply the current case law to the facts ***now*** available in the record.

Given the significant developments in the law and facts, there is nothing binding this Court to the Motion to Dismiss Opinion. *Bank Leumi*, 98 F. Supp. 3d at 647.[6]

**B.    The Trustee's Motion does not overcome the undisputed evidence establishing that the safe harbor applies.**

The Trustee's Motion must fail because all three elements of the safe harbor are met: (i) the NPAs through which Tops sold the Notes that funded the Safe Harbor Dividends were "securities contracts"; (ii) the Safe Harbor Dividends were paid "in connection with" the NPAs; and (iii) Tops and Cap V were both "financial institutions" by virtue of being customers of their agent banks.

**1.    The NPAs are "securities contracts."**

As shown in the Morgan Stanley Defendants' Motion (MS Mot. at 23–24), the NPAs— the instrument through which Tops sold the Notes—are indisputably securities contracts. *See, e.g.*, MTD Op. at 62; *Official Com. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F.3d 94, 98–99 (2d Cir. 2013), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018) ("*Merit*") (holding contract to purchase or redeem notes was a "securities contract"). The Trustee does not dispute this.

---

[6] The other cases the Trustee cites are all distinguishable. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2018 Bankr. LEXIS 828, at *12–13 (Bankr. S.D.N.Y. Mar. 22, 2018) (Trustee Mot. at 11) is inapplicable because an alleged "change in the law" put forward to support reconsideration did not address the Bankruptcy Code provision that was at issue in the prior ruling. *Wimberly v. Experian Info. Sols.*, 2021 U.S. Dist. LEXIS 18748, at *9 (S.D.N.Y. Feb. 1, 2021) (Trustee Mot. at 9) dealt with leave to file a second amended complaint and so is likewise inapplicable. And *Klaper v. Cypress Hills Cemetery*, 2014 WL 1343449 (E.D.N.Y. Mar. 31, 2014) (Trustee Mot. at 11) is inapt because there, the court held that purported "new" evidence bearing on the interpretation of a contract did not warrant revisiting the court's prior ruling on the agreement's meaning because the agreement's language was clear and unambiguous.

**2.      The Safe Harbor Dividends were "in connection with" the NPAs.**

The question is whether the Safe Harbor Dividends were "in connection with" securities

contracts the explicit purpose of which was to pay the Safe Harbor Dividends.  That question

answers itself.  "In connection to" means "related to" or "associated with," *Picard v. Ida*

*Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 422 (2d Cir.

2014) ("*Madoff*"), and as the MS Motion showed, dividends are quite obviously "related to" or

"associated with" a securities contract that was made for the purpose of paying the dividends.

(MS Mot. at 24–27):

- The NPAs funded the Safe Harbor Dividends and the NPAs and Offering
  Memoranda explicitly referenced that the Notes were being offered to fund the
  Safe Harbor Dividends.  (SOUF ¶¶ 100, 129, 178, 216.)

- The funds flow memoranda for the 2009 and 2012 transactions referenced both
  the Notes and the Safe Harbor Dividends they funded.  (*Id.* ¶¶ 129, 178.)

- The solvency firms hired for each of the transactions ███████████████████

  ████████████████████████████████████████

  ████████████████████████████████████

  ████████.  (*Id.* ¶¶ 110, 162, 198, 207.)

- Each respective Notes offering occurred on or about the same day as the
  corresponding Safe Harbor Dividend that it funded.  (*Id.* ¶¶ 65, 125, 130–31, 179–
  80, 211, 217–19.)

The Trustee offers four flawed arguments for why the Court should ignore the

relationship between the Notes and the Safe Harbor Dividends:  (i) under *Merit*, the Notes are

irrelevant; (ii) a dividend cannot be safe harbored; (iii) the Dividends were not "integrated" into the Notes; and (iv) the intended use of the Notes proceeds is irrelevant. All four arguments fail.

### A)    Merit is *inapposite*.

Relying on *Merit*, 583 U.S. at 369–71, the Trustee argues that the Notes are "irrelevant" to the question of whether § 546(e) applies. But *Merit* does not support that conclusion.

The Trustee makes two arguments about *Merit*: the first is irrelevant and the second finds no support in either *Merit*, the plain language of § 546(e), or subsequent caselaw.

First, the Trustee spends several pages citing *Merit*'s discussion about the relevant transfer. (Trustee Mot. at 13–15.) But the statement in *Merit* that "the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid," 583 U.S. at 370, was made in the context of resolving a dispute about what the relevant transfer was. That issue has no bearing here, where **both parties agree** that the relevant transfers are the Safe Harbor Dividends. (*See* Trustee Mot. at 14 (acknowledging the Morgan Stanley Defendants' admission that the 2009, 2012, and 2013 Dividends are the relevant transfers for the safe harbor analysis).) The question here is whether those indisputably relevant transfers were "in connection with" the NPAs, which is a question *Merit* did not consider or resolve.

Second, the Trustee argues that because the Safe Harbor Dividends are the relevant transfers, the Notes are irrelevant to the analysis. But *Merit* does not command—or even suggest—that result. The plain language of § 546(e) protects any transfer made "in connection with" a securities contract. *Merit* did not analyze the "in connection with" prong of § 546(e), and the application of that language was not at issue in *Merit*. *See* 583 U.S. at 377.[7] Indeed, in

---

[7] In fact, the *Merit* Court expressly acknowledged that "[t]he question before this Court is whether the transfer . . . implicates the safe-harbor exception because the transfer 'was made by

discussing the "in connection with" requirement, the district court's decision in *Boston
Generating* recognized that "*Merit* does not support the proposition that a court must analyze a
transfer divorced from its context." *Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 WL
4150523, at *3 (S.D.N.Y. Sept. 13, 2021) ("*Boston Generating II*"). Here, the context
demonstrates that the Safe Harbor Dividends were issued in connection with the sale of the
Notes.

Contrary to the Trustee's suggestion, *Merit* does not require that every step in a multi-
step transaction involve a securities contract. If that were the requirement, then the statute would
not use the broad phrase "in connection with" to describe the relationship between the transfer
and the securities contract. Rather, Congress would simply have required that the transfer be
made pursuant to a securities contract. If Congress had intended to use the language "pursuant
to," it could have. It did not. *See Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405,
414 (2017) (when confronting an issue of statutory interpretation, courts must always "begin and
end [their] inquiry with the text" and "give effect to the clear meaning of statutes as written."ch").
And the fact that it used the capacious term "in connection with" means that the safe harbor
necessarily extends beyond transfers that were made pursuant to a securities contract. The
Trustee's argument impermissibly reads "in connection with" out of the statute.

In fact, the Second Circuit has repeatedly emphasized that the "in connection with"
requirement of § 546(e) should be read broadly. *See, e.g.*, *Madoff*, 773 F.3d at 416, 418 ("Section
546(e) is a very broadly-worded safe-harbor provision" and its protection is "broadened even
farther because § 546(e) also protects a transfer that is 'in connection' with a securities

---

or to (or for the benefit of)' . . . a financial institution." *Id.* *Merit*'s relevance to that legal
argument is addressed below. *See infra* at 18–19.

contract."); *see also Boston Generating III*, 2024 WL 4234886 (affirming lower court's reasoning that a transaction is "in connection with" securities contract when it is "associated with" or "related to" it). And the Second Circuit's broad interpretation of "in connection with" is consistent with the Supreme Court's broad interpretation of the phrase as it is used in other securities-related statutes. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 72, 85 (2006) (relying on the fact that courts construe the phrase "in connection with the purchase or sale of securities" in Securities and Exchange Act Section 10(b) and Rule 10b-5 broadly, and holding that under the Securities Litigation Uniform Standards Act of 1998's phrase "in connection with the purchase or sale of a covered security," it is "enough that the fraud alleged 'coincide' with a securities transaction[.]").

The Trustee's position would also improperly require the Court to view the Safe Harbor Dividends in isolation, ignoring the surrounding context, and thus § 546(e)'s "in connection with" language. Tops issued the Notes and sold them through the NPAs for the express purpose of funding dividends to accomplish dividend recapitalizations; under any plausible understanding of the English language, the Safe Harbor Dividends were paid "in connection with" the Notes and the NPAs. As the district court decision in *Boston Generating* held, ignoring such an obvious connection would "unnecessarily restrict the safe harbor." *Boston Generating II*, 2021 WL 4150523, at *3; *see also Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("[A]n alleged[] fraudulent conveyance must be evaluated in context; '[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.'").

### B)      A dividend can be safe harbored.

The Trustee's suggestion that the Safe Harbor Dividends cannot be "in connection with" securities contracts because they were "pure dividends" (Trustee Mot. at 24) finds no support in the law. Indeed, in *Boston Generating III*, the Second Circuit held that a dividend made in

connection with a securities contract—just like the dividends at issue here—was safe-harbored.

That case involved a leveraged recapitalization in which the debtors entered into credit facilities

to (i) fund a tender offer to purchase shares, and (ii) pay a $35 million dividend to shareholders

(the "BG Dividend").  The shareholders received the BG Dividend regardless of whether they

tendered shares.  *Holliday v. K Rd. Power Mgmt., LLC (In re Bos. Generating LLC)*, 617 B.R.

442, 451 (Bankr. S.D.N.Y. 2020).  The bankruptcy court reasoned that the BG Dividend "was

not an isolated dividend paid in the ordinary course," but rather was related to the tender offer

because the tender offer "specifically contemplated that the $35 million" would be paid as part of

the leveraged recapitalization.  *Id.* at 493.  And, as noted in the MS Motion, while Judge Drain

"declin[ed] to follow" that holding and its reasoning (MTD Op. at 69), the Second Circuit

subsequently disagreed with Judge Drain, affirming the *Boston Generating* bankruptcy court's

determinations and adopting the district court's "thorough and well-reasoned" conclusions.

*Boston Generating III*, 2024 WL 4234886, at *2.  The Trustee puzzlingly argues that "*Boston

Generating [III]* shows exactly why the Dividends here are not 'in connection with' the Notes

Offerings," but provides no explanation for that implausible *ipse dixit*.  (Trustee Mot. at 30–31.)

*Boston Generating III* affirmed and expressly agreed with the reasoning of the very decision

Judge Drain had rejected, which means that in this Circuit, Judge Drain's decision rejecting

application of the safe harbor was wrong.[8]

---

[8] Judge Wiles's suggestion in *In re IIG Glob.*, 2024 WL 4751276, that the transfers in *Boston Generating III* were safe harbored because they were "intermediate movements of funds" made pursuant to the governing tender offer, does not support the Trustee's conclusion that *Boston Generating III*'s ruling would only apply if the Safe Harbor Dividends here were "necessary for or transferred to effectuate the prior Notes Offerings." (Trustee Mot. at 31.)  If Congress had intended to limit the safe harbor in the manner the Trustee suggests, it could have phrased the statute to safe harbor a "transfer that was necessary for" or "to effectuate" a "securities contract."  Instead, Congress chose the phrase "in connection with," which does not require a transfer to be "necessary for" a securities contract.

The Trustee also argues that "every court to consider a stand-alone gratuitous dividend . . . has concluded the [§ 546(e)] defense is not applicable." (*Id.*) In addition to ignoring *Boston Generating III* and other cases holding that a dividend can be safe harbored,[9] this argument rests entirely on a false premise: that the Safe Harbor Dividends were "stand-alone." As shown above, the Safe Harbor Dividends were expressly issued in connection with the NPAs. The Trustee's cases are inapplicable because they involved materially different transactions and because they did not address whether dividends were payments "in connection with" a securities contract, but instead concerned an entirely different question of whether dividends were "settlement payments" under the statute. *See In re Glob. Crossing Ltd.*, 385 B.R. 52, 57 n.1 (Bankr. S.D.N.Y. 2008) (finding a dividend to shareholders was not a "settlement payment" because it was issued on stock previously purchased); *Weinman v. Fid. Cap. Appreciation Fund (In re Integra Realty Res., Inc.)*, 198 B.R. 352, 360 (Bankr. D. Colo. 1996) (holding a stock distribution to shareholders to accomplish a spin-off was not a "settlement payment" because the shareholders did not receive stock in exchange and the company received no consideration).[10] As a result, they do not speak to the relevant question here—whether a dividend can be considered "in connection with" a securities contract where the securities contract explicitly states that it was undertaken in order to pay the dividend.

---

[9] *See, e.g.*, *Crescent Res. Litig. Tr. v. Duke Energy Corp.*, 500 B.R. 464, 471–76 (W.D. Tex. 2013) (refusing to "conceptually sever" a transaction and holding that $1 billion that subsidiaries transferred to parent as a "distribution or dividend" was a transfer "in connection with" a securities contract because the payment was part of a broader transaction to sell the parent company's equity security holdings in subsidiaries).

[10] Specifically, in *Weinman*, the court considered: (1) "whether the Spin-Off constituted a settlement payment," and (2) "whether the delivery of stock certificates" was a settlement payment "made by or to a financial institution or securities clearing agency." 198 B.R. at 359. *In re Glob Crossing Ltd*., in turn, did not even involve a securities contract and so could not have involved a question as to whether the challenged transaction was "in connection with" one. 385 B.R. at 52.

While *Hurwitz* addressed the "in connection with" question at issue here, the Trustee's reliance on it is misplaced. 2024 WL 5114996. There, a trustee sought to avoid a March 2019 $100 million transfer from the debtor, GBG, to Fung Holdings, an affiliate of GBG's indirect parent company, GBGH. *Id.* at *1. Defendants argued that the "event that first prompted the GBGH directors and controlling shareholders to contemplate the payment of a dividend" was the October 2018 sale of one of GBG's businesses, Centric, which included a sale of securities. *Id.* at *19. Defendants asserted that the March 2019 dividend was therefore "in connection" with the 2018 Centric sale, and thus safe harbored. *Id.* The court disagreed, holding that the facts were "nothing like the facts in [ ] *Boston Generating*;" the dividend was not in connection with the Centric sale because the sale occurred six months prior, and the "sale proceeds were not even used to fund the dividend." *Id.* at *21. Assuming this conclusion was correct, it sheds no light on this case because the facts here are vastly different:

| Facts in *Hurwitz* | Facts in *Tops* |
| --- | --- |
| Sale of securities occurred six months prior to dividend | Notes offerings occurred on or about the same day as the Safe Harbor Dividends |
| Securities contract proceeds did not fund the dividend | The proceeds of the Notes offerings funded the Safe Harbor Dividends |
| No allegation that the securities contract referenced the dividend | The NPAs and Offering Memoranda expressly note that the proceeds would be used to fund the Safe Harbor Dividends |
| No allegation that the parties involved in the Centric sale knew that the proceeds would be used to fund the dividend or was in any way connected to a dividend | Contemporaneous documents such as funds flow memoranda and solvency reports, and witness testimony from parties involved in issuing the Notes reflect that contemporaneous parties understood the Safe Harbor Dividends to be in connection with the Notes offerings |

Because the dividends and securities contract in *Hurwitz* were separated by months, and the

securities contract was not entered into for the purpose of paying the dividend, *Hurwitz* is

inapplicable.[11]

**C)**    ***The Safe Harbor Dividends need not be "integrated" into the NPAs.***

In another effort to rewrite the plain language of § 546(e), the Trustee asserts that it

cannot apply because the Safe Harbor Dividends were not "integrated with the Notes Offerings."

(Trustee Mot. at 26.)  This argument is conjured out of thin air:  the Morgan Stanley Defendants

are not required to show that the NPAs and the Safe Harbor Dividends were "integrated."  What

is required is that the transfer and the securities contract be "in connection with" each other; the

transfer and the securities contract need not be collapsed, let alone "integrated."

Judge Wiles's decision in *IIG* does not support a contrary conclusion because it did not

hold that a dividend can only be safe harbored if it is "integrated" into a securities contract.  In

*IIG*, a trustee sought to avoid transfers made by funds to an intermediary and subsequent

transferees.  *See In re IIG Glob. Trade Fin. Fund Ltd.*, 2024 WL 4751276, at *1 (Bankr.

S.D.N.Y. Nov. 8, 2024).  Asserting that the transfers fell within the scope of § 546(e), the

defendants argued that the "real" relevant transfers for § 546(e) purposes were separate transfers

meant to redeem notes, and that those were settlement payments and in connection with

securities contracts.  *Id.* at *22.  As the Trustee acknowledges, defendants there argued to "re-

define the transactions in order to try to bring them within the scope of section 546(e)," which

---

[11] Judge Wiles in *Hurwitz* acknowledged the difference between the cases in commenting
that "in Tops . . . the transfers that were challenged had actually been funded by a prior securities
transaction.  That is not the case here."  2024 WL 5114996, at *22.

the court held was contrary to *Merit*.[12]  *Id.* at *14.  There is no attempt or need to redefine the relevant transfers here—they were dividends funded by the Notes—and *IIG* is therefore inapt. And while Judge Wiles appears to criticize the Second Circuit's decision in *Boston Generating III* as inconsistent with *Merit* (*see IIG Glob. Trad.*, 2024 WL 4751276, at *17), a bankruptcy court cannot overrule or disregard a Second Circuit ruling.

### D)    *The intended use of the Notes proceeds is relevant.*

The Trustee's illogical argument that the contemplated use of the Notes proceeds is "legally irrelevant" also fails.  (Trustee Mot. at 28.)  That the NPA proceeds were expressly intended to pay the Dividends is what connects the two—*i.e.*, what makes them "in connection with" each other.  The Trustee's contrary argument again disregards *Boston Generating III* where the court found that the BG Dividend was "in connection" with a tender offer precisely because the tender offer "expressly contemplated" that the BG Dividend would be paid.  *Boston Generating III*, 2024 WL 4234886, at *2.[13]  That finding is on all fours with the present facts, where both the NPAs and the Offering Memoranda expressly notified securities markets participants that the proceeds would be used to fund the Dividends.  By contrast, the cases cited by the Trustee—*IIG* and *Hurwitz*—say nothing about the weight given to a securities contract's

---

[12] In *Buchwald Cap. Advisors, LLC v. Papas, et. al (In re Greektown)*, 621 B.R. 797, 821 (Bankr. E.D. Mich. 2020), the other case on which the Trustee relies, defendants made the same argument to collapse different transactions, so the case is not applicable here.

[13] The Trustee ignores similar reasoning in *SunEdison Litig. Tr. v. Seller Note, LLC*, 2020 WL 6395497 (Bankr. S.D.N.Y. Nov. 2, 2020).  That case involved a two-step transaction, where the SunEdison debtor transmitted certain securities to another party (Seller Note, LLC), which then pledged the securities to a collateral agent, Wilmington Trust, for the benefit of the defendants.  The court reasoned that the relevant inquiry in a corporate transaction with multiple steps should not be limited to the initial stock transfer, which was merely the first step in an overarching transaction that was deliberately structured for the debtor's stock to be pledged to Wilmington Trust in connection with a securities contract:  "[T]he Step One Transfer would not have occurred without agreement on the Step Two Transfer as well."

intended use.  They cannot:  In *IIG* the debtors allegedly "did not even know" the "intended use

of funds" of the alleged securities contract (2024 WL 4751276, at *17), and in *Hurwitz*, there

was no allegation that the debtor's sale of its business six months earlier (which allegedly

involved a securities contract) was entered in order to fund a dividend (2024 WL 5114996).

Here, the Trustee himself has expressly pled that the Notes were issued "in order to" fund

the Safe Harbor Dividends.  (*See, e.g.*, Am. Compl. ¶ 8 ("Tops issued [the 2012 Notes] in order

to pay [the 2012 Dividend] to Morgan Stanley and the Private Equity Investors.").)  That

pleading admission should end the Court's inquiry on this element.  If something was done "in

order to" facilitate something else, the two are by definition "related to" or "associated with"[14]

each other—to suggest otherwise is to mangle both English and common sense beyond

recognition.  *See Kelley v. Safe Harbor Managed Acct. 101, Ltd.*, 654 F. Supp. 3d 850, 855 (D.

Minn. 2023) (finding under "common sense," that a transfer that was made for no other reason

but for the existence of a securities contract, was "in connection with" the securities contract).[15]

The Trustee is also incorrect in arguing that "Defendants' position would lead to absurd

results," because any use of funds listed in a securities contract's "use of proceeds" provision

would be safe harbored.  (Trustee Mot. at 29.)  As an initial matter, this Court is bound by the

plain language of § 546(e) without consideration of the impact of that language.  *See Merit*, 583

U.S. at 385–86 (declining to rely on "purposivist arguments" to "deviate from the plain meaning

---

[14] *Madoff*, 773 F.3d at 422.

[15] The Trustee also relies on an out-of-circuit decision, *Crown Paper Co. v. Fort James Corp. (In re Crown Vantage, Inc.)*, 2006 WL 2348850, at *5 (N.D. Cal. Aug. 11, 2006).  Here again, however, the case involved the interpretation of "settlement payment," and not whether a transfer was "in connection with" a securities contract.  The case in no way establishes that a securities contract's use of funds is irrelevant to whether a transaction is in connection with it.

of the language used in § 546(e)").  Perhaps the connection the Trustee's hypothetical posits

would be too tenuous to satisfy the statute.  But the Court need not decide where to draw the line

because this case is nowhere close to it:  the Safe Harbor Dividends were not merely a

"contemplated" use of proceeds—they were the *sine qua non* of the NPAs and were only made

possible through the NPAs.  *See Kelley*, 654 F. Supp. 3d at 855 ("Given the 'low bar' needed to

find a connection between the transfers and the Note Purchase Agreement, the Court concludes

that no reasonable jury could find that the transfers . . . were not related to the Note Purchase

Agreement," because "no facts . . . support an inference that the transfers at issue were for a

reason other than the existence of the Notes Purchase Agreement."); *see also Nine West*, 87 F.4th

at 150 (finding that in a two-step leveraged buyout, payments to shareholders in exchange for

cancelling their shares were made to "effectuate" the relevant securities transaction, and thus

subject to the safe harbor).  There is no plausible argument that one was not connected with the

other, and the Trustee's contrary argument should be rejected.

> **3.    The Safe Harbor Dividends were transfers made "by and to" financial institutions.**

The Bankruptcy Code defines a "financial institution" to include a "customer" of a

"commercial or savings bank," where the bank is "acting as agent" for the customer "in

connection with a securities contract."  11 U.S.C. § 101(22)(A).  The Trustee does not dispute

that Bank of America and Citibank were banks and that Tops and Cap V were their customers.

His only argument is that Bank of America and Citibank did not act as their agents.  (Trustee

Mot. at 20–23.)  The Trustee is wrong.  In *Tribune* the Second Circuit laid out the three elements

necessary to establish a § 546(e) principal-agent relationship, all of which the MS Motion

showed are satisfied here:  (i) Tops and Cap V intended for the banks (the agents) to act on their

behalf; (ii) the banks accepted those undertakings; and (iii) Tops and Cap V retained control over

the key aspects of the undertaking.  *See Deutsche Bank Tr. Co. Ams. v. Large Priv. Ben. Owners (In re Tribune Co. Fraudulent Conv. Litig.)*, 946 F.3d 66, 79 (2d Cir. 2019) ("*Tribune*").  (MS. Mot. at 31–33.)

The Trustee offers two primary arguments to the contrary:  (i) *Merit*, *Tribune*, and *Nine West* purportedly establish that Tops and Cap V were not financial institutions, and (ii) the evidence does not support finding an agency relationship.  Neither argument persuades.

### A)      *Second Circuit precedent confirms that Tops and Cap V were financial institutions.*

Once again, the Trustee mischaracterizes *Merit*.  The Trustee asserts that *Merit* refused to apply the safe harbor "even though two financial institutions . . . were intermediaries in the transfer."  (Trustee Mot. at 15.)  But the Morgan Stanley Defendants do not contend that Tops and Cap V were financial institutions merely because the banks were intermediaries in the transfer.  Rather, the critical point is that Tops and Cap V were the banks' ***customers***, a relationship that rendered them "financial institutions" by the express terms of the statute.  11 U.S.C. § 101(22)(A).  As the Supreme Court's decision in *Merit* expressly made clear, it did not address whether the relevant parties were "customers" under the statute:  "The parties here do not contend that either the debtor or petitioner in this case qualified as a 'financial institution' by virtue of its status as a 'customer' under § 101(22)(A)," and "[w]e therefore do not address what impact, if any, § 101(22)(A) would have in the application of the § 546(e) safe harbor."[16]  *Merit* at 373 n. 2.

---

[16] Ignoring the Court's clear disclaimer, the Trustee claims in a footnote that Defendants are arguing that the *Merit* Court "got it wrong," in declining to apply the safe harbor when one of the parties had been a customer of one of the banks at issue.  (Trustee Mot. at 15 n.9.)  The Morgan Stanley Defendants' point is not that the Supreme Court "got it wrong;" it is that the Supreme Court did not address the significance of customer status because the parties did not raise it. Indeed, at oral argument in *Merit*, Justice Breyer questioned why the parties had not argued that

While the *Merit* Court self-avowedly did not address the issue, the Second Circuit

squarely did in *Tribune*.  There, the Second Circuit confirmed that under the plain language of

the Bankruptcy Code's definition of "financial institution," when a financial institution

intermediary acts as an agent for a customer in connection with a securities contract, the

customer itself is a financial institution.  946 F.3d at 77–78 (holding "Tribune was likewise a

'financial institution' with respect to the [transfers] if it was Computershare's 'customer,' and

Computershare was acting as its agent").  Thus, it is *Tribune*, not *Merit*, that answers the

question of whether Tops and Cap V were financial institutions under § 546(e), and confirms that

they were.

The Trustee strains to distinguish *Tribune* by arguing that the decision "confirmed that

the scope of the relevant agency was to undertake acts in connection with the at-issue securities

contract."  (*Id.* at 16–17.)  But the same is true here:  The banks at issue here, Bank of America

and Citibank, also undertook "acts in connection with the at-issue securities contract[s]," the

NPAs, by wiring and accepting NPA proceeds on behalf of Tops and Cap V.  And there is no

meaningful daylight between the capacity in which the banks in *Tribune* and the banks here

undertook such acts.  In *Tribune*, in connection with a leveraged buyout transaction, Tribune

borrowed funds to refinance its existing debt and cash out shareholders, and hired

Computershare to act as its "Depositary."  946 F.3d at 72, 78.  The Second Circuit concluded

---

the debtor was a financial institution under Bankruptcy Code § 101(22)(A) by virtue of being a
customer of banks that facilitated the transaction, and indicated that he would have agreed with
such an argument.  Transcript of Oral Argument, *Merit Mgmt. Grp. V. FTI Consulting, Inc.*, 583
U.S. 366 (2018) (No. 16-784) (Breyer, J.), https://www.supremecourt.gov/oral_arguments/
argument_transcripts/2017/16-784_j5f0.pdf ("[W]hy are we hearing this case? . . . [W]hen I look
up the definition of financial institution, it says not only is it Credit Suisse [and] Citizens Bank,
but it is also the customers of each of those financial institutions in an instance where the bank is
acting as agent or custodian from the customer.  Now, it seems to me that Citizens Bank is acting
for agent or custodian of a customer, namely [the debtor] . . . . So why doesn't that cover it?").

that Tribune was a financial institution by virtue of being Computershare's customer because it

had "manifested its intent to grant authority to Computershare by depositing the aggregate

purchase price for the shares with Computershare and entrusting Computershare to pay the

tendering shareholders." *Id.* at 80. So too here: Tops "manifested its intent" to grant authority

to Bank of America by depositing the proceeds of the Notes offering with Bank of America and

entrusting the bank to wire the proceeds to shareholders in accordance with Tops's instructions,

just as Cap V entrusted Citibank to receive the Dividend proceeds on its behalf. (SOUF ¶¶ 130–

132, 179–80, 217–19.)

Nor does the Trustee's argument that the Second Circuit recently applied a "transfer-by-

transfer" analysis in *Nine West* (Trustee Mot. at 17) do anything to derail the straightforward

conclusion that Tops and Cap V were "financial institutions" under the circumstances here. In

*Nine West*, in the context of a leveraged buyout where Sycamore partners acquired Jones Group

(Nine West's parent company), Wells Fargo was hired to act as Nine West's paying agent to

disburse LBO payments to shareholders. *Nine West*, 87 F.4th at 140–41. The Jones Group's

directors, officers and employees were paid for their shares through a separate payroll processor.

*Id.* The Second Circuit reiterated that the plain language of Bankruptcy Code § 101(22)(A)'s

definition of "financial institution" indicates that "courts must look to each transfer and

determine when the bank is acting as agent for its customer for a transfer." *Id.* at 145. The court

held that the payments by Wells Fargo, which acted as Nine West's agent in paying out the

merger proceeds, were safe harbored. *Id.* at 143. But the court held that payments by the payroll

processor to the Jones Group's directors, on the other hand, were not safe harbored because

Wells Fargo was not Nine West's agent with respect to those transfers. *Id. Nine West* thus

stands for the unremarkable propositions that (i) the statute safe harbors transfers where the

transferor is a customer of a financial institution, and not transfers where the transferor is not a

customer of a financial institution, and (ii) one's status as the customer of a financial institution

qualifies one as a "financial institution" for purposes of transfers as to which the customer

relationship exists but not for purposes of transfers as to which it does not. Here, Tops and Cap

V were customers of banks for the purposes of the transfers at issue, and *Nine West* thus supports

the treatment of Tops and Cap V as "financial institutions" for the purposes of those transfers.

> **B)**    ***The undisputed facts support that Tops and Cap V were financial institutions.***

In addition to his effort to distort Supreme Court and Second Circuit authority, the

Trustee lodges a number of arguments that reduce to the contention that the banks were not

really the agents of Tops and Cap V for purposes of the challenged transfers.

With respect to Bank of America, the Trustee's arguments center on the notion that a

depository banking relationship is a "creditor-debtor" relationship and the fact that Bank of

America's disclaimer of fiduciary status in its deposit agreement with Tops is dispositive.

(Trustee Mot. at 19–21.) But, neither of those facts remotely undermines the principal-agent

relationship here. A bank operates as a depositor's agent when it carries out instructions to wire

a multimillion dollar dividend from the proceeds of a notes issuance to shareholders on the

issuer's behalf, as Bank of America did for Tops here. Despite the Trustee's contention that

"[no] court suggest[s] that sending a wire alone [is] sufficient to create the requisite agency . . .

and qualify the customer as a financial institution," (Trustee Mot. at 18), the bankruptcy court in

*Plassein International Corp.* held just that. *Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l

Corp.)*, 366 B.R. 318, 323 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*, 590

F.3d 252 (3d Cir. 2009). In that case, the court reasoned that the "financial institution"

requirement is satisfied when a "payment is made by wire transfer," since "federal regulations

require that a wire must be performed by a bank; [and] thus, a wire transfer must be made

through a financial institution." 366 B.R. at 323. And it thus held that wire transfers that a bank

made on a customer's behalf were safe harbored. *Id.* The bankruptcy court's reasoning in

*Plassein* is supported, in turn, by the very definition of "wire transfer" under federal banking

law, which tracks the elements of an agency relationship, *i.e.*, authorizing a bank to act on the

principal's behalf at the principal's direction as to amount and date. *See* 12 C.F.R. § 229.2

(defining a "wire transfer" as an "unconditional order to a bank to pay a fixed or determinable

amount of money to a beneficiary upon receipt or on a day stated in the order").

The Trustee's more general argument that "payment" is too "ministerial" to create an

agency relationship (Trustee Mot. 20–21) is likewise contrary to existing case law (not to

mention common sense). In *Fairfield Sentry*, for example, the court held that a bank's accepting

direction from its customer to make specific payments in specific amounts was enough to satisfy

the agency requirement. *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield

Sentry Ltd.)*, 2020 WL 7345988, at *6–7 (Bankr. S.D.N.Y. Dec. 14, 2020). There, the court held

that certain feeder funds were financial institutions under § 546(e) because they were customers

of Citco Bank "who acted as their agents in connection with" a securities contract pursuant to

which redemption payments were made, because Citco Bank paid the redemptions in accordance

with the funds' instructions. *Id.* at *7. The court reasoned that it was "implausible to infer that

Citco Bank made the redemption payments to specific redeemers in specific amounts absent the

Funds' directions to do so," and "Citco Bank accepted those directions by executing the

redemption payments." *Id.*; *see also Delbrueck & Co. v. Mfrs. Hanover Tr. Co.*, 609 F.2d 1047

(2d Cir. 1979) (holding that a bank at which a customer maintained an account and that the

customer authorized to make payments out of the account, was the customer's "agent").

-22-

Nor does the statement in Bank of America's deposit agreement that the depository

relationship itself did not create a fiduciary relationship preclude the conclusion that Bank of

America acted as agent with respect to the wire transfers.  Tops's deposit agreement is not

dispositive as to whether an agency relationship exists with respect to wire transfers.  Moreover,

even the deposit agreement's definition of a funds transfer tracks the elements of agency, *i.e.*, as

a customer providing instructions to the bank to carry out the transfer on the customer's behalf.

(*Id.* (defining funds transfer as "the process of carrying out payment orders that lead to paying a

beneficiary" and stating "the payment order is a set of instructions given to [the bank] to transfer

funds").)  And importantly, a contractual disclaimer cannot overcome an agency relationship

established by parties' conduct.  *See, e.g.*, *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Morgan

Stanley Mortg. Cap., Inc.*, 2013 WL 3146824, at *26 (S.D.N.Y. June 19, 2013) ("While parties

may disclaim agency relationship in an agreement, a court is not bound by the disclaimer of . . .

agency between the parties in determining their true relationship.").

The Trustee's statement that "there is no evidence that Tops assented, Bank of America

accepted, or Bank of America took any action as agent for Tops" is also plainly wrong.  (Trustee

Mot. at 20.)  The Trustee makes much of the fact that the funds flow memoranda state that Tops

effectuated the wire transfers.  But the Trustee himself admits that Tops effectuated those

transfers ***through*** Bank of America:  "Tops wire[d] funds from its Bank of America checking

account to MS Cap V's bank account at Citibank."  (Trustee Mot. at 8.)  The Citibank statements

reflecting Cap V's receipt of the Safe Harbor Dividends confirm as much, listing Bank of

America as the "PAY BK," *i.e.*, the paying bank.  (CSOUF ¶¶ 5, 15, 22.)  The funds flow

memoranda and bank statements taken together reflect the obvious:  Tops instructed Bank of

America to wire dividends on its behalf after Bank of America received the NPA proceeds.[17]
The suggestion that Bank of America wired hundreds of millions of dollars to shareholders
without direction from Tops is preposterous. *Nine West*, 87 F.4th at 146–47 (2d Cir. 2023)
(affirming district court's conclusion that Wells Fargo was Nine West's agent and its reasoning
that "Wells Fargo was entrusted with millions of dollars of Nine West cash and was tasked with
making payments on Nine West's behalf to Shareholders[.]").[18]

The Trustee's arguments that Citibank was not an agent are different but no less flawed.
The Trustee argues that Citibank was not an agent because it was not a party to any securities
contract. (Trustee Mot. at 21.) But the court in *Boston Generating II* explicitly rejected that
argument, holding that "there is no requirement that a financial institution be identified in a
securities contract for it to serve as agent of a customer." *Boston Generating II*, 2021 WL
4150523, at *7. And the Trustee's other argument, that Citibank was only "passive," and was
not "acting" at all, ignores that Citibank acted to receive the wired dividend funds. (Trustee Mot.
at 21.) The Trustee claims that Citibank did nothing "in connection with the Notes Offerings"
(*id.*), but the requirement that the agent be acting "in connection with" a securities contract is met

---

[17] Judge Drain considered the funds flow memoranda at the motion to dismiss stage, but only for the fact that Tops transferred funds from its Bank of America account to Cap V's Citibank account. (MTD Op. at 61–62.)

[18] While Bank of America and Citibank were Tops's and Cap V's respective agents under the common-law test articulated in *Tribune*, they also meet the plain meaning of the term "agent." Black's Law Dictionary defines "agent" as "someone who is authorized to act for or in place of another," and defines a "fiscal agent" as "a bank or other financial institution that collects and disburses money and serves as a depository of private and public funds on another's behalf." Black's Law Dictionary (11th ed. 2019). Both definitions indisputably apply to Bank of America and Citibank.

as long as the transfer itself is "in connection with" the securities contract, as is the case here. *See Opioid Master Tr. II*, 2024 Bankr. LEXIS 2058, at *14–15, n.14.[19]

### C.    The Trustee's congressional intent argument does nothing to change the result.

Finally, the Trustee's argument that applying § 546(e) here would "obviate Congressional intent" (Trustee Mot. at 31–33) fails for several reasons.

First, statutory language is the best evidence of Congress's intent, and the Trustee identifies no ambiguity in the language of § 546(e).  *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says."); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 721–22 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) (same).  Statutory interpretation therefore begins and ends with the plain meaning of the text, and where statutory language is clear, the court's function is to enforce it.  *Id.* ("[T]o deviate from what Congress has clearly and constitutionally decreed is a power the judiciary does not possess.").  Absent an ambiguity, there is no reason to consider congressional intent to clarify the statute's language.[20]

---

[19] The language the Trustee quotes from Cap V's agreement with Citibank does not undermine the agency relationship, but merely clarifies that the agreement applies to Cap V's "cash accounts" and not to Morgan Stanley's affiliated "securities business."  (CSOUF ¶ 30.)

[20] For that reason, courts have repeatedly rejected attempts to narrowly construe the scope of § 546(e) based on the argument that the statute's purpose would not be advanced.  *See, e.g.*, *Petr v. BMO Harris Bank, N.A.*, 95 F.4th 1090 (7th Cir. 2024) (rejecting argument that safe harbor did not apply to private securities transactions even though they did not implicate the national system for the clearance and settlement of publicly held securities); *see also In re Quorum Health Corp.*, 2023 WL 2552399, at *11 (Bankr. D. Del. Mar. 16, 2023) (addressing concerns with the wide "reach" of § 546(e) but stating that "[t]he Court notes that it is constrained by the broad language of Bankruptcy Code § 546(e) to dismiss these claims").

Second, the Trustee's argument that applying § 546(e) here would safe harbor "virtually every transfer made in connection with a securities contract, since some party to almost every transfer will use a bank account," and his reliance on *Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414, 425 (Bankr. S.D.N.Y. 2011), fail to take into account that cases following *MacMenamin's Grill* have embraced a broad view of Congress's purpose, even after reviewing the legislative history.  The Second Circuit in *Tribune* held that the statute's "***narrowest purpose*** . . . was to protect other commodities and securities firms from avoidance claims seeking to unwind a bankruptcy commodities or securities firm's transactions that consummated transfers between customers." *Tribune*, 946 F.3d at 91 (emphasis added).  But the "broad language" Congress selected for the statute "is intended to protect the process or market from the entire genre of harms of which th[at] particular problem was only one symptom." *Id.* at 92.  Section 546(e) thus "protects transactions rather than firms[.]" *Id.*  As the *Tribune* court emphasized, "Section 546(e) is simply a case of Congress perceiving a need to address a particular problem within an important process or market and using statutory language broader than necessary to resolve the immediate problem." 946 F.3d at 92.  In other words, since Congress wrote the statute broadly, that a narrower construction could more precisely address an issue that Congress meant to solve is not a justification for rewriting the statute with such limitation.

## II.    The Court Should Deny Summary Judgment on the Statute of Limitations Defense.

The Morgan Stanley Defendants' statute of limitations defense asserts that the Trustee's claims challenging the 2009 and 2010 Dividends are untimely under the applicable six-year limitations period.  The Trustee does not dispute that he failed to file his claims within six years of those Dividends, but argues that the Morgan Stanley Defendants' statute of limitations defense is not "legally viable" because he may invoke "the ten-year limitation period applicable to the

IRS." (Trustee Mot. at 34.) The Trustee bases his claimed rights to the IRS's longer limitations period on Bankruptcy Code § 544. But, under that section, to have standing, the Trustee must show that "as of the bankruptcy petition date there was at least one holder of an allowable unsecured claim" against the debtor that made the transfer. (*See* MTD Op. at 19–20 (citing 11 U.S.C. § 544(b)).)[21] In other words, to take advantage of the ten-year limitations period applicable to the IRS, the Trustee must show that the IRS filed an allowable claim at the time of Tops's bankruptcy against the Tops entity that issued the 2009 and 2010 Dividends. The Trustee cannot make that showing.

First, "[a]n allowable claim only includes those claims for which a proof of claim has been filed." *Miller v. Fallas (In re J&M Sales Inc.)*, 2022 WL 532721, at *3 (Bankr. D. Del. Feb. 22, 2022) (citing 11 U.S.C. § 544(b)); *see* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."). Second, that allowable claim must have been filed against the "specific debtor" that made the transfer because "§ 544(b) requires a trustee to prove that the debtor for whose estate he sues, in fact had a creditor" that could have invoked state-law avoidance remedies against that debtor "on the date of the bankruptcy filing and in the absence of the bankruptcy filing." *Kelley v. Opportunity Fin., LLC (In re Petters Co., Inc.)*, 550 B.R. 438, 443–44 (Bankr. D. Minn. 2016); *accord Mendelsohn v. Kovalchuk (In re APCO Merch. Servs., Inc.)*,

---

[21] The Trustee is incorrect that Judge Drain's order at the motion to dismiss stage disposes of the limitations defense. (*See* Trustee Mot. at 35–38.) Judge Drain held only that the statute of limitations defense was "premature at this stage of the litigation." (MTD Op. at 27–28.) The Trustee is also incorrect that the burden is on the Morgan Stanley Defendants. To the contrary, the Trustee has the burden to establish that he can avail himself of the IRS's ten-year limitations period to save his § 273 claims for the 2009 and 2010 Dividends because those claims are time-barred on the face of the Complaint. (*See id.* at 21.)

585 B.R. 306, 313 (Bankr. E.D.N.Y. 2018) ("In order for a trustee to maintain an action for avoidance of a fraudulent conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law.") (quoting *Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995)).  This precise issue was addressed in *Mallinckrodt* last year.  *See Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt PLC)*, 2024 WL 206682, at *38 (Bankr. D. Del. Jan. 18, 2024) (holding that the trustee could not invoke the IRS ten-year statute of limitations to bring a fraudulent transfer claim because the IRS did not file a proof of claim against the specific entity that made the challenged transfer).

Here, the Trustee must show that (i) the IRS filed a proof of claim (ii) against Tops Holding LLC, the successor entity to Tops Holding Corporation, which effectuated the transfer of the 2009 and 2010 Dividends.  (*See* CSOUF ¶¶ 42, 68.)  The Trustee has not made these showings.  The Trustee asserts that "the factual record shows that the IRS was a creditor of Tops at the time of the 2009 and 2010 Dividends and at the time of the bankruptcy." (Trustee Mot. at 37.)  But this broad statement obscures critical details:  the transferor of the 2009 and 2010 Dividends was Tops Holding Corporation, as the Trustee acknowledges in his Statement of Undisputed Material Facts.  (ECF No. 242-2 ¶¶ 5, 9; *see also* CSOUF ¶ 42.)  The Trustee seems to understand these details matter.  Despite identifying Tops Holding Corporation as the transferor of the 2009 and 2010 Dividends when describing the dividends in his Statement of Undisputed Material Facts, later in that same document when supporting his motion on the statute of limitations defense, the Trustee conflates the corporate entities into the vague assertion

that "[t]he IRS was a creditor of *Tops*." (ECF No. 242-2 ¶ 41.) And the Trustee simply omits the name of the debtors against which the IRS filed its proofs of claim. (*See id.* ¶¶ 39, 40.)

That omission strategically conceals that the IRS does not have an allowable proof of claim against Tops Holding LLC, the successor to Tops Holding Corporation. In May 2013, Tops Holding Corporation became Tops Holding LLC, and Tops Holding LLC became a direct subsidiary of Tops Holding II Corporation. (CSOUF ¶ 68.) The IRS filed a proof of claim against Tops Holding II Corporation, not Tops Holding LLC. (*Id.* ¶¶ 70–71.) Tops Holding LLC is the successor to the entity that issued the 2009 and 2010 Dividends and was a separate debtor in these consolidated chapter 11 cases. (*See id.* ¶ 68–69 (Bankr. ECF No. 51 (*Order Directing Joint Administration of Related Chapter 11 Cases*) (consolidating cases for procedural purposes only)).) Because the IRS did not file an allowable claim against the entity that made the alleged transfers (Tops Holding LLC), the Trustee is unable to avail himself of the IRS's statute of limitations. Notably, other creditors did file claims against Tops Holding LLC. (*See id.* ¶ 72 (Bankr. ECF No. 904 (*Stipulation, Agreement and Order Regarding Certain Proofs of Claim Filed by U.S. Bank National Association, in its Capacity as Indenture Trustee*) (resolving the various proofs of claim filed by U.S. Bank against the Tops entities, including Tops Holding LLC).) And the IRS filed claims against multiple other Debtors, but not against Tops Holding LLC. (*See id.* ¶ 70–71, 73 (Proof of Claim No. 186 (Tops Holding II Corporation); Proof of Claim No. 348 (Erie Logistics LLC); Proof of Claim No. 1039 (Tops Markets LLC); Proof of Claim No. 1040 (Tops PT, LLC); Proof of Claim No. 1041 (Tops Holding II Corporation)).) The Trustee cites these proofs of claim in his statement of facts to support his attempt to stand in the IRS's shoes. (*See* ECF No. 242-2 at 7–8.) But none of these proofs of claim allows the Trustee to fulfill the requirement set out in multiple cases cited above that he identify a specific

creditor with an allowable, filed proof of claim against the transferor of the 2009 and 2010 Dividends.

To save his claims, the Trustee argues that under 26 U.S.C. § 6901, Tops Holding II Corporation "stepped into the shoes" of Tops Holding Corporation for tax purposes. (*See* Trustee Mot. at 39–40.)  This does not help the Trustee at all, and the Trustee knows it.  The IRS has no allowable claim against Tops Holding II Corporation because the IRS's initial claim against Tops Holding II Corporation was disallowed and expunged by Court order upon a motion by the Trustee. (CSOUF ¶¶ 75, 78 (Bankr. ECF No. 894 at 11 (ninth claims objection against "no liability claims"); Bankr. ECF No. 911 (order granting ninth claims objection)).)  The facts are straightforward on this issue:  the IRS filed a proof of claim for $505,332.83 against Tops Holding II Corporation on April 20, 2018. (*Id.* ¶ 70 (Proof of Claim No. 186).)  Five months later, the IRS filed an amended proof of claim—the claim the Trustee relies on in his motion— asserting a claim amount of zero dollars, thereby acknowledging that it had no claims against Tops Holding II Corporation. (*Id.* ¶ 71 (Proof of Claim No. 1041).)  On March 22, 2019, the Trustee objected to the IRS claim, asserting that Tops's "books and records reflect no liability" for the claims asserted by the IRS against Tops Holding II Corporation. (*Id.* ¶ 75 (Bankr. ECF No. 894 at 11).)  The IRS did not contest the Trustee's claim objection (*see id.* ¶ 77 (Bankr. ECF No. 905 (certificate of no objection to ninth omnibus claim objection))), and an order was entered granting it. (*Id.* ¶ 78 (Bankr. ECF No. 911).)  That order "disallowed and expunged in its entirety" the IRS's claim, and ordered that "it shall be deleted from the Debtors' claims register." (*Id.*)  It is self-evident that an amended claim for zero dollars following a claim that was disallowed, expunged, and deleted from the claims register is not an allowable claim—and therefore the IRS was not a creditor with an allowable claim against Tops Holding II

Corporation. These facts—known to the Trustee for nearly six years—make it clear that the IRS
cannot serve as a triggering creditor against either Tops Holding II Corporation or Tops Holding
LLC and, therefore, the Trustee cannot defeat the Morgan Stanley Defendants' statute of
limitations defense on summary judgment.

In any event, even if the IRS had an allowable claim against Tops Holding II
Corporation, the Trustee overstates Section 6901. Section 6901 merely provides a procedural
mechanism for the IRS to collect a taxpayer-debtor's unpaid taxes from a transferee of a
taxpayer-debtor's assets when the transferee is liable for the taxpayer-debtor's unpaid taxes. *See
Gonzales v. U.S. (In re Silver)*, 303 B.R. 849, 865 (10th Cir. BAP 2004) ("This section is a
'procedural mechanism,' allowing the IRS to impose a tax lien against a transferee of a taxpayer-
debtor's assets for the purpose of holding the transferee liable for the transferred property under
applicable law, such as fraudulent transfer law."); IRS, Internal Revenue Manual § 4.11.52.2(1)
(Dec. 16, 2021), https://www.irs.gov/irm/part4/irm_04-011-052 ("IRC 6901, Transferred Assets,
provides the IRS an administrative mechanism to assert that a transferee is liable for a
transferor's primary liability."). But nothing in the IRS's proof of claim shows that its claim
against Tops Holding II Corporation flowed from taxes owed by Tops Holding Corporation or
Tops Holding LLC.

In the absence of such a showing, the Trustee's argument is that Tops Holding II
Corporation and Tops Holding Corporation are one and the same, and that he can stand in the
IRS's shoes to bring a claim against Tops Holding Corporation because the IRS filed a proof of
claim against Tops Holding II Corporation. (*See* Trustee Mot. at 38–40 (arguing that there was
only a "nominal reorganization" and that Tops Holding II Corporation was "no more than the
alter ego" of Tops Holding Corporation).) But the Trustee offers no evidence in support of that

claim (*e.g.*, an alter ego or veil-piercing theory) as is required at the summary judgment stage.

*See In re Firestar Diamond, Inc.*, 643 B.R. 528, 540 (Bankr. S.D.N.Y. 2022) ("When the movant

has the burden of proof at trial, its own submissions in support of the motion must entitle it to

judgment as a matter of law.").  Even as the parent company, Tops Holding II Corporation is not

the same entity as Tops Holding Corporation.  It is true that Tops Holding II Corporation is liable

as the parent company to Tops Holding LLC for any income tax owed by Tops Holding LLC

because Tops Holding LLC is a disregarded entity for tax purposes.  (*See* CSOUF ¶ 68); *see*

*Stanziale v. CopperCom, Inc. (In re Conex Holdings, LLC)*, 518 B.R. 792, 802 (Bankr. D. Del.

2014) ("As a disregarded entity, the SMLLC's assets, liabilities, income items, and deduction

items will be treated as owned, owed, received, and incurred directly by its owner.").  But that

does not mean that the two are one and the same, or that a proof of claim filed against one can be

treated as a proof of claim filed against the other.  An entity is not an alter ego of another merely

because it is a disregarded entity for tax purposes under the Internal Revenue Regulations.  *See*

*Rice v. First Energy Corp.*, 339 F. Supp. 3d 523, 536 (W.D. Pa. 2018) (holding that statements in

a company's annual financial statements that a subsidiary is a disregarded entity for tax purposes

does not establish an alter ego relationship).  Further, disregarded entities may still be liable for

certain non-income taxes for which the IRS can file a proof of claim.  *See Maxwell v. U.S. (In re*

*Horizon Grp. Mgmt.)*, 617 B.R. 581, 596 (Bankr. N.D. Ill. 2020) ("[D]isregarded foreign

business entities may still be liable for non-income taxes.").  If Tops Holding LLC owed such

taxes, then the IRS could have filed a proof of claim against it; it did not.

Other courts have rejected what the Trustee attempts here.  Last year, Judge Dorsey held

that a trustee lacked standing to bring a fraudulent transfer claim because the IRS was not a

triggering creditor as it did not file a proof of claim against the entity that made the challenged

transfer.  *See Mallinckrodt*, 2024 WL 206682, at *38.  Judge Dorsey further rejected the

Trustee's argument that "a claim against one debtor [is] a claim against all of the Debtors"

because to do so "would require allegations of a 'horizonal' alter ego scheme, *i.e.*, a failure to

observe the corporate separateness of the individual Mallinckrodt entities."  *Id.*  As in

*Mallinckrodt*, the Trustee has made no allegations of a "horizontal alter ego scheme," and there

is no evidence to support such a scheme in this case.  Indeed, the Trustee's arguments are an

improper attempt to substantively consolidate the Debtors where the *Second Amended Joint*

*Chapter 11 Plan of Reorganization of Tops Holding II Corporation and its Affiliated Debtors*

*(with Technical Modifications)* (the "Plan") states explicitly that the Debtors are not

substantively consolidated "with respect to the Classes of Claims or Interests set forth in the

Plan, or otherwise."  (CSOUF ¶ 69.)  Accordingly, the Trustee cannot prevail on the statute of

limitations defense with respect to the fraudulent transfer claims relating to the 2009 and 2010

Dividends because the Trustee brought the case after the six-year New York statute of limitations

for the claims lapsed.[22]

## III.   The Court Should Deny Summary Judgment on the Morgan Stanley Defendants' Other Affirmative Defenses.

### A.   The UFCW Pension Plan's receipt of federal funds is relevant to the Trustee's claims.

The Trustee asks the Court to eliminate the Cap V's Eighth Affirmative Defense which

addresses the significance of the federal government's payment of Special Financial Assistance

("SFA") to pension plans that are creditors of the Tops bankruptcy estate.  The Trustee contends

that the defense does not meet the requirements of the doctrine of double recovery.  But the label

---

[22] If the Court concludes that the Trustee is not entitled to summary judgment on the statute of limitations defense, the Morgan Stanley Defendants reserve the right to seek judgment against the Trustee for dismissal of all counts related to the 2009 and 2010 Dividends.

of "double recovery"—a label not actually used in the Cap V's affirmative defense (*see* Cap V

Am. Answer, ECF No. 141, ¶ 325)—is ultimately irrelevant.  The payment of SFA to those plans

bears on the Trustee's core narrative in this case and the affirmative elements of his claims, and,

contrary to the Trustee's contentions, it bears on the availability of remedy regardless whether

the "double recovery" label applies.

The core contention underlying the Trustee's claims against the Morgan Stanley

Defendants is that, at the time of the respective Dividends, Tops was insolvent, inadequately

capitalized, and unable to pay its liabilities.  (Am. Compl. ¶¶ 52, 62, 76, 81, 82, 105, 119, 180,

187.)  That contention, in turn, critically turns on the position that Tops would incur massive

withdrawal liabilities for the UFCW Pension Plan and the Teamsters Pension Plan when the

Plans became insolvent.  (*Id.* ¶¶ 7, 40, 63, 77, 82, 120, 188; MS Mot. at 6–8.)  The Trustee

alleges that the Pension Plans' insolvency was "inevitable," and, as the Morgan Stanley

Defendants explained in support of their own summary judgment motion, his expert Marc

Brown's opinion that ███████████████████████████████████.  (Am. Compl.

¶¶ 7, 40, 63, 82, 120, 188; MS Mot. at 37–40.)

Recent developments, however, demonstrate the danger of assuming the inevitability of

future events.  In August 2023, the PBGC approved the UFCW Pension Plan's application for

SFA, and the UFCW Pension Plan received approximately $764 million from the federal

government.  (CSOUF ¶ 66.)  The Teamsters Pension Plan received even more, collecting

payments in November 2022 and May 2023 that totaled over $1.3 billion.  (*Id.* ¶ 60.)  Neither

Pension Plan is insolvent, and, according to the UFCW Pension Plan, participants in the Plan will

continue to receive "retirement benefits without reduction for many years into the future."  (*Id.*

¶ 67.)  While the Trustee may argue that the receipt of SFA specifically was not anticipated at

the time of the Dividends, ██████████████████████████████████████████

███████████████████████████████████████████. (*Id.* ¶¶ 55, 58.)  And,

as the Morgan Stanley Defendants have addressed (MS Mot. at 40), ████████████

████████████████████████████████████████████████████████████

██████.  (CSOUF ¶ 53.)  The fact that government assistance—a possibility that the Pension Plan

actuaries expressly identified as early as November 2010 (*Id.* ¶ 55)—actually occurred,

underscores the error of the Trustee's and his expert's inevitability assumption.  (*Id.* ¶ 52.)  And,

because his expert's insolvency opinion depends on that inevitability assumption, the Plans'

receipt of SFA undermines the central thesis of the Trustee's claims.  Indeed, the UFCW Pension

Plan itself seems to have recognized the severe impediment the payment of SFA poses for the

Trustee's claims, as the Plan sold its claim to hedge fund Silver Point Capital for

$7,389,641.12—less than one penny on the dollar of the allowed amount in the bankruptcy—

shortly after submitting its SFA application.  (*Id.* ¶ 63.)

        The payment of the SFA also goes to the availability of a remedy on the Trustee's claims.

The UFCW Pension Plan's claim of $865,924,384 constitutes 67 percent of the claims in the

GUC Trust.  (*See id.* ¶¶ 64–65.)  That claim represents the withdrawal liability Tops agreed to

pay the UFCW Pension Plan following Tops's bankruptcy filing—*i.e.*, an amount intended to

cover Tops's share of the shortfall between the UFCW Pension Plan's assets and the amount

necessary to ensure the future payment of benefits to participants and beneficiaries.  (*Id.* ¶¶ 62,

64.)  That shortfall, however, has since been greatly mitigated by the UFCW Pension Plan's

receipt of SFA.  Fraudulent transfer law is intended to be remedial, not punitive,[23] and no

---

[23] *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 464 B.R. 606, 618 (Bankr.
S.D.N.Y. 2012) ("Beyond the specific limitations in 11 U.S.C. § 550, courts have recognized that

remedial purpose is served by recovering assets by the bankruptcy estate for a creditor whose claim has largely been satisfied.

The cases that the Trustee cites do not provide otherwise. The first, *NextWave Personal Communications*, is not good law; it was reversed. *NextWave Pers. Commc'ns, Inc. v. FCC (In re NextWave Pers. Commc'ns, Inc.)*, 235 B.R. 305 (Bankr. S.D.N.Y. 1999), *rev'd*, *FCC v. NextWave Pers. Commc'ns, Inc. (In re NextWave Pers. Commc'ns, Inc.)*, 200 F.3d 43, 62 (2d Cir. 1999). The other, *Tronox*, merely recognizes certain circumstances in which a bankruptcy estate may recover more through avoidance actions than amounts currently outstanding to creditors—such as the scenario in *Tronox* itself where a creditor had entered into an express agreement agreeing to satisfaction of its claims against an estate in return for the right to the proceeds from an adversarial proceeding brought by the estate against another party. 464 B.R. at 610, 615. None of the circumstances described in *Tronox*, however, apply here.

To the extent the Trustee contends that the salience of the SFA payment to remedies does not fit within the doctrine of "double recovery," the quibble is immaterial. The evidence will be relevant to the substance of the Trustee's claims and to the relief available under them. Accordingly, the Trustee's request for summary judgment on Cap V's Eighth Affirmative Defense should be denied, and the Court should avoid issuing any ruling that would prevent the Morgan Stanley Defendants from arguing the full implications of the SFA payments on the Trustee's claims at any possible trial.

---

the purpose of fraudulent conveyance law is remedial rather than punitive.") (*citing In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y.1994)).

### B.    The Morgan Stanley Defendants' laches defense is viable.

The Trustee devotes the last few pages of his Memorandum to trying to convince the

Court to sweep away what he terms "Defendants' Miscellaneous Affirmative Defenses,"

including the Morgan Stanley Defendants' defense of laches.  Although the Trustee lodges

multiple attacks on the laches defense, none is sufficient to warrant summary judgment.

The Trustee's first effort to derail the laches defense is to assert that laches is an equitable

defense that only applies to equitable claims, not legal ones.  (Trustee Mot. at 42.)[24]  That

assertion is irrelevant here because, contrary to the Trustee's contention, the breach of fiduciary

duty and aiding and abetting claims, and the relief the Trustee purports to seek through them, are

equitable in nature.

To determine whether a claim is legal or equitable, courts analyze whether (i) the claim is

historically equitable or legal in nature, and (ii) the relief requested is legal or equitable.

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989).  As to the former, breach of fiduciary

duty claims (and any aiding and abetting claims flowing therefrom), are historically equitable in

nature.  *Cantor v. Perelman*, 2006 WL 318666, at *9 (D. Del. 2006) (noting the "long history of

treating breach of fiduciary duty claims as equitable" and applying the same conclusions to

plaintiffs' aiding and abetting breach of fiduciary duty claim); *Damage Recovery Sys., Inc. v.

Tucker*, 2005 WL 388597, at *2 (D. Del. Feb. 2, 2005) (noting that "[i]f the underlying action is

equitable in nature, a claim of aiding and abetting that underlying cause of action must also be

equitable" and finding breach of fiduciary duty and aiding and abetting claims thereof equitable).

---

[24] The Trustee also directed this argument at the Morgan Stanley Defendants' unclean hands
defense.  The Morgan Stanley Defendants have elected to withdraw that defense, as well as their
defense of set off, and so do not address them.  The Morgan Stanley Defendants' arguments
regarding waiver, including that they have been prejudiced by the Trustee's delay in bringing
this action, are addressed under their laches defense.

-37-

And while the Trustee purports in his Amended Complaint to seek "[c]ompensatory and consequential damages," he now indicates that he is seeking only the return of the Dividends (Trustee Mot. at 42–43, 46–47)—*i.e.*, the equitable remedy of restitution or disgorgement of the Morgan Stanley Director Defendants' "ill-gotten gains." (Am. Compl. at 88, Prayer for Relief (l), (m)); *Liu v. SEC*, 591 U.S. 71, 79 (2020) (discussing at length the "equitable remedy" of disgorgement noting that "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains"). As recognized in the Trustee's own case, *Monterey Bay Military Housing, LLC v. Ambac Assurance Corporation*, equitable defenses are appropriate where equitable remedies, including disgorgement, are among the remedies sought. 2021 WL 4173929 (S.D.N.Y. Sept. 14, 2021). The rest of the Trustee's cases are all in accord. *Ogilvy Group Sweden, AB v. Tiger Telematics, Inc.* states the uncontested proposition that laches does not bar claims for legal remedies. 2006 WL 547785, at *2 (S.D.N.Y. Mar. 7, 2006) ("Laches is an equitable doctrine and cannot be invoked as a defense to a claim for damages."). *Rapf v. Suffolk County* is more of the same. 755 F.2d 282 (2d Cir. 1985). There, the Second Circuit, applying state law, simply concluded that "if the doctrine of laches were applicable, it would bar only appellants' claims for equitable relief, not their claims for monetary damages." *Id.* at 293.

The Trustee next argues that laches does not apply because he asserted his claim within the applicable limitations period. (Trustee Mot. at 45.) But the Trustee's assertion of a categorical rule—that no claim within an applicable limitations period may be barred by laches—is baseless. In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, the Supreme Court clearly explained that laches may bar even technically timely claims for equitable relief.[25] 572 U.S. 663,

---

[25] The Court further recognized that even if the affirmative defense of laches does not apply, a court is free to "take account of [plaintiff's] delay in commencing suit" and any other factors

685 (2014); *see also New Era Publ'ns Int'l v. Henry Holt & Co., Inc.*, 873 F.2d 576, 584–85 (2d Cir. 1989) (applying laches despite claim for equitable relief being filed within limitations period).

The cases the Trustee cites are not to the contrary. While he invokes *Petrella*, he ignores that the Supreme Court explicitly disclaimed the categorical rule he advances, and recognized that timely claims for equitable relief may be subject to a laches defense. 572 U.S. at 685 (stating that, under extraordinary circumstances, the "consequences of a delay in commencing suit may be of sufficient magnitude to warrant . . . curtailment of the relief equitably awardable"). Rather than grappling with this binding precedent, the Trustee points this Court to a series of inapposite cases. First, *Astra USA, Inc. v. Bildman* predates and necessarily yields to the Supreme Court's opinion in *Petrella*. 375 F. App'x 129, 133 (2d Cir. 2010). The Trustee's invocation of *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, by turn, misleadingly ignores that, in that decision, the court acknowledged *Petrella*'s recognition that technically timely claims are sometimes barred. *Compare* Trustee Mot. 45 *with Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 655 B.R. 149, 180 (Bankr. S.D.N.Y. 2023) (discussing *Petrella*'s recognition that timely claims are not *per se* exempt from laches defense).

Having relied on a categorical rule that does not exist, the Trustee has made no argument that laches is not warranted under the circumstances, and therefore cannot carry his burden on summary judgment. In any event, the record supplies ample reasons for a factfinder to conclude that laches applies. The Trustee's deposition testimony confirms that he engaged in no

---

"that would justify adjusting injunctive relief" in departing from a plaintiff's requested equitable relief. *Petrella*, 572 U.S. at 687.

meaningful fact development before initiating this case; indeed, he admitted that he did not conduct a *single* witness interview before filing the Complaint although the Trustee (and the Debtors and statutory committee of unsecured creditors) had the option to compel pre-complaint witness testimony under Federal Rule of Bankruptcy Procedure 2004. (CSOUF ¶ 82.) Chapter 11 Plans for the Debtors were confirmed in November 2018 in these cases, and the Trustee had already been identified by that date. (Bankr. ECF No. 721 at 3.) But instead of moving expeditiously, the Trustee waited nearly 15 months—until the last day of the 10-year limitations period he claims applies—to file a complaint that merely packaged together factual assertions lifted directly from the First Day Declaration of Michael Buenzow that was publicly filed two years earlier on February 21, 2018. (*See* CSOUF ¶¶ 83–84 (comparing First Day Declaration of Michael Buenzow that describes Tops's dividend recap transactions, including debt incurred with same description and figures in Amended Complaint).) Some allegations were constructed out of thin air, and the Trustee has been unable to substantiate them with actual facts.[26] The Trustee offers no explanation for sitting on his hands until the eleventh hour before filing a complaint that, to the extent based on facts at all, was based on facts that were readily available to the Trustee years earlier. And the record itself suggests none.

---

[26] For example, the Trustee testified that he was "not sure" of the basis for Paragraph 8 of the Amended Complaint (Paragraph 8 in the original Complaint), which alleges that Gary Matthews on September 8, 2008, told the "President of the Union and Chairman of the Board of Trustees of the UFCW Pension Plan" that "the UFCW Pension Plan would go bankrupt and that Tops would be forced to incur withdrawal liability," and that "the President of the Union and Chairman of the Board of Trustee of the UFCW Pension Plan met with Tops management and proposed that Tops issue $50 million in debt and contribute the proceeds into the UFCW Pension Plan in order to improve the funding of the Plan and was told that Tops could not do so because of the covenants in its existing loans." The Trustee later stated in an April 23, 2024 discovery letter to the Morgan Stanley Defendants that he received that information from the UFCW Pension Plan, but he did not provide any supporting declaration or other admissible evidence to support that statement. (CSOUF ¶¶ 85–86.)

The Trustee's final bid to knock out the laches defense is to claim that the Morgan

Stanley Defendants have suffered no prejudice from his delay.  But prejudice exists where the

passage of time results in the degradation of available evidence.  *Zuckerman v. Metro. Museum*

*of Art*, 928 F.3d 186, 194 (2d Cir. 2019) (stating laches barred plaintiffs' claims because

defendant suffered prejudice including "faded memories" and "likely disappearance of

documentary evidence" due to plaintiffs' delay in asserting their rights); *Transp. Workers Union*

*of Am., Loc. 100, AFL-CIO v. N.Y.C. Transit Auth.*, 341 F. Supp. 2d 432, 452 (S.D.N.Y. 2004)

("Typically, prejudice ensues where the passage of time has resulted in unavailability of

witnesses, changed personnel, and the loss of pertinent records." (quotation omitted)), *appeal*

*dismissed and remanded*, 505 F.3d 226 (2d Cir. 2007).  And the record demonstrates that has

happened here:  Numerous witnesses, including those closest to the transactions, were unable to

recall details about key transactions that were long past by the time of their depositions.  (*See,*

*e.g.*, CSOUF ¶ 87 (E. Kanter Dep. Tr. at 240:23–241:17 ("I haven't been in this industry for ten

years."); G. Matthews Dep. Tr. at 170:25–173:20 ("I haven't looked at this in ten years"); G.

Strong Dep. Tr. at 49:13–18 ("I've explained and have tried to be as thorough and forthcoming

as I can based on what I can remember from a deal that happened 16 years and, I guess, four jobs

ago.")).)  Indeed, Tops's former general counsel Lynne Burgess repeatedly responded to

deposition questions by stating that ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████. (*See, e.g.*, CSOUF ¶ 88.)  And other witnesses ████████████

████████████████████████████████. (*See, e.g.*, *id.* ¶ 89.)  The

observations of these witnesses, if they had been recalled, would have been highly relevant to the

-41-

Morgan Stanley Defendants' defense of claims that go to the motivations, knowledge and states of mind of Morgan Stanley and former Tops officials. The understandable inability of witnesses to remember events more than a decade ago when they were in positions they no longer hold has unquestionably prejudiced the Morgan Stanley Defendants' defense of those claims.

### C. The Trustee must be held to his word that he seeks only the return of the Dividends.

The Trustee seeks to dispose of the Morgan Stanley Defendants' defense that the Trustee is seeking speculative and unascertainable damages by arguing that he is seeking "damages in the exact amount of the unlawful dividends—$376,919,570.14 in total[.]" (Trustee Mot. at 46–47.) The Trustee's argument would perhaps have merit if he was only seeking the amounts of the respective Dividends and if he was only pursuing theories going to legitimacy of those Dividends. The Trustee's Amended Complaint, however, is not so constrained. To the contrary, in addition to seeking "[r]ecovery of the property fraudulently transferred" and the "[c]ompensatory damages . . . for the full amount" of the Dividends, the Trustee's Prayer for Relief explicitly seeks, "[c]ompensatory *and consequential damages*" for the MS Directors for "breaches of fiduciary duties" and from MSIM for "aiding and abetting the MS Director Defendants' breaches[.]" (Am. Compl. at 88, Prayer for Relief (l), (o).) And he alleges that "the Company and its creditors" have suffered "over $1 billion in losses"—more than two-and-a-half times the aggregate amount of the Dividends. (Am. Compl. ¶ 17.) The Trustee has not proffered any expert to establish the undefined "[c]ompensatory and consequential damages" his Amended Complaint demands, nor has he otherwise identified either their specific amount or the Trustee's basis for claiming them. Yet the Trustee has not formally withdrawn his demand for them either.

Likewise, the Amended Complaint contains theories of relief that do not go to the validity of the Dividends. The Trustee, for example, alleges a theory that the Morgan Stanley

Directors breached fiduciary duties by mismanaging Tops, including by improperly constraining

the Company's capital expenditures in their own interest.  (*Id.* ¶¶ 94–98, 306(g)).)  That theory of

self-dealing and corporate mismanagement is entirely distinct from the Trustee's separate

contention that the corporate projections used in connection with the Dividends were too rosy

given the level of capital expenditures, and it entails a different quantum of evidence.  The

Trustee has pointed to no expert testimony or other evidence to establish that the Dividends were

the result of the supposed corporate mismanagement, and any suggestions that the Dividends

could somehow serve as damages for the alleged self-dealing and mismanagement thus can only

be considered "purely speculative" and "remote."  (*See* E. Fry Am. Answer, ECF No. 143, ¶ 324;

E. Kanter Am. Answer, ECF No. 144, ¶ 324; G. Matthews Am. Answer, ECF No. 145, ¶ 324.)

The Morgan Stanley Defendants, of course, have no interest in preventing the Trustee

from narrowing his claims or requested relief.  But the Trustee cannot reasonably wipe away

affirmative defenses on the assertion that he is seeking the amounts of the Dividends while

retaining the right to recover additional or different amounts and to pursue theories that are not

causally connected to the payment of those Dividends.  Accordingly, summary judgment as to

the Morgan Stanley Defendants' speculative damages defense should be conditioned on the

express understanding and limitations that (i) the Trustee may not seek a monetary recovery

beyond the amounts of the Dividends; and (ii) the Trustee may not pursue, or introduce evidence

solely going to, theories of liability that do not directly challenge the validity of those Dividends.

*See Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 247 (S.D.N.Y. 2014) (noting that judicial

estoppel applies to prohibit a party from taking a position where "a party's later position is

clearly inconsistent with its earlier position; . . . [that] position has been adopted in some way by

the court in the earlier proceeding" and the party would "derive an unfair advantage" if allowed to change its position).

## CONCLUSION

For these reasons, the Court should deny the Trustee's Motion.

Dated:  February 7, 2025

Respectfully submitted,

/s/ *Pamela A. Miller*

Pamela A. Miller
Peter Friedman (admitted *pro hac vice*)
Lauren M. Wagner
Amber L. Covucci
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
Email: pmiller@omm.com
        pfriedman@omm.com
        lwagner@omm.com
        acovucci@omm.com

Meaghan VerGow
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
Email: mvergow@omm.com

*Attorneys for Defendants Morgan Stanley Investment Management, Inc., Morgan Stanley Capital Partners V U.S. Holdco LLC, Gary Matthews, Eric Kanter, and Eric Fry*